UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| **United States of America** <br><br> v. <br><br> **Quadrant Magnetics LLC et al.** | No. 3:22-CR-88-DJH |

MOTION TO SUPPRESS EVIDENCE CONCERNING
ALLEGED ITAR VIOLATIONS

    Defendants Quadrant Magnetics LLC ("Quadrant"), Phil Pascoe, Monica Pascoe, and Scott Tubbs (collectively, "Defendants") respectfully move the Court under Federal Rules of Criminal Procedure 12(b)(3)(C) and 41(h), to suppress improperly obtained physical and electronic evidence concerning alleged International Traffic in Arms Regulations ("ITAR") violations. Such evidence was obtained pursuant to four search warrants. The affidavits supporting each search warrant were insufficient to support a finding of probable cause that Quadrant, and the other victims of the search warrants, violated the ITAR by sending drawings of magnets outside the United States. It is clear that the government failed to properly evaluate its evidence in light of the demands of the ITAR, and, thus, the warrant was improvidently authorized.

    The affiant, FBI Special Agent Kaila A. Bogner, improperly certified to the magistrate judge that Defendants violated the ITAR without performing the necessary legal analysis (or inquiring that such analysis had occurred) to determine whether Quadrant actually needed a license to transfer the drawings for Quadrant's magnets outside the United States. The affidavits relied only on conclusory statements that, standing alone, do not provide a basis for finding that drawings for Quadrant's magnets were subject to the ITAR. Because the affidavits were insufficient, the

1

search warrants were not supported by probable cause. Accordingly, any ITAR-related evidence obtained from these searches should be suppressed.[1]

## BACKGROUND

The government has charged the Defendants in this case with one count of conspiracy to violate the Arms Control Export Act ("AECA") and the ITAR, *see* ECF 73 ¶¶ 15–18, and has charged Phil Pascoe, Scott Tubbs, and Quadrant with four counts of exporting technical data without a license in violation of the AECA and the ITAR, *see id.* ¶¶ 21–28.

In October 2018, U.S. Magistrate Judge Colin Lindsay of the United States District Court for the Western District of Kentucky signed a warrant authorizing the government to search Quadrant's then-current business address in Louisville, Kentucky. *See* **Exhibit 1**. The 2018 search warrant was issued, in part, to search Quadrant's facility for ITAR-related evidence and was supported by the affidavit of NCIS Special Agent James McCartney. *Id.* ¶ 1. SA McCartney's affidavit concluded that Quadrant's magnets were subject to ITAR because they were samarium-cobalt magnets. *Id.* ¶ 22, 24. According to the affiant, Quadrant's magnets and related technical data were subject to the ITAR because the U.S. State Department had opined in a January 2, 2018 letter that samarium-cobalt magnets were designated as defense articles under Category VIII(h)(1) of the United States Munitions List ("USML").[2] *Id.* Besides these conclusory statements, the

---

[1] As is later explained, the four search warrants authorized in 2022 relied in-part on evidence gathered from a search warrant issued in October 2018. The 2018 search warrant suffers from the same flaws as the four search warrants authorized in 2022 because the affidavit supporting it was insufficient to support a finding of probable cause that Defendants violated the ITAR. Like the four other search warrants, the 2018 search warrant affiant failed to perform the necessary legal analysis (or inquire that such analysis had occurred) to determine if Quadrant actually needed a license to transfer its drawings outside the United States. Accordingly, any arguments in this motion concerning the four search warrants are also applicable to the 2018 search warrant, and Defendants also move to suppress all ITAR-related evidence obtained from the 2018 search warrant. Additionally, to the extent the four search warrants rely on the 2018 search warrant, the four search warrants are tainted by the 2018 search warrant's lack of probable cause. Thus, any evidence obtained from the four search warrants should be suppressed for that reason, in addition to the reason that is the primary basis of this motion—that the four search warrants independently lack probable cause.

[2] Category VIII(h)(1) provides that items are on the USML if they are "[p]arts, components, accessories, and attachments specially designed for the following U.S.-origin aircraft: The B-1B, B-2, B-21, F-15SE, F/A-18 E/F, EA-18G, F-22, F-35, and future variants thereof; or the F-117 or U.S. Government technology demonstrators." 22 C.F.R.

affiant made no allegation and offered no evidence to support the conclusion that the noted drawings were for magnets that qualified for the USML. Pursuant to that 2018 search warrant, the government obtained digital evidence that the government claims demonstrates alleged ITAR violations.

About four years later, in August 2022, Defendants were first charged in this case. Then, around November 2022, the government applied for four warrants to search various personal residences of owners, officers, and employees of Quadrant and business addresses of Quadrant, Quadrant's parent company, Quadrant International, Inc., and of other Quadrant International, Inc. subsidiaries. In relevant part, the search warrant applications are essentially identical. The warrants seek "evidence of a crime"—the crime being, pertinent to the instant motion, ITAR violations. The ITAR regulates the export and import of defense articles. Under the ITAR, certain articles and their related technical data may not be exported without first obtaining a license. The search warrants thus sought evidence concerning whether Defendants had exported such articles or related technical data without a license.

The four search warrant applications are each supported by the same affiant, SA Bogner. Pertinent to the instant motion, SA Bogner's affidavits set forth what the government asserts is probable cause for finding evidence of ITAR violations. The affidavits conclude that Quadrant is a supplier of samarium-cobalt magnets, which, along with the magnets' technical data, fall under Category VIII(h)(1) of the USML. *See* **Exhibit 2** ¶¶ 100–01.[3] To support the conclusion that the items are on the USML, the affiant claimed that the government had obtained certain "digital evi-

---

§ 121.1, Category VIII(h)(1). An item is not specially designed—and thus not on the USML—if it satisfies a condition set forth in 22 C.F.R. § 120.41(b).

[3] The other three search warrant applications are attached hereto as **Exhibits 3, 4,** and **5**. Because the search warrants are in relevant part identical, with slightly varying pagination, in referring to the search warrants, the instant motion refers only to **Exhibit 2**.

dence" pursuant to the 2018 search warrant and asserted this digital evidence depicted technical descriptions and drawings of magnet product numbers. *Id.* ¶¶ 102–03. The affiant further explained that to "confirm" the magnet product numbers were on the USML and under the ITAR's jurisdiction, agents attempted to determine both the magnets' ownership and end-use, meaning the project or equipment the magnet would be placed in. *Id.*

Once agents determined the magnets' end-use, which the affiant asserted were various defense products, agents requested commodity jurisdiction determinations ("CJD") for the magnet product numbers from the U.S. State Department. *Id.* ¶ 104. A CJD is a technical review performed by U.S. government agencies if doubt exists as to whether an item is covered by the USML. *See* 22 C.F.R. § 120.4. According to the affiant, the U.S. State Department determined, via its CJDs, that a license was required to export the drawings by virtue of the magnets and their related technical data being on the USML. **Exhibit 2** ¶ 105. Like with the 2018 search warrant, despite the affidavits' conclusory statements that Quadrant's drawings were subject to the ITAR, the affiant made no inquiry and offered no evidence to support the conclusion that the noted drawings were for magnets that were actually on the USML and subject to the ITAR. *See id.* And, based on what is detailed in the affidavits, the affiant did not include any reference or evidence that anyone completed the required analysis to determine if the magnets and related technical data were indeed subject to the ITAR or fell under an exception.[4] Both the 2018 and other four search warrants suffer from this dearth of support.

If the magnets are not on the USML—and it is now clear they are not—then the magnets (and their corresponding drawings) are not subject to the ITAR and a license is not required. The

---

[4] As set forth below, a CJD's determination (and, for purposes of the 2018 search warrant, a U.S. State Department "letter" opining) that the magnets and technical data were on the USML does *not* equate to a determination that the items were actually on the USML and under the ITAR's jurisdiction such that exporting them without a license would violate the ITAR.

affiant is a highly trained and sophisticated federal agent.[5] Yet, it is clear that the affiant never performed the necessary analysis—nor even inquired whether the requisite analysis was performed—to actually determine that the magnets were on the USML. Had the proper analysis been done, the warrant would have never been approved.

## LEGAL FRAMEWORK

Section 38 of the AECA, 22 U.S.C. 2778, as amended, authorizes the President to control export and import of defense articles and defense services. The President, through the U.S. Department of State, promulgated the ITAR. *See* 22 C.F.R. Parts 120–130. The ITAR contains a list of items known as the USML. The articles, services, and related technical data designated as defense articles or defense services under the AECA constitute the USML.

The ITAR is not a static set of rules. Rather, it has changed frequently over the past ten years; this includes numerous changes to the items that are identified on the USML.[6]

USML categories are organized by paragraphs and subparagraphs identified alphanumerically. *See* 22 C.F.R. § 121.1. They usually start by enumerating or otherwise describing end-items, followed by major systems and equipment; parts, components, accessories and attachments; and technical data and defense services directly related to the defense articles of that USML category. Articles are controlled on the USML because they are either enumerated in a category or described in a catch-all paragraph that incorporates "specially designed" as a control parameter.

---

[5] According to SA Bogner, she has been employed by the FBI since August 2021. **Exhibit 2** ¶ 4. SA Bogner is assigned to work in a variety of criminal and national security matters and has received advanced training in national security matters. *Id.* § 5.

[6] "The ITAR is regularly updated and revised to reflect changes in technological developments and in U.S. national security and foreign policy interests." DDTC, *ITAR & Export Controls*, https://www.pmddtc.state.gov/ddtc_public/ddtc_public?id=ddtc_public_portal_itar_landing (last accessed December 15, 2023). *See, e.g.*, 81 Fed. Reg. 49531 (July 28, 2016); 81 Fed. Reg. 70340 (Oct. 12, 2016); 81 Fed. Reg. 83126 (Nov. 21, 2016); 82 Fed. Reg. 2889 (Jan. 10, 2017); 82 Fed. Reg. 41172 (Aug. 30, 2017

With the exception of certain end-items (e.g., the "B-1" bomber), the U.S. State Department does not identify specific individual items by their commercial name on the USML. Rather, in the case of "enumerated" items, it uses descriptions of "control parameters" (i.e., technical characteristics) to identify the items controlled in a particular entry. If an item meets the control parameters in an enumerated entry, it is controlled on the USML.

Even if an item does not meet the control parameters of any enumerated entries on the USML, it still may be controlled if it is "specially designed" for a defense article as described in various entries in the USML. Thus, for example, USML entry XII(e)(1) controls "parts and components specially designed for articles described in paragraph (a)(1) or (a)(5)" of USML Category XII. Likewise, USML entry VIII(h)(1) controls "[p]arts, components, accessories, and attachments specially designed for" the F/A-18 E/F, among other military aircraft.

The "specially designed" rule was implemented in April 2013[7] and based on a "catch" and "release" concept for determining whether unenumerated lower-level parts, components, accessories, attachments, or software are covered by the USML. The intent was to create a broad "catch" for items that are "used in or with" defense articles, but to allow for certain "releases" from control if the criteria of the releases are met. Five releases are identified in paragraphs (b)(1) through (b)(5) of 22 C.F.R. § 120.41.

Paragraph (b)(3) of 22 C.F.R. § 120.41 allows for a part or component that is used in or with a defense article to be released from control under the USML if it: Has the same function, performance capabilities, and the same or equivalent form and fit as a commodity or software used in or with a commodity that: (i) is or was in production (i.e., not in development); and (ii) is not enumerated on the USML.

---

[7] *See* 78 Fed. Reg. 22740, 22754 (Apr. 16, 2013).

Technical data may be identified on the USML if it is "directly related" to a defense article, such as a specially designed part listed somewhere on the USML. Thus, technical data directly related to an item controlled under USML paragraph XII(e) or XX(c) would be controlled under USML paragraphs XII(f) or XX(d), respectively.

U.S. persons and companies are generally responsible for self-determining whether their items are covered by the USML. The commodity-jurisdiction procedure is used if doubt exists as to whether an item is covered by the USML. A commodity-jurisdiction determination is only as good as the information sent to, or gathered by, the State Department, which is a reason that the State Department should take great care to provide detailed instructions, require substantial amounts of information, and include a certification requiring the accuracy and completeness of the information when commodity-jurisdiction requests are submitted by the government or public.

## LEGAL STANDARD

Federal Rule of Criminal Procedure 12(b)(3)(C) and 41(h) permit defendants to move to suppress evidence before trial. FED. R. CRIM. P. 12(b)(3)(C). A motion to suppress is appropriate "when evidence sought to be introduced in a criminal case is alleged to have been unlawfully obtained." *United States v. Guzman*, No. 5:10-CR-00020, 2021 WL 1899767, at *1 (W.D. Ky. May 19, 2021). Evidence is unlawfully obtained pursuant to a search warrant if there is no probable cause to issue the search warrant. *See* U.S. CONST. amend. IV ("[N]o Warrants shall issue, but upon probable cause[.]"). Probable cause is shown through an affidavit attached to the search warrant. *See United States v. Moore*, 999 F.3d 993, 996 (6th Cir. 2021) (citation omitted). An affidavit will show probable cause only if it "provides a 'substantial basis' for the issuing magistrate to believe 'there is a fair probability that contraband or evidence of a crime will be

found in a particular place.'" *United States v. Smith*, 510 F.3d 641, 652 (6th Cir. 2007) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

An affidavit fails to provide a "substantial basis" for issuing the search warrant if the affidavit makes material false statements or material omissions with deliberate falsehood or reckless disregard for the truth, *see United States v. Atkin*, 107 F.3d 1213, 1217 (6th Cir. 1997) (citations and internal quotations omitted), and the false or omitted information was necessary to the finding of probable cause, *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). The omitted information is material if, after putting aside the material omissions, the remaining independent and lawful information is insufficient to support probable cause. *See United States v. Ferguson*, 758 F.2d 843, 848 (2d Cir. 1985). Even in the absence of a material omission, an affidavit also fails to provide a basis for probable cause if it lacks sufficient particularized information. *See United States v. Waide*, 60 F.4th 327, 336 (6th Cir. 2023) (discussing whether the affidavit proffered sufficient information to support a finding of probable cause).

Ultimately, "[t]he Supreme Court has adopted a 'totality of the circumstances' approach to reviewing the sufficiency of an affidavit underlying a search warrant." *Smith*, 510 F.3d at 652 (quoting *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (en banc)); *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005). "Under this approach, an issuing magistrate must 'make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying [] hearsay information,' there is probable cause." *Smith*, 510 F.3d at 652 (quoting *United States v. King*, 227 F.3d 732, 740 (6th Cir. 2000)). Probable cause is to be determined on the facts of each case. *United States v. Sims*, 975 F.2d 1225, 1238 (6th Cir. 1992).

## ARGUMENT AND AUTHORITIES

The 2018 and 2022 affidavits are insufficient because the government never properly determined whether the relevant magnets, and their corresponding drawings, actually qualified to be on the USML. Failing to make this proper determination is detrimental to a finding of probable cause.

The affiants of the 2018 and 2022 search warrants relied on a U.S. State Department letter and CJDs, respectively, to conclude Quadrant's drawings were on the USML and, thus, subject to the ITAR. Vitally, however, the letter's and CJDs' conclusory statements that Quadrant's magnets and related technical data are on the USML do *not* mean those items actually are on the list nor that they fall under the ITAR's jurisdiction. That is because, as detailed above, paragraph (b)(3) of 22 C.F.R. § 120.41 requires the government to confirm, before an item is placed on the USML, that the part or component that is used in or with a defense article does not have a commercial equivalent—that is, the same function, performance capabilities, and the same equivalent form and fit as a commodity that: (i) is or was in production; and (ii) is not enumerated on the USML ("commercial equivalent"). The noted CJDs were based on a flawed process in which the government neglected to determine—or even consider—whether Quadrant's magnets had a commercial equivalent. The affidavits' sole reliance on the flawed CJDs, their failure to determine whether Quadrant's magnets had commercial equivalents, and failure to acknowledge that a CJD is insufficient to determine whether Quadrant's magnets are actually on the USML and subject to ITAR, are reckless omissions and fatal to a finding of probable cause.[8] *See, e.g.*, *Waide*, 60 F.4th

---

[8] Even if a CJD was sufficient to support probable cause concerning an ITAR violation, Defendants take issue with *any* reliance on the CJDs. The CJDs are hearsay, conclusory, unsupported by reasoning, and thus incomplete and unreliable. These are factors a court must consider in determining whether probable cause is satisfied. *See, e.g.*, *United States v. Indivior Inc.*, 448 F. Supp. 3d 587, 596 (W.D. Va. 2020) (quoting *Gates*, 462 U.S. at 238) (noting that, in determining whether probable cause exists, "courts must consider a number of factors in a practical manner, 'including the veracity and *basis of knowledge* of persons supplying hearsay information'") (emphasis added). The affidavits

at 336 (finding the affidavit insufficient to support probable cause because affiant failed to "'corroborate'—or even attempt to corroborate—'the information that [persons making hearsay statements] provided'" (quoting *Frazier*, 423 F.3d at 532)); *see id.* at 337 ("[T]he absence of particularized facts in a warrant affidavit is fatal to a finding of probable cause because 'the information presented must be sufficient to allow the [magistrate] to independently determine probable cause; 'his action cannot be a mere ratification of the bare conclusions of others.'" (quoting *United States v. Weaver*, 99 F.3d 1372, 1377 (6th Cir. 1996)). In short, the warrants are based on a flawed process and bare legal conclusions lacking the necessary analysis to a finding of ITAR jurisdiction.

The affidavits and the CJDs were required to include the commercial equivalent analysis to establish a substantial basis for a finding of probable cause because, as the affidavits themselves allege, the magnets could only fall on the USML if they were "specially designed." The affidavits assert that Quadrant's magnets and corresponding technical data qualify as defense articles because they fall under Category VIII(h)(1) of the USML. *See* **Exhibit 2** ¶¶ 100–01. The affidavits support this assertion through the CJDs. *See id.* ¶¶ 105–06. Category VIII(h)(1) provides that the following items are on the USML:

> Parts, components, accessories, and attachments *specially designed* for the following U.S.-origin aircraft: The B-1B, B-2, B-21, F-15SE, F/A-18 E/F, EA-18G, F-22, F-35, and future variants thereof; or the F-117 or U.S. Government technology demonstrators.

22 C.F.R. § 121.1, Category VIII(h)(1) (emphasis added). By categorizing Quadrant's magnets and drawings as items "specially designed" for other defense articles, the affidavits implicate the commercial equivalent provision, and thus it was required to address—or at the bare minimum

---

provide conclusory, hearsay statements, but no basis of knowledge—i.e., analysis or discussion of the commercial equivalent provision—of those providing the hearsay statements contained in the CJDs.

assert (for search warrant purposes)—that the magnets and technical data did not fall under this provision before concluding that the drawings were on the USML. Although probable cause is not an exacting standard, *see Florida v. Harris*, 568 U.S. 237, 243–44 (2013), a court reviewing a magistrate judge's decision must ensure that the magistrate judge had a "substantial basis for concluding that probable cause existed." *See, e.g.*, *United States v. Maali*, 346 F. Supp. 2d 1226, 1239 (M.D. Fla. 2004) (cleaned up). Whether there is a substantial basis depends upon common sense, which is "necessarily guided by the information presented regarding the specific offense which was allegedly committed." *Id.* at 1240 (cleaned up). Thus in a case concerning complex regulatory provisions such as this one—and when the affiant is an agent highly trained concerning such regulator provisions—an affidavit must present the statutory requirements of a specific offense to allow the magistrate judge to make a decision based on common sense. *See, e.g.*, *United States v. Vasquez*, No. SACR 07-202(A), 2010 WL 368792, at *1–2 (C.D. Cal. Jan. 27, 2010) (evaluating defendant's argument that affidavit supporting wiretap application made material omissions because it failed to sufficiently address the wiretap statute's requirements).[9]

The affidavits failed to do so here because the affidavits certified that the drawings were on the USML but failed to fully explain what the ITAR is, what a defense article is, what it means to be listed on the USML, and what constitutes an ITAR violation. Because the affidavits failed to address whether Quadrant's magnets and technical data were subject to the commercial equivalent analysis, and thus might not be subject to the ITAR, the affidavits improperly certified that Quadrant's magnets and technical data fell on the USML and were subject to the ITAR. This

---

[9] The United States Supreme Court has acknowledged that affidavits "are normally drafted by nonlawyers in the midst and haste of a criminal investigation," and thus affidavits should be read as a whole in a common sense, rather than hypertechnical, manner. *See United States v. Ventresca*, 380 U.S. 102, 109 (1965). Considering the affiant's specialized training and knowledge in this case, and the complexity and frequently changing nature of the ITAR, it is common sense to expect bare legal conclusions concerning an article's placement on the ITAR to be corroborated and supported by the appropriate analysis.

11

improper certification means there is not a "substantial basis" for an issuing magistrate judge to believe there is a "fair probability" that evidence of an ITAR violation would be found pursuant to the search warrants. *See Smith*, 510 F.3d 641, 652.

In sum, if Quadrant's magnets and technical data are not specially designed (i.e., there is a commercial equivalent anywhere in the world), the drawings are not on the USML, not subject to the ITAR, and exporting them without a license does not violate the ITAR. To demonstrate probable cause to believe that evidence of an ITAR violation would be uncovered, the affidavits or the CJDs must have addressed the commercial equivalent provision, or at the very least asserted that Quadrant's drawings did not fall under this provision. Without doing so, the affidavits are insufficient and cannot support probable cause.

## CONCLUSION

For these reasons, the search warrants' affidavits are insufficient to support a finding of probable cause to believe evidence of an ITAR violation would be present at the places searched. Defendants thus respectfully request that the Court enter an order suppressing any ITAR-related evidence obtained from the four aforementioned search warrants and the 2018 search warrant based on lack of probable cause.

Pursuant to Joint Local Criminal Rule 47.1(g), Defendants respectfully request a hearing and oral argument on this motion.

Dated: December 18, 2023          By:     */s/ John Brownlee*

    John L. Brownlee (*pro hac vice*)
    William F. Gould (*pro hac vice*)
    Timothy J. Taylor (*pro hac vice*)
    Caitlin A. Eberhardt (*pro hac vice*)
    HOLLAND & KNIGHT LLP
    1650 Tysons Blvd., Suite 1600
    Tysons, VA 22201
    T: 703.720.8053
    F: 703.720.8610
    John.Brownlee@hklaw.com
    William.Gould@hklaw.com
    Timothy.Taylor@hklaw.com
    Caitlin.Eberhardt@hklaw.com

    ATTORNEYS FOR DEFENDANT
    QUADRANT MAGNETICS, LLC

    */s/ Kent Wicker (with permission)*
    Kent Wicker
    WICKER / BRAMMELL PLLC
    323 W. Main Street, 11th Floor
    Louisville, Kentucky 40202
    (502) 541-5533
    Kent@wickerbramel.com
    *Counsel for Phil Pascoe*

    */s/ Patrick Renn (with permission)*
    Patrick J. Renn
    Smith & Helman
    600 W. Main Street, Suite 100
    Louisville, KY 40202
    502-540-5700
    Fax: 502-568-3600
    prenn@600westmain.com
    *Counsel for Scott Tubbs*

    */s/ Scott Cox (with permission)*
    Scott C. Cox
    Cox & Mazzoli, PLLC
    600 W. Main Street, Suite 300
    Louisville, KY 40202
    502-589-6190
    502-584-1744
    CoxECF@aol.com
    *Counsel for Monica Pascoe*

## CERTIFICATE OF SERVICE

I hereby certify that on December 18, 2023, foregoing motion was electronically filed with the Clerk of the Court via the CM/ECF system, which sent a notice of electronic filing to the attorneys of record.

/s/ *John Brownlee*

14