# EXHIBIT 1

AO 106 (Rev. 04/10) Application for a Search Warrant

## UNITED STATES DISTRICT COURT
### for the
### WESTERN DISTRICT OF KENTUCKY

In the Matter of the Search of )
Quadrant Magnetics, )
2606 River Green Circle, )
Louisville, Kentucky 40206 )    Case No.   3:18mj-616
)
)

### APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe property to be searched and give its location): Quadrant Magnetics, 2606 River Green Circle, Louisville, Kentucky 40206. See Attachment A.*

located in the Western District of Kentucky, there is now concealed *(identify the person or describe the property to be seized):* See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of a crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 22 U.S.C. § 2751-2799 | (Arms Export Control Act and International Traffic in Arms Regulations) |
| 18 U.S.C. §§ 286 and 287 | (False Claims Conspiracy and False Claims Act) |
| 18 U.S.C. § 1343 | (Wire Fraud) |
| 18 U.S.C. § 1001 | (False Statement) |
| 18 U.S.C. § 371 | (Conspiracy) |
| 18 U.S.C. § 1519 | (Destruction of Records) |

The application is based on these facts:

☑ continued on the attached sheet

_____
*Applicant's signature*

James McCartney, Special Agent, Naval Criminal Investigative Service
*Printed name and title*

*Sworn to before me and signed in my presence.*

Date: 10/22/2018

_____
*Judge's Signature*

City and State:   Louisville, Kentucky

Colin H. Lindsay, U.S. Magistrate Judge
*Printed Name and Title*

**JDJ (AUSA initials)**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY

**IN THE MATTER OF THE SEARCH OF:**

Quadrant Magnetics,
2606 River Green Circle,
Louisville, Kentucky 40206

Case No. _____

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, **James McCartney,** being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      Affiant is a duly sworn Special Agent with the U.S. Naval Criminal Investigative Service (NCIS) assigned to NCISRU Crane 300, Highway 361, Building 5, Office 001, Crane, IN 47522.  Affiant has statutory authority to serve search and arrest warrants pursuant to 10 U.S.C. § 7480.  Furthermore, Affiant is an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7) and in connection with his official duties as a Special Agent of NCIS.  Affiant is responsible for conducting investigations into violations of the United States Code and other federal criminal statutes. Affiant is specifically empowered under the laws

USA-046373

of the United States to investigate criminal and civil violations of law, including but not limited to major procurement fraud against the United States Government, specifically the Department of Defense and U.S. Navy, to include 18 U.S.C. § 1031 (Major Fraud Against the Government), 31 U.S.C. § 3729 (False Claims Act), and 22 C.F.R. 121-30 (International Traffic in Arms Regulations (ITAR)). My training and experience has involved, among other things: conducting surveillance, serving search and arrest warrants, interviewing witnesses, debriefing defendants, as well as identifying, gathering, and analyzing evidence.

2.      Affiant has been a Special Agent/Criminal Investigator for 26 years with NCIS. Affiant was a certified Ohio Police Officer and Narcotics Detective for 4 years. Affiant has investigated numerous crimes, as a local police officer and federal law enforcement officer. These crimes include false claims, larceny, armed robbery, fraud, assault, murder, illegal narcotics, prostitution, domestic violence, rape, child physical abuse, child sexual abuse, and production, possession, and intent to distribute child pornography. Affiant has attended group, in person and individual training online and in the classroom for several aspects of criminal investigation to include search and seizure, arrest, interview, interrogation, crime scene examination and collection and preservation of evidence. Affiant is a certified fraud examiner.

3.      Affiant has statutory authority to serve search and arrest warrants pursuant to 10 U.S.C. § 7480. Furthermore, Affiant is an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7) and in connection with his official duties as a Special Agent of NCIS. Affiant is responsible for conducting investigations into violations of the

2

USA-046374

United States Code and other federal criminal statutes. Affiant is specifically empowered under the laws of the United States to investigate criminal and civil violations of law, including but not limited to major procurement fraud against the United States Government, specifically the Department of Defense and U.S. Navy, to include 18 U.S.C. § 1031 (Major Fraud Against the Government), 31 U.S.C. § 3729 (False Claims Act), and 22 C.F.R. 121-30 (International Traffic in Arms Regulations (ITAR)). My training and experience has involved, among other things: conducting surveillance, serving search and arrest warrants, interviewing witnesses, debriefing defendants, as well as identifying, gathering, and analyzing evidence.

4.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## I.      SUMMARY OF PROBABLE CAUSE

### A. Defense Federal Acquisition Regulations Supplement Fraud and False Claims

5.      GE Aviation Systems (GEA) manufactures Generator Converter Unit (GCU) using samarium-cobalt magnets purchased from Quadrant Magnetics (QM).  GEA and QM are selling magnets melted and magnetized in China to the Department of the Navy (DON) and Boeing for use in air craft, including the F-18.  Defense Federal Acquisition Regulation Supplement (DFARS), 48 C.F.R. 252.225-7008, requires that the magnets be melted and magnetized in the United States rather than in China.

### B. Arms Export Control Act and International Traffic in Arms Regulations

3

6.      In addition, the Arms Export Control Act (AECA) and International Traffic in Arms Regulations (ITAR) (22 C.F.R. 121-30) regulate the export and import of defense articles.  The Department of State designated the samarium-cobalt magnets a defense article under Category VIII(h)(1) of the United States Munitions List.  Pursuant to ITAR, the export of technical data to manufacture a defense article, the export of defense services, and the import of defense articles from China require a  a license or other form of approval from the Department of State.

### C. Destruction of Records/Conspiracy/False Statements

7.      QM provided emails between GEA and its employees pursuant to a Department of Defense Inspector General (DOD-IG) subpoena.  On October 5, 2017, GEA sourcing manager Jay Babler directed via email that QM Vice President Scott Tubbs and QM Technical Sales Representative Pierce Hackett instruct their Chinese counterparts to destroy/shred any documents or e-mails pertaining to magnet information that may have been supplied to them.  GEA did not produce the email in response to its DOD-IG subpoena.  On November 2, 2017, QM VP Scott Tubbs responded to GEA employee Jay Babler that "all documents pertaining to GE Aviation – meaning any internal drawing, prints, and instructions have been destroy at our facility in China.

8.      On March 7, 2018, QM Vice President Scott Tubbs stated GEA representative Joe Rebeck, during an in person visit to QM, made him sign a letter dated August 7, 2017.

> This letter is to confirm that there has been no technical information sent to China regarding part number FP24018P1. The part is purchased semi-finished by Quadrant Magnetics with value-add secondary operations performed at the Quadrant location in Louisville, KY. Thus, the country of origin for part number FP24018P1 is the United States of America. The FP24018P1 magnets comply with DFARS 252.225-7009.

4

This letter is on QM letterhead and states all magnets are in conformance with the government contract and the country of origin is the United States. Scott Tubbs said the letter was then sent to Jay Babler, Sourcing Manager, GEA Grand Rapids, Michigan. During an interview with the affiant, Tubbs said the magnets were manufactured and magnetized in China. The letter also contradicts, among other things, the QM price proposals sent to GEA between 2011 and 2014 identifying the magnet's country of origin as China. There is evidence that GEA and QM deliberately attempted to conceal the fact that part FP24018P1 is manufactured in China by conspiring and making this false statement.

9.      The warrant applied for in this affidavit, will allow seizure of the information called for by that subpoena, and evidence of violations of Defense Federal Acquisition Regulation Supplement (DFARS 48 C.F.R. 252.225-7008) (Restriction on Specialty metals); Arms Export Control Act (AECA) (22 U.S.C. § 2751-2799) and International Traffic in Arms Regulations (ITAR), and 18 U.S.C. §§ 286 and 287 (False Claims Conspiracy and False Claims Act); 18 U.S.C. § 1343 (Wire Fraud); 18 U.S.C. § 1001 (False Statement); 18 U.S.C. § 371 (Conspiracy), and 18 U.S.C. § 1519 (Destruction of Records).

## II.    BACKGROUND

10.      Affiant's investigation to date has substantiated GE Aviation Systems (GEA) and Quadrant Magnetics (QM) are each buying and selling samarium cobalt magnets under government contracts with the U.S. Navy and Boeing. These same magnets are manufactured,

5

USA-046377

melted, and magnetized, in China and subsequently sold by QM and GEA direct to Boeing and direct to Department of Navy (DON) under separate contracts for use in the U.S. Navy F-18 aircraft.

11.     GE is the parent company of GE Aviation and GE Aviation Systems LLC.  GEA is headquartered at 1 Neumann Way, Cincinnati, Ohio 45215.  GEA provides commercial, military and business and general aviation jet and turboprop engines and components as well as avionics, electrical power and mechanical systems for aircraft. GEA is also located in Vandalia, Ohio where the Generator Converter Unit (GCU) for the U.S. Navy F-18 aircraft is manufactured.

12.     GE Aviation Systems LLC (also GEA) is a provider of commercial and military general aviation jet and turboprop engines and components as well as avionics, electrical power and mechanical systems for aircraft. GEA engages in the manufacture, distribution, and service of jet engines, components, and integrated systems for commercial, military, and business and general aircraft, as well as aero-derivative gas turbines for marine applications worldwide. It offers engine maintenance services, avionics, electrical power systems, digital systems, structures, propellers, repair services, used parts, engineering and forecasting services, logistics and management services, military gas turbines, propulsion systems, exhaust energy recovery systems, DLE combustor systems, commercial gas turbines, and flight efficiency services. The company was formerly known as Smiths Aerospace Inc., and prior to that, Leland Electric.

13.     For the purposes of this warrant, both GE Aviation Systems and GE Aviation locations will be referred to as GEA but differentiated by location.

6

14.     QM is a Delaware limited liability company registered with the Kentucky Secretary of State with its principal office located at 2606 River Green Circle, Louisville, Kentucky 40206. The registered agent is Mr. Services LLC, 401 South 4th Street, Suite 2600, Louisville, KY 40202. The manager is listed as John Wang with an address of 5405 Morehouse Drive, Ste, 320 Sand Diego, and California 92121. The accounting manager is listed as Monica Pascoe. The Organizer of the companies is listed as Quadrant Technologies Corporation. In approximately 2002, QM purchased Crew Max which sold Magnets used for aviation systems to GEA. Quadrant Magnetics (Hang Zhou, China) has an address at 14F Green City Building, No 819 Shixin RD Xiaoshan, Hang Zhou, China. QM Louisville subpoenaed documents, purchase orders, and shipping manifests obtained from QM Louisville also lists X-Mag Inc. address as 14F Green City Building, No 819 Shixin RD Xiaoshan, Hang Zhou, China. Shipping invoices provided by QM also show that same address in China also show shipping invoices for samarium-cobalt magnets.

A. Defense Federal Acquisition Regulation Supplement (DFARS 48 C.F.R. 252.225-7000-7048) (Restriction on Specialty metals to Export Control Act).

15.     The Federal Acquisition Regulation (FAR) is a set of clauses that are part of the U.S. Code of Federal Regulations. See 48 C.F.R. 1. Federal government agencies and contractors awarded a government contract are regulated by the FAR and must follow the procurement rules and policies set forth in the FAR. The Defense Federal Acquisition Regulation Supplement (DFARS) is a supplement to the FAR that provides Department of Defense (DOD) specific acquisition regulations that DOD government acquisition officials and those contractors doing

7

USA-046379

business with DOD must follow in the procurement process of good and services.  See 48 C.F.R. 252.225-7000-7048.

16.     The use of Chinese magnets in components of the F-18 is generally prohibited by the specialty metal clause in 10 U.S.C. § 2533b.   This code section prohibits the DOD from acquiring end units or components for aircraft, missile and Federal government agencies as well as contractors who win a contract for space systems, ships, tank and automotive items, weapon systems, or ammunition unless these items have been manufactured with specialty metals that have been melted or produced in the United States. Thousands of products used for defense, aerospace, automotive, and renewable energy technologies rely on specialty metals for which there are often few, if any, substitutes. Specialty metals covered by this provision include certain types of cobalt, nickel, steel, titanium and titanium alloys, zirconium, and zirconium base alloys.

17.     The current definition of specialty metals can be found in DFARS, 48 C.F.R. 252.225-7008 and 7009.  This DFARS Specialty Metal Defined—In these sections, the term "specialty metal" means any of the following:

> (1) Steel—
> (A) with a maximum alloy content exceeding one or more of the following limits: manganese, 1.65 percent; silicon, 0.60 percent; or copper, 0.60 percent; or
> (B) containing more than 0.25 percent of any of the following elements: aluminum, chromium, cobalt, columbium, molybdenum, nickel, titanium, tungsten, or vanadium.
> (2) Metal alloys consisting of nickel, iron-nickel, and cobalt base alloys containing a total of other alloying metals (except iron) in excess of 10 percent.
> (3) Titanium and titanium alloys.
> (4) Zirconium and zirconium base alloys

8

18.     According to DFARS 225.252-7009, specialty metals procured by DOD and used in defense articles must be melted in the United States or a "qualifying country," or melted anywhere but incorporated into an article that is manufactured in a qualifying country. The specialty metals clause allows a qualifying country to manufacture parts from metal that was melted anywhere, provided it meets specifications, but a United States company can only use metal that was melted in the United States or a qualifying country. DFARS 225.252-7002 and DFARS subsection 225.003 lists the qualifying countries are Austria, Belgium, Canada, Czech Republic, Denmark, Egypt, Estonia, Finland, France, Germany, Greece, Israel, Italy, Japan, Latvia, Luxembourg, Netherlands, Norway, Poland, Portugal, Slovenia Spain, Sweden, Switzerland, Turkey, United Kingdom of Great Britain and Northern Ireland.  China is not an authorized country.

19.     The DON uses GEA and QM magnets in the U.S. Navy F-18.  As referenced above, QM samarium cobalt magnets are subject to DFARS because they contain the specialty metal alloy samarium-cobalt and because they are purchased and installed under multiple DON procurement contracts which are regulated, including by the DFARS. Furthermore, the U.S. Navy F-18 aircraft and weapons platform is manufactured and maintained under major procurement contracts with the U.S. Navy.  GEA Generator Converter Unit (GCU) is purchased by the U.S. Navy under prime and subcontracts.  The QM samarium cobalt magnets is installed GCU which is installed in the U.S. Navy F-18 Aircraft weapons platform under multiple procurement contracts.

USA-046381

20.     QM and GEA are both responsible to comply with the DFARS. QM is a 2rd tier government subcontractor to GEA on U.S. Navy maintenance contracts. QM is a 3rd tier subcontractor to GEA who as a 2nd tier contractor delivers the GCU to the prime contractor Boeing who installs the GEA GCU in F-18 Aircraft. Furthermore, GEA is responsible for informing QM of the DFARS and legal requirements in government contracting. QM is required to comply with these requirements.

21.     Boeing also uses QM and GEA magnets in the U.S. Navy F-18.  On March 27, 2018, Affiant interviewed Vern Zurliene, Boeing Engineer in St. Louis, Missouri, who has worked on the Boeing F-18 program since its inception in 1986.  Zurliene said GEA Vandalia places 16 QM Samarium-Cobalt magnets into each Permanent Magnet Generator (PMG) and there is one PMG in each GCU.  Boeing is currently installing GCU Generation 4 on the F-18 aircraft.

B.  **Arms Export Control Act (AECA) and International Traffic in Arms Regulations (ITAR)**

22.     Samarium-Cobalt Magnets identified by part number (P/N) FP24018P1 is designated a defense article under Category VIII(h)(1) the Arms Export Control Act (AECA) (22 U.S.C. § 2751-2799) and International Traffic in Arms Regulations (ITAR) (22 C.F.R. 121-30). Because the magnets are defense articles under ITAR, the specifications or technical data used to manufacture the magnets should not be sent to China.  In addition, the magnets should not be manufactured in China without a license.

23.     AECA and ITAR authorize the United States State Department's Office of Defense Trade Controls ("ODTC") to establish and maintain the United States Munitions List (the

10

USA-046382

"Munitions List"). 22 C.F.R. 121.1. The Munitions List is a catalog of designated "defense articles" subject to export restrictions. 22 C.F.R. 121.1. Anyone wishing to export from the United States a defense article on the Munitions List must first obtain a license from the Department of State Office of Defense Trade Controls (ODTC). 22 C.F.R. 121.1. Included on the Munitions List are certain electronic components designed and manufactured for use by the military for advanced communications and radar systems in aircraft, warships, satellites, tanks and ground forces defense systems. 22 C.F.R. 121.1.

24.     The ODTC also regulates the export of "defense services." As part of the limitations on providing defense services pursuant to ITAR, an individual in the United States may not contract with a foreign person to build an item on the Munitions List outside of the United States without first obtaining a license under the AECA. In a letter dated January 2, 2018, ODTC opined that Samarium-Cobalt Magnets P/N FP24018P1 is designated a defense article under Category VIII(h)(1) of the United States Munitions List. Pursuant to ITAR, a license or other form of approval is required for export or import.

## C. Obstruction, False Claims Act, and Wire Fraud, False Statement, and Conspiracy

25.     18 U.S.C. § 286, makes it a crime for anyone to enter into any agreement, combination, or conspiracy to defraud the United States or any department or agency thereof by obtaining or aiding to obtain the payment or allowance of any false, fictitious or fraudulent claim. A "conspiracy" is an agreement between two or more persons to join together to accomplish some

USA-046383

unlawful purpose. It is a kind of "partnership in crime" in which each member becomes the agent of every other member.

26.     18 U.S.C. § 287, makes it a crime to knowingly make a false or fraudulent, claim against any department or agency of the United States, such as the Department of the Navy.

27.     18 U.S.C. § 1343 makes it a crime to devise or intend to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

28.     18 U.S.C. § 1519 makes it a crime to knowingly alter, destroy, mutilate, conceal, cover up, falsify, or make a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States, or in relation to or contemplation of any such matter or case.

29.     18 U.S.C. § 1001 makes it a crime to knowingly make or cause to be made a materially false statement or the submission of a materially false, fictitious, or fraudulent document to the United States Government.

30.     18 U.S.C. § 371 makes it a crime to knowingly conspired to commit any of the previously discussed criminal offenses that are violations of federal criminal law or to conspire to defraud the United States.

12

USA-046384

31.     As part of the requirements in the FAR, Title 48 C.F.R. 4.702 requires that GEA and QM to maintain records related to government acquisition contracts.   48 C.F.R. 4.705-3 detailed acquisition and supply records requirements as follows:

    (a)   Store requisitions for materials, supplies, equipment, and services: Retain 2 years.

    (b)   Work orders for maintenance and other services: Retain 4 years.

    (c)   Equipment records, consisting of equipment usage and status reports and equipment repair orders: Retain 4 years.

    (d)   Expendable property records, reflecting accountability for the receipt and use of material in the performance of a contract: Retain 4 years.

    (e)   Receiving and inspection report records, consisting of reports reflecting receipt and inspection of supplies, equipment, and materials: Retain 4 years.

    (f)   Purchase order files for supplies, equipment, material, or services used in the performance of a contract; supporting documentation and backup files including, but not limited to, invoices, and memoranda; *e.g.,* memoranda of negotiations showing the principal elements of subcontract price negotiations (see 52.244-2): Retain 4 years.

    (g)   Production records of quality control, reliability, and inspection: Retain 4 years.

    (h)   Property records (see FAR 45.101 and 52.245-1): Retain 4 years.

48 C.F.R. 4.705-3(g) requires a government contractor to maintain certain acquisition and supply records up to four years after the last payment on the contract.

### III.     PROBABLE CAUSE

32.     There is probable cause to believe that GEA submitted false claims to the United States and fraudulently sold magnets to the DON and Boeing for the F-18 knowing the magnets

USA-046385

were manufactured in China in violation of DFARS regulations requiring the magnets to be melted and magnetized in the United States.

33.     There is probable cause to believe that employees at GEA conspired with QM employees to conceal from the United States that the magnets were melted and magnetized in China.

34.     There is probable cause to believe that GEA employees directed QM employees to delete magnet specifications, technical data, and source information sent to China related to the production of magnets in QM's facility in China.

35.     There is probable cause to believe that QM employees knowingly sold Chinese made magnets to GEA in violation of DFARS.

36.     There is also probable cause to believe QM employees transferred specifications and technical data to manufacture the magnets to their facility in China without a license and imported the magnets without a license in violation of ITAR and DFARS.

## INVESTIGATION OF SOURCE OF MAGNETS AND SUBPOENAS TO GEA AND QM

37.     Affiant initiated a joint investigation with DCIS Indianapolis on October 6, 2017. On that same day, Naval Air Systems Command (NAVAIR) reported that on August 29, 2017, Boeing disclosed that GEA delivered non-compliant parts under NAVAIR production contracts and Naval Supply Systems Command (NAVSUPP) maintenance contracts for the F-18 aircraft.

38.     In a letter of notification to the Defense Contract Management Agency (DCMA) dated August 9, 2017, GEA reported the magnetic sub-component P/N FP24018P1 was purchased

14

from QM of Louisville, Kentucky. The magnetic sub-component is part of the GEA Part number FV111457G1 installation kit, F-18 GCU. According to the GEA disclosure, the non-compliant part is included in the GCU identified as part number FH30001G4. The Rotor (FH30007G4) on the GCU uses a magnetic sub-component (FP24018P1) determined to include samarium-cobalt alloy magnets melted and produced in China, and thus not in compliance with DFARS 252.225-7009.

39.     In a letter from ODTC to General Electric Company on December 22, 2018, ODTC provided a commodity jurisdiction determination (DDTC Case CJ 0512-17) that Samarium-Cobalt Magnets P/N FP24018P1 used in the generator converter unit of the F/A-18E/F is designated a defense article under Category VIII(h)(1) of the United States Munitions List. Pursuant to ITAR, a license or other form of approval is required for export or temporary import. The letter is not dated but indicated it was in response to a submission from GE dated October 6, 2017.

40.     The General Electric Company (GE), on behalf of its GEA business unit, submitted a letter to the U.S. Department of State, Directorate of Defense Trade Control Compliance, Office of Defense Trade Controls Compliance (ODTC) dated January 2, 2018 signed by Laura Molinari, Executive Counsel, International Trade Compliance. The letter indicated that GE submitted an initial Voluntary disclosure on September 7, 2017 on a potential export violation. The letter contained the following:

> In August 2017, GE Aviation's Sourcing organization was conducting an internal audit of US suppliers procuring items outside of the United States. During the course of this review, the auditor flagged a magnet for the F18's Generator Converter Unit, sourced to Quadrant Magnetics, as potentially being subcontracted to China. Upon receiving this information,

USA-046387

GE's legal organization immediately notified its US military customer and submitted the initial VD [Voluntary Disclosure] notification to DDTC.

Upon further review of the item at issue, it was determined that the product outsourced to China was an EAR99 ingot and not the final magnet. The magnetization of the ingot occurs in the United States, which would change the item's classification from EAR99 to VIII(h)(1).

However, after discussions with the supplier, GE discovered that the supplier sent a drawing that included some specifications on the magnetic properties. Upon further review of the drawing sent, GE requested the immediate destruction of that data, even though the data sent was the supplier's design. The supplier sent an email confirming the immediate destruction.

Due to the technologically unsophisticated nature of the component, in October 2017, GE submitted a Commodity Jurisdiction (CJ) to confirm its assessment of the magnet (fully magnetized item). On December 22nd, DDTC confirmed the magnet is classified as subject to the USML VIII(h)(1).

It is GE's policy to be strictly compliant with U.S. export laws. GE is committed to continually improving its export compliance with the rules and regulations promulgated by the respective United States Government agencies, including the ITAR. Therefore, when GE finds a system or process flaw such as the one revealed by the events that are the subject of this letter, GE makes every reasonable effort to implement corrective actions to prevent the same error from occurring again. With that said, in this case GE seeks to close the pending VD at has deemed no export escape or violation on its end.

Note that GE has communicated with the supplier, Quadrant Magnetics, and has suggested it filed a CJ on its drawing. It has also suggested evaluating whether an initial disclosure should be filed concurrent or post filing of the CJ.

### Certification

I am an empowered official for General Electric Company. In accordance with ITAR 127.12(e), all of the representations made in connection with this request for extension of time are true and correct to the best of my knowledge and belief and have been made with the knowledge of GE's senior management.

16

USA-046388

41.     The letter dated January 2, 2018 from GE showed that QM employees Scott Tubbs, Phil Pascoe, Pierce Hackett were included in the distribution of the letter.  The letter was also recovered from QM produced materials in response to an admin subpoena dated March 6, 2018.

42.     On January 17, 2018, DCIS Special Agent Jeff Capehart served GEA Vandalia, Ohio, with a subpoena for documents, correspondence and records associated with GEA's purchase of samarium cobalt magnets from QM. The subpoena specifically requested electronic e-mail and stored communications between GEA and QM. The subpoena requested any and all contracts, agreements and contract requirements to include but not limited to REMARK C64 (defined as GEA document containing terms and conditions detailing FAR requirements) and its revisions GEA had or has with Smith's Aerospace from January 1, 2004 December 31, 2007 to manufacture Generator Converter Unit (GCU) kits and converter kits FH30001G1 through FH30001G4, containing magnetic sub-component FP24018P1 for the F-18 aircraft. Any and all contracts, agreements and contract requirements to include but not limited to REMARK C64 and its revisions GEA had or has with Quadrant Magnetics from January 1, 2010 to present to manufacture GCU kits and Converter kits FH30001G1 through FH30001G4, containing magnetic sub-component FP24018P1 for the F-18 aircraft.  Any and all solicitations and awarded contracts, agreements and contract requirements to include but not limited to REMARK C64 and its revisions GEA has with the Boeing Company for the manufacture and or delivery of the GCU kits and Converter kits FH30001G1 through FH30001G4, containing magnetic sub-component FP24018P1 for the F-18 aircraft from January 1, 2010 to the present. Any and all GEA purchase

17

USA-046389

orders containing REMARK C64 manufacturing requirements and revisions thereof and sent to Smith Aerospace and or Quadrant Magnetics for the manufacture and or delivery of the GCU kits and Converter kits FH30001G1 through FH30001G4, containing magnetic sub-component FP24018P1 for the F-18 aircraft from January 1, 2010 to the present. Any and all Smiths Aerospace and Quadrant Magnetics Invoices to GEA for the manufacture and delivery of GCU kits and Converter kits FH30001G1 through FH30001G4, containing magnetic sub-component FP24018P1 for the F-18 aircraft from January 1, 2010 to the present.

43.     Remark C64 (RC64) is a contract requirement included in the prime Boeing contract with the U.S. Navy to deliver the F-18 Aircraft and weapons platform. RC64 lists a series of DFARS 252.225-7000 to 252.225-7014 requirements including but not limited to country of origin requirements for specialty metals use in military systems and the International Traffic in Arms Regulations (ITAR) DFARS 252.225-7048 that regulates technical data from being shared with certain criteria countries. Remark C64 is updated annually and when a provision of a contract, purchase order or invoice, prime and sub-contractors must adhere to its requirements when delivering articles under contract to the Department of Defense.

44.     In response to the January 17, 2018 subpoena, GEA provided invoices and purchase orders related to samarium-cobalt magnets and a spread sheet detailing how many magnets were purchased by GEA from QM for installation into the F-18 GCU. According to a GEA spreadsheet, approximately $480,000 in samarium-cobalt magnets were purchased by GEA from QM between 2008 and 2017. GEA has also provided three contracts/blanket purchase agreements between GEA

and the government to supply the GCU containing samarium cobalt magnets to United States Navy on maintenance contracts. GEA counsel has agreed to cooperate with the supply of these e-mails, however, GEA has not yet provided additional e-mail Correspondence.

45.     Interviews with GEA and QM employees revealed GEA found as early as 2011 that QM was delivering Chinese manufactured specialty metals for the GCU. On January 17, 2018, Affiant and DCIS Special Agent Jeff Capehart interviewed GEA Lead Sourcing Specialist Marvin Barga at Vandalia, Ohio. Barga advised GEA Vandalia Sourcing Functions were consolidated and moved to GE Aviation (GEA) Grand Rapids, Michigan in July 2015 and Jay Babler has been responsible for all GEA Vandalia sourcing functions since the consolidation. Barga specifically said that as early as 2011, he asked QM to provide country of origin on their invoices billing GEA for samarium cobalt magnets. QM replied by placing country of origin as China on their invoices sent to GEA Vandalia for payment. QM documents also received under DOD-IG subpoena contain proposals from QM to GEA Vandalia dated August 15, 2011, March 26, 2012, and March 5, 2014 specifically stating QM's country of origin for the samarium cobalt magnets is China. Furthermore, Barga said during his interview that as early as 2010-2011 GE Corporate required him to ask QM where the magnets were made and QM reported the country of origin as China. Barga said QM never requested a waiver to deviate from the C-64 requirement for the magnets to be manufactured in the United States or another qualified country, other than China.

46.     On January 12, 2018, GEA Counsel Michael Bishop provided a letter dated August 7, 2017. The letter was sent to Jay Babler, GE Aviation from QM VP of Sales and Marketing

USA-046391

Scott Tubbs. The Subject: "FP24018P1 Product Compliance". The letter was signed by Scott Tubbs and states:

> This letter is to confirm that there has been no technical information sent to China regarding part number FP24018P1. The part is purchased semi-finished by Quadrant Magnetics with value-add secondary operations performed at the Quadrant location in Louisville, KY. Thus, the country of origin for part number FP24018P1 is the United States of America. The FP24018P1 magnets comply with DFARS 252.225-7009.

47.     On March 6, 2018, Affiant served a DOD-IG subpoena on Quadrant Magnetics (QM) Louisville, KY. QM responded to the subpoena with several price proposals, purchase orders, invoices, and e-mail correspondence between QM and GEA Vandalia, OH and GEA Grand Rapids, Michigan.  QM provided an e-mail written by Jay Babler, Sourcing Manager, GEA Grand Rapids specifically giving instruction to QM sub-contractor personnel to have their plant in China destroy any and all correspondence and documents related to samarium-cobalt magnets.

48.     On March 6, 2018, Affiant served QM with a DOD-IG subpoena for correspondence and records associated with the manufacture and sale of samarium cobalt magnetics to GEA Vandalia, Ohio.  In response to the subpoena, QM provided documents and e-mails between QM and GEA documenting the sale of samarium cobalt magnets to GEA for inclusion in the F-18 GCU.

49.     On March 7, 2018, Affiant interviewed QM Vice Presidents Scott Tubbs and Phillip Pascoe. Scott Tubbs stated that QM manufactures the Samarium Cobalt magnets in China. Phillip

USA-046392

Pascoe stated the Samarium cobalt magnets are manufactured in China and believes the magnets have been magnetized at QM Louisville, Kentucky for the last 2 to 3 years.

50.     On March 7, 2018, Scott Tubbs was interviewed by affiant and confirmed the QM samarium cobalt magnets sold to GEA are manufactured and magnetized at QM China, imported by QM, and sold to GEA.

51.     On March 7, 2018, QM Vice President Scott Tubbs stated GEA representative Joe Rebeck, during an in person visit to QM, made him sign the aforementioned letter in paragraph 45 dated August 7, 2017.  This letter is on QM letterhead and states all magnets are in conformance with the government contract and the country of origin is the United States.  Scott Tubbs said the letter was then sent to Jay Babler, Sourcing Manager, GEA Grand Rapids, Michigan.

52.     The letter dated August 7, 2017 stating the magnets were not made in China contradicts QM price proposals sent to GEA between 2011 and 2014 identifying the magnet's country of origin as China. It also contradicts the problem advisory reports dated August 25, 2017 signed by QM Technical Representative Pierce Hackett also identifying the country of origin as China but claiming the magnetizing location as Kentucky.  Scott Tubbs said Joe Rebeck visited QM and made Pierce Hackett sign the problem advisory reports and also made Scott Tubbs sign the Quadrant letter to Jay Babler dated August 7, 2017 stating that Part number FP24018P1 (Samarium Cobalt Magnet) is in compliance with the contract and the country of origin for the part is the United States of America. Affiant believes GEA and QM deliberately attempted to

21

USA-046393

conceal the fact that part FP24018P1 is manufactured in China by conspiring and causing false statements to the government.

## REVIEW OF INFORMATION PROVIDED BY QM

53.    In an email dated September 21, 2015, from Paul Fitzpatrick of GE Aviation emailed Pierce Hackett at QM regarding a Request for Quote (RFQ) for GE Part Number FP24018P1 (MAGNET – PMG ROTOR). The email from GE Aviation contained the following warnings:

GE PROPRIETARY INFORMATION
The information contained in this document is GE proprietary information and is disclosed in confidence. It is the property of GE and shall not be used, disclosed to others or reproduced without the express written consent of GE, including, but without limitation, it is not to be used in the creation, manufacture, development, or derivation of any repairs, modifications, spare parts, designs, or configuration changes or to obtain FAA or any other government or regulatory approval to do so. If consent is given for reproduction in whole or in part, this notice and the notices set forth on each page of this documents shall appear in any such reproduction in whole or in party.

This technical data is considered ITAR and/or EAR controlled pursuant to 22 CFR Part 120-130 and 15 CFR Parts 730-774 respectively. *Transfer of this data by any means to a Non-US Person, whether in the United States or abroad, without the proper U.S. Government authorization (e.g., License, exemption, NLR, ect.), is strictly prohibited.*

*(Italic Emphasis Added)*

54.    Pierce Hackett, Technical Sales, QM, responded on September 22, 2015:

Paul,
Attached is the completed quotation for P/N FP 24018P1 for you. If you have any questions just let me know. Thanks! This e-mail chain is memorialized by bate stamp QUADRANT_014305.

22

55.     QM provided an e-mail dated August 15, 2017 from GE Sourcing Manager Pete Naud to QM Vice President Scott Tubbs.  In the e-mail Naud asks Tubbs to provide a copy of the specification drawing he sent to China to make P/N 36B423718P1.  On August 15, 2017 Tubbs replied to Naud's e-mail stating "Attached is the 36B423718P1-RAW drawing that was sent to China to make this part. The drawing is memorialized by bate stamp QUADRANT_000743 and has Quadrant Magnetics with a date of 9-13-06.  Part number 36B423718P1 is a Magnet PM Generator Rotor, a variation of part number FP24018P1 with the same nomenclature.  I know from training and experience that technical data and drawings containing specifications restricted by ITAR commonly contain markings to that effect. This drawing does not appear to have an ITAR caveat on it.

56.     In a separate e-mail dated August 15, 2017, from Scott Tubbs to QM Vice President Phil Pascoe, Tubbs tells Pascoe that GEA wants to know how long it will take QM to start using compliant materials.  Tubbs is asking Pascoe, Jeff Moore and Pierce Hackett for guidance on how long it will take for QM to find a source who can deliver compliant parts to GEA. This e-mail is memorialized by bate stamp Quadrant_000744.

57.     On September 8, 2017 Jay Babler sent and e-mail to QM Vice President Scott Tubbs. GE Employee, Pete Naud is copied on this e-mail.  The e-mail states:

> Scott we need a letter on Quadrant letterhead and needs to be signed by someone from Quadrant.  The body of the email should look similar to the attached scanned image. The letter should cover the supply chain of part numbers FP24018P1 and 36B4233718P1.
>
> It is important that this letter be received today.

23

USA-046395

Let me know if you require additional clarity.

Jay Babler PMP
GE Aviation
Aviation Systems
Lead Sourcing Specialist
616 241 8588
jay.babler@ge.com
3290 Patterson Ave
Grand Rapids, MI 49512, U.S.A.
GE Aviation Systems LLC
GE imagination at work

58.    On October 5, 2017, GEA sourcing manager Jay Babler sent an email directing QM

Vice President Scott Tubbs and QM Technical Sales Representative Pierce Hackett to instruct their

Chinese counterparts to destroy/shred any documents or e-mails pertaining to magnet information

that may have been supplied to them. GE employee Jeff Pirrone was in the to line on this e-mail.

The e-mail states:

Pierce and Scott
As you know, there is a lot of focus on DFAR compliance for magnets and specialty
metals at GE. Please instruct your Chinese supplies to destroy/shred any documents or
emails pertaining to magnet information that may have been supplied to them.
Let me know when you have verified that this has been completed.  Call me if you have
any questions
Jay Babler PMP
GE Aviation
Aviation Systems
Lead Sourcing Specialist
616 241 8588
jay.babler@ge.com<mailto:jay.babler@ge.com>
3290 Patterson Ave
Grand Rapids, MI 49512, U.S.A.
GE Aviation Systems LLC
GE imagination at work

24

The information contained in this electronic message is privileged and confidential and is intended for the use of the individual(s) named above and others who have been specifically authorized to receive it. If you are not the intended recipient, you are hereby notified that any dissemination distribution or copying of this message is strictly prohibited. If you have received this message in error, please destroy it immediately, and notify the sender.

59.    On November 2, 2017 QM Vice President Scott Tubbs responded to Jay Babler via e-mail. The e-mail states:

Jay, all documents pertaining to GE Aviation – meaning any internal drawings, prints and instructions have been destroyed at our facility in China.
As a reminder, all GE Aviation produced print have been held in the United States by Quadrant. Best Regards,
Scott Tubbs
s.tubbs@quadrant.us ***PLEASE NOTE NEW E-MAIL ADDRESS***

60.    Rebeck, Naud, and Babler are GEA employees who made e-mail inquiries with QM in 2017 regarding the origin of the Samarium Cobalt magnets sold to GEA and the notifications to the government that they are not conforming because they are manufactured in China.

### EVIDENCE OF CRIMINAL ACTIVITY

61.    As is evident in the e-mails listed in Paragraph 54 through 61 above, there is probable cause to believe that GEA Lead Sourcing Specialist Jay Babler and QM Vice President Scott Tubbs conspired along with other GEA and QM employees on the e-mail chain to destroy GEA and QM internal drawings, prints and instructions that were sent to China and used to manufacture samarium cobalt magnets subsequently installed in the F-18 weapons platform GCU.

25

62.    Affiant believes Jay Babler requested QM destroy the internal drawings, prints and instructions to cover up fact that QM and GEA had knowledge that technical data and specification information was sent to China to manufacture the samarium cobalt magnets and also to cover up the fact that magnets previously installed on the F-18 weapons were melted and magnetized in China in violation of the DFARS and ITAR clauses previously identified in this affidavit.

63.    Probable cause exists that Babler knew China is not a qualifying country of origin to manufacture specialty metals on a U.S. Military weapons platform. China does not have a reciprocal defense procurement memorandum of understanding or international agreement with the United States to import specialty metals for installation on U.S. military weapons systems, per DFARS 252.225-7000, 252.225-7009 and 22 U.S.C. § 2776 and the International Traffic in Arms Regulations (ITAR) (22 C.F.R. Parts 120-130). E-mail traffic between Babler and Tubbs along with others at QM and GEA reveal they knew China is not authorized country of origin to manufacture the specialty metal magnets QM sold GEA and GEA installed in the GCU that was installed on the U.S. Navy F-18 weapons platform.

64.    Review of subpoenaed documents indicate GEA sourcing specialist Marvin Barga began placing Remark C64 (RC64) requirement on all purchase orders for samarium cobalt magnets from QM as early as January 17, 2011.   RC64 lists DFARS compliance requirements placed on QM for the manufacture and delivery of samarium cobalt magnets GEA for installation on the GCU F-18 weapons platform.   Affiant reviewed RC64 revisions between 2007 and 2017. According to RC64, QM and GEA were required to manufacture the samarium cobalt magnets for

USA-046398

the F-18 GCU in accordance with RC64, DFARS (252.225.7048) and ITAR (22 C.F.R. Parts 120-130).

65.     Further review of subpoenaed documents from QM revealed a Bill of Lading (BOL) dated August 27, 2012.  The BOL documents a shipment of Speaker Sets and Magnet and rare earth permanent magnet from X-Mag Inc., China to QM Louisville, Kentucky. This confirms QM was importing Samarium cobalt magnets into the United States from China.

66.     Investigation shows GEA sourcing specialist Marvin Barga had requested country of origin information on the magnets from QM as early as 2011.

67.     Open source inquiry identified Joe Rebeck as a GEA Lead Supplier Quality Engineer in Vandalia, Ohio.

68.     Open source inquiries identified Pete Naud as a Sourcing Manager at General Electric, 41 Farnsworth St, Boston, Massachusetts.

69.     Open source inquiry through Google surfaced Jay Babler's LinkedIn profile and lists Babler as a Supply Chain Lead at GE in the Greater Grand Rapids Michigan area. CLEAR report lists an associated address with Babler as 3290 Patterson Avenue SE Grand Rapids, Michigan 49512-1991. Open source inquiries for GEA Grand Rapids lists GEA address as 3290 Patterson Avenue, SE Grand Rapids, Michigan 49512-1991. Babler's LinkedIn profile reports he was a Manufacturing Engineer at Smith Aerospace from 1985-1994.  As previously stated, GEA Vandalia purchased the former Smith Aerospace plant in Vandalia, Ohio.

27

USA-046399

70.     The QM response to the subpoena provided inventories of purchase orders files between 2007 and 2017.  The only year of purchase orders missing in the inventory is 2010. Another item left out of these inventories are certificates of compliance for the samarium cobalt magnets manufactured by QM.  Inventory lists provided by QM between 2007 and 2017, minus 2010 produced only four Certificates of Compliance.  Based affiant's knowledge, training, and experience as a NCIS investigator, I know that that individuals who sign false and fraudulent certificates of compliance in relation to the delivery of goods and materials procured through U.S. Government contracts can be charged with Title 18 U.S.C. § 1001.

71.     (QM Warrant) Affiant seeks a search warrant based on the above probable cause to search Quadrant Magnetics, 2606 River Green Circle, Louisville, Kentucky  40206 premises, and search and or image computer, computer server, vehicles, work space, and mobile telephones belonging to President Jeff Moore, Vice President Scott Tubbs, Vice President Phil Pascoe, and Technical Sales Representative Pierce Hackett, there. These items will be searched for e-mails, documents, other correspondence and communications and any other media, meta data and media of native form for evidence of violations of  Defense Federal Acquisition Regulation Supplement (DFARS 48 C.F.R 252.225-7008) (Restriction on Specialty metals); Arms Export Control Act (AECA)( 22 U.S.C. § 2751-2799)  and International Traffic in Arms Regulations (ITAR) (22 C.F.R. Parts 120-130), 18 U.S.C. §§ 286 and 287 (False Claims Conspiracy and False Claims Act); 18 U.S.C. §1343 (Wire Fraud); 18 U.S.C. 1001 (False Statements); 18 U.S.C. 371 (Conspiracy); and 18 U.S.C. § 1519 (Destruction of Records)  illegal manufacture of samarium cobalt magnets

28

in China for use in the US Navy F-18 aircraft and the subsequent cover up of this fact by multiple GEA and QM personnel.

72.     The server will be searched for e-mail communication sent and received from outside the United States relating to the production of magnets in Quadrant's Chinese Facilities. The server will be searched for information regarding communications directing the production of magnets in a Chinese facility and the transfer of technical data outside the Untied States.  The server will also be search for communications between GEA Sourcing employees Jay Babler, jay.babler@ge.com, Pete Naud, peter.naud@ge.com, Joe Rebeck, Joe.Rebeck@ge.com and Jeff Pirrone, Jeff.Pirrone@ge.com and any other GEA sourcing and purchasing personnel who worked with QM purchase orders, invoices and quality and conformance issues. The server will also be searched for e-mail communication between the aforementioned GEA employees and QM employees Scott Tubbs, s.tubbs@quadrant.us, Jeff Moore, j.moore@quadrant.us, Phil Pascoe, p.pascoe@quadrant.us, and Pierce Hackett, p.hackett@quadrant.us.

73.     These items will be searched for e-mails, documents, other correspondence and communications and any other media, meta data and media of native form for evidence of violations of  Defense Federal Acquisition Regulation Supplement (DFARS 48 C.F.R 252.225-7008) (Restriction on Specialty metals); Arms Export Control Act (AECA)( 22 U.S.C. § 2751-2799) and International Traffic in Arms Regulations (ITAR) (22 C.F.R. Parts 120-130), 18 U.S.C. §§ 286 and 287 (False Claims Conspiracy and False Claims Act); 18 U.S.C. §1343 (Wire Fraud); 18 U.S.C. 1001 (False Statements); 18 U.S.C. 371 (Conspiracy);  and 18 U.S.C. § 1519

29

USA-046401

(Destruction of Records) illegal manufacture of samarium cobalt magnets in China for use in the US Navy F-18 aircraft and the subsequent cover up of this fact by GEA and QM personnel.

## TECHNICAL TERMS

74.      Based on my training and experience, I use the following technical terms to convey the following meanings:

   a.   IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

   b.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

30

USA-046402

    c.  Storage medium: A storage medium is any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

75.    As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

76.    *Probable cause.*  I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

    a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a

31

computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e.  Based on actual inspection of other evidence related to this investigation, spreadsheets, financial records, invoices, I am aware that computer equipment was

32

USA-046404

used to generate, store, and print documents used in the false claims and ITAR violations scheme.   There is reason to believe that there is a computer system currently located on the PREMISES.

77.   *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

    a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.   Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record

USA-046405

information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer

34

USA-046406

accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

35

USA-046407

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f. I know that when an individual uses a computer, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a

36

USA-046408

storage medium for evidence of the crime.  The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The computer is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

78.     *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

    a.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence

USA-046409

of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

38

USA-046410

79.   *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## 80.   **CONCLUSION**

81.   I submit that this affidavit supports probable cause for a warrant to search the PREMISES, described in Attachment A and seize the items described in Attachment B.

### **REQUEST FOR SEALING**

82.   It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time.  Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums.  Premature disclosure of the contents

USA-046411

of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

James McCartney
Special Agent
Department of Defense
Naval Criminal Investigative Service

Subscribed and sworn to before me
on October 22, 2018:

COLIN H. LINDSAY
UNITED STATES MAGISTRATE JUDGE

40

USA-046412

# ATTACHMENT A

*Property to be searched*

The property to be searched is located at Quadrant Magnetics 2606 River Green Cir, Louisville, KY 40206, a one story building located on the south end of a plaza building in the River Green Industrial section of Louisville, KY.  The building is made up of brick and glass front with offices and conference room along the front of the building, a magnetizing laboratory in the middle of the building and a warehouse and loading dock on the rear of the office building. The property to be searched includes but is not limited to any and all IT storage devices, computers, cellular telephones, notes, papers and hard files located at the above address and inside the work space of all QM employees to include but is not limited to V.P. Phil Pascoe, V.P. Scott Tubbs, Pierce Hackett and Accountant Monica Pascoe. The property to be searched also includes but is not limited to QM Information Technology Server, computer, cellular telephone, external and internal storage devices issued to and or utilized by the above QM employees. The search area includes QM employee desks, drawers and cabinets surrounding the immediate area of their work stations at QM Louisville, KY.  The property to be searched includes the QM server that holds all correspondence, documents, storage media, files, e-mails, attachments, pdf's, documents, my documents, pst files, and desktop files, software, hardware to include meta data and data in its native form and other work products created and or received by QM employees.

USA-046413

**ATTACHMENT B**

*Property to be seized*

All records relating to violations of:

1. Arms Export Control Act (AECA) (22 U.S.C. § 2751-2799) and International Traffic in Arms Regulations (ITAR) (22 C.F.R. Parts 120-130);
2. Title 18 U.S.C. §§ 286 and 287 (False Claims Conspiracy and False Claims Act);
3. Title 18 U.S.C. § 1343 (Wire Fraud);
4. Title 18 U.S.C. § 1519 (Destruction of Records);
5. Title 18 U.S.C. § 1001 (False Statements or Documents);
6. Title 18 U.S.C. § 371 (Conspiracy);
7. Title 48 CFR 4.702 (Retention of Contractor records); and
8. Defense Federal Acquisition Regulation Supplement (DFARS 48 CFR 252.225-7008) (Restriction on Specialty metals);

those violations involving and Quadrant Magnetics (Including Quadrant Asia and its affiliates) employees Jeff Moore, Phil Pascoe, Scott Tubbs, and Pierce Hackett and any other QM corporate employees, managers or officials and GE Aviation (including GE, GE Aviation Systems, GE Aviation) employees Jay Babler, Pete Naud, Jeff Pirrone, Joe Rebeck and any other GEA corporate employees, managers or officials, implicated here for violations occurring form October 2007 to April 30, 2018. It is affiant's belief that October 2007 is the first full fiscal year GEAS was delivering the GCU to The Boeing Company and the U.S. Navy after the purchase of Smith Avionics.

    a. Any communication, e-mail, memo, mailing or other correspondence indicating documents, correspondence, specifications, drawings or other document or technology pertaining to samarium cobalt magnets mining, ordering, production, delivery or shipment were sent to a foreign entity in China, another criteria country

USA-046414

or other foreign entity in direct violation of AECA, ITAR and the restrictions on specialty metals.

b.   Any communication, e-mail, memo, mailing or other correspondence directing or responding to direction to destroy documents, correspondence, specifications and or drawings pertaining of the samarium cobalt magnets.  E-mails from employees of GEA to QM employees, including but not limited to, Jay BABLER to QM Vice President Scott TUBBS and or Pierce HACKETT directing them or others to sign certification letters and destroy or shred documents sent to QM China, the Chinese manufacturer of the samarium cobalt magnet.

c.   Records and information relating to a conspiracy to defraud U.S. Government and U.S. Navy's F-18 program and any other DOD weapons platform being supplied the samarium cobalt magnets by QM and GEA, and any other DOD contracts.

d.   Records and e-mail relating to the access of Jay Babler's GEA computer, to include software, hardware, telephone, e-mail, my documents, pst folders, and any other electronic device and hard document that documents Jay Babbler's activity involving the sourcing, production, ordering, manufacturing of samarium cobalt magnets for sale to and purchase by GEA for inclusion into the F-18 GCU.

e.   Records and information relating QM e-mails s.tubbs@quadrant.us, j.moore@quadrant.us, p.pascoe@quadrant.us, p.hackett@quadrant.us.

3

f.  Records and information relating General Electric e-mail accounts jay.babler@ge.com,peter.naud@ge.com,Joe.Rebeck@ge.com, Jeff.Pirrone@ge.com.

g.  Records and information relating to communications by or with QM employees Jeff Moore, Phil Pascoe, Scott Tubbs, and Pierce Hackett and any other QM corporate employees, managers or officials by GE Aviation (including GE, GE Aviation Systems, GE Aviation) employees Jay Babler, Pete Naud, Jeff Pirrone, Joe Rebeck and any other GEA corporate employees, managers or officials regarding Samarium Cobalt Magnets supplied to the F-18 GCU

h.  Records and information relating to malicious software;

i.  Records and information relating to the communications by GEA personnel including GE Aviation (including GE, GE Aviation Systems, GE Aviation) employees Jay Babler, Pete Naud, Jeff Pirrone, Joe Rebeck and any other GEA corporate employees, managers or officials, to QM to destroy any samarium cobalt magnet manufacturing information such as specifications, technical data, drawings, technical drawings, measurements etc. that was sent to China to assist in the manufacture of the magnets on behalf of DOD weapons systems.

j.  The search will be made for evidence of GE Aviation (including GE, GE Aviation Systems, GE Aviation) employees Jay Babler, Pete Naud, Jeff Pirrone, Joe Rebeck and any other GEA corporate employees, managers or officials directing the

4

USA-046416

deletion, removing, destroying, ex-filtrating data implicating GEA and QM in DFAR and ITAR violations suspected in this investigation. Specifically, any correspondence, e-mail or letter to QM from GEA ordering the destruction of any samarium cobalt magnet manufacturing information to include but not limited to magnet specifications, technical data, drawings, technical drawings, measurements etc. that was sent to China by QM to assist in the manufacture of the magnets on behalf of DOD weapons systems, and another other DOD contracts.

k. The computer will be seized in its entirety if necessary, however, if not, the computer will be imaged in place to recover all contents of the computer. These contents include but are not limited to all documents, photographs, spreadsheets, e-mails, attachments to e-mails, my documents, desk top, pst files and any other form of electronic data storage and communication, their meta data and in their native form. Correspondence includes but is not limited to instant messenger, snap chat, text, that QM employees Jeff Moore, Phil Pascoe, Scott Tubbs, and Pierce Hackett and any other QM corporate employees, managers or officials assigned or used computers containing data related to communications with sub-contractors, prime contractors and other GEA, QM and Boeing personnel.

l. BOEING/GEAS/QM diagrams, drawing and specifications for four part numbers:

1. B 36B423718P1 (all historical variations and revisions)

2. P17806P1 (all historical variations revisions)

5

       3. P19209P1 (all historical variations revisions)

       4. FP24018P1 (all historical variations revisions)

2.     Any computers or storage media on the premises that QM employees Jeff Moore, Phil Pascoe, Scott Tubbs, and Pierce Hackett and any other QM corporate employees, managers or officials have access to at the QM Louisville, KY facility or other affiliated networks/locations accessible from the QM Louisville, KY location and used as a means to commit the violations described above;

3.     Any magnets and magnet information about origin and compliance with FARS and DFARS.

4.     For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

      a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

      b.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence

6

of the presence or absence of security software designed to detect malicious

software;

c.   evidence of the lack of such malicious software;

d.   evidence indicating how and when the computer was accessed or used to

determine the chronological context of computer access, use, and events relating

to crime under investigation and to the computer user;

e.   evidence indicating the computer user's state of mind as it relates to the crime

under investigation;

f.   evidence of the attachment to the COMPUTER of other storage devices or similar

containers for electronic evidence;

g.   evidence of counter-forensic programs (and associated data) that are designed to

eliminate data from the COMPUTER;

h.   evidence of the times the COMPUTER was used;

i.   passwords, encryption keys, and other access devices that may be necessary to

access the COMPUTER;

j.   documentation and manuals that may be necessary to access the COMPUTER or

to conduct a forensic examination of the COMPUTER;

7

    k.  records of or information about Internet Protocol addresses used by the
COMPUTER;

    l.  records of or information about the COMPUTER's Internet activity, including
firewall logs, caches, browser history and cookies, "bookmarked" or "favorite"
web pages, search terms that the user entered into any Internet search engine, and
records of user-typed web addresses;

    m.  contextual information necessary to understand the evidence described in this
attachment.

    5.      Routers, modems, and network equipment used to connect computers to the
Internet.

As used above, the terms "records" and "information" includes all forms of creation or
storage, including any form of computer or electronic storage (such as hard disks or other media
that can store data); any handmade form (such as writing); any mechanical form (such as printing
or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives,
videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical,
or other high speed data processing devices performing logical, arithmetic, or storage functions,
including desktop computers, notebook computers, mobile phones, tablets, server computers, and
network hardware.

8

USA-046420

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

USA-046421