# EXHIBIT 5

AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Northern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>ONE PHYSICAL LOCATION FOR INVESTIGATION OF<br>18 U.S.C. § 1343 AND OTHER OFFENSES | )<br>)<br>)<br>)<br>)<br>)     Case No. CR 22-71457-SVK |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

     I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

   See Attachment A-2

located in the     Northern     District of     California    , there is now concealed *(identify the person or describe the property to be seized)*:

   See Attachment  B

    The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

    ☑ evidence of a crime;

    ❑ contraband, fruits of crime, or other items illegally possessed;

    ❑ property designed for use, intended for use, or used in committing a crime;

    ❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1343; 1001;<br>1546; 371; and 22 U.S.C. §<br>2778 | WIRE FRAUD; FALSE STATEMENTS; VISA FRAUD; CONSPIRACY; AND<br>ARMS EXPORT CONTROL ACT AND INTERNATINOAL TRAFFICKING IN<br>ARMS REGULATIONS VIOLATIONS |

    The application is based on these facts:

  See Affidavit in Support of Search Warrant by Kailea Bogner, FBI Special Agent

    ☑ Continued on the attached sheet.

    ❑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under
    18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
/S/ Kailea Bogner/SvK
*Applicant's  signature*

_____
Kailea Bogner, Special Agent, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means)*.

Date:     11/07/2022

                               *Judge's signature*

City and state:  San Jose, California                Hon. Susan van Keulen, U.S. Magistrate Judge
                                                   *Printed name and title*

**<u>AFFIDAVIT IN SUPPORT OF APPLICATION FOR A SEARCH WARRANT</u>**

I, Kailea Bogner, a Special Agent of the Federal Bureau of Investigation, being duly sworn, hereby state as follows:

**<u>INTRODUCTION</u>**

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the following premises located at:

  a. 6425 Meadowbrush Circle, San Diego, CA 92130 (Subject Residence #1);
  b. 5901 Ladys Secret Court, Rancho Del Mar, California 92067 (Subject Residence #2);
  c. **3500 Palmilla Drive, Unit 1026, San Jose, California 95134 (Subject Residence #3)**

(collectively the "**Subject Residences**")

  d. 5405 Morehouse Drive, Suite 320, San Diego, CA 92121 (Business Address #1);
  e. 5186 Carroll Canyon Road, San Diego, California 92121 (Business Address #2);
  f. **1120 Ringwood Court, San Jose, California 95131(Business Address #3)**

(collectively the "**Business Addresses**")

The search locations are further described in the following paragraphs and in Attachment A. This affidavit and application for a search warrant seeks authority to search **Subject Residence #3** and **Business Addresses #3**, including electronic devices, for the items, things, and property described in Attachment B. Seized electronic devices will be searched according to the protocol set forth in Attachment C.

2.     As set forth herein, there is probable cause to believe that the **Subject Residence #3** and **Business Addresses #3** contain evidence, fruits, and/or instrumentalities of violations of 18 U.S.C. § 1343 (wire fraud); 22 U.S.C. § 2778 and 22 C.F.R. § 127.1 (Armed Export Control Act (AECA) and International Traffic in Arms Regulations (ITAR) violations); 48 C.F.R.

1

§ 252.225-7008 (DFAR violations); 18 U.S.C. § 371 (conspiracy); and 18 U.S.C. § 1546 (fraud and misuse of visa, permits, and other documents).

3.      The facts in this affidavit come from my personal observations, my training and experience, my review of documents, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## AFFIANT BACKGROUND

4.      I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, § 1832.

5.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since August 2021.  I presently am assigned to work a variety of criminal and national security matters, including the investigation of violent crimes and financial crimes. I have received advanced training in national security matters.

6.      During my training at the FBI Academy, Quantico, Virginia, I have received training in a variety of investigative and legal matters, including the topics of Fourth Amendment searches, the drafting of search warrant affidavits, and probable cause.

7.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1343 (wire fraud); 22 U.S.C. § 2778 and 22 C.F.R. § 127.1 (AECA and ITAR violations); 48 C.F.R. § 252.225-7008 (DFAR violations); 18 U.S.C. § 371 (conspiracy); and 18 U.S.C. § 1546 (fraud and misuse of visa, permits and other documents) have been committed by Hang "Cody" Sun, Jiang "John" Wang, and

CongCong "Michelle" Qian. There is also probable cause to search the premises described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes as described in Attachment B.

**SUMMARY OF PROBABLE CAUSE FOR SUBJECT RESIDENCE #3**

8.       CongCong "Michelle" Qian is the beneficiary of multiple Form I-129, Petition for a Nonimmigrant Worker Petitions submitted to United States Citizenship and Immigration Services (USCIS) in order to obtain or extend her visa immigration benefits.  These petitions claimed that she lived and worked in Louisville, Kentucky for Quadrant Magnetics.  The investigation showed that at a time Qian resided in Alabama and California it was represented that she worked for Quadrant Magnetics in Louisville, Kentucky during the period of the petitions. The petitions also claim that Qian held a supervisory position at Quadrant Magnetics to meet the eligibility requirements for the particular visa.  Conversations with Quadrant Magnetics employees indicated that Qian did not perform supervisory functions over them in contradiction to statements on the petitions.  During the time period of some of the petitions, Qian resided in Alabama and San Jose, California but her petitions (including supporting documentation), IRS income records, and filed tax returns created the false impression that she lived, resided, and worked in Louisville, Kentucky to maintain eligibility for her visa.  It is believed that she maintains visa records, personal financial information, and information related to tax records in her residence, that is evidence of violations of 18 U.S.C. § 371 (conspiracy) and 18 U.S.C. § 1546 (fraud and misuse of visa, permits and other documents).  In addition, Qian worked for Quadrant Magnetics, LLC, in Louisville, Kentucky in 2014.  She had access to a shared server at the business containing ITAR marked technical data.  She also sent and received ITAR marked drawings as a non-US person, which is a violation of the AECA and ITAR regulations.  She also

sent an email containing ITAR restricted information, including technical data, to China. There is probable cause to believe there is evidence of violations of 18 U.S.C. § 1343 (wire fraud); 22 U.S.C. § 2778 and 22 C.F.R. § 127.1 (AECA and ITAR violations); 48 C.F.R. § 252.225-7008 (DFAR violations); 18 U.S.C. § 371 (conspiracy), in her residence.

9.      Qian resides at **Subject Residence #3** according to statements made to USCIS officers, vehicle registration, USPS mail confirmation, and physical surveillance. During the COVID-19 pandemic, Quadrant employees worked from home. In October 2022, Qian was observed returned to her home in the afternoon after leaving work. Qian told USCIS officers that her hours are flexible and Phil Pascoe, an executive for Quadrant Magnetics, stated that Qian works offsite.

### SUMMARY OF PROBABLE CAUSE FOR BUSINESS ADDRESS #3

10.      **Business Address #3** is the location for Quadrant Solutions, Inc., according to the California Secretary of State's website, physical surveillance, emails between Quadrant employments and the Quadrant website. Physical surveillance, employee statements, and Qian's statements show that Qian currently works at **Business Address #3**. This location is a Quadrant entity that is interconnected with Quadrant Magnetics, LLC, according to organizational charts. **Business Address #3** is considered the research and development center for Quadrant according to the Quadrant website and a prior USCIS site visit.

### BACKGROUND OF INDIVIDUALS AND INTERCONNECTED BUSINESSES

11.      The investigation of Quadrant Magnetics, associated companies, and employees began with an investigation by the Defense Criminal Investigative Services (DCIS) and the Naval Criminal Investigative Service (NCIS) in October 2017. The DCIS/NCIS investigation revealed Quadrant Magnetics sold a Chinese magnetized samarium cobalt alloy magnet, intended for use

in a generator converter unit (GCU), to GE Aviation Systems, LLC (GEAS). Defense Federal Acquisition Regulation Supplement (DFARS) 48 C.F.R. § 252.225-7008 requires magnets be melted and magnetized in the United States rather than in China. The FBI joined the investigation in March 2020.

12.     The main subject of the investigation is Sun. Sun has numerous companies established in China.  In 1999, Sun started his first business in China, X-Mag, Inc. which has grown into multiple manufacturing and engineering companies in China which specialize in the magnet industry. Sun also owns Hangzhou Foresee Group Holding Co., Ltd, which has numerous subsidiaries based in China. In 2001, Sun established Quadrant Magnetics, LLC, (Quadrant) in Louisville, Kentucky, and subsequently other Quadrant entities throughout the United States. On or about January 3, 2015, Sun entered the United States and was authorized to work as part of a "specialty business", and subsequently became a lawful permanent resident.  Sun is currently in the United States with an E51 visa (investor pilot program) which was approved on January 23, 2020, and as of August 23, 2022 has a current application in process to become a naturalized United States citizen.  Sun resides at Subject Residence #2 - 5901 Ladys Secret Court, Rancho Del Mar, California. Sun's magnetic businesses in the United States are largely variations of the "Quadrant" name. Quadrant Magnetics, LLC was incorporated in 2001, Quadrant Solutions, Inc., was established in 2007 and Quadrant International, Inc., was established in 2016. Sun has additional smaller entities within the United States as well.

13.     Jiang "John" Wang, another primary subject, is an accountant and Chief Financial Officer (CFO) for multiple companies owned by Sun. Wang founded an accounting firm, D&W Accounting Firm, located at Business Address #1 - 5405 Morehouse Drive, Suite 320, San Diego, California. Wang is also the CFO and registered agent of Quadrant International, Inc. Wang is

also the secretary/director of Quadrant Solutions, Inc. and manager of Quadrant Magnetics, LLC. The address of Wang's accounting firm is listed for various associated business entities, to include Quadrant International, Inc., Quadrant Electromobility, Inc., and Quadrant Solutions, Inc. Wang provides accounting services for Sun's personal and business financial accounts and is Sun's tax preparer.  Wang resides at Subject Residence #1 - 6425 Meadowbrush Circle, San Diego, CA 92130.

14.     Quadrant International, Inc. is a California corporation and, according to California Secretary of State records, is located at Business Address #1 - 5405 Morehouse Drive, Suite 320, San Diego, California - the same address for Wang's accounting firm, D&W Accounting Firm.  Quadrant International is the parent company of the following subsidiaries: Quadrant Solutions, Inc., Quadrant Magnetics and Lab Magnetics, among other entities. Quadrant's San Diego, California office is located at 5186 Carroll Canyon Road, San Diego, CA. According to the Quadrant website (www.quadrant.us), in 2021, "Quadrant transitioned into a 10,000 square foot facility located at 5186 Carroll Canyon Road, San Diego, CA," hereafter Business Address #2. Quadrant Magnetics, LLC is located in Louisville, Kentucky according to business filing with the Kentucky Secretary of State's Office.  Quadrant Solutions, Inc. is located in San Jose, California at **Business Address #3** - 1120 Ringwood Court, San Jose, California 95131, according to business filing with the California Secretary of State's website.  As of November 2021, Lab Magnetics is located in San Jose, CA according to employees located at their facility at 1120 Ringwood Court, San Jose, CA (**Business Address #3**) and is housed at the same address as Quadrant Solutions, Inc. All the above referenced entities will be hereafter referred to as Quadrant, unless specification is necessary. Below is an organizational chart that

was attained through a March 30, 2022 search warrant for emails for Quadrant employee email accounts, which was served on Microsoft Corporation.[1]



15.     Quadrant Magnetics, LLC, has a listed address of 12500 Plantside Drive, Louisville, Kentucky. Quadrant Magnetics was previously located at 2606 River Green Circle, Louisville, KY 40206. Quadrant Magnetics was located at this location as recent as October 2018. According to the Quadrant website, the new facility was constructed in November 2018. Open

---

[1] This organizational chart identifies some employees that are not subjects of the investigation. The organizational chart is included in its entirety for context of the organizational structure of the Quadrant entities.

record news articles detail the new facility for Quadrant Magnetics is located at 12500 Plantside Drive, Louisville, KY and was fully constructed by February 2019. Wang is listed as the manager for Quadrant Magnetics with the provided address of Business Address #1 - 5405 Morehouse Drive, Suite. 320, San Diego, California. Quadrant Solutions, Inc., has the same listed address for Wang as the registered agent.

16.     CongCong "Michelle" Qian, another primary subject, is a Chinese citizen and is a purported employee of Quadrant Magnetics, LLC according to documents filed with USCIS, but is listed as the Chief Operating Officer for Quadrant International according to an organizational chart dated January 22, 2022, as discussed above. Qian's LinkedIn profile lists her as Chief Operation Officer for Quadrant Magnetics since October 2021. Qian's current address is **Subject Residence #3** located at 3500 Palmilla Drive, Unit 1026, San Jose, California 95134. Qian has worked in the magnet industry for the majority of her career, working as Vice President of Sales and Marketing for X-Mag, Inc., prior to allegedly working for Quadrant Magnetics, LLC. Qian is currently in the United States on an L-1A nonimmigrant visa obtained based on an I-129 Petition from Quadrant Magnetics.

17.     Phil Pascoe was the Vice President of Operations at Quadrant Magnetics, LLC. In October 2018, Phil Pascoe was promoted to President.

18.     Scott Tubbs was Vice President of Operations at Quadrant Magnetics, LLC. As of January 2022, Tubbs is the Senior Director, Internal Sales for Quadrant Magnetics, LLC.

19.     Monica Pascoe was the accounting manager for Quadrant Magnetics, LLC. As of January 2022, Pascoe is the Director, Account, Operations for Quadrant Magnetics, LLC.

20.     Michael Brand is the President of Quadrant International as indicated by an organization chart dated January 2022. Brand previously was President of SM Magnetics, a

Quadrant entity located in Pelham, AL according to an interview with Phil Pascoe in August 2021 by USCIS officers.

## PROBABLE CAUSE

21.     Qian is a Chinese national and is the beneficiary of multiple Form I-129, Petitions for a Nonimmigrant Worker, submitted to USCIS by Quadrant Magnetics in order to obtain or extend her visa immigration benefits.  She participated in a conspiracy to secure and attempt to secure fraudulently obtained nonimmigrant visas for Qian under the L-1 nonimmigrant visa program, by knowingly making or presenting false statements and documents containing false statements with respect to material facts in visa applications so that Qian could obtain and extend such visas and enter into and remain in the United States.  Quadrant Magnetics, through its authorized signatory, John Wang, aided and abetted by others, circumvented the requirements of the L-1 nonimmigrant visa program by petitioning Qian from China by submitting visa applications to USCIS knowing that such applications contained false statements and submitting documents containing false statements under penalty of perjury with respect to material facts in the visa applications, specifically material false statements relating to Qian's residential address, work location, licensure requirement for access to technology or technical data regulated under Export Administration Regulations (EAR) and the International Traffic in Arms Regulations (ITAR), and management responsibilities.  Qian has resided at **Subject Residence #3** since late 2017 and it is believed that her residence and any digital devices therein will have evidence of a conspiracy to commit visa fraud that was occurring at this time, in particular because part of the fraud involved obfuscating the true nature of Qian's residence and work location.

//

//

**A.    Probable Cause for Violations of Title 18 United States Code § 371 (conspiracy) and § 1546 (fraud and misuse of visa, permits and other documents).**

22.    Section l(b) of Public Law 91-225 of April 7, 1970, created a nonimmigrant visa ("NIV") classification at Immigration and Naturalization Act § 10l(a)(15)(L) for intra-company transferees.

23.    Title 8 of Code of Federal Regulations Part 214 describes the L1 classification under Section 10l(a)(15)(L) of the Immigration and Naturalization Act as providing that an alien who within the preceding three years has been employed abroad for one continuous year by a qualifying organization may be admitted to the United States to be employed by a parent, branch, affiliate, or subsidiary of that employer in a managerial or executive capacity, or in a position requiring specialized knowledge. An alien transferred to the United States under this nonimmigrant classification is referred to as an intra-company transferee and the organization which seeks the classification of an alien as an intra-company transferee is referred to as the petitioner.

24.    The L-1A nonimmigrant classification enables a United States employer to transfer an executive or manager from one of its affiliated foreign offices to one of its offices in the United States. This classification also enables a foreign company which does not yet have an affiliated United States office to send an executive or manager to the United States with the purpose of establishing one.  To qualify for L-1A classification, the employer must: (1) have a qualifying relationship with a foreign company (parent company, branch, subsidiary, or affiliate, collectively referred to as qualifying organizations); and (2) currently be, or will be, doing business as an employer in the United States and in at least one other country directly or through a qualifying organization for the duration of the beneficiary's stay in the United States as an L-1. While the business must be viable, there is no requirement that it be engaged in international trade.

Doing business means the regular, systematic, and continuous provision of goods and/or services by a qualifying organization and does not include the mere presence of an agent or office of the qualifying organization in the United States and abroad.  To qualify, the named employee must also: (1) generally have been working for a qualifying organization abroad for one continuous year within the three years immediately preceding his or her admission to the United States; and (2) be seeking to enter the United States to provide service in an executive or managerial capacity for a branch of the same employer or one of its qualifying organizations.  Executive capacity generally refers to the employee's ability to make decisions of wide latitude without much oversight. Managerial capacity generally refers to the ability of the employee to supervise and control the work of professional employees and to manage the organization, or a department, subdivision, function, or component of the organization.  It may also refer to the employee's ability to manage an essential function of the organization at a high level, without direct supervision of others.

25.   The L-1B nonimmigrant classification enables a U.S. employer to transfer a professional employee with specialized knowledge relating to the organization's interests from one of its affiliated foreign offices to one of its offices in the United States. This classification also enables a foreign company which does not yet have an affiliated U.S. office to send a specialized knowledge employee to the United States to help establish one.  To qualify for L-1B classification in this category, the employer must: (1) have a qualifying relationship with a foreign company (parent company, branch, subsidiary, or affiliate, collectively referred to as qualifying organizations); and (2) currently be, or will be, doing business as an employer in the United States and in at least one other country directly or through a qualifying organization for the duration of the beneficiary's stay in the United States as an L-1B.  To qualify, the named employee must also: (1) have been working for a qualifying organization abroad for one continuous year within the

three years immediately before your admission to the United States; and (2) be seeking to enter the United States to provide services in a specialized knowledge capacity to a branch of the same employer or one of its qualifying organizations. Specialized knowledge either means knowledge the employee has about the petitioning organization's product, service, research, equipment, techniques, management, or other interests and its application in international markets, or an advanced level of knowledge or expertise in the organization's processes and procedures.

26.    To apply for an L-1 visa (either under L1-A or L1-B), the petitioner is required to file a Form 1-129, Petition for Nonimmigrant Worker, with the USCIS which must be petitioned in conjunction with the services of the L-1 nonimmigrant, and not filed more than one year before the L-1 nonimmigrant begins employment. The petitioner is required to submit supporting documentation with the Form 1-129 including sufficient evidence to establish that the petitioner meets all requirements to qualify for the L1 classification requested. Once USCIS approves the petition, the beneficiary applies for a visa at a United States consulate overseas, or, if already in the United States, the beneficiary's status is changed and/or extended as requested in the petition.

27.    On or about December 4, 2013, Qian, in connection with her B1/B2 business/tourist visa, completed a DS-160 (Application for a Non-Immigrant Visa) document indicating that she was traveling to the United States for business/tourism, that she would be staying at 800 East Main St., Louisville, Kentucky 40206 (the address where Quadrant Magnetics was located at that time), and that her intended length of stay in the United States was seven days. She was issued a B1 visa on January 15, 2014.

28.    On or about April 21, 2014, Quadrant Magnetics employee Phil Pascoe executed a 12-month lease agreement on behalf of Quadrant Magnetics for property located at Waterside at Riverpark Place Apartments Community, 1500 River Shore Drive, Louisville, Kentucky 40206

listing Qian as the occupant.  The next day, April 22, 2014, Qian came to the United States from China on her B1 visa.

29.     During her time in the United States on a B1/B2 business/tourist visa, in particular, on June 19, 2014, Qian (m.qian@quadrantmagnetics.com) was given access to ITAR restricted technical data.  On June 19, 2014, Pierce Hackett, Technical Sales, Quadrant Magnetics sent an email to Phil Pascoe, p.pascoe@quadrantmagnetics.com and cc: to Scott Tubbs, s.tubbs@quadrantmagnetics.com.  The subject line is titled: Re: RFQ KY1566 P/N 6000U-1002 - General Dynamics, with four attachments including one attachment with International Traffic in Arms Regulations (ITAR) restricted technical data, in particular an ITAR restricted drawing for PN 6000U-1002.  Later, on June 19, Qian responded with a quote relating to P/N 6000U-1002 - General Dynamics.

30.     In or about July 2014, Quadrant Magnetics LLC through its representative Bob Zoglmann (now deceased), caused a Form I-129, Petition for a Nonimmigrant Worker (EAC1423852572) ("July 2014 I-129 Petition") requesting L-1B classification for beneficiary Qian to be prepared and submitted to USCIS requesting a non-immigrant visa L-1B allowing her to work for Quadrant Magnetics in Louisville, Kentucky. Part 6 of the July 2014 I-129 Petition certified under penalty of perjury that "With respect to the technology or technical data the petitioner will release or otherwise provide access to the beneficiary, the petitioner certifies that it has reviewed the Export Administration Regulations (EAR) and the ITAR and has determined that: 1. A license is not required from either the U.S. Department of Commerce or the U.S. Department of State to release such technology or technical data to the foreign person."  The magnet product numbers (discussed in detail later in affidavit) sold by Quadrant are considered to be designated as defense articles under the ITAR and required to have a license prior to the

export from the United States. The July 2014 I-129 Petition was approved by USCIS on October 3, 2014, with a validity date of October 3, 2014 to August 17, 2017.

31.     On May 4, 2015, Zoglmann emailed Qian asking Qian for a "rough draft" for the information for him to provide to attorneys to process the L-1A visa.[2]  He requested her "Company work charts and where you fit into the chart, with responsibilities"; "Job Description for each company showing Management Executive level, with budget responsibilities, people and budgets you are in charge of"; and "Other information about your jobs."  Qian responded the same day indicating she was planning to discuss with Sun when she was back from China next month.

32.     Real estate records confirm that in or about September 2015, Qian purchased the property located at 4554 Lake Valley Drive, Birmingham, Alabama 35244.

33.     In addition, Monica Pascoe prepared a "Notice of intent to vacate" indicating that Qian would vacate the apartment at Waterside at Riverpark Place Apartments Community, 1500 River Shore Drive, Louisville, Kentucky 40206 in February 2016 indicating that Qian would primarily be "out of state." Qian signed this document.  USCIS officers interviewed S.H., leasing specialist with Waterside at Riverpark Place in August 2021 who verified, through the company's computerized records, that Qian vacated the apartment at 1500 River Shore Drive, Louisville, Kentucky 40206 on February 28, 2016.

34.     On December 2, 2015, Sun sent an email to Phil Pascoe, cc'ing Bob Zoglmann stating that Sun had been trying to move non-U.S. person Marieta V. Amante (Maya) to the

---

[2] While reviewing the digital information acquired through the federal search warrants, investigators located email communications with numerous senior members of Quadrant pertaining to the visa renewal process for CongCong Qian "Michelle" and other foreign nationals.  The emails contained evidence of members of Quadrant conspiring to commit visa fraud.  The emails from Quadrant employees originated from email addresses ending in "quadrantmagnetics.com".

United States to take care of Sun's family.  Sun continued stating to Pascoe that the first step is to get her a tourist visa with a sponsor and to do this Sun needed Pascoe to provide him with an invitation letter from Quadrant Magnetics on official Quadrant Magnetics letterhead.  Sun stressed to Pascoe that the letter must contain her full name, passport number and purpose of the visit and must state tour and training.  Additionally, Sun requested Pascoe to send a copy of the Quadrant's business permit.

35.     On December 2, 2015, Pascoe responded to Sun cc'ing Zoglmann with a letter of invitation on official Quadrant letterhead stating, "In an effort to intensify and maintain our international business relationship and growth, Quadrant would like to extend an invitation to non-U.S. person Marieta V. Amante of the Philippines (passport number EC1973226) to visit Quadrant for product training and facilities tour.  All expenditures while visiting the USA will be covered by Phil Pascoe and Quadrant."  Additionally, Pascoe attached a copy of the Kentucky Quadrant business permit.

36.     On December 18, 2015, Qian sent an email to Zoglmann stating the following: "Cody told me that you would continue helping me to get my L1-A visa before applying for a green card.  I am writing to follow up the process and documents which attorneys need from my side, because now I need an executive or managerial position at Quadrant Magnetics or equivalent roles under Quadrant International holding company, whatever works for the L1-A category.  I may also request your help to draft the job description for my management position."

37.     On December 20, 2015, Sun sent an email to Zoglmann cc'ing Qian stating the following: "Bob how about we position Michelle in Quadrant International, as vice president of international sales?  Have a nice day."

38.     On or about February 8, 2016, Sun sent an email to Monica Pascoe cc'ing Wang and Zoglmann, instructing Monica Pascoe to pay Qian $10,000 per month from Quadrant Magnetics in Louisville from January 2016 and invoice a subsidiary company of Quadrant Magnetics called SM Magnetics located in Alabama.

39.     On or about February 10, 2016, Wang sent an email to Sun and Monica Pascoe stating that he "spoke with Bob [Zoglmann] about Michelle's [Qian] situation today; and we felt that it would not work to move her payroll to new QI [Quadrant International] since her visa is sponsored by or related to QM [Quadrant Magnetics].  So we'll probably keep her payroll that way until we find some other solution."

40.     On February 11, 2016, Monica Brashear responded with an email to Wang, Sun, and Zoglmann saying "I also agree this is best for now given her Visa status with QM. We will continue with her payroll and invoice SMM accordingly. Her salary increase has been implemented as of Feb 1-15 pay period. The difference for January will be spread over the two pay periods in February."

41.     Later on February 11, 2016, Sun responded in an email cc'ing Wang saying "Hi Monica, Ok, let's do this."

42.     USCIS records reflect that upon her arrival back in the United States on a flight from China on February 16, 2016, Qian completed an I-94 (Arrival/Departure Form) indicating a destination address of 4554 Lake Valley Drive, Birmingham, Alabama 35244.

43.     On or about February 25, 2016, Monica Pascoe sent an email to Wang seeking advice regarding Qian's payroll taxes stating "[s]ince the apartment lease is up at the end of this month and she is living in AL [Alabama], we should begin withholding taxes as it related to AL [Alabama].  It is no longer appropriate for me to withhold Louisville resident and KY [Kentucky]

state taxes beginning March 1, since she no longer has a KY [Kentucky] address.  I have asked for her current address several times, and she still has not given it to me.  I think she is reluctant because she's afraid it will affect her Visa."

44.     Later, on or about February 25, 2016, Wang wrote an email responding to Monica Pascoe cc'ing Sun instructing Monica Pascoe to use Quadrant Magnetics' corporate address in Kentucky as the residential address for Qian and to continue to withhold Louisville and Kentucky taxes.

45.     On February 29, 2016, Qian emailed a response to Wang cc'ing Sun stating the following: "Thank you, I have attached my W-2 and 1095-B from within this email, basically I have two requests. 1) Please help to file and do my tax for 2015.  2) Do I need to keep or change the address for tax purposes but do not want to mess up my current L-1B visa.  Officially I am working for Quadrant in Louisville with a L-1B visa position until August 2017, So I am in Quadrant payroll now.  I had a living address in Louisville until 2/28/16, but I am living in Alabama now.  Monica Broshears [Pascoe] at Quadrant told me that I have to change my address for tax purposes from March on.  I am not sure if that will mess up my visa or it is a must to change the address from a tax point of view, hopefully not will rely on your suggestion."

46.     On February 29, 2016, Michael Brand sent an email to Sun stating the following: "Michelle [Qian] is asking me about her taxes this year.  "Would it be ok if John [Wang] did her taxes this year?  I am not a tax person and would not want to get them wrong.  If he can do them what he would charge her?  I think her taxes would be fairly easy, but again, I'm not a tax person so I don't know for sure."

47.     On February 29, 2016, Sun sent an email to Wang cc'ing Qian stating the following: "Michelle Qian is currently working under Michael Brand at SMM [SM Magnetics

located in Alabama] and she is still on a working visa.  I guess she needs some help to file her taxes, do you have time?  If you think it's too easy to use your expertise, would you please share some guidelines with her?  I am copying this email to Michelle.

48.      On February 29, 2016, Wang emailed a response to Sun cc'ing Qian stating the following: "Sure Cody, I will prepare her returns (free of charge).  Michelle, feel free to call me so we can discuss and have your returns filed."

49.      On February 29, 2016, Wang emailed a response back to Qian stating the following: "Got it, no problem.  Cody told me about your situation.  As to your address on payroll, I have told Monica to keep it in Louisville (use Quadrant's) as we don't want the change of address to cause any issues with your L1 status.  To prepare your 2015 returns, I'll also need your date of birth and a copy of 2014 returns."

50.      On October 5, 2016, Wang sent an email to Qian stating the following: "Hi Michelle hope all is well.  I just meet with Manqi about your L-1 application.  Manqi mentioned that she'd follow up with you as some of the documents from China may need updated.  I have most of the documents ready, except a couple of items pending from state and local government agencies.  I'd suggest emailing her asking if she needs anything else from you if you don't receive such email by this Friday.  What we have discussed is to submit the application before the end of the month.  As for Cody, he told me that we're going to pay extra fees to expedite the process. We should expect to have the results back within November.  I'm heading to Louisville this Sunday, one of the conversations I'm going to have is going to be with Phil (Pascoe) and Monica (Pascoe) to keep an eye on potential onsite visit from immigration agency (Quadrant is the previous sponsor) and make sure they provide the appropriate info about your whereabouts.  We'll do the same in San Diego office likely in December and January.  Hopefully you will get L-1A

18

visa soon."

51.    The W-2 issued by Quadrant Magnetics to Qian for tax year 2016 lists her address as 2606 River Green Circle, Louisville, Kentucky 40206.  This address was the corporate address for Quadrant Magnetics at that time.

52.    The 2016 1040 prepared by Wang and filed with the Internal Revenue Service (IRS) Qian listed Qian's address as 2606 River Green Circle, Louisville, Kentucky 40206.

53.    In or about November 2016, Quadrant International, through its representative, caused a Form I-129, Petition for a Nonimmigrant Worker ("November 2016 I-129 Petition") requesting L-1A classification for Qian to be prepared and submitted to USCIS.  The November 2016 I-129 Petition was denied by USCIS.

54.    In or about January 2017, Quadrant Solutions Incorporated, through its representative Wang, caused a Form I-129, Petition for a Nonimmigrant Worker ("January 2017 I-129 Petition") requesting L-1A classification for Qian to be prepared and submitted to USCIS. The January 2017 I-129 Petition was denied by USCIS.

55.    A few months later in or about August 2017, just before Qian's L-1B visa was set to expire, Quadrant Magnetics, through its representative Wang, caused a Form I-129, Petition for a Nonimmigrant Worker ("August 2017 I-129 Petition") to be prepared and submitted to USCIS seeking to extend Qian's stay in the United States on her L-1B visa sponsored by Quadrant Magnetics. Wang signed the August 2017 I-129 Petition certifying "under penalty of perjury that [he] reviewed this petition and that all of the information contained in the petition, including all responses to specific questions, and in the supporting documents, is complete, true, and correct." The August 2017 I-129 Petition indicated that Qian's residential address was Waterside at Riverplace Park, 1500 River Shore Drive, Louisville, Kentucky 40206 when in fact, she had

vacated that address in February 2016 and had purchased a residence in Alabama. The August 2017 I-129 indicated that Qian would be working at Quadrant Magnetics located at 2606 River Green Circle, Louisville, Kentucky 40206 despite the fact she was living in Alabama at the time and that she would be supervising Quadrant Magnetics employees Kevin Fautz and Kimberly Morrison. The August 2017 I-129 was approved on August 4, 2017.

56.     In connection with the August 2017 I-129 Petition, Qian applied for her L-1B visa by completing a Form DS-160 for the United States Department of State on or about August 27, 2017. On the Form DS-160, Qian declared under penalty of perjury that the address she planned to stay in the United States was "2606 River Green Circle, Louisville, Kentucky 40206." This address was the corporate address for Quadrant Magnetics at that time.

57.     Contrary to what was submitted on the August 2017 I-129 Petition, a W-2 issued by Quadrant Magnetics to Qian for tax year 2017 falsely listed her address as 2606 River Green Circle, Louisville, Kentucky 40206. In addition, the 2017 1040 prepared by Wang with D&W CPAs Inc. (Business Address #1) and filed with the IRS on behalf of Qian, listed Qian's address as 2606 River Green Circle, Louisville, Kentucky 40206. This address was the corporate address for Quadrant Magnetics at that time.

58.     In or around November 2017, Qian sold the property located at 4554 Lake Valley Drive, Birmingham, Alabama 35244. The address listed for Qian on the warranty deed is **Subject Residence #3** - 3500 Palmilla Drive. Apt. 1026, San Jose, California 95134.

59.     On February 21, 2018, Wang emailed Monica Pascoe copying Jeff Moore (president of Quadrant Solutions- San Jose, CA) about how to account for payment of Qian stating "To better reflect financial positions of QM and also QS, we will have QS [Quadrant Solutions] to reimburse payroll expenses for Michelle, which was currently on QM [Quadrant Magnetics].

20

Her total monthly payroll expense is $12,919.13" QS will transfer monthly payment to QM for Qian's salary."

60.    A W-2 issued by Quadrant Magnetics to Qian for tax year 2018 listed her address as 12500 Plantside Dr. Louisville, Kentucky 40206.  In addition, the 2018 1040 prepared by Wang with D&W CPAs Inc. (Business Address #1) and filed with the IRS on behalf of Qian, listed Qian's address as 12500 Plantside Dr. Louisville, Kentucky 40206.  This address was the corporate address for Quadrant Magnetics at that time.

61.    On October 1, 2018, Sun sent an email regarding "Announcement of Quadrant Changes" which included an attachment "Announcement of Quadrant Changes" indicating that Qian has been promoted to "Vice President of Sales and Marketing for Quadrant International." Quadrant International is a California corporation located at Business Address #1 - 5405 Morehouse Drive, Suite 320, San Diego, California.  This is different than what was listed on the August 2017 Petition indicating that Qian was the Engineering, Sales, and Quality Control Manager at Quadrant Magnetics in Louisville, Kentucky.

62.    Income reporting documents for Qian showed that she liquidated investment accounts in November and December of 2018.  The address for the reporting documents from JP Morgan showed Qian's address at **Subject Residence #3** - 3500 Palmilla Dr. Unit 1026, San Jose, California.

63.    In or about February 2019, Quadrant Magnetics through its representative Wang caused a Form I-129, Petition for a Nonimmigrant Worker ("2019 I-129 Petition") to be prepared and submitted to USCIS seeking to change Qian's visa classification from L-1B (specialized knowledge) to L-1A (executive or management).  Wang signed the 2019 I-129 Petition certifying "under penalty of perjury that [he] reviewed this petition and that all of the information contained

21

in the petition, including all responses to specific questions, and in the supporting documents, is complete, true, and correct." The 2019 I-129 Petition indicated that Qian's residential address was Waterside at Riverplace Park, 1500 River Shore Drive, Louisville, Kentucky 40206 when in fact, she had vacated that address in February 2016 and appeared to be residing in California.  The 2019 I-129 indicated that Qian would be working at Quadrant Magnetics located at 2606 River Green Circle, Louisville, Kentucky 40206 despite the fact she was living in California at the time. The 2019 I-129 Petition and accompanying documents also indicated that Qian would be directly managing Quadrant Magnetics employees Kevin Fautz, Chet First, Kimberly Morrison, and Paul Murray.



The 2019 I-129 Petition was approved by USCIS on May 10, 2019, with a validity date of August 18, 2017 to May 6, 2020.

64.    In connection with the 2019 I-129 Petition, Qian applied for her L-1A visa by completing a Form DS-160 for the United States Department of State on or about August 3, 2019. On the Form DS-160, Qian declared under penalty of perjury that the address she planned to stay in the United States was "5404 Merribrook Lane, Prospect Kentucky 40059" and that her present work was at Quadrant Magnetics located at "2606 River Green Circle, Louisville, KY 40206."

65.    The W-2 issued by Quadrant Magnetics to Qian for tax year 2019 lists her address as 12500 Plantside Dr. Louisville, Kentucky 40299.  The 2019 1040 prepared by Wang with D&W CPAs Inc. (Business Address #1) and filed with the IRS on behalf of Qian also lists her address as 12500 Plantside Dr. Louisville, Kentucky 40299.  This address was a corporate address for Quadrant Magnetics at this time.

66.    In or about May 2020, Quadrant Magnetics through its representative Wang caused a Form I-129, Petition for a Nonimmigrant Worker ("2020 I-129 Petition") to be prepared and submitted to USCIS seeking to change Qian's visa classification from L-1B (specialized knowledge) to L-1A (executive or management).  Wang signed the 2020 I-129 Petition certifying "under penalty of perjury that [he] reviewed this petition and that all of the information contained in the petition, including all responses to specific questions, and in the supporting documents, is complete, true, and correct." The 2020 I-129 Petition indicated that Qian's residential address was 5404 Merribrook Lane, Prospect Kentucky 40059 when it appeared she was residing in California.  The 2020 I-129 Petition indicated that Qian would be working as the Vice President of Operations at Quadrant Magnetics located at 12500 Plantside Drive, Louisville, Kentucky 40299 despite the fact she appeared to be living in California at the time.  The 2020 I-129 Petition and accompanying documents also indicated that Qian would be directly managing Quadrant Magnetics employees Kevin Fautz, Chet First, Kimberly Morrison, and Paul Murray.

23



67.     Wage and earnings documents attained from the Kentucky Workforce Database at
the Office of Unemployment Insurance show that Kimberly Morrison was not employed by
Quadrant Magnetics beginning in the third quarter of 2019.  This was approximately one year
prior to the 2020 I-129 Petition for an extension of stay was filed on Qian's behalf wherein it was
reported that Qian was managing Morrison.

68.     Kim Morrison stated that Phil Pascoe was her supervisor at Quadrant Magnetics and that Qian worked at Quadrant for "maybe eight months" and that her role was to "kind of watch everything that we all done."

69.     On or about July 9, 2021, Wang sent an email to Sun stating "I talked to Michelle a couple of times yesterday. And at one point, she's a bit emotional, which was understandable, about what she went through, living in Kentucky and Alabama…The key is that Bob or Phil (not sure who's in charge of engaging the lawyer and deciding, way back) didn't get the visa type right. They didn't challenge the notion that Michelle was not qualified for L-1A, which is for an executive or manager, compared to L-1B, for which the candidate possesses a specialized knowledge & very difficult to get a green card. Once I was on board, we're working on getting her to transfer from L-1B to L-1A. And she got approved first; and now working on the extension before can apply for the green card. Otherwise she could have been approved before the overall environment went south. We know it doesn't help now. But she vented, which's positive. Considering she's such a key member of the management team, I think we probably should consider other options, including marring a citizen."

70.     On August 20, 2021, USCIS conducted a site visit at Quadrant Magnetics in Louisville, Kentucky.  During the site visit, Phil Pascoe was interviewed.  Pascoe stated that Qian did not live in Louisville and that she was last in Louisville 1.5 – 2 years ago.  Pascoe said that after Qian left Louisville she moved to Alabama and then to California noting that "her role was very fluid."  Pascoe confirmed that Qian "does not live in Louisville" and that she has been reassigned and is working "offsite in California running sales stuff for clients in California." Pascoe said she was remoting back and forth. Pascoe provided the address of 3500 Palmilla Drive, San Jose, California 95134 with a phone number of 502-432-5511. Pascoe said that Quadrant

25

Solution performs "Research and Development (R&D) and coordinates sales." Pascoe stated that when Qian worked at Quadrant Magnetics she did not oversee or supervise anyone and that she was responsible for completing tasks he assigned. Pascoe confirmed that Qian's salary still came from Quadrant Magnetics' budget but admitted he does not know why that is the case since she works for Quadrant Solutions. When specifically asked if Qian supervised Kevin Fautz, Chet First, Kimberly Morrison, and Paul Murray, Pascoe stated Qian did not supervise anyone.

71.     On August 25, 2021, Phil Pascoe emailed a supplemental responses to USCIS indicating that Qian's address was **Subject Residence #3** - 3500 Palmilla Dr. Unit 1026, San Jose, California. Contrary to what he told USCIS, Pascoe stated that Qian was the vice president of Operations in Louisville and he provided an organizational chart indicating that Kevin Fautz, Theresa Nicholson, Chet First, and Paul Murray reported to Qian.



**Corporate Organization Chart**

72.     During the August 20, 2021 USCIS site visit, Kevin Fautz was interviewed.  Fautz stated that he had met Qian once in the five years when Quadrant Magnetics was located at the River Green Circle address.  Fautz further stated that he recalled seeing Qian once after that, "about a year ago" when Qian dropped in, but he recalled having no interaction with her.

73.     During the August 20, 2021 USCIS site visit, Chet First stated that he had seen Qian one time from afar.

74.     During the August 20, 2021 USCIS site visit, Pascoe stated that Paul Murray was a forklift operator, a laborer.

75.     On November 2, 2021, USCIS conducted site visits in California.  USCIS located Qian at **Subject Residence #3** - 3500 Palmilla Drive, Unit 1026, San Jose, California 95134. Qian said she moved to San Jose in 2017.  She claimed to travel a lot to Kentucky and Alabama. She stated she last traveled to Kentucky in April 2018 but has not traveled since.  She said she lived in Louisville from 2015 to 2016.  She then bought a house in Alabama between 2016 to 2017.  Qian stated that she has been the Vice President of Operations at Quadrant Magnetics since 2019.  Qian stated that she supervised "Kim" but she does not remember Kim's last name.  This directly contradicts Kim Morrison's statement.  Qian also stated "Kim" never provided reports to her because "Kim" did not do reports.

76.     In the course of the USCIS site visit, Qian agreed to provide a sworn statement about the employees she supervised and her job duties. When asked to include all employees she had ever supervised on the sworn statement, Qian stated she is currently not in charge of Chet First. Qian admitted she last emailed or had contact with Chet First in May 2019. Qian admitted that Chet First reported to Phil Pascoe in Louisville, KY, regarding daily operations. Qian stated she did not do performance reviews for Chet First and Phil Pascoe reviewed his performance.

27

When asked whether Chet First ever provide any reports to Qian, Qian answered "no." This directly contradicts the information provided in the 2019 and 2020 I-129 petitions.

77.     Qian stated she also supervised "Paul" and she does not remember his last name. Qian stated "Paul" works in Warehouse Logistics and the last time she communicated with him was in 2019. Qian stated "Paul" reports to Phil Pascoe and she had never done any performance evaluation for Paul. This directly contradicts the information provided in the 2019 and 2020 I-129 petitions.

78.     Qian was asked if she knew Theresa Nicholson and she replied that she has never heard of that name.

79.     When Qian was asked why the organizational chart she submitted with the 2020 Petition extension lists Kimberly Morrison and Kevin Fautz when she was not supervising these people in 2020, Qian stated the organizational chart was old and that she would provide an updated chart.

80.     On November 2, 2021, Qian emailed USCIS agents a corporate organization chart that indicated that Qian was the Engineering, Sales, & Quality Control Manager, not the Vice President as was stated in the 2020 I-129 Petition, and, in direct contravention of her statements,

that she was supervising Kevin Fautz. The corporate chart provided by Qian also indicated she

was supervising Morrison, who had not worked at Quadrant Magnetics since 2019.



81. On November 2, 2021, USCIS officers completed a site visit at **Business Address**

**#3** - 1120 Ringwood Court, San Jose, California. Officers made contact with Min Zou, Director

of Lab Magnetics. Zou said Lab Magnetics was housed with Quadrant Solutions. Zou stated they

moved to into this location on October 12, 2021. Zou stated that Qian is the Chief Operations

Officer for Quadrant International and also worked for Quadrant Magnetics in Kentucky.

**B.**   ***Probable Cause for Violations of Title 18 United States Code § 1343 (wire fraud); Title 22 Code of Federal Regulations 22 U.S.C. § 2778 and 22 C.F.R. § 127.1 (AECA and ITAR), and Title 48 Code of Federal Regulations § 252.225-7008 (DFAR)***

82.   The Defense Federal Acquisition Regulation Supplement (DFARS) provides Department of Defense (DOD) specific acquisition regulations that DOD government acquisition officials and those contractors doing business with DOD must follow in the procurement process of good and services. According to DFARS 252.225-7009, "Except as provided in paragraph (c) of this clause any specialty metals incorporated items delivered under this contract shall be melted or produced in the United States, its outlying areas, or a qualifying country." Review of paragraph (c) showed no applicable exceptions. According to DFARS 225.003, definitions section, China is not considered a qualified country pursuant to the definition of qualifying country, which lists the countries considered as qualified countries.

83.   Quadrant Magnetics, LLC is a supplier of numerous magnets, to include samarium-cobalt magnets. Samarium-cobalt magnets are a rare earth element magnet abundantly used in DOD end items. Quadrant sold samarium-cobalt magnets that were melted and magnetized in China to the U.S. Department of the Navy, Boeing, and General Dynamics for use in aircraft, including the F-18, and other military assets.

84.   The AECA and the ITAR regulate the export and import of defense articles. The Department of State designated the samarium-cobalt magnets as defense articles under Category VIII(h)(1) of the United States Munitions List. Since the magnets are defense articles under the ITAR, the specifications or technical data used to manufacture the magnets can only be sent to a foreign person or company if there is an export license or approval from the U.S. Department of State.

85.   On October 31, 2018, U.S. Magistrate Judge, Colin Lindsay of the United States

30

District Court for the Western District of Kentucky, signed a federal search warrant (3:18 MJ-616) for Quadrant Magnetics, LLC, located at their prior location, 2606 River Green Cir., Louisville, KY 40206. The federal search warrant included digital evidence in the possession of Quadrant Magnetics, LLC, to include emails.

86.     Federal agents identified emails with schematic and technical descriptions of magnet product numbers from review of digital evidence attained from the October 31, 2018 search warrant. In order to confirm the magnet product numbers were designated as defense articles and under the jurisdiction of the AECA and the ITAR regulations, agents had to first determine ownership of the magnets and what the magnets end-use was, meaning what project or equipment the magnet was placed in. Agents requested that information by issuing federal subpoenas to Business 1 and Business 2. Business 1 and 2 both purchased the magnet product numbers, at issue, from Quadrant. Agents received a partial response to those subpoenas in 2020 and returns are ongoing. In that partial response, agents were able to determine that the end-use items were used in various defense products, to include a submarine periscope, targeting system, missile system, fighter jet radar, among others. The responses from Business 1 and Business 2 also identified who Quadrant Magnetics sold specific magnet product numbers to.

87.     After identifying the company that received the magnet product numbers from Quadrant and the end-use items for the requested magnet product numbers, gents then requested a commodity jurisdiction determination from the U.S. State Department. The commodity jurisdiction determination was requested for the magnet product numbers, which Quadrant employees sent the schematics and technical data for those product numbers. These were the same emails that Quadrant Magnetics employees sent to individuals or companies located in China in violation of U.S. export control laws and regulations.

31

88. A commodity jurisdiction determination is a technical review performed by "requisite agencies of the United States government." The review will determine if the schematics and technical drawings are "subject to its jurisdiction in accordance with the ITAR. Federal agents received the U.S. State Department's determination via a commodity jurisdiction determination letter. This letter also advised that, "Pursuant to ITAR, a license or other approval was required prior to any export from, or temporary import into, the United States."

89. Agents received numerous commodity jurisdiction determination letters that identified several magnet product numbers that were subject to the jurisdiction of the ITAR and required to have a license prior to the export from the United States.

90. Federal agents then requested a license and registration history check for Quadrant from the U.S. Department of State, Bureau of Political Military Affairs, Directorate of Defense Trade Controls (DDTC). DDTC is responsible for the administration of Section 38 of the ARCA issued pursuant thereto. DDTC performed a license and registration history check for Quadrant and found no licenses or registration.

91. Federal agents reviewed the emails obtained as a result of the October 31, 2018 search warrant. Email chains show Quadrant Magnetics employees sending ITAR designated schematics/technical data (magnet product numbers that are within the jurisdiction of ITAR) were identified as early as 2012. These emails were sent from Quadrant employees to or from China.

   a. On August 5, 2009, Quadrant Employee Scott Tubbs emailed Quadrant employee Phil Pascoe. "Attached is a print and specifications for magnet used by Smith/GE Aviation. . . . You might want to re-draw this print for export reasons. Also the specifications are located in the customer's file on the server – how convenient is that?"

32

b. On August 7, 2009, Phil Pascoe sent an email with a purchase order ("PO") to Ming

Sun at X-Mag and Cody Sun.  The email contained the following warning:

> New order for the Axsys company, company, this is for components
> that I will assemble here at QM. Due to Dfar requirements, I must
> assemble here. Please ref RFQ 1826. As with all Axsys orders,
> please ensure that axsys prints are NOT shared with supplies.  Please
> note tight tolerance on prints.

c. On July 23, 2012, Quadrant employee Pierce Hackett emailed Quadrant employee

Jeff Moore and Tubbs discussing General Dynamics order:

> Got some P/N 100101 in today.  Goya had asked for a bunch of pull-
> ins (below).  We couldn't meet this one but are close.  Monica was
> saying that don't know that everything is made in China and the
> order was place[d] 6/25/12.  Does it make sense to send the parts to
> them this quickly?  Or is that too fast and will blow our cover?  If
> I'm being confusing let me know.  Not sure I have this all straight
> either…

The email contained an ITAR export control warning at the bottom.

d. On September 18, 2012, General Dynamics employee, Mehrshahi emailed QM

Tubbs and Hackett.  The email contained the following: "This documents contains

technical data within the definition of the [ITAR] and is subject to the export control

laws of the U.S. Government.  Transfer of this data by any means to a foreign

person, whether in the [U.S.] or abroad, without approval from the U.S. [D.O.S.] is

prohibited."  Phil Pascoe responded to the email stating that "This is Phil here,

currently over in China.  Can you please give me some details of what the failure

mode is.  Any photos ore descriptions etc."

e. On February 29, 2012, Quadrant employee Phil Pascoe emailed an ITAR marked

drawing to Jane Gu, an employee of X-Mag, a company based in China. Since this

period, there are numerous emails from Quadrant employees sending ITAR

designated schematics to Chinese companies or individuals located in China in violation of U.S. export control laws and regulations.

f.  On February 27, 2013, QM Tubbs emailed GD Mehrshahi the Quadrant ITAR registration letter.  Tubbs wrote:

> To that end, late last year you asked about Quadrant being registered with the U.S. Department of State in relationship to ITAR compliance. As you know, we applied last Fall and through a lengthy process have now been granted our registrant code. That code is M31748. We actually were issued our code in December 2012, however for some reason, and after many phone calls to the Department of State, we finally received written notification. And I have attached that letter to this email. Obviously, we went through this process in an effort to provide General Dynamics "proof" that we are serious and compliant to ITAR regulations. In addition, we are hopeful that this registration will open up new opportunities with General Dynamics for our superior permanent magnet materials and magnetic assemblies. As always, I thank you for your business, whether in the past, current or future. I believe that together we both can say [as our motto states] and be "at the forefront of magnetic solutions". Looking forward to seeing potentially new business opportunities as a results of our ITAR compliance.

g.  On August 26, 2013, Pierce Hackett emailed Phil Pascoe and Scott Tubbs an RFQ for Sunpower Amatek.  He wrote, "Phil—Can you get me the costing for P/N 300DEV-99674-09-011 (print attached)?  This print MAY NOT leave the US due to ITAR/DFAR regulations.  RFQ KY 2604.  Request sheet also attached.  Thanks for the help."

h.  On June 5, 2014, an FBI Special Agent met with Phil Pascoe.  Pascoe said he sends prints over to China to make parts but prints do not contain ITAR data nor the application of the part.  Pascoe admitted he knew GD and GEAS magnets were for military.

i.  On July 8, 2014—Hackett emailed Phil Pascoe—

> Phil—GD asking for first article repot for P/N 8860-1022.  Is the attached all they need (after I take the Chinese symbols off)?

j.  On October 26, 2016, Scott Tubbs and John Wang discussed keeping their ITAR registration with Quadrant Solutions because changing to QM would raise red flags. ITAR registration failed to disclose Cody Sun as the owner and foreign production facilities at X-Mag.  The form falsely claimed that there were no U.S. subsidiaries engaged in the illegal ITAR activities. It also falsely claimed there were no foreign subsidiaries.  It also failed to list any parent companies.  It also falsely claimed that the company was not owned by foreign persons.

k.  On December 12, 2016, Phil Pascoe emailed ITAR-controlled technical data for Product Number 5 to a Chinese company employee, Jane Gu, a non-U.S. person, with a request for quote in violation of U.S. export control laws and regulations.

l.  On December 15, 2016, DDTC sent a letter to Scott Tubbs titled "Manufacturer Registration Statement and Fee Submission." The letter explained that registration is a precondition to submitting an application for an export license or other approval from the DDTC.  The letter explained that they needed a compliance program and provided information to find an explanation of the export licensing procedures.  The registration was set to expire on 12/31/17.

m.  On January 9, 2017, the Department of State emailed Scott Tubbs indicating that the ITAR registration  would not expire until 12/31/2017.

n.  On or about January 10, 2018, Phil Pascoe emailed ITAR-controlled technical data for PN 1500P-1002 (Product Number 2) to a Chinese company employee, Jane Gu, a non-U.S. person in violation of U.S. export control laws and regulations.

35

o.  On February 6, 2017, General Dynamics employee Farrah emails Pierce Hackett PO for PN 03-052532-01.  The information was forwarded the same day to Monica Pascoe.  Attached to the email is a PO and technical data with ITAR warnings.  The PO contained an ITAR/Export control warning.

> Export/Import—U.S. export Law as contained with the [ITAR] and [EAR] is applicable to all technical information submitted with/during this P.O./RFQ.  This technical information is not to be placed int eh public domain, exported from the U.S., or given to any foreign person in the U.S. without the prior specific written authorization of General Dynamics and the U.S. [D.O.S.}.

p.  March 23, 2017, Phil Pascoe forwarded an email with a PO 13784 to a X-Mag employee, J.G., a non-U.S. person, requesting an updated quote for PN 030-052317-01 in violation of U.S. export control laws and regulations.  Attached to the email was the ITAR-marked technical drawing, PO 13784 dated December 16, 2014.  The ITAR-marked document contained conspicuous language stating:

> WARNING – This document contains technical data within the definition of the International Traffic in Arms Regulations (ITAR) and is subject to the export control laws of the U.S. Government. Transfer of this data by any means to a foreign person, whether in the United States or abroad, without an export license or other approval from the U.S. Department of State is prohibited.

q.  On March 24, 2017, Scott Tubbs emailed a Chinese email account *******@quadrant.cn and X-Mag approving the quote for Corporation 2 (General Dynamics). Attached to the email were the ITAR-marked technical drawings, X-Mag's quote to Quadrant for PN 030-052317-01, and QUADRANT MAGNETIC LLC's quote to General Dynamics. The domain ".cn" is a domain that is managed by China Internet Network Information Center, which falls under the cyberspace of

the People's Republic of China. This was a violation of U.S. export control laws and regulations.

r.    On July 26, 2017, Hackett emailed Jay Babler and Simon Lopez at GE.  Hackett wrote: "That is correct the part is manufactured in China [PN FP24018P1].

s.    On August 3, 2017, QM Hackett emailed GE Babler—

> After discussion with our VP of Operations, I found that my initial response was incorrect. We do some grinding and heat treatment of this part at our facility in the US and then deliver the part. Sorry for any inconvenience this has caused.

t.    On August 7, 2017, QM Tubbs drafted a letter to GE Babler.  "This letter is to confirm there has been no technical information sent to China regarding part number FP24018P1.  The part is purchased semi-finished by [QM] with value-add secondary operations performed at the Quadrant facility in Louisville, KY.  Thus the country of origin . . . is the United States of America."  The letter contained the ITAR Registration Code M31748 on "Quadrant" letterhead.

u.    On August 7, 2017, Phil Pascoe emailed Jeff Moore at Quadrant Solutions.  The subject stated "GE aviation ITAR".

v.    On August 10, 2017, Phil Pascoe emailed Tubbs:

> Sounds like they think the print exported technical data.  Didn't at all.  Can we become compliant with usa or Nato country sourcing. Our business model has always been to optimize our partners in Asia, and domestically value add where possible.

w.    On August 15, 2017, Hackett emailed Pete Naud at General Electric and Tubbs at Quadrant Magnetics (cc'ing Pascoe and Moore).  "Attached is the 36B423718P1-Raw drawing that was sent to China to make this part."  If sent to China, this was in violation of U.S. export control laws and regulations

x. On August 16, 2017, QM Pascoe email EEC (electronenergy): "I have included 2 items that require ITAR complaint material (Sintered in the USA) for your quotation process".

y. On August 16, 2017, Phil Pascoe emailed X-Mag employee, J.G., a non-U.S. person, releasing PO 14797 for 50 units of PN 6000U-1002 to be supplied magnetized. Attached to the email were the ITAR-marked technical drawing for the part and the quote from X-Mag in Hangzhou, China in violation of U.S. export control laws and regulations.

z. On August 16, 2017, GE employee Ken Fischer emailed Scott Tubbs and Pierce Hackett—

> As you know we're going to be submitting a Commodity Jurisdiction (CJ) request regarding the magnet material (FP24018P1-RAW) in the hopes the government will determine that the imported item has not reached a state of manufacture in which it is considered meeting the ITAR criteria. Toward that objective, can you provide a range of potential magnetic properties to which FP24018P1-RAW could reasonably be expected to be magnetized? If you have any questions, please don't hesitate to contact me (mobile number is best). Thank you,

aa. On August 21, 2017, GE employees Rebeck and Naud visited Quadrant Magnetics LLC in Louisville, Kentucky.

bb. On August 18, 2017, Hackett emailed General Electric Aviation Systems Joe Rebeck in response to Rebeck wanted to meet with a quality person to discuss origin of magnets and the ITAR. :

> Our VP of Operations and quality manager are one in the same. I understand the urgency of your request and we are diligently working to identify a designee in his absence.

cc. On August 22, 2017, Phil Pascoe emailed EEC Walmer: "Steven, I am out of the country on travels this week. Please relay your questions via email and I will do best to respond timely."

dd. Pascoe wrote:

> Steve, thanks for your fast reply. Q1 answer is that **I can not machine the material in house**. So you sinter and machine, these are the requirements needed. Raw material can be procured in china, **but the itar requirement** is that the **mixing, sintering can be done by an approved county source**. From my understanding that was in your wheelhouse. Q2, yes those are the published eau qtys. Thanks again for your help.

ee. EEC responded:

> We understand and agree that you can't use Asian sourced sintered blank stock and machine the magnets at your facility. There are producers of SmCo that are DFARS compliant and sell their sintered blank stock to magnet fabricators. Arnold, Vacuumschmelze and others.

> EEC does not sell our blank stock material to magnet fabricators that are viewed as competitors to us. We have at times however sold our finished magnet components to select fabricators. It is somewhat odd to hear that you are unable to procure the grade 26 material. That is a fairly common grade of SmCo.

> Founded in 1970 EEC is a vertically integrated producer, manufacturer and supplier of sintered SmCo magnets. We are compliant with all DFARS and ITAR regulations and restrictions. In1970 we were the first company in the world to produce, manufacture and *supply SmCo magnets for commercial use and remain as the only producer of sintered SmCo magnets located in the USA*. **Is there a colleague at your facility that we can address our Quotation** to as we will not send the Quote directly to **you since you are offshore**.

ff. On August 25, 2017, Phil Pascoe and Scott Tubbs, created and caused the creation of a Government-Industry Data Exchange Program ("GIDEP") Problem Advisory

for Magnet PMG Rotor for PN 36B423718P1.  This is a part number for the generator convertor unit for the U.S. Navy's F-18.   A GIDEP Problem Advisory Reports a problem with the manufacturing process to members of the GIDP program that includes U.S. Government Agencies, including the U.S. Army, Navy, and Air Force.  The GIDEP falsely claimed the magnets were magnetized by QUADRANT MAGNETICS LLC in Louisville, Kentucky, before shipping to General Electric Aviation Systems.  In truth, the magnets were smelted and magnetized in China.

gg. On August 25, 2017, Hackett emailed Pascoe, Tubbs and Moore with the GIDEP's for PN 36B423718P1 and FP24018P1 for GEAS attached to the email.

hh. On August 28, 2017, Phil Pascoe emailed Jeff Moore, Hackett and Tubbs approving the GIDEPS.

ii. On October 5, 2017, GE Babler emailed QM Tubb:

> As you know, there is a lot of focus on DFAR compliance for magnets and specialty metals at GE.  Please instruct you Chinese Supplies to destroy/shred any documents or emails pertaining to magnet information that may have been supplied to them.

jj. On October 10, 2017, QM Hackett responded:

> Scott has instructed our facilities in China to destroy any and all documents pertaining to GE Aviation parts that have to do with the specialty metals clause. GE Aviation drawings prints or other GE aviation information was never directly released to our facilities outside of the United States to our knowledge.

kk. On November 2, 2017, QM Tubbs emailed GE Babler.  Tubbs wrote:

> "All documents pertaining to GE Aviation—meaning any internal drawings, prints and instructions-have been destroyed at our facility in China.  As a reminder all GE Aviation produced print have been held in the United States by Quadrant."

ll.  On November 20, 2017, Phil Pascoe sent an email to X-Mag Employee, J.G., a non-U.S. person. This email released P0 14875 for 325 units of PN 100101 to be supplied magnetized. Attached to the email was a copy of the ITAR-marked technical drawing for PN 100101 in violation of U.S. export control laws and regulations.

mm.    On December 15, 2017, GE Joe Rebeck emailed QM Hackett (cc Pascoe and Tubbs)—He wrote "Please ensure future correspondence of technical or proprietary information Is not communicated through email.  GE e-distrib is mandatory for License Required (LR) technical date for all transmission. "

nn. On December 19, 2017, Phil Pascoe emailed X-Mag employee, Jane Gu, a non-U.S. person, requesting an updated quote for **PN 10500B-1022**. Attached to this email was the ITAR-marked technical drawing in violation of U.S. export control laws and regulations.

oo. On December 20, 2017, General Dynamics Global imaging Technologies Jihad Farrah sent a PO to QM Hackett for PN **10500B-1022**.  On that same day Hackett forwarded the emails chain and attached PO and technical data to Monica Pascoe. The email contained an ITAR warning and attached to the email was the PO and technical data drawing in violation of U.S. export control laws and regulations.  The technical data contained an ITAR marking/warning.  The PO also contained Export control warnings.

> Export/Import—U.S. export Law as contained with the [ITAR] and [EAR] is applicable to all technical information submitted with/during this P.O./RFQ. This technical information is not to be placed int eh public domain, exported from the U.S., or given to any foreign person in the U.S. without the prior specific written authorization of General Dynamics and the U.S. [D.O.S.}.

pp. On December 20, 2017, Phil Pascoe emailed X-Mag employee, J.G., a non-U.S. person, releasing PO 14893 for PN **10500B-1022** to be supplied magnetized.   Attached to the email were the ITAR-marked technical drawings and the PO showing X-Mag as the vendor in violation of U.S. export control laws and regulations.

qq. On November 20, 2017, Phil Pascoe emailed ITAR-controlled technical data for PN 100101, hereafter Product Number 5, to Chinese Company employee, Jane Gu, a non-U.S. person, releasing PO 14875 for 325 units of Product Number 5 to be supplied magnetized in violation of U.S. export control laws and regulations.

rr. On January 2, 2018, GE Molinari mailed DDTC a letter and cc'd QM Tubbs, Hackett, and Pascoe.

> Upon Further review of the item at issue, it was determined that the product outscored to China was an EAR99 ingot and not the final magnet.  The magnetization of the ingot occurs in the United States, which would change the item classification from EAR99 to VIII(h)(1).   _However, after discussion with the supplier, GE discovered that the supplier sent a drawing that included some specifications on the magnetic properties.  Upon further review of that drawing sent, GE requested the immediate destruction of the data, even though the data sent was the suppliers design.  The supplier sent an email confirming the immediate destruction._

> Due to the technologically unsophisticated nature of the component, in October 2017, GE submitted a Commodity jurisdiction (CJ) to confirm its assessment of the magnet (fully magnetized item).  _On December 22nd, DDTC confirmed the magnet was classified as subject to the USML VIII(h)(1)._

ss. On January 2, 2018, Scott Tubbs emailed to GE scheduling phone call with GEA employees Molinari, Ken Fisher, QM Scott Tubbs, QM Phill Pascoe, and QM Pierce Hackett.

tt. On January 3, 2018, Pierce Hackett emailed Scott Tubbs:

> GIDEPs had been submitted.
> Scott—A small timeline on the GIDEP's that were submitted (attached email strings as well).  Let me know if you need anything else regarding the GIDEP submissions.
> 8/24/17—Joe Rebeck at GE-A wrote and distributed the GIDEP's for both FP24018P1 and 36B423718P1
> 8/25/17—GIDEP's were submitted by me
> 9/8/17—I confirmed with Jeo Rebeck at GE-A that the GIDEP's had been submitted.

uu. January 3, 2018, GE Aviation Conference call with Tubbs, Hackett, Pascoe. (Molinari and Fisher from GEAS).

vv. January 10, 2018, Phil Pascoe emailed ITAR controlled technical data for PN 1500P-1002 to an X-Mag employee, Jane Gu, a non-U.S. person in violation of U.S. export control laws and regulations. Attached to this email were a previous quote from X-Mag dated November 10, 2014 and the ITAR-marked technical drawing.

ww. January 15, 2018, X-Mag employee, Ethel Yang, a non-U.S. person, emailed Monica Pascoe and Phil Pascoe with a shipping update showing 250 units for **PN 10500B-1022** to be shipped on January 17, 2018 from China.

xx. January 15, 2018, General Dynamics employee Farrah emailed QM Hackett a RFQ for PN **3730D-1012**.  Technical data for the part was attached to the email.  The technical data contained an ITAR warning.  Hackett forwarded the information to Monica Pascoe.

yy. On or about January 15, 2018, Monica Pascoe processed a request for quote for PN 3730D-1012, hereafter Product Number 6 emailed by a U.S. Company 2 employee.

43

Technical data for the part was attached to the email. The technical data contained an ITAR warning.

zz. On January 31, 2018, Phil Pascoe emailed X-Mag employee, Jane Gu, a non-U.S. person, releasing PO 14926 for 50 units of PN 6000U-1002 to be supplied magnetized. Attached to the email were the ITAR-marked technical drawings for the part and the quote from X-Mag in Hangzhou, China in violation of U.S. export control laws and regulations.

aaa. On February 5, 2018, X-Mag employee, Ethel Yang, emailed Phil Pascoe and Monica Pascoe. This email updated shipping notification for PO 14907 and showed 360 units for PN **3730D-1012** being shipped via FEDEX on February 6, 2018 from China.

bbb. On March 12, 2018, Phil Pascoe emailed Scott Tubbs a spreadsheet dated March 12, 2018, authored by MONICA PASCOE titled "SmCo [samarium cobalt] itar DPAS review.xlsx." The spreadsheet indicated part numbers for General Dynamic Corporation 2 and indicated that a part had an "ITAR print". PN 10500B-1022, PN 100101, PN 6000U-1002 was highlighted on the spreadsheet with "ITAR prints".

ccc. On March 14, 2018, General Dynamics employee Farrah emailed Quadrant Magnetics Hackett PO for **PN 100101, 11375B-1002, 1937S-1062**. The email contained a PO and technical data for PN 100101. The PO, and technical data contained ITAR warnings. The email chain and attachments were forwarded to Monica Pascoe.

44

ddd.     On or about March 14, 2018, Monica Pascoe processed a PO sent by a U.S. Company employee containing a PO and technical data drawing to Quadrant Magnetics, LLC for Product Number 5.  The PO and technical data drawing all contained ITAR export control warnings.

eee.     On March 19, 2018, X-Mag employee Ethel Yang, a non-U.S. person, emailed Monica Pascoe and Phil Pascoe, with a shipping update regarding PN 6000U-1002 from China.

fff. On April 10, 2018, Phil Pascoe emailed X-Mag employee, Jane Gu, a non-U.S. person, requesting an updated quote.  Attached to the email were the previous quote from Hangzhou X-Mag dated May 16, 2017 and the ITAR-marked technical drawing of PN 6000U-1002.

ggg.     On April 16, 2018, X-Mag employee, Ethel Yang, emailed Phil Pascoe and Monica Pascoe.  This email updated shipping notification for P0 14970 and showed 100 units of **PN 100101** Rev B being shipped via FEDEX on April 17, 2018.

hhh.     On June 7, 2018, Phil Pascoe emailed X-Mag employee, Jane Gu, a non-U.S. person, releasing PO 15036 for 250 units of PN 6000U-1002 to be supplied magnetized. Attached to this email were the ITAR-marked technical drawing for the part, the quote from X-Mag in Hangzhou, China, and the PO showing 250 units of PN 6000U-1002.  This was a of U.S. export control laws and regulations.

iii. On July 9, 2018, X-Mag employee, A.C., a non-U.S. person, emailed MONICA PASCOE and PHIL PASCOE, with a shipping update regarding PN 6000U-1002 and PN  030-049420-01. In this email, A.C. asked MONICA PASCOE if X-Mag can ship some of the parts by sea.

45

jjj. On September 28, 2018, GD Farrah sendt a PO to Quadrant Magnetics Hackett for PN 11375B-1002.  The PO contained ITAR/DFAR clauses.  The email contained a terms and conditions document with explanation of compliance with Export Laws including the ITAR and the release of technical data without a license.  It also discussed requirements regarding DFARS.  The technical drawing contained an ITAR warning as well.

kkk.     On October 25, 2018, Phil Pascoe emailed X-Mag employee, Jane Gu, a non-U.S. person, releasing PO 15156 for 500 units of PN 6000U-1002 to be supplied magnetized. Attached to this email were the ITAR-marked technical drawings for the part, the quote from X-Mag in Hangzhou, China, and the PO showing 500 units of PN 6000U-1002 in violation of U.S. export control laws and regulations.

lll. On October 31, 2018, search warrant was executed at Quadrant Magnetics LLC Louisville.

mmm.     On November 1, 2018, Phil Pascoe provided General Dynamics a letter titled "ITAR registration / DFARS conformance".  He wrote:

> After a corporate review of our current business model, and consideration of re-location to our new Quadrant Magnetics world headquarters facility in Louisville, KY in Q1 2019, we have at this time elected to forgo the renew our ITAR registration.  Per this directive, Quadrant will no longer be able to facilitated the acceptance of new order or RFQ's specified as ITAR controlled an or DFARs specific."

92.     At the time Quadrant did not even have a registration for Quadrant Solutions or Quadrant Magnetics for 2018.

93.    Cody Sun was carbon copied on the majority of the emails referenced above, that included the sending of ITAR designated schematics.

94.    On March 30, 2022, Magistrate Judge Colin Lindsay, Western District of Kentucky, signed a federal search warrant (3:22MJ-202), which was later executed on Microsoft Corporation for content emails for several Quadrant Magnetics employees, to include Hang "Cody" Sun, Jiang "John" Wang, CongCong "Michelle" Qian, Phil Pascoe and Scott Tubbs, among others.

95.    On August 17, 2022, Quadrant Magnetics LLC, Phil Pascoe, Monica Pascoe, and Scott Tubbs were indicted for Conspiracy, AECA and ITAR violations, and Smuggling in the Western District of Kentucky in violation of 18 U.S.C. § 1343 (wire fraud);  127.122 U.S.C. § 2778 and 22 C.F.R. § 127.1 (AECA and ITAR violations); 48 C.F.R. § 252.225-7008 (Wire Fraud violations); 18 U.S.C. § 371 (conspiracy).

### *Qian's Ties to the Subject Residence #3 at 3500 Palmilla Drive, Unit 1026, San Jose, California*

96.    Qian resides at 3500 Palmilla Drive, Unit 1026, San Jose, California, hereafter **Subject Residence #3**. In November 2021, USCIS officers completed a site visit at 3500 Palmilla Drive. Qian informed officers that she moved to the address in December 2017 and currently resides there. A search query in a law enforcement database revealed that the 3500 Palmilla Drive address is associated with Qian as of November 2017 through August 2022.

97.    Qian has received several payment confirmation emails from "The Sycamore Apartment Homes," as recent as November 2021. The Sycamore Apartment Homes is the property located at 3500 Palmilla Drive, San Jose, California.

98.     Qian has vehicle registration in the State of California, which is valid from November 18, 2021 through November 18, 2022. Qian's listed address is 3500 Palmilla Drive, Unit 1026, San Jose, California 95134.

99.     On or about September 8, 2022, the United States Postal Inspection Service (USPS) was contacted by FBI Louisville regarding an ongoing criminal investigation.  FBI Louisville informed (USPS) that they were investigating a case where individuals were claiming residency at a particular address and needed to verify who was receiving mail at that address.  The address was 3500 Palmilla Drive, Unit 1026, San Jose, CA 95134.

100.     The USPS and GA Sisk conducted an address verification for 3500 Palmilla Drive, Unit 1026, San Jose, CA 95134 with the servicing post office.  A review of postal service business records identified that the name receiving mail at the address is: Congcong Qian.

101.     Following the rise in Covid-19 positivity rates in March 2020, California established a series of escalating executive orders that restricted non-essential businesses from working in-person and encouraged remote working.

102.     Quadrant Magnetics, like many other businesses, had specific Covid-19 protocols for their workforce. In an email on November 25, 2020, Phil Pascoe, stated, "As a reminder of original std [sic] QM protocol. At first signs, and or potential exposure avenues, entry into QM is restricted, and you are asked to continue work from home (noted by signs on all doors)…" In an August 2021 email, Michael Brand wrote, "Employees having symptoms & signs of COVID should immediately notify their supervisors and stay home." There were several employees who sent emails stating that they would be working from home during the height of the pandemic, to include Scott Tubbs, Phil Pascoe and Kevin Kurtz, among others.

103.    On November 2, 2021, Qian told USCIS officers that she works three days a week and her days at the office are flexible. In August 2021, Pascoe also told USCIS officers that Qian was working offsite.

104.    On October 5, 2022, FBI special agents completed surveillance of Qian and observed the following:

a.   Agents observed Qian's registered vehicle, a dark grey Lexus sedan with California license place 8ABZ410, in the parking lot of 1120 Ringwood Court, San Jose, California. At approximately 10:55am, four individuals were observed through the business side entrance in a large size conference room. Qian was seen exiting 1120 Ringwood Court, San Jose, California, at approximately 11:47am. Qian appeared to be carrying what appeared to be a black portfolio or purse out of the business.

b.   Qian then drove to the vicinity of a hair salon and is believed to have entered the hair salon. Qian then departed the vicinity and drove to Spicy Way, 42 Dixon Road, Milpitas, CA., 95035. Qian was observed brushing off hair from her shirt before she entered into Spicy Way. Qian picked up food and departed the vicinity.

c.   At approximately 2:12pm, Qian arrived in the vicinity of her residence. Qian parked in front of her residence, facing the wrong way, exited 8ABZ410 and entered the complex through the gated front entrance. Qian carried her food and a hand full of unknown things in her hands. Shortly after she entered through the front gate, Qian returned to her vehicle and was observed as she drove to the underground parking structure, located on Palmilla Drive and Descanso Drive. The parking structure is gated. Qian entered and was observed as she parked in spot 47. Qian exited

8ABZ410 and exited the garage through underground door. Qian was no longer observed.

***Subjects' Ties to Business Address #3 at 1120 Ringwood Court, San Jose, California***

105.     Quadrant Solutions, Inc. is located at 1120 Ringwood Court, San Jose, California 95131, hereafter **Business Address #3**. A "Corporation Statement of Information" was filed with the California Secretary of State's Office on January 24, 2022. The listed principal office address and mailing address for the company was **Business Address #3**. Cody Sun was listed as the Chief Executive Officer and Director of Quadrant Solutions, Inc. The Secretary and Chief Financial Officer is listed as John Wang. The addresses for both Sun and Wang are listed as **Business Address #3**.

106.     In September 2022, federal agents performed spot checks of 1120 Ringwood Court, which had a sign prominently displayed in front of the building with the text, "Quadrant." The same text was directly overhead in the interior entryway of the building. Agents also observed multiple vehicles parked in the parking lot of the building during business hours.

107.     A review of emails between employees shows that the facility located at 1120 Ringwood Court was purchased for Quadrant Solutions, Inc., in late-August 2021 to September 2021. There were numerous emails regarding the remodeling of the facility in the fall of 2021.

108.     On December 13, 2021, an email from Min Zou, Director of Lab Magnetics to Michelle Qian, Cody Sun and other employees, stated a "Magnetics Bootcamp" would occur at the "Quadrant" location at 1120 Ringwood Court, San Jose, CA 95131 in May 2022.

109.     Qian apparently now works at Quadrant Solutions, Inc., located at **Business Address #3 -** 1120 Ringwood Court, San Jose, California. In August 2021, Pascoe stated that Qian works at the Quadrant Solutions, Inc., location in San Jose, California. During a November

2021 site visit by USCIS officers, Min Zou, Director of Lab Magnetics, confirmed that Qian works at the location. Zou also stated Lab Magnetics and Quadrant Solutions share the address and are both under the umbrella of Quadrant International.

110.    Employees from Quadrant Solutions work closely with employees from Quadrant Magnetics, LLC. According to employee wage data records, Qian received wages from Quadrant Magnetics, LLC, from 2017 through 2022. Thus, Qian received wages from Quadrant Magnetics, LLC, based in Louisville, Kentucky, while living and working in San Jose, California. There are also numerous email correspondences between Quadrant employees, to include between Louisville and San Jose based employees.

111.    Quadrant Solutions, Inc., has significant ties to Quadrant Magnetics, LLC. Qian's visa applications switched from being sponsored by Quadrant Magnetics, LLC, to Quadrant International to Quadrant Solutions, Inc. Further, both Quadrant Magnetics and Quadrant Solutions are under the umbrella of Quadrant International. Qian's pending visa extension for her stay listed her supervising Quadrant Magnetics employees, while an employee from Quadrant Solutions affirmed Qian supervised her and worked from the physical location at Quadrant Solution's facility, **Business Address #3**.

112.    According to the Quadrant website (www.quadrant.us), "Our R&D center expanded into a 33,000 square feet world class innovative hub in 2021." The facility was described as in Silicon Valley and next to the description was a picture of a facility with the same "Quadrant" sign and the numbers "1120", the same signage as federal agents observed on the **Business Address #3** during a spot check in September 2022. See below picture from the website along with the picture from September 2022:



*Picture from September 2022*



*Picture from Quadrant Website*

113.    **Business Address #3** has two labs, a testing lab and a manufacturing lab. During

a November 2021 visit by USCIS officers, officers were permitted to take pictures of both

laboratories, see below:



*Manufacturing Lab*



*Testing Lab*

114.   **Business Address #3** is referred to as the "R&D center" for Quadrant Solutions, Inc. In November 2021, USCIS officers were able to interview employees at **Business Address #3** and receive a tour of the location.

115.   In February 2021, Abby Shen (a.shen@quadrant.us) emailed an employee from Apple and confirmed the San Jose facility manufactures magnets at their facilities. Shen stated, "We can make the quick-turn magnets in our San Jose facility."

116.   Numerous emails, including flight, hotel and rental confirmations show Sun traveling to San Jose, California. These confirmations are as recent as a flight confirmation in February 2022.

117.   Quadrant has engaged in the selling of samarium-cobalt magnets, which have been designated as defense articles, including controlled technical data, that are subject to the AECA and the ITAR regulations. Email records have shown that employees have frequently emailed technical data to foreign persons in violation of U.S. export laws and regulations. These emails also indicate a large amount of documentation has been generated through the purchase and sale of these magnets. This includes invoices, technical drawings, financial documentation, business filings, and business correspondences, among others. There are numerous scans of documents that were sent to employee's emails, ranging from 2018 through 2022. This indicates physical

documents are created and located on the business grounds. There is no known documentation retention policy, so it is likely documents from the origin of the violations to present could still be present at the business address.

118.    There are also frequent mentions of notes following meetings or phone calls. It is a common habit for employees of a business to take handwritten notes during meetings or phone calls as well. Those notes would likely be stored at the business address.

119.    In affiant's training and experience, it is a regular course of business for employees of business entities to maintain physical records at the business address. These documents are frequently in electronic form as well, but original documents are often stored in physical office locations for security and organization purposes. Thus, there is probable cause to believe there will be physical records and digital evidence, to include business and financial records at **Business Address #3**.

120.    In affiant's training and experience, interconnected business entities store business and financial records of associated business entities in their office locations. Thus, there is probable cause to believe **Business Address #3** will have business and financial documentation of other Quadrant entities besides Quadrant Solutions, Inc.

## COMPUTERS, ELECTRONIC STORAGE AND FORENSIC ANALYSIS

121.    As described above and in Attachment B, this application seeks permission to search for records that might be found on the Subject Premises, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

122.    I know through my training and experience that removable USB devices are used to save files, often for transferring to other devices or sharing with other individuals.  In my training and experience, individuals store information on personal devices so they can access it later while concealing their possession of such information.  Individuals who take or store stolen confidential information often transfer them to other storage media including computers, phones, and external storage media.

123.    Second, based on my training and experience, I also know that individuals generally maintain assorted other records on paper or in some sort of electronic format relating to their activity.  In this instance, paper records may include printed material, schematics, or notes taken from business meetings, financial records that reveal payments to or from individuals or entities who seek to obtain the valuable trade secret information, and notes involving possible co-conspirators, contracts, agreements, and communications.  Other electronic records, not noted above, may include activities conducted on a subject's laptop or personal computer systems, other removable storage devices such as external hard drives, compact discs, DVDs, and additional thumb drives.  In my training and experience, individuals communicate using electronic media, including their phones (and often on messaging applications), and additional electronic records may be found on other unknown cell phones, computers, or electronic devices that may solely be used to communicate with co-conspirators and/or conducted illegal activity.

124.    For these reasons, there is probable cause to believe that the subjects may also maintain these physical records and other electronic devices at their personal residences and business addresses and may have used them to assist or are fruits of his efforts to take and conceal commission of various criminal violations.

125.    I submit that if a computer or storage medium is found on the **Subject Residence #3** or **Business Address #3**, there is probable cause to believe those records will be stored on that computer or storage medium, for the following reasons in addition to the above:

a.      Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

b.      Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically

56

possible to delete this information.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

126.    As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of, or the fruits or instrumentalities of, the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **Subject Residence #3** or **Business Address #3** because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.      As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from

57

further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence.  For example, images stored on a computer may both show a location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may

58

either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

*Necessity of seizing or copying entire computers or storage media.*

127.   Based on my training and experience, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant.  In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.   The time required for an examination.  As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.  As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.   Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be

60

required to analyze the system and its data on the **Subject Residences #3** or **Business Address #3**. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.     Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

## CONCLUSION

128.   Based upon the foregoing information, my training and experience, and investigators involved in this investigation, I believe that there is probable cause that evidence, fruits, and/or instrumentalities of 18 U.S.C. § 1343 (wire fraud); 22 U.S.C. § 2778 and 22 CF.R. § 127.1 (AECA and ITAR violations); 48 C.F.R. § 252.225-7008 (DFAR violations); 18 U.S.C. § 371 (conspiracy); 18 U.S.C. § 1546 (fraud and misuse of visa, permits and other documents) exists in **Subject Residence #3** and **Business Address #3**. I respectfully request that this Court issue a search warrant for the **Subject Residence #3** and **Business Address #3** as described in Attachment A, and the seizure of any of the said items that are found, in compliance with the protocol described in Attachments B and C.

## REQUEST FOR SEALING

129.   I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from

prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

/S/ Kailea Bogner/SvK
Kailea A. Bogner
Special Agent
Federal Bureau of Investigation

Sworn to before me over the telephone and signed by me pursuant to Fed.R.Crim.P. 4.1 and 4(d) on this 7th day of November 2022.  This application and warrant are to be filed under seal.

HONORABLE SUSAN VAN KEULEN
United States Magistrate Judge

62

## ATTACHMENT A-1

### Locations to be Searched

The locations to be searched are as follows:

**3500 Palmilla Drive, Unit 1026, San Jose, California 95134 (Subject Residence #3)**

3500 Palmilla Drive, Unit 1026, San Jose, California 95134, is an apartment unit located on the first floor with the front entrance facing the Rio Robles East Street. The premise to be searched includes 3500 Palmilla Drive, Unit 1026, San Jose, California 95134, the mailboxes, as well as trash containers and yards assigned to the above-described premises.


*Patio Entrance*


*Apartment Complex View*


*Apartment Unit Entrance*

1

## ATTACHMENT A-2

### Locations to be Searched

The locations to be searched are as follows:

### 1120 Ringwood Court, San Jose, California 95131 (Business Address #3)

1120 Ringwood Court, San Jose, California 95131, is a building built in 1984 with an approximate lot size of 5.41 acres. The building is approximately 32,552 square feet. The premises to be searched includes 1120 Ringwood Court, San Jose, California 95131, the mailboxes, trash containers, assigned to the above-describes premises.



2

## ATTACHMENT B

### Particular Things to be Seized

The following items to be seized in whatever form (including electronic) found at the Property to be Searched described in Attachment A ("**SUBJECT PREMISES**"), including any digital devices, for evidence, fruits or instrumentalities of violations of 18 U.S.C. § 1343 (wire fraud); 22 U.S.C. § 2778 and 22 C.F.R. § 127.1 (AECA and ITAR violations); 48 C.F.R. § 252.225-7008 (DFAR violations); 18 U.S.C. § 371 (conspiracy); and 18 U.S.C. § 1546 (fraud and misuse of visa, permits and other documents), involving Quadrant Magnetics, Quadrant Solutions, Quadrant International (including subsidiaries), subjects Hang "Cody" Sun, Jiang "John" Wang; CongCong "Michelle" Qian, Phil Pascoe, Scott Tubbs and Monica Pascoe.  These records and materials are more specifically described below.

a. Any communication, e-mail, memo, mailing or other correspondence indicating documents, correspondence, specifications, drawings or other document or technology pertaining to samarium cobalt magnets mining, ordering, production, delivery or shipment were sent to a foreign entity in China, another criteria country or other foreign entity in direct violation of the AECA, the ITAR and the restrictions of specialty metals

b. Any communication, email, memo, mailing or other correspondence directing or responding to direction to destroy documents, correspondence, specifications and or drawings pertaining to the samarium cobalt magnets. Emails between employees regarding ITAR restrictions, ITAR designated defense articles, or business dealing with General Electric Aviation Support and General Dynamics Office Tactical Support or Chinese based emails. Any communications between, to or from foreign business entities, to include email addresses ending in .cn.

    c. All communications, records, documents, applications, information or materials related to Quadrant Magnetics, Quadrant Solutions, Quadrant International (including subsidiaries), including, but not limited to records relating to:

        i. Employment records

        ii. Owners, investors, managers, employees, consultants, or any other individuals affiliated with the above mentioned business entities;

        iii. Any technology, including the source of this technology;

        iv. Related companies; and

        v. The type of work conducted by the above mentioned business entities

    d. All communications, records, documents, programs, applications, information, or materials related to entities or individuals that reasonably appear to be operating on behalf of:

        i. Entities or individuals located in the People's Republic of China ("PRC");

        ii. The government of the PRC, including its military and intelligence services;

        iii. Companies in or acting on behalf of the PRC; and

        iv. Academic institutions in the PRC, including PRC-based talent plans;

    e. Any business documents regarding the organizational structure, job responsibilities, business plans, business meetings, or any additional documentation regarding the internal business functions of the business entities.

    f. Any immigration documents, documents originating from the United States Citizenship and Immigration Services, or documents associated with immigration applications, to include documentation of payments for immigration applications, to include, but not

4

limited to, the immigration applications of CongCong "Michelle" Qian and other applications petitioned by Quadrant business entities.

g.  Any travel documents, to include flight itineraries, customs documentation, passports, or any other documentation indicating countries traveled to and from.

h.  Any notes from the desks of Quadrant employees Hang "Cody" Sun, Jiang "John" Wang; CongCong "Michelle" Qian.

i.  Any computers or storage media on the premises that Quadrant employees Hang "Cody" Sun, Jiang "John" Wang; CongCong "Michelle" Qian, Phil Pascoe, Scott Tubbs, Monica Pascoe, Pierce Hackett, Michael Brand and any other Quadrant corporate employees, managers or officials that have access to the office location in San Jose, California or other affiliated networks or locations accessible from the San Jose office location and used as a means to commit the violations described above;

j.  Any digital video recorder or external electronic storage device utilized for the storage of surveillance images or videos.

k.  Any magnets and magnet information about origin and compliance with the AECA, the ITAR and the DFARS.

l.  All ITAR designated schematics, technical data, purchase orders related to the purchase and sale of magnets, documentation associated with defense articles,

m.  For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or store medium that contains or in which is stored records or information that is otherwise called for this this warrant (hereinafter COMPUTER)

i.  Evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited or deleted, such as logs,

5

registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contracts, "chat" instant messaging lots, photographs and correspondence;

ii. Evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

iii. Evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

iv. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

v. Evidence of the times the COMPUTER was used;

vi. Passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

vii. Evidence of encryption applications used to communicate between persons, to include Signal, WhatsApp, WeChat and other applications utilized for secure communications.

viii. Documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

ix. Records of or information about Internet Protocol addresses used by the COMPUTER;

x. Records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite"

web pages, search terms that the user entered into any Internet search engine, and records of user-types web addresses;

   xi. Routers, modems, and network equipment used to connect computers to the Internet.

n. The identity of the Internet service provided to the **Subject Residence #3**;

o. Indicia of occupancy, control, possession, custody or dominion **Subject Residence #3** or digital media found in the **Subject Residence #3** including but not limited to: personal mail, check books, personal identification, personal effects, notes, other correspondence, utility and other bills, letters, rent receipts, mortgages and loan documents, financial documents, vehicle registration information or ownership warranties, keys or photographs (developed or undeveloped); and

p. The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware. The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

q. Any financial records related to Quadrant entities owned by Hang "Cody" Sun or financial records, including bank statements, tax documents, accounting statements, business filings submitted to state Secretary of State's office or other governmental entities, corporation internal documents.

r.  Personal financial and business mailings related to Sun and entities owned or controlled by Sun.

s.  Records reflecting indicia of ownership of assets by Sun.

t.  Business and bookkeeping records and other financial records, such as General Ledgers, General Journals, all Subsidiary Ledgers and Journals, Gross Receipts and income records, Cash Receipts and Disbursement records and/or Journals, Sales and Purchase records and/or Journals, Accounts Receivable and Payable Ledgers and records, Cost of Goods Sold records, Loan Receivable and Payable Ledgers, Register and all Sales and Expense invoices including invoices documenting expenses paid by cash (currency) or bank check (cashier or teller checks) or credit card and retained copies of any bank checks (cashier or teller checks), related to Sun.

u.  Records of the movement, transfer, payment or receipt of funds, money, or assets.

v.  Records of the purchase, transfer, sale or other disposition or receipt of assets.

w.  Bank statements, cancelled checks, check stubs, duplicate checks, check books, check authorization documents, check registers, deposit slips, wire transfers, letter instructions regarding transfers of funds, bank notices, credit memos, certificates of deposit, money orders, trust account records, and records reflecting any cash receipts and cash disbursements, safe deposit box records and keys.

x.  Records regarding loans, promissory notes, notes receivable and notes payable, leases

y.  Workpapers relating to the preparation and/or accumulation of financial data and tax returns.

**ATTACHMENT C**

**PROTOCOL FOR SEARCHING DEVICES OR MEDIA THAT STORE DATA ELECTRONICALLY**

1.    In executing this warrant, the government will begin by ascertaining whether all or part of a search of a device or media that stores data electronically ("the device") reasonably can be completed at the location listed in the warrant ("the site") within a reasonable time.  If the search reasonably can be completed on site, the government will remove the device from the site only if removal is necessary to preserve evidence, or if the item is contraband, a forfeitable instrumentality of the crime, or the fruit of a crime.

2.    If the government determines that a search reasonably cannot be completed on site within a reasonable time period, the government must determine whether all or part of the authorized search can be completed by making a mirror image of, or in some other manner duplicating, the contents of the device and then conducting the forensic review of the mirror image or duplication off site.  The government will complete a forensic review of that mirror image within 120 days of the execution of the search warrant.

3.    In a circumstance where the government determines that a mirror image of the contents of a device cannot be created on site in a reasonable time, the government may seize and retain that device for 60 days in order to make a mirror image of the contents of the device.

4.    When the government removes a device from the searched premises, it may also remove any equipment or documents ("related equipment or documents") that reasonably appear to be necessary to create a mirror image of the contents of the device or conduct an off-site forensic review of a device.

5.    When the government removes a device or related equipment or documents from the site in order to create a mirror image of the device's contents or to conduct an off-site forensic

9

review of the device, the government must file a return with a magistrate judge that identifies with particularity the removed device or related equipment or documents within 14 calendar days of the execution of the search warrant.

6.      Within a reasonable period of time, but not to exceed 60 calendar days after completing the forensic review of the device or image, the government must use reasonable efforts to return, delete, or destroy any data outside the scope of the warrant unless the government is otherwise permitted by law to retain such data.

7.      The time periods set forth in this protocol may be extended by court order for good cause.

8.      In the forensic review of any device or image under this warrant the government must make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, or other electronically-stored information that are identified with particularity in the warrant, while minimizing exposure or examination of irrelevant, privileged, or confidential files to the extent reasonably practicable.

9.      For the purposes of this search protocol, the phrase "to preserve evidence" is meant to encompass reasonable measures to ensure the integrity of information responsive to the warrant and the methods used to locate same.