UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| **United States of America** <br><br> v. <br><br> **Quadrant Magnetics LLC et al.** | No. 3:22-CR-88-DJH |

**DEFENDANTS' MOTION TO DISMISS UNCONSTITUTIONALLY VAGUE AECA AND ITAR ALLEGATIONS**

Defendants Quadrant Magnetics, LLC (Quadrant), Phil Pascoe, Scott Tubbs, and Monica Pascoe (collectively, Defendants) respectfully move the Court under Federal Rule of Criminal Procedure 12(b)(3) to dismiss ¶¶ 16(a)–(b), 17(b)–(c), and 18(c)–(v) of Count 1 (Conspiracy), Counts 5 through 8 (Exporting Technical Data Without a License), and Count 9 (Smuggling) of the Second Superseding Indictment, ECF 73 (Indictment). These allegations rest on a regulatory provision that, as applied, nobody can determine has been violated and is thus unconstitutionally vague.

The Defendants are alleged to have exported drawings of magnets. Counts 1, 5–8, and 9 of the Indictment allege this violated of section 38 of the Arms Export Control Act (AECA), 22 U.S.C. § 2778, as implemented through the International Traffic in Arms Regulations (ITAR), 22 C.F.R. §§ 120–130. The ITAR includes the U.S. Munitions List (USML), a catalog of articles and data that cannot be exported without a license. Some items are clearly on the list, like a fighter jet or a machine gun. Others are on the list because they are "specially designed" to go into military hardware. But a part is "specially designed" only if there is no commercial equivalent—a part ever used by commercial industry that works the same but fits differently into an assembly. For magnets of the type identified in the Indictment, which have hundreds of commercial applications, the government's determination of commercial equivalency is a guessing game. It turns on whether

someone else has ever used an equivalent magnet—which is almost certainly going to be the case, somewhere, given these sorts of magnets' ubiquity for decades. But absent the power of an emperor and an omniscience surpassing even ChatGPT, the government has no meaningful way to fulfil its mandate of determining the existence of those equivalents. Therefore the "specially designed" provision of the ITAR, as applied to the magnets in the Indictment, encourages the most "arbitrary and discriminatory enforcement" of all—the wild guess. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).

## BACKGROUND

Quadrant supplies rare-earth permanent magnets to other businesses. The indictment alleges that Quadrant supplied magnets to companies that used them in military items. *See* Indictment ¶¶ 1–2. The indictment alleges that Quadrant allegedly sent controlled technical data in the form of drawings overseas without a license, in violation of the AECA and ITAR. *See id.* ¶¶ 6, 13, 22, 24, 26, 28, 30.

## LEGAL FRAMEWORK

Section 38 of the AECA, 22 U.S.C. 2778, as amended, authorizes the President to control export and import of defense articles and defense services. The President, through the U.S. Department of State, promulgated the ITAR. *See* 22 C.F.R. Parts 120–130. The ITAR contains a list of items known as the USML. The articles, services, and related technical data designated as defense articles or defense services under the AECA constitute the USML.

The ITAR is not a static set of rules. Rather, it has changed frequently over the past ten years; this includes numerous changes to the items that are identified on the USML.[1]

---

[1] "The ITAR is regularly updated and revised to reflect changes in technological developments and in U.S. national security and foreign policy interests." DDTC, *ITAR & Export Controls*, https://www.pmddtc.state.gov/ddtc_public/ddtc_public?id=ddtc_public_portal_itar_landing (last accessed December 15, 2023). *See, e.g.*, 81 Fed. Reg. 49531

USML categories are organized by paragraphs and subparagraphs identified alphanumerically. *See* 22 C.F.R. § 121.1. They usually start by enumerating or otherwise describing end-items, followed by major systems and equipment; parts, components, accessories and attachments; and technical data and defense services directly related to the defense articles of that USML category. Articles are controlled on the USML because they are either enumerated in a category or described in a catch-all paragraph that incorporates "specially designed" as a control parameter.

With the exception of certain end-items (e.g., the "B-1" bomber), the U.S. State Department does not identify specific individual items by their commercial name on the USML. Rather, in the case of "enumerated" items, it uses descriptions of "control parameters" (i.e., technical characteristics) to identify the items controlled in a particular entry. If an item meets the control parameters in an enumerated entry, it is controlled on the USML.

Even if an item does not meet the control parameters of any enumerated entries on the USML, it still may be controlled if it is "specially designed" for a defense article as described in various entries in the USML. Thus, for example, USML entry XII(e)(1) controls "parts and components specially designed for articles described in paragraph (a)(1) or (a)(5)" of USML Category XII. Likewise, USML entry VIII(h)(1) controls "[p]arts, components, accessories, and attachments specially designed for" the F/A-18 E/F, among other military aircraft.

The "specially designed" rule was implemented in April 2013[2] and based on a "catch" and "release" concept for determining whether unenumerated lower-level parts, components, accessories, attachments, or software are covered by the USML. The intent was to create a broad "catch" for items that are "used in or with" defense articles, but to allow for certain "releases" from control

---

(July 28, 2016); 81 Fed. Reg. 70340 (Oct. 12, 2016); 81 Fed. Reg. 83126 (Nov. 21, 2016); 82 Fed. Reg. 2889 (Jan. 10, 2017); 82 Fed. Reg. 41172 (Aug. 30, 2017).

[2] *See* 78 Fed. Reg. 22740, 22754 (Apr. 16, 2013).

if the criteria of the releases are met. Five releases are identified in paragraphs (b)(1) through (b)(5) of 22 C.F.R. § 120.41.

Paragraph (b)(3) of 22 C.F.R. § 120.41 allows for a part or component that is used in or with a defense article to be released from control under the USML if it: Has the same function, performance capabilities, and the same or equivalent form and fit as a commodity or software used in or with a commodity that: (i) is or was in production (i.e., not in development); and (ii) is not enumerated on the USML.

Technical data may be identified on the USML if it is "directly related" to a defense article, such as a specially designed part listed somewhere on the USML. Thus, technical data directly related to an item controlled under USML paragraph XII(e) or XX(c) would be controlled under USML paragraphs XII(f) or XX(d), respectively.

U.S. persons and companies are generally responsible for self-determining whether their items are covered by the USML. The commodity-jurisdiction procedure is used if doubt exists as to whether an item is covered by the USML. A commodity-jurisdiction determination is only as good as the information sent to, or gathered by, the State Department, which is a reason that the State Department takes care to provide detailed instructions, require substantial amounts of information, and includes a certification requiring the accuracy and completeness of the information when commodity-jurisdiction requests are submitted by the public.

## LEGAL STANDARD

Federal Rule of Criminal Procedure 12(b) authorizes a defendant to raise by pretrial motion "any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). Under Rule 12, a defendant may move to dismiss defects in the indictment. Fed. R. Crim. P. 12(b)(3)(B)(v); *see United States v. Jones*, 542 F.2d 661, 664–65 (6th Cir. 1976).

An indictment is defective if it alleges a violation of an unconstitutional statute. *United States v. Rife*, 429 F. Supp. 3d 363, 366 (E.D. Ky. 2019); *see also United States v. Brown*, 715 F. Supp. 2d 688, 689 (E.D. Va. 2010) (citing *In re Civil Rights Cases*, 109 U.S. 3, 8-9 (1883)).

## ARGUMENT AND AUTHORITIES

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). To avoid unconstitutional vagueness, a law must (1) define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited, and (2) do so in a manner that does not encourage arbitrary and discriminatory enforcement. *See Kolender v. Lawson*, 461 U.S. 352, 357 (1983). The second element requires a legislature to establish minimal guidelines to govern law enforcement, preventing prosecutors and juries from pursuing their personal predilections. *See id.* at 358. Without such guidance, "a criminal statute may permit 'a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections." *Id.* (brackets and quoted source omitted). This precision is required for statutes as well as agencies' regulations and policies. *See FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012).

Further, a legal requirement is unconstitutionally vague if it requires reference to unknowable facts. *See Giacco v. Pennsylvania*, 382 U.S. 399, 402–03 (1966); *Watkins v. United States*, 354 U.S. 178, 214 (1957) ("[I]t was not adequately revealed to petitioner when he had to decide at his peril whether or not to answer. Fundamental fairness demands that no witness be compelled to make such a determination with so little guidance."); *Int'l Harvester Co. of Am. v. Kentucky*, 234 U.S. 216, 221 (1914) (invalidating conviction because legal standard was premised on unknowable fact: "the market value ... under normal market conditions"). A legal requirement violates due process if it provides no "*ascertainable* standard of guilt." *Skilling v. United States*, 561 U.S. 358,

5

418 (2010) (Scalia, J., concurring in part and in the judgment) (emphasis added) (quoting *United States v. L. Cohen Grocery Store Co.*, 255 U.S. 81, 89 (1921)); *see also United States v. Smith*, 695 F. App'x 854, 858 (6th Cir. 2017) (unpublished); *United States v. Devore*, 932 F.2d 970, 1991 U.S. App. LEXIS, *13 (6th Cir. 1991) (unpublished table decision).

Various aspects of the AECA and the ITAR have been challenged for vagueness numerous times. *See, e.g., United States v. Sun*, 278 F.3d 302, 309 (4th Cir. 2002); *United States v. Durrani*, 659 F. Supp. 1177, 1181 (D. Conn. 1987). Courts have been unpersuaded because the AECA is aimed at sophisticated businesspeople who are capable of protecting their own interests, it requires scienter so as to preclude a criminal conviction for a genuine misunderstanding or mistake, and exporters can seek a commodity-jurisdiction determination if they have doubts. *See, e.g.*, *Sun*, 278 F.3d at 310; *United States v. Lee*, 183 F.3d 1029, 1032–33 (9th Cir. 1999).

This challenge is different. The Defendants do not challenge any aspect of the AECA itself as vague, nor complain that the language of the "specially designed" provision is incomprehensible. Instead, the Defendants' challenge is tightly bound to a particular item—the drawings of the rare-earth permanent magnets described in the Indictment paragraphs and counts listed *supra* on page 1—and whether any party, including *the government*, under its own chosen regulatory framework, has any reliable means of telling whether those drawings depict magnets that are "specially designed" and thus controlled. Nobody can. The test for "specially designed," as applied to these magnets, requires resort to information that neither the government nor the regulated party has, so enforcement under those circumstances violates due process.

Lest there be doubt, the government cannot simply point to a commodity-jurisdiction determination as conclusively deciding the issue. The State Department's designation of items as defense articles on the USML is not judicially reviewable. *See* 22 U.S.C. § 2778(h). However, the

government must still prove that the particular part, machine, data, or the like charged in a case falls under the definition of one of those USML proscribed items. *See United States v. Roth*, 628 F.3d 827, 832 (6th Cir. 2011); *see also United states v. Zhen Zhou Wu*, 711 F.3d 1, 18–19 (1st Cir. 2013) (Souter, J., on panel); *United States v. Pulungan*, 569 F.3d 328, 328 (7th Cir. 2009) (Easterbrook, C.J.).

   **1. Not every item used in military hardware is on the U.S. Munitions List.**

The U.S. Munitions List is organized into 21 Roman-numeral categories, such as Category I—Firearms and Related Articles, Category VIII—Aircraft and Related Articles, and Category XVIII—Directed Energy Weapons. *See* 22 C.F.R. § 121.1. The articles in them are generally not named specifically (except some end items like the F-35 or certain chemicals). Instead, the USML uses control parameters—technical characteristics—to identify them. These can be all-but-synonymous with certain military equipment, such as "tanks," *id.* VII(a), or "bombers," *id.* VIII(a)(1), or instead be described by certain features, like "spacecraft … that … [h]ave space-to-ground weapons systems," *id.* XV(a)(6).

Also included on the USML are items that are "specially designed" for military use. Something is "specially designed" if it either (1) has in essence military-level performance, *see id.* § 120.41(a)(1), or (2) is "a part, component, accessory, attachment, or software for use in or with a defense article," *id.* § 120.41(a)(2). Here are some examples:

- "Firearms specially designed to integrate fire control, automatic tracking, or automatic firing (e.g., Precision Guided Firearms)." *Id.* I(c).

- "Systems for firing superposed or stacked ammunition and specially designed parts and components therefor." *Id.* II(j)(5).

- "Flight control and guidance systems (including guidance sets) specially designed for [rockets, space launch vehicles (SLVs), missiles, bombs, torpedoes, depth charges, mines, and grenades]." *Id.* IV(h)(1).

7

Whether a firearm is specially designed to integrate automatic firing is relatively simple. The same holds for a flight control system specially designed for a missile. But what about a rudimentary, fungible piece like a hose, metal plate, or a magnet with thousands or millions of commercial applications? Controlling those would militarize everything on Wal-Mart's shelves. Indeed, a magnet is on the ground floor of the assembly hierarchy for anything. It is a fundamental component that is unassembled itself. Magnets go into lots of things. Nothing goes into a magnet.

The ITAR has attempted to solve this problem through its "specially designed" release provisions. The releases apply only to a "part, component, accessory, attachment, or software." *Id.* § 120.41(b). Each of these is defined. *See id.* §§ 120.40(c), (d), (e), (g). A magnet is a "part," even lower on the totem pole than components, accessories, and attachments: "A *part* is any single unassembled element of a major or a minor component, accessory, or attachment which is not normally subject to disassembly without the destruction or the impairment of designed use." *Id.* § 120.40(e).

There are five releases in all. These provisions say that certain articles are not "specially designed"—and thus not ITAR-controlled—generally in circumstances where they are not distinct for defense uses. An item qualifies if it:

(1) Is subject to the EAR pursuant to a commodity jurisdiction determination;

(2) Is, regardless of form or fit, a fastener (e.g., screws, bolts, nuts, nut plates, studs, inserts, clips, rivets, pins), washer, spacer, insulator, grommet, bushing, spring, wire, or solder;

(3) Has the same function, performance capabilities, and the same or equivalent form and fit as a commodity or software used in or with a commodity that: (i) [i]s or was in production (i.e., not in development); and (ii) [i]s not enumerated on the USML;

(4) Was or is being developed with knowledge that it is or would be for use in or with both defense articles enumerated on the USML and also commodities not on the USML; or

8

> (5) Was or is being developed as a general purpose commodity or software, i.e., with no knowledge for use in or with a particular commodity (e.g., a F/A–18 or HMMWV) or type of commodity (e.g., an aircraft or machine tool).

*Id.* § 120.41(b).

As used in these provisions, the following definitions apply:

- A *commodity* is "any article, material, or supply, except technology/technical data or software." *Id.* § 120.40(a).

- The *function* "of a commodity is the action or actions it is designed to perform." *Id.* § 120.42(c).

- *Performance capability* "is the measure of a commodity's effectiveness to perform a designated function in a given environment (e.g., measured in terms of speed, durability, reliability, pressure, accuracy, efficiency)." *Id.* § 120.42(d).

- The *form* "of a commodity is defined by its configuration (including the geometrically measured configuration), material, and material properties that uniquely characterize it." *Id.* § 120.42(a).

- The *fit* "of a commodity is defined by its ability to physically interface or connect with or become an integral part of another commodity." *Id.* § 120.42(b).

- *Equivalent* means that a commodity's "form has been modified solely for fit purposes." *Id.* § 120.42(e).

- *Development* "is related to all stages prior to serial production, such as design, design research, design analyses, design concepts, assembly and testing of prototypes, pilot production schemes, design data, process of transforming design data into a product, configuration design, integration design, and layouts. Development includes modification of an existing design." *Id.* § 120.43(a).

- *Production* means, in short, "all production stages, such as product engineering, manufacture, integration, assembly (mounting), inspection, testing, and quality assurance. . . ." *Id.* § 120.43(b)(1).

Four of the five release provisions are readily ascertainable. To be released under (1), there must be a commodity-jurisdiction determination, and one that determines the item belongs under the Department of Commerce's Export Administration Regulations instead of the ITAR. For (2), an item can be easily examined to decide if it is a "fastener … , washer, spacer, insulator, grommet, bushing, spring, wire, or solder." For (4) and (5), there must be contemporaneously created

supporting documentation; otherwise, the item defaults to ITAR-controlled status. *See id.* § 120.41 (note 2 to paragraph (b)).

Release (3) has no default setting. It requires further inquiry. Release (3) requires a determination of, to paraphrase, whether another commodity exists that works just as well and was put into a non-defense item. Or to put it specifically, before something can be ITAR-controlled, there cannot be another commodity that:

- Has the same function—meaning it is designed to perform the same action(s);
- Has the same performance capability—meaning it has the same effectiveness to perform a designated function in a given environment;
- Has an equivalent form and fit—meaning its form is modified solely for fit purposes, i.e., to interface, connect with, or become an integral part of another commodity; and
- Is used in another commodity that is or was in production rather than in development.

**2. Nobody can determine if the magnets are "specially designed."**

Nobody can determine as a practical matter whether the magnets in the Indictment are specially designed under 22 C.F.R. § 120.41 and thus controlled by the ITAR. The only way to know is to check every neodymium or samarium–cobalt magnet ever used in a commercial product—not just the magnets the government may have access to as a purchaser, and not just the magnets known to the private actor, but all such magnets used by every non-defense entity.

A search of that scope may seem unnecessary, and a demand for it unrealistic, as if tasking prosecutors with an endless hunt for exculpatory evidence; but it is not. It is fundamental to the basic administration of the ITAR in situations like this one. There are two reasons for this, one practical and the other conceptual.

First is the practical. A search like this is required when it comes to the sorts of basic magnets alleged in the Indictment because of the high likelihood that commercially equivalent magnets exist. Each of the seven magnets identified in the Indictment is a small rectangular prism ranging in size from a dime to a domino. While they are rare-earth permanent magnets rather than

traditional refrigerator-door magnets, permanent magnets "are a part of almost all the most important products in our lives,"[3] including in "automobiles," the "magnetic heads of Hard Disk Drives, CDs, as well as in motors of peripheral devices such as printers, fax machines, scanners, and photocopie[r]s," plus "air conditioners, washing machines, dryers, cooling fan motors in computers, fans, microwaves, loudspeakers, and VCR tape drive motors."[4] They are sold on Amazon,[5] eBay,[6] and Wal-Mart,[7] and by many magnet specialty retailers.[8] So the idea that commercially equivalent magnets exist to the magnets identified in the Indictment is not speculative in the least; it is a near-certainty, provided a proper search could be done for them. But neither the Defendants nor the government can do that sort of search because they are limited to only a small portion of the magnet universe. Further, that limitation is both in breadth—the thousands of private entities who make and use magnets—and in *time*. Remember, the test is whether an equivalent magnet "[i]s or *was*" in production. 22 C.F.R. § 120.41(b)(3)(i) (emphasis added). Nobody possessing less

---

[3] Ass'n for Advancing Automation, *Permanent Magnet Advancements and Applications* (Oct. 10, 2017), https://www.automate.org/blogs/permanent-magnet-advancements-and-applications (last accessed Dec. 16, 2023).

[4] Markets & Markets, *Permanent Magnet Market by Type (Neodymium Iron Boron Magnet, Ferrite Magnet, Samarium Cobalt Magnet), End-Use Industry (Consumer Electronics, General Industrial, Automotive, Medical Technology, Environment & Energy), and Region—Global Forecast to 2026* (July 2021), https://www.marketsandmarkets.com/Market-Reports/permanent-magnet-market-806.html (last accessed Dec. 16, 2023).

[5] *See, e.g.*, *MIN CI 100Pcs Super Strong Rare Earth Magnets Bar, Rectangular Metal Neodymium Magnets, for Refrigerator Cruise Crafts DIY Science Industrial Kitchen Tool Storage (10x4x2mm)*, Amazon.com, https://www.amazon.com/MIN-CI-Rectangular-Refrigerator-Industrial/dp/B09M6BJK5N/ (last accessed Dec. 16, 2023) (available in five different sizes).

[6] *See, e.g.*, *1″ x 1/4″ x 1/4″ Bars - SmCo- Samarium Cobalt Rare Earth Magnet*, ebay.com, https://www.ebay.com/itm/361494953183?hash=item542ac73cdf:g:qkMAAOSwMT1is1~G (last accessed Dec. 16, 2023).

[7] *See, e.g.*, *Trayknick 2 Pack 20Pcs 30x10x3mm N50 NdFeB Strong Rare Earth Bar Block Shape Neodymium Magnets*, Walmart.com, https://www.walmart.com/ip/Trayknick-2-Pack-20Pcs-30x10x3mm-N50-NdFeB-Strong-Rare-Earth-Bar-Block-Shape-Neodymium-Magnets/1250421833 (last accessed Dec. 16, 2023).

[8] *See, e.g.*, https://appliedmagnets.com, https://www.kjmagnetics.com, https://www.apexmagnets.com (each last accessed Dec. 16, 2023).

than the Infinity Gauntlet[9] (which itself would surely be ITAR-controlled) can meaningfully determine if an equivalent magnet existed in 1984 or 2002.[10]

This is a problem of the government's own making. It stems from how it chose to write the "specially designed" test. It is unlike any other legal test we can think of. The concept of legal rights flowing from blacklists and whitelists is common in law. For a "blacklist," a source of information consulted to establish liability or an element of it, the only question is whether the needed information is on the list; once found, no further searching is necessary. For example, under 18 U.S.C. § 922(g), the felon-in-possession law, the government can establish the "felon" element by checking federal and state registries until they find the necessary listed conviction. Once that is done, they need look no further for a second felony. For a "whitelist," however, a source of information consulted to permit conduct or negate liability, the list must be searched until the needed information is found or the list's contents are exhausted. The ITAR licensing regime is one example. The government will need to show that the alleged exportation of the technical data not only took place, but that there was no license in place. It will attempt to establish that element by showing that it checked its licensing database, for that is where any license would reside.

A whitelist works fine when the government has access to its entire contents. Then the government can say with reasonable certainty whether or not the information requested is in it. But that process fails when the government does *not* have access to the entirety of the whitelist. Then

---

[9] Popularized in the blockbuster Marvel films *Avengers: Infinity War* and *Avengers: Endgame*, the Infinity Gauntlet "is one of the most powerful objects in the Universe," with its six infinity stones granting the power to, inter alia, exercise "total control over all aspects of time including time travel" and tap "into the universal consciousness." Marvel Database, *Infinity Gauntlet (Item)*, https://marvel.fandom.com/wiki/Infinity_Gauntlet_(Item) (last accessed Dec. 16, 2023).

[10] The neodymium–iron–boron magnet was invented by General Motors and Sumitomo in 1983, and the samarium–cobalt magnet even earlier. *See, e.g.*, Glenn Zorpette, *The Magnet that Made the Modern World*, IEEE Spectrum (June 21, 2022), https://spectrum.ieee.org/the-men-who-made-the-magnet-that-made-the-modern-world (last accessed Dec. 16, 2023).

12

the government can only guess whether the information is on the whitelist or not. And we do not send people to prison over guesses.

Unlike previous cases challenging the AECA or ITAR for unconstitutional vagueness, the Defendants' sophistication and business acumen have no bearing on this problem. Courts have held that businesses engaged in exporting should be able to comply with export regulations, even if the regulations are not clear to someone with less sophistication. *See, e.g.*, *Zhen Zhou Wu*, 711 F.3d at 14; *Sun*, 278 F.3d at 309. The specially designed provision calls not for sophistication, but omniscience. Defendants do not have access to current and historical data on every magnet available in the United States to identify a commercial equivalent. Courts further point to the commodity-jurisdiction determination process, which allows companies to obtain the government's view on whether an item is on the USML before they engage in potentially unlawful conduct. *See Zhen Zhou Wu*, 711 F.3d at 15. That may provide a safe harbor, but when it comes to the "specially designed" provision and magnets, the government cannot meaningfully answer whether the magnets are ITAR-controlled or not. The government can only guess.

Rules with indeterminate metrics, like the "specially designed" rule as applied to the Indictment's magnets, have been held unconstitutionally vague. For example, the court in *Doe v. Snyder* analyzed a sex-offender registration law that imposed a 1000-foot exclusion zone around schools. 101 F. Supp. 3d 672, 683 (E.D. Mich. 2015), *rev'd on other grounds*, 834 F.3d 696 (6th Cir. 2016) (law held unconstitutional as ex post facto). The exclusion zone was indeterminable for sex-offender registrants because the law did not prescribe guidelines for measuring the distance. *Id.* The zone was similarly indeterminable for law enforcement because Michigan State Police did not have the necessary data to precisely determine the exclusion zones. *Id*. at 684. The Court concluded that the registration law was unconstitutionally vague because neither the registrants nor law

enforcement could accurately determine the zone, forcing registrants to alter their behavior to a greater extent than required by the law. *Id*. at 684–85. Here, as in *Snyder*, neither the Defendants nor the government can determine whether magnets are on the USML because neither have access to the very data the government says is necessary. Like the registrants in *Snyder*, the Defendants can act prophylactically, but they cannot know the actual bounds of lawful conduct. Thus, the rule as applied to Defendants is unconstitutionally vague.

Also unlike other cases challenging the AECA and ITAR for vagueness, the fact that the AECA requires *scienter* for criminal liability does not solve the problem here. Although a *scienter* requirement may mitigate a law's vagueness, it cannot save a statute that has no meaning to begin with. *See Screws v. United States*, 325 U.S. 91, 105 (1945) ("[W]illful conduct cannot make definite that which is undefined."). The issue is not *mens rea* but the *actus reus*—whether the magnets are specially designed and thus controlled at all. *See Zhen Zhou Wu*, 711 F.3d at 18. Even if the Government can prove that the Defendants had the requisite *mens rea* to violate the AECA, it must still prove the *actus reus* that the magnets were actually on the USML. *Id*. As described *supra*, that determination is impossible to make.

## CONCLUSION

For all of these reasons, Defendants respectfully request that the Court dismiss ¶¶ 16(a)–(b), 17(b)–(c), and 18(c)–(v) of Count 1 (Conspiracy), Counts 5 through 8 (Exporting Technical Data Without a License), and Count 9 (Smuggling) of the Second Superseding Indictment, ECF 73 (Indictment).

Pursuant to Joint Local Criminal Rule 47.1(g), Defendants respectfully request a hearing and oral argument on this motion.

Dated: December 18, 2023                    By: */s/ John Brownlee*

                                          John L. Brownlee (*pro hac vice*)
William F. Gould (*pro hac vice*)
Timothy J. Taylor (*pro hac vice*)
Caitlin A. Eberhardt (*pro hac vice*)
HOLLAND & KNIGHT LLP
1650 Tysons Blvd., Suite 1600
Tysons, VA 22201
T: 703.720.8053
F: 703.720.8610
John.Brownlee@hklaw.com
William.Gould@hklaw.com
Timothy.Taylor@hklaw.com
Caitlin.Eberhardt@hklaw.com

ATTORNEYS FOR DEFENDANT
QUADRANT MAGNETICS, LLC

*/s/ Kent Wicker (with permission)*
Kent Wicker
WICKER / BRAMMELL PLLC
323 W. Main Street, 11th Floor
Louisville, Kentucky 40202
(502) 541-5533
Kent@wickerbramel.com
*Counsel for Phil Pascoe*

*/s/ Patrick Renn (with permission)*
Patrick J. Renn
Smith & Helman
600 W. Main Street, Suite 100
Louisville, KY 40202
502-540-5700
Fax: 502-568-3600
prenn@600westmain.com
*Counsel for Scott Tubbs*

*/s/ Scott Cox (with permission)*
Scott C. Cox
Cox & Mazzoli, PLLC
600 W. Main Street, Suite 300
Louisville, KY 40202
502-589-6190
502-584-1744
CoxECF@aol.com
*Counsel for Monica Pascoe*

15

**CERTIFICATE OF SERVICE**

I hereby certify that on December 18, 2023, the foregoing motion was electronically filed with the Clerk of the Court via the CM/ECF system, which sent a notice of electronic filing to the attorneys of record.

/s/ *John Brownlee*