UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| **United States of America** <br><br> v. <br><br> **Quadrant Magnetics LLC et al.** | No. 3:22-CR-88-DJH |

**DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE
EXPERT TESTIMONY FROM ALEX DOUVILLE AND STEVEN BURTON**

Defendants Quadrant Magnetics, LLC ("Quadrant"), Phil Pascoe, Scott Tubbs, and Monica Pascoe (collectively, "Defendants") respectfully move the Court under Federal Rules of Evidence 401, 403, and 702 to exclude the expert testimony of government experts Alex Douville and Steven Burton to the extent they seek to opine that Quadrant's magnets, and thereby their underlying drawings, are "specially designed" or otherwise fall within the U.S. Munitions List (USML) and are thus controlled by the Arms Export Control Act (AECA) as implemented through the International Traffic in Arms Regulations (ITAR).

Mr. Douville is expected to testify about, among other things, the AECA, its implementation through the ITAR, including the U.S. Munitions List (USML), and that drawings of Quadrant's magnets qualify as ITAR-controlled technical data requiring a license before export. Mr. Burton is expected to testify about, among other things, thirteen part numbers that are, in his view, specially designed for ITAR-controlled defense articles so that their associated technical drawings are likewise ITAR-controlled technical data.

Both witnesses' proffered testimony ignores the actual legal test for determining whether an item is "specially designed" and thus ITAR-controlled. The test is not merely whether an item is drawn up to particular specifications to go into a defense article—for instance, a magnet shaped a

certain way so it can fit into a generator, which generator goes into an F-18. The other half of the test, utterly absent from the proffered testimony, is whether the item has a commercial equivalent. If the F-18 magnet has a fraternal twin magnet that goes into an MRI machine, a high-tech movie camera, or a wind turbine, then it is not an ITAR-controlled magnet. The magnets need not be identical. They must have the same performance capabilities and function, but their form can be different so as to "fit" whatever they go into. Because both witnesses have failed to account for this critical regulatory fact, their methodology is fatally flawed and their ultimate conclusion—that Quadrant's drawings were ITAR-controlled—is irrelevant under Federal Rule of Evidence 401, poses a danger of prejudicing and misleading the jury under Rule 403, and is unreliable under Rule 702.

## BACKGROUND

Quadrant supplies rare-earth permanent magnets to other businesses. The Indictment alleges that Quadrant supplied magnets to companies that used them in military items. *See* Indictment ¶¶ 1–2. The Indictment alleges that Quadrant allegedly sent controlled technical data in the form of drawings overseas without a license, in violation of the AECA and ITAR. *See id.* ¶¶ 6, 13, 22, 24, 26, 28, 30.

1. **Legal framework.**

Section 38 of the AECA, 22 U.S.C. 2778, as amended, authorizes the President to control export and import of defense articles and defense services. The President, through the U.S. Department of State, promulgated the ITAR. *See* 22 C.F.R. Parts 120–130. The ITAR contains a list of items known as the USML. The articles, services, and related technical data designated as defense articles or defense services under the AECA constitute the USML.

The ITAR is not a static set of rules. Rather, it has changed frequently over the past ten years; this includes numerous changes to the items that are identified on the USML.[1]

USML categories are organized by paragraphs and subparagraphs identified alphanumerically. *See* 22 C.F.R. § 121.1. They usually start by enumerating or otherwise describing end-items, followed by major systems and equipment; parts, components, accessories and attachments; and technical data and defense services directly related to the defense articles of that USML category. Articles are controlled on the USML because they are either enumerated in a category or described in a catch-all paragraph that incorporates "specially designed" as a control parameter.

With the exception of certain end-items (e.g., the "B-1" bomber), the U.S. State Department does not identify specific individual items by their commercial name on the USML. Rather, in the case of "enumerated" items, it uses descriptions of "control parameters" (i.e., technical characteristics) to identify the items controlled in a particular entry. If an item meets the control parameters in an enumerated entry, it is controlled on the USML.

Even if an item does not meet the control parameters of any enumerated entries on the USML, it still may be controlled if it is "specially designed" for a defense article as described in various entries in the USML. Thus, for example, USML entry XII(e)(1) controls "parts and components specially designed for articles described in paragraph (a)(1) or (a)(5)" of USML Category XII. Likewise, USML entry VIII(h)(1) controls "[p]arts, components, accessories, and attachments specially designed for" the F/A-18 E/F, among other military aircraft.

---

[1] "The ITAR is regularly updated and revised to reflect changes in technological developments and in U.S. national security and foreign policy interests." DDTC, *ITAR & Export Controls*, https://www.pmddtc.state.gov/ddtc_public/ddtc_public?id=ddtc_public_portal_itar_landing (last accessed December 15, 2023). *See, e.g.*, 81 Fed. Reg. 49531 (July 28, 2016); 81 Fed. Reg. 70340 (Oct. 12, 2016); 81 Fed. Reg. 83126 (Nov. 21, 2016); 82 Fed. Reg. 2889 (Jan. 10, 2017); 82 Fed. Reg. 41172 (Aug. 30, 2017)

The "specially designed" rule was implemented in April 2013[2] and based on a "catch" and "release" concept for determining whether unenumerated lower-level parts, components, accessories, attachments, or software are covered by the USML. The intent was to create a broad "catch" for items that are "used in or with" defense articles, but to allow for certain "releases" from control if the criteria of the releases are met. Five releases are identified in paragraphs (b)(1) through (b)(5) of 22 C.F.R. § 120.41.

Paragraph (b)(3) of 22 C.F.R. § 120.41 allows for a part or component that is used in or with a defense article to be released from control under the USML if it: Has the same function, performance capabilities, and the same or equivalent form and fit as a commodity or software used in or with a commodity that: (i) is or was in production (i.e., not in development); and (ii) is not enumerated on the USML.

Technical data may be identified on the USML if it is "directly related" to a defense article, such as a specially designed part listed somewhere on the USML. Thus, technical data directly related to an item controlled under USML paragraph XII(e) or XX(c) would be controlled under USML paragraphs XII(f) or XX(d), respectively.

U.S. persons and companies are generally responsible for self-determining whether their items are covered by the USML. The commodity-jurisdiction procedure is used if doubt exists as to whether an item is covered by the USML. A commodity-jurisdiction determination is only as good as the information sent to, or gathered by, the State Department, which is a reason that the State Department takes care to provide detailed instructions, require substantial amounts of information, and includes a certification requiring the accuracy and completeness of the information when commodity-jurisdiction requests are submitted by the public.

---

[2] *See* 78 Fed. Reg. 22740, 22754 (Apr. 16, 2013).

The State Department's DDTC sub-agency administers the ITAR. DDTC has three offices.[3] The Office of Defense Trade Controls Policy manages, among other things, "Commodity Jurisdiction requests from industry and the U.S. government, an interagency process that issues determinations as to whether a product or service is described on the USML."[4] The Office of Defense Trade Controls Licensing manages export authorization for ITAR-controlled items.[5]

### 2. Mr. Douville's and Mr. Burton's proposed testimony.

Mr. Douville works in DDTC's licensing office. *See* Ex. 1 at 1. His proffered testimony would cover broadly the AECA legal regime and its administration by DDTC. This would include how the USML works, how technical data is controlled, how DDTC issues licenses, business registration requirements, and the commodity jurisdiction process. He "will testify that he took no part in the DDTC Office of Policy's assessment or determination of articles at issue in this case." Ex. 1 at 4. What he did instead was "independently review the DDTC's final [commodity-jurisdiction] letter," *id.*—a roughly one-page form document that typically says little more than that the article is controlled under a particular category. *See* Ex. 3 (an example). According to Mr. Douville, DDTC's Office of Policy "conducts a thorough review to consider whether any information might cause the item at issue to not match a description on the USML." Ex. 1 at 4. And Mr. Douville also conducted "his own independent review of [the] defense articles at issue" and "agrees with the DDTC's assessment and rationales made therein" because "magnets that go into submersible submarines or the F-18 fighter jet, and other similar military items, are described on the USML as a defense article and are controlled for export, requiring a license or other approval." *Id.* at 5.

---

[3] *See* DDTC, *About DDTC*, https://www.pmddtc.state.gov/ddtc_public/ddtc_public?id=ddtc_public_portal_about_us_landing (last accessed Dec. 15, 2023).
[4] DDTC, *Defense Trade Controls Policy (DTCP)*, https://www.pmddtc.state.gov/ddtc_public/ddtc_public?id=ddtc_kb_article_page&sys_id=47ee3b08dbc7bf0044f9ff621f9619d7 (last accessed Dec. 15, 2023).
[5] *See* DDTC, *Defense Trade Controls Licensing (DTCL)*, https://www.pmddtc.state.gov/ddtc_public/ddtc_public?id=ddtc_kb_article_page&sys_id=02bbbbc4dbc7bf0044f9ff621f9619ac (last accessed Dec. 15, 2023).

5

Mr. Burton works for the Department of Defense. *See* Ex. 2 at 1. His proffered testimony would similarly cover how the ITAR works, as well as how the Department of Defense works with the State Department on ITAR issues. *See id.* 1–2, 3–4. He would testify about the importance of magnets to the military and the miliary supply chain. *See id.* at 3.[6] He would also testify that he reviewed nine DDTC commodity-jurisdiction determinations pertaining to thirteen parts, and would confirm that each part is "specially designed" under 22 C.F.R. § 120.41. He would say that they are not "commercial-off-the-shelf" items, "so new magnets were specially designed to meet the military requirement." *Id.* at 2.

## LEGAL STANDARDS

Federal Rule of Evidence 401 states that "[e]vidence is relevant if … it has any tendency to make a fact more or less probable than it would be without the evidence; and … the fact is of consequence in determining the action." Rule 402 states that relevant evidence is admissible and irrelevant evidence is not. Rule 403 states that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

Rule 702 permits or forbids expert testimony as follows:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

---

[6] Defendants' Motion *In Limine* to Exclude Expert Testimony from Scott McCall, James Blankenship, and Steven Burton, filed contemporaneously with this motion, explains why part of Mr. Burton's testimony should be excluded on other grounds as well.

    (c)   the testimony is the product of reliable principles and methods; and

    (d)   the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Subsection (a) "goes primarily to relevance. Expert testimony which does not relate to any issues in the case is not relevant and, ergo, non-helpful." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993) (quoted source omitted). Subsection (a) also requires that "testimony proffered in the case [be] sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Id.* (quoted source omitted). "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 592.

Expert testimony must also be reliable. "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93.

## ARGUMENT AND AUTHORITIES

Mr. Douville's and Mr. Burton's testimony should be excluded to the extent they seek to testify that Quadrant's drawings depict articles that are "specially designed" or controlled by the ITAR. Both have ignored how an article is not specially designed, and thus not ITAR-controlled, if a commercial equivalent exists. Mr. Douville's and Mr. Burton's conclusions are irrelevant, threaten to mislead the jury, and are unreliable under Federal Rules of Evidence 401, 403, and 702.

Lest there be doubt, the government cannot simply point to a commodity-jurisdiction determination as conclusively deciding the issue. The State Department's designation of items as defense articles on the USML is not judicially reviewable. *See* 22 U.S.C. § 2778(h). However, the government must still prove that the particular part, machine, data, or the like charged in a case falls under the definition of one of those USML-proscribed items. *See United States v. Roth*, 628 F.3d 827, 832 (6th Cir. 2011); *see also United states v. Zhen Zhou Wu*, 711 F.3d 1, 18–19 (1st Cir.

7

2013) (Souter, J., on panel); *United States v. Pulungan*, 569 F.3d 328, 328 (7th Cir. 2009) (Easterbrook, C.J.).

1. **Not every item used in military hardware is on the U.S. Munitions List.**

The U.S. Munitions List is organized into 21 Roman-numeral categories, such as Category I—Firearms and Related Articles, Category VIII—Aircraft and Related Articles, and Category XVIII—Directed Energy Weapons. *See* 22 C.F.R. § 121.1. The articles in them are generally not named specifically (except some end items like the F-35 or certain chemicals). Instead, the USML uses control parameters—technical characteristics—to identify them. These can be all-but-synonymous with certain military equipment, such as "tanks," *id.* VII(a), or "bombers," *id.* VIII(a)(1), or instead be described by certain features, like "spacecraft … that … [h]ave space-to-ground weapons systems," *id.* XV(a)(6).

Also included on the USML are items that are "specially designed" for military use. Something is "specially designed" if it either (1) has in essence military-level performance, *see id.* § 120.41(a)(1), or (2) is "a part, component, accessory, attachment, or software for use in or with a defense article," *id.* § 120.41(a)(2). Here are some examples:

- "Firearms specially designed to integrate fire control, automatic tracking, or automatic firing (e.g., Precision Guided Firearms)." *Id.* I(c).
- "Systems for firing superposed or stacked ammunition and specially designed parts and components therefor." *Id.* II(j)(5).
- "Flight control and guidance systems (including guidance sets) specially designed for [rockets, space launch vehicles (SLVs), missiles, bombs, torpedoes, depth charges, mines, and grenades]." *Id.* IV(h)(1).

Whether a firearm is specially designed to integrate automatic firing is relatively simple. The same holds for a flight control system specially designed for a missile. But what about a rudimentary, fungible piece like a hose, metal plate, or a magnet with thousands or millions of commercial applications? Controlling those would militarize everything on Wal-Mart's shelves. Indeed, a

8

magnet is on the ground floor of the assembly hierarchy for anything. It is a fundamental component that is unassembled itself. Magnets go into lots of things. Nothing goes into a magnet.

The ITAR has attempted to solve this problem through its "specially designed" release provisions. The releases apply only to a "part, component, accessory, attachment, or software." *Id.* § 120.41(b). Each of these is defined. *See id.* §§ 120.40(c), (d), (e), (g). A magnet is a "part," even lower on the totem pole than components, accessories, and attachments: "A *part* is any single unassembled element of a major or a minor component, accessory, or attachment which is not normally subject to disassembly without the destruction or the impairment of designed use." *Id.* § 120.40(e).

There are five releases in all. These provisions say that certain articles are not "specially designed"—and thus not ITAR-controlled—generally in circumstances where they are not distinct for defense uses. An item qualifies if it:

(1) Is subject to the EAR pursuant to a commodity jurisdiction determination;

(2) Is, regardless of form or fit, a fastener (e.g., screws, bolts, nuts, nut plates, studs, inserts, clips, rivets, pins), washer, spacer, insulator, grommet, bushing, spring, wire, or solder;

(3) Has the same function, performance capabilities, and the same or equivalent form and fit as a commodity or software used in or with a commodity that: (i) [i]s or was in production (i.e., not in development); and (ii) [i]s not enumerated on the USML;

(4) Was or is being developed with knowledge that it is or would be for use in or with both defense articles enumerated on the USML and also commodities not on the USML; or

(5) Was or is being developed as a general purpose commodity or software, i.e., with no knowledge for use in or with a particular commodity (e.g., a F/A–18 or HMMWV) or type of commodity (e.g., an aircraft or machine tool).

*Id.* § 120.41(b).

As used in these provisions, the following definitions apply:

- A *commodity* is "any article, material, or supply, except technology/technical data or software." *Id.* § 120.40(a).

- The *function* "of a commodity is the action or actions it is designed to perform." *Id.* § 120.42(c).

- *Performance capability* "is the measure of a commodity's effectiveness to perform a designated function in a given environment (e.g., measured in terms of speed, durability, reliability, pressure, accuracy, efficiency)." *Id.* § 120.42(d).

- The *form* "of a commodity is defined by its configuration (including the geometrically measured configuration), material, and material properties that uniquely characterize it." *Id.* § 120.42(a).

- The *fit* "of a commodity is defined by its ability to physically interface or connect with or become an integral part of another commodity." *Id.* § 120.42(b).

- *Equivalent* means that a commodity's "form has been modified solely for fit purposes." *Id.* § 120.42(e).

- *Development* "is related to all stages prior to serial production, such as design, design research, design analyses, design concepts, assembly and testing of prototypes, pilot production schemes, design data, process of transforming design data into a product, configuration design, integration design, and layouts. Development includes modification of an existing design." *Id.* § 120.43(a).

- *Production* means, in short, "all production stages, such as product engineering, manufacture, integration, assembly (mounting), inspection, testing, and quality assurance. . . ." *Id.* § 120.43(b)(1).

Four of the five release provisions are readily ascertainable. To be released under (1), there must be a commodity-jurisdiction determination, and one that determines the item belongs under the Department of Commerce's Export Administration Regulations instead of the ITAR. For (2), an item can be easily examined to decide if it is a "fastener … , washer, spacer, insulator, grommet, bushing, spring, wire, or solder." For (4) and (5), there must be contemporaneously created supporting documentation; otherwise, the item defaults to ITAR-controlled status. *See id.* § 120.41 (note 2 to paragraph (b)).

Release (3) has no default setting. It requires further inquiry.[7] Release (3) requires a determination of, to paraphrase, whether another commodity exists that works just as well and was put into a non-defense item. Or to put it specifically, before something can be ITAR-controlled, there cannot be another commodity that:

- Has the same function—meaning it is designed to perform the same action(s);
- Has the same performance capability—meaning it has the same effectiveness to perform a designated function in a given environment;
- Has an equivalent form and fit—meaning its form is modified solely for fit purposes, i.e., to interface, connect with, or become an integral part of another commodity; and
- Is used in another commodity that is or was in production rather than in development.

**2. Mr. Douville's testimony should be excluded because it is irrelevant, threatens misleading the jury, and is unreliable.**

Mr. Douville's expert report contains no indication he considered release (3), much less that he made any effort to undertake its necessary analysis. The analysis might be unnecessary or perfunctory for a commodity that obviously has exclusively military application, like the missile guidance system mentioned earlier. But it is absolutely essential for a part so basic as a magnet the magnets at issue her used pervasively by the commercial sector. Neodymium magnets, for instance, "are particularly used in hard disc drives, mobile phones, video and audio systems of television;" "magnetic separators, filters, ionizers, in production of on–off buttons, safety sector and security systems;" "in covering machines, cars with awning and in the production of magnetic tool belts;" and "in jewelry clips, identification badges and in the production of baby strollers . . . ."[8]

---

[7] In fact, Release (3)'s further inquiry is so hopelessly impossible and arbitrary for a part as fundamental and fundamental as the magnets at issue in this case that it violates due process, as explained in Defendants' Motion to Dismiss Unconstitutionally Vague AECA and ITAR Allegations, filed contemporaneously with this motion.

[8] Cengiz Yuksel et al., *The Use of Neodymium Magnets in Healthcare and Their Effects on Health*, 5 N. Clin. Istanb. 268 (2018).

11

Mr. Douville did not consider release (3). He looked at the brief commodity jurisdiction letter. Apparently, that is good enough because other people, probably, did their job correctly:

> Mr. Douville will testify that he took no part in the DDTC Office of Policy's assessment or determination of articles at issue in this case. However, he did independently review the DDTC's final CJ determination letter, which was provided to the Defense. Mr. Douville is expected to testify that, in his experience, it is his opinion that when DDTC's Office of Policy issues a determination letter, it conducts a thorough review to consider whether any information might cause the item at issue to not match a description on the USML.

Ex. 1 at 4. It is unclear what sort of "independent review" Mr. Douville could even do of the letter. It is a conclusory pronouncement that a commodity is or is not within a category of items on the USML. It is akin to a court's disposition, not its reasoned opinion.

As for what the Policy Office did to investigate these particular magnets, Mr. Douville admits he has no idea. Granted, he has worked with the Licensing Office for a long time, and in his opinion the Policy Office generally does a thorough job. That opinion is questionable on its face when the government has repeatedly fought to shelter DDTC's jurisdictional determinations from the disciplining forces of judicial review and juror assessment. *See Zhen Zhou Wu*, 711 F.3d at 16; *Pulungan*, 569 F.3d at 328. But in any event, it does not answer whether the Policy Office did a thorough job here. An expert's testimony must be "based on sufficient facts or data." Fed. R. Evid. 702(b). That is sorely lacking from Mr. Douville's report.

But not to worry—Mr. Douville's report says he also conducted his own "independent review of [the] defense articles at issue." *Id.* at 5. It is unclear what Mr. Douville did beyond read the one-page-or-so letters, if anything at all. He says only that he knows that the magnets went into submarines or fighter jets. *See id.* To him, that appears conclusive of the question. *See id.* It is not. There are at least five ways a magnet can be in a submarine yet out of the USML. *See* 22 C.F.R. § 120.41(b). At least one of them, release (3) for commercial equivalents, requires more than just reading a commodity-jurisdiction determination or asking where the magnet goes. The magnet's

12

use in military hardware is a *necessary* condition for ITAR control, but it is not *sufficient*. Mr. Douville's report never shows understanding of that regulatory fact.[9] Therefore, his opinion that Quadrant's drawings are ITAR-controlled is neither "the product of reliable principles and methods" nor reflect "a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(c), (d). By that same token, his opinion is also irrelevant and threatens misleading the jury under Rules 401 and 403 because it does not apply the proper legal test.

3. **Mr. Burton's testimony should be excluded for the same reasons.**

Mr. Burton's expert report suffers from the same fatal defect. His report states that the thirteen parts he reviewed are "specially designed," so the underlying technical drawings are ITAR-controlled technical data. *See* Ex. 2 at 2. His report states that "these magnets are not commercial-off-the-shelf (COTS). No existing COTS magnets met DoD requirements so new magnets were specially designed to meet the military requirement." *Id.* at 2. His report gives the example of a magnet with the part number FP24018P1, which was, in his words, specially designed for the F-18's generator convertor unit. *Id.* at 3. His report goes on to state that "the magnets have part numbers that identify them as unique and essential in the manufacturing bill of materials (BOM) for the related defense article," and that several Department of Defense bills of materials "identify these specially designed magnet part numbers in the assembly and operation of the defense article." *Id.*

Mr. Burton's expert report addresses only the first half of the equation. Again, it is necessary that the item go into military hardware. But it is not sufficient. The magnet may indeed be used in an F-18. It may be used in an important component of the F-18. The magnet may be used for other

---

[9] Had a proper review been done, the government would have found commercial equivalents. An example is included in the declaration of Dr. Stanley Trout, attachment A, page 12 & Ex. 4, attached as Exhibit 1 to Defendants' Motion *In Limine* to Exclude Testimony from Scott McCall, James Blankenship, and Steven Burton, filed contemporaneously with this motion.

13

fighter jets too, and appear in any number of the Defense Department's bills of materials. But the magnet is not ITAR-controlled if a release (3) commercial equivalent exists.

Mr. Burton's expert report never seriously addresses this question. It mentions that the magnets are not commercial-off-the-shelf magnets. But that is not the test for whether release (3) applies. "COTS" never appears in 22 C.F.R. § 120.41(b)(3). An equivalent magnet need not be sold on store shelves; it need only be used in a non-defense commodity.

Likewise, the report states that the Defense Department commissioned new magnets with unique part numbers for its needs. That would indeed establish that the magnets were new *to the Defense Department*. That is part one of the equation. But it does not establish that identical or release (3)-qualifying equivalent magnets did not exist in commercial application. The Defense Department may have many binders full of lists of parts, including magnets. But it does not have the towers of binders from every commercial manufacturer. That is part two of the equation. And Mr. Burton's report, like Mr. Douville's, fails entirely to reckon it. Consequently, Mr. Burton's expert report is also irrelevant, threatens misleading the jury, and is unreliable under Rules 401, 403, and 702.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request the exclusion of any testimony based on the identified defective portions of Mr. Douville's and Mr. Burton's expert reports in which they seek to opine that Quadrant's magnets, and thereby their underlying drawings, are "specially designed" or otherwise fall within the USML and are thus controlled by the AECA as implemented through the ITAR.

Pursuant to Joint Local Criminal Rule 47.1(g), Defendants respectfully request a hearing and oral argument on this motion.

| | |
|---|---|
| Dated: December 18, 2023 | By: */s/ John Brownlee* |

John L. Brownlee (*pro hac vice*)
William F. Gould (*pro hac vice*)
Timothy J. Taylor (*pro hac vice*)
Caitlin A. Eberhardt (*pro hac vice*)
HOLLAND & KNIGHT LLP
1650 Tysons Blvd., Suite 1600
Tysons, VA 22201
T: 703.720.8053
F: 703.720.8610
John.Brownlee@hklaw.com
William.Gould@hklaw.com
Timothy.Taylor@hklaw.com
Caitlin.Eberhardt@hklaw.com

ATTORNEYS FOR DEFENDANT
QUADRANT MAGNETICS, LLC

*/s/ Kent Wicker (with permission)*
Kent Wicker
WICKER / BRAMMELL PLLC
323 W. Main Street, 11th Floor
Louisville, Kentucky 40202
(502) 541-5533
Kent@wickerbramel.com
*Counsel for Phil Pascoe*

*/s/ Patrick Renn (with permission)*
Patrick J. Renn
Smith & Helman
600 W. Main Street, Suite 100
Louisville, KY 40202
502-540-5700
Fax: 502-568-3600
prenn@600westmain.com
*Counsel for Scott Tubbs*

*/s/ Scott Cox (with permission)*
Scott C. Cox
Cox & Mazzoli, PLLC
600 W. Main Street, Suite 300
Louisville, KY 40202
502-589-6190
502-584-1744
CoxECF@aol.com
*Counsel for Monica Pascoe*

## CERTIFICATE OF SERVICE

I hereby certify that on December 18, 2023, the foregoing motion was electronically filed with the Clerk of the Court via the CM/ECF system, which sent a notice of electronic filing to the attorneys of record.

/s/ *John Brownlee*