# EXHIBIT 1

**Witness: Alex Douville, Defense Directorate Trade Controls, United States Department of State**

The government does not concede this witness is an expert but discloses his testimony in an abundance of caution. Pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G), the government hereby discloses that, at trial in the above-captioned matter, the government presently intends to elicit testimony from the following witness, pursuant to Federal Rules of Evidence 702, 703, and 705.

The government intends to call Mr. Alex J. Douville from the Directorate of Defense Trade Controls ("DDTC") with the United States Department of State as a witness in its case-in-chief at trial in the above-captioned matter to provide testimony regarding the export control jurisdiction and classification of the defense articles at issue in the Superseding Indictment.

### I. Background Expertise and Qualifications

As provided in Mr. Douville's curriculum vitae (attached hereto), Mr. Douville's expertise lies in his over 13 years of experience in DDTC and as one of three most senior International Traffic in Arms Regulations ("ITAR") licensing officials in the State Department. In his current roles as the Chief of DDTC's Division of Light Weapons and the former acting Chief of the Division of Space, Missiles, and Sensor Systems, Mr. Douville has overseen several DDTC teams in their assessments and determinations of ITAR licenses. Throughout his approximately 13 years of experience at the DDTC from an analyst to Division Chief, Mr. Douville has assessed, assisted, or reviewed tens of thousands of ITAR licenses, as well as reviewed countless Commodity Jurisdiction determinations (discussed further below) made by DDTC.

For background, the State Department and its subagency, DDTC, housed within the Bureau of Political-Military Affairs, ensures that the commercial exports of defense articles and defense services are consistent with U.S. national security and foreign policy objectives. DDTC is responsible for implementing the Arms Export Control Act ("AECA"), classified at 22 U.S.C. § 2778, and consequently for regulating the export and temporary import of defense articles and services under the ITAR (22 C.F.R. pts. 120-130) by delegations of authority contained therein and under Executive Order 13637.

Mr. Douville has not authored any publications within the past ten years.

Mr. Douville has testified as an expert at trials in the following cases within the last four calendar years:
- United States v. Ross Roggio, 3:18-cr-97 (M.D. Pa. May 11, 2023)
- United States v. Wilson Nuyila Tita, 1:21-cr-334 (D. Md. Apr. 29, 2022)
- United States v. Genovevo Alvarez-Ronquillo, 19-cr-3240 (D.N.M. Dec. 3, 2019)
- United States v. Andre Moores, 19-cr-80014 (S.D. Fla. July 16, 2019)
- United States v. Junior Joel Joseph, 18-cr-80139 (S.D. Fla. Jan. 29, 2019)

### II. Statement of Opinion, Testimony, Bases, and Reasons

The government anticipates that at trial Mr. Douville will testify as to why the articles at issue in the case met descriptions in Categories in the U.S. Munitions List ("USML") in 22 C.F.R. § 121.1, and were thus controlled under the ITAR, 22 C.F.R. Parts 120-130.

Mr. Douville may explain, by way of background, why certain articles and services are controlled for export under the ITAR, how the ITAR implements the Arms Export Control Act ("AECA"), and how the AECA and the ITAR help to support United States' national security and foreign policy. Mr. Douville may also explain that an export is defined as "[a]n actual shipment or transmission out of the United States, including the sending or taking of a defense article out of the United States in any manner," 22 C.F.R. § 120.50, and that conducting an export without a license or other approval is a violation of the ITAR and therefore the AECA, 22 C.F.R. § 127.1(a)(1); 22 U.S.C. § 2778(c).

He will testify that the ITAR prohibits transfer of USML listed defense article to non-U.S. persons located in the U.S. or outside the United States. Such export would require a license. In addition, providing a USML defense article, including to assist manufacturing in a foreign country requires a license. Although the recipient of a USML defense article may be a U.S. person, that person may not export the manufacture of the defense article outside the United States or to Non-U.S. person domestic or abroad without a license.

Mr. Douville is expected to elaborate as to how the articles at issue are described on the USML. Mr. Douville will explain that "technical data" is defined in pertinent part as follows:

> Information, other than software as defined in § 120.40(g), which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance, or modification of defense articles. This includes information in the form of blueprints, drawings, photographs, plans, instructions, or documentation.

22 C.F.R. § 120.33(a)(1). The government expects Mr. Douville to explain that technical data does not have a limit on the form it takes. Such information can be disclosed and thus exported by hand-written letter, by electronic mail, or by video—any method that allows a foreign person to access, view, or possess it. *See e.g.*, 22 C.F.R. § 120.56 (definition of "release"). In recent decades, technical data has been most commonly presented in electronic form. In fact, many regulations in the ITAR expressly note the electronic nature of technical data in certain requirements or exemptions. *See e.g.*, 22 C.F.R. §§ 120.54(a)(5), (b), 120.55, 120.56.

<u>The Importance of Technical Data Controls and the ITAR Generally</u>

The government also anticipates that Mr. Douville will testify about the importance of the USML, ITAR, and the AECA, as generally described below:

The Arms Export Control Act, and the ITAR regulations that implement it, are a line of protection for our nation's defense and military. The defense articles and defense services described on the USML have been referred to by officials, including former Secretary of Defense

Robert Gates, as the "crown jewels" of our nation's military technology. The principal purpose of the ITAR is to control the export and proliferation of these crown jewels and limit their access to only vetted allies and uses.

The controls set forth in the ITAR are meant to apply higher walls and protections around certain USML-described defense articles and services that provide a critical military or intelligence advantage. The ITAR and the State Department's requirement to authorize the export of such tangible articles or intangible technical data related thereto keeps our nation and our military, as well as those of our allies safe. It prevents U.S. origin technologies from being used against our military, our country, and our allies, and it aims to ensure that U.S. warfighters continue to retain supremacy and deterrence for any future conflict.

Indeed, technical data controls are taken extremely seriously by the State Department and the U.S. government and law enforcement agencies generally. They are critical to the export control regime and protecting the interests just identified. That is in large part due to larger risks from illegal technical data transfers than of an actual tangible item. The rationale is simple. If someone, say an agent of a foreign adversary, gets an item, particularly a sophisticated defense article, then it is not certain they would be able to use it properly or at least reverse engineer it. But if the "technical data" underlying that article is smuggled out to such agents, then they are more likely to be able to build and operate that item—and produce very many more. Even small leaks of technical data could be key components that reveal critical data by themselves, or when aggregated with one or more other small leaks. The information contained in technical data can also be exploited by adversaries to reveal weaknesses or vulnerabilities in U.S.-origin defense articles, which can lead to the development of technologies or tactics to diminish or neutralize the critical military or intelligence advantage the article provides. Put more simply, any technical data risks spillage of the advanced technologies produced by our defense industrial base, which our military relies on for its superiority.

Mr. Douville will testify that in his experience, companies engaged in the business of manufacturing or exporting defense articles recognize and comply with ITAR requirements and diligently perform internal compliance, security, and training to be able to engage in authorized global trade and to prevent unauthorized dissemination.

### Licensing

DDTC's Office of Licensing, in which Mr. Douville is a leader and senior official, undertakes careful consideration of each application for a license or other approval to export a particular USML defense article. Factors like military alliances, regional stability, the sophistication of the article, the desired and possible end uses, human rights concerns, and many more factors are carefully adjudicated on a case-by-case basis. Some country-specific policies are also set out by regulation or statute, and are reflected in 22 C.F.R. 126.1. He will testify that exports to China have a policy of denial as listed in 22 C.F.R. 126.1(d)(1) Table 1.

Mr. Douville may also testify about the licensing process. Once a person or company is registered with DDTC, a license application is submitted to DDTC. DDTC utilizes a filing system for export control information where businesses upload applications and submissions of information to obtain export licenses. The business would need to submit information such as

the purchase order and other information such as end uses or users, the description and classification of the USML article desired to be exported, and sometimes more information about associated military platforms. Any significant military equipment (SME), as per 22 C.F.R. § 120.36, would need assurances identifying any possible foreign interaction during the export process. The information regarding foreign interaction would be checked against certain databases to see if that entity is prohibited. Upon submission, a license application is assigned to a division within in DDTC licensing (DTCL). The submitted information is reviewed for compliance and completeness. The licensing matter is initially assigned to an analyst to review. The case is staffed to interagency counterparts for national security and foreign policy review. Information is compiled for final adjudication of the position for licensing. A decision in the following categories is issued with regard to licensing: (1) approved; (2) approved with provisos; (3) denied; or (4) return without action (RWA).

Based on the parts and commodity jurisdiction determinations in this case, Mr. Douville will testify that DDTC would not have issued export licenses, including because of the policy of denial set forth in 22 C.F.R. § 126.1

<u>How DDTC Makes USML Determinations and Assists Prospective Exporters</u>

Mr. Douville may also testify to how DDTC assesses whether an item is described on the USML and how it assists exporters, including generally as follows:

Any member of the public, if they have doubt as to whether an item is described on the USML, is free to avail themselves of a free service DDTC provides called a Commodity Jurisdiction determination, often referred to as a "CJ." The CJs are explained in ITAR regulations at 22 C.F.R. §§ 120.4 and 120.12. The CJ process involves several government agencies offering their opinion as to (1) the export control jurisdiction and (2) the proper classification of an item. The export control jurisdiction means which agency's export control regulations apply. For example, items that are not controlled for export by the State Department by being listed on the USML are usually controlled by the Department of Commerce under the Export Administration Regulations ("EAR"). EAR items generally require an authorization for export, just as the ITAR items do. ITAR defense articles, however, typically have more stringent export controls, and have associated technical data controls. As for the proper classification of an item, often a defense article will have more than one applicable description on the USML. When two or more USML entries describe the item at issue, the CJ process determines which USML Category and paragraph best describe the item in order to assist DDTC in making more uniform or standardized licensing determinations.

Mr. Douville will testify that he took no part in the DDTC Office of Policy's assessment or determination of articles at issue in this case. However, he did independently review the DDTC's final CJ determination letter, which was provided to the Defense. Mr. Douville is expected to testify that, in his experience, it is his opinion that when DDTC's Office of Policy issues a determination letter, it conducts a thorough review to consider whether any information might cause the item at issue to not match a description on the USML. In Mr. Douville's opinion, any person or exporter similarly situated would have likely thought that the items were USML controlled, or exercised diligence to refer to the USML or the CJ process if they had any doubt. Over 20,000 licenses approved annually by his DDTC's Office of Licensing show that

other exporters do this regularly and diligently. Also, based on Mr. Douville's training and experience, Mr. Douville will testify that based on his own independent review of defense articles at issue, he agrees with the DDTC's assessment and rationales made therein. For instance, magnets that go into submersible submarines or the F-18 fighter jet, and other similar military items, are described on the USML and hence their related technical data would be also described on the USML as a defense article and are controlled for export, requiring a license or other approval. Moreover, Mr. Douville may testify about the CJ process, including that while the CJ process determined that certain paragraphs offered the best classification, other USML Categories could have also described the defense articles at issue. Mr. Douville may only be asked to admit the final executive branch decision on the commodity jurisdiction determination regarding the specific part numbers at issue in this case.

### Registration with DDTC Under the AECA

Mr. Douville will testify that under the AECA and 22 C.F.R. § 122.1, registration with DDTC is required for anyone in the business of, among other things, manufacturing or exporting defense articles or furnishing defense services. Registration is essentially the first step in obtaining authorization to conduct an export, including a deemed export. Persons or businesses submit a registration statement providing important information about what categories of information might be manufactured or exported, and information about the export company, including affiliates and foreign ownership. The registration information submitted to DDTC can be used to conduct a due diligence check on the business. A fee is required to register. The information about the amount of the fee is located online. Once the registration form and fee are submitted and approved, a registration statement is issued with a registration number to the empowered official. Once registration is submitted, DDTC would issue a registration letter. It acknowledges that you are an export and a manufacturer. The registration letter indicated that registration is a prerequisite to obtaining a license. The registration letter refers to a DOS website for additional information. The registration is for a period of one year.

Mr. Douville may testify that DDTC also maintained a publicly available website since 2013, which was available in 2017 and 2018, that discusses registration, ITAR, AECA, export licensing and more. DDTC has also offered educational training to business on ITAR/AECA export issues, and it maintains a help desk with officials available to help the public with common questions about registration, licenses, or other aspects of the ITAR. Moreover, as per 22 C.F.R. § 120.22, DDTC issues advisory opinions on topics like preliminary authorization determinations to interpretations of the ITAR.

### Testimony As a Fact Witness

The government also anticipates Mr. Douville testifying as a fact witness, based on his personal knowledge from observations, that he has witnessed and assisted in a search of ITAR license and registration databases conducted by DDTC officials for the name of the defendants, including Quadrant Magnetics LLC, Phil Pascoe, Scott Tubbs, Monica Pascoe, and other employees at Quadrant entities including its owners and management of other entities. Mr. Douville will testify that this search resulted in no matches, meaning that the defendants were not registered with DDTC.

Furthermore, Mr. Douville plans to testify that as part of his duties, he conducted registration and licensing checks for the entities and individuals associated with Quadrant Magnetics LLC, Phil Pascoe, Scott Tubbs, Monica Pascoe, including the entities and individuals charged in the Indictment. No licenses were located to export technical data or licenses for the export of manufacturing of a defense article to China by Quadrant Magnetics LLC and other individuals and entities associated with QM. He will testify that Quadrant Solutions had registered and was issued a registration number as prerequisite to obtaining a license or other approval, but that the registration expired in 2017. A communication provided to Quadrant explained that registration was a prerequisite to actually obtaining a license to export or manufacture the defense articles outside the United States. Mr. Douville may also testify that registration is not sufficient to export a defense article, including technical data. Each time an export occurs would require a license consistent with the notification letter provided to Quadrant in 2018.

Mr. Douville may also testify that investigative agents assigned the case submitted search terms to query registration and licensing information. Mr. Douville utilized a team of dedicated IT specialists to conduct licensing and registration checks. He utilized search criteria and search for specific names and variations to see if they can catch any variations and it will pop up any responsive records or no records. He reviewed the records and determined whether they are responsive. The registration and licensing information was shared with the investigators.

### III. Signature

_____          11/30/23
**Alex J. Douville**                      Date

# ALEX J. DOUVILLE
U.S. Department of State
Bureau of Political Military Affairs
Directorate of Defense Trade Controls – Licensing (DTCL)

**EXPERT WITNESS:**
- *U.S. v. Ross Roggio*, 3:18-CR-97 (Scranton, Pennsylvania, May 11, 2023)

- *U.S. v. Wilson Nuyila Tita*, 1:21-cr-334 (Baltimore, Maryland, April 29, 2022)

- *U.S. v. Genovevo Alvarez-Ronquillo*, 19-CR-3240 KG (Las Cruces, New Mexico, December 3, 2019)

- *U.S. v. Andre Moores*, 19-CR-80014-RKA (Fort Lauderdale, Florida, July 16, 2019)

- *U.S. v. Junior Joel Joseph*, 18-CR-80139 (Fort Lauderdale, Florida, January 29, 2019)

**PROFESIONAL EXPERICENCE:**
- **2021–present** – Division Chief, DDTC's Small Arms and Training Team (Division 6) – USML categories, I, II, III, IX, X, and XIV; Acting Division Chief (Division 3 – Space, Missile and Sensor Systems) (July 2022–present)

- **2014–present** – Coordinator for all direct commercial sales (DCS) cases for DDTC that meet certain Congressional Notification (CN) thresholds and Coordinator of UN Security Council Notifications.

- **2017-2021** – Co-Acting Division Chief, DDTC's Firearms Team (Division 6) – USML categories I and III

- **2012-2017** – Analyst for the DDTC Space, Sensor, and Missile Team (Division 3) – USML categories IV, V, IX, XII, XIV, and XV

- **2010-2012** – Analyst for DDTC Office of Policy's Response Team

- **2007-2010** – Director of Policy Studies, Center of the Study of the Presidency and Congress

- **2005-2007** – Strategic Planning Director, Center for the Study of the Presidency and Congress

- **2004-2005** – Research Assistant, Homeland Security Projects, Center for the Study of the Presidency and Congress

- **1999-2004** - Workflow Coordinator, Licensing and Commissions Department, Manufactures Life Insurance Company USA

**EDUCATION:**
- Temple University, Philadelphia, Pennsylvania, Master of Arts

- Union College, Schenectady, New York, Bachelor of Arts