# EXHIBIT 2

**Steven B. Burton, Senior Electronics Engineer, Defense Technology Security Administration (DTSA)**

Pursuant to Federal Rules of Criminal Procedure 16(a)(1)(G):

The government does not concede this witness is an expert but discloses his testimony in an abundance of caution. The government provides the following written summary of testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case in chief:

I. Testimony: Mr. Burton will testify that the drawings in the Indictment and involved in the case are technical data, as defined by 22 CFR 120.33, and that a Department of State export license is required to export the technical data.

The Arms Export Control Act (AECA), 22 USC 2778(a) and 2794(7), provides that the President of the United States shall designate the articles and services deemed to be defense articles and defense services for purposes of import and export controls. The President has delegated to the Secretary of State the authority to control the export and temporary import of defense articles and services. The items designated by the Secretary of State for purposes of export and temporary import control constitute the United States Munitions List (USML) (22 CFR 121.1). Designations of defense articles and defense services on the USML are made by the Department of State (DoS) with the concurrence of the Department of Defense (DoD).

The Defense Technology Security Administration (DTSA) represents the DoD to the DoS. DTSA ensures the U.S. Warfighter's Edge through Department of Defense (DoD) technology security policies on the export of International Traffic in Arms Regulations (ITAR) defense articles (including item or technical data) and defense services (22 CFR 120.31 and 120.32). It is one of DTSA's missions to identify and mitigate national security risks associated with the export of ITAR-controlled technology (USML) to maintain the U.S. warfighter's edge as well as support U.S. national security objectives. DTSA serves as the U.S. Government's premier experts on defense technology and provide technical assessments and recommendations to the DoS Directorate of Defense Trade Controls (DDTC) regarding the export of ITAR-controlled technology.

DTSA was established in the mid-1980s as a Department of Defense Field Activity within the Office of the Under Secretary of Defense for Policy. DTSA was initially created to review and oppose technology transfers sought by the Soviet Union in its effort to improve its military capability. DoD officials considered such transfers, especially of dual-use technologies, a potential threat against the U.S. and a major challenge to U.S. national security. With the fall of the Soviet Union, DTSA's role evolved. While retaining its mission to protect the U.S. military's technological edge in the most critical and sensitive areas, DTSA has increasingly been involved in reviewing critical technologies that could be transferred to friends and Allies.

- DTSA goals include:
    - Protect the US Warfighter Technology Edge
    - Promote Allies and Partners Technology Security and Shared Perspectives

- o   Counter Strategic Competitor's Technology Acquisitions and Methodologies

U.S. defense contractors are primarily responsible for ITAR compliance and consequently make self-determinations if commodities are controlled by the ITAR, and if so, the USML classification. On the occasion when a contractor is uncertain if a commodity is subject to the ITAR, the contractor can submit, to DoS DDTC, a Commodity Jurisdiction (CJ) Determination Request (22 CFR 120.12). After a thorough review by DoD and DoS, DoS DDTC will provide an official CJ Determination back to the contractor. If a contractor challenges a DoS determination, the contractor can submit an updated request and DoS will reach-out to DoD again, and DTSA will review all new information and provide an updated technical recommendation. Department of State reviews the updated recommendation and issues the final, official determination. Commodity Jurisdiction is a DoS DDTC determination with concurrence of DTSA providing a technical assessment and recommendation as to why or why not a commodity would be a USML defense article or technical data. For this Indictment, DoS DDTC has provided official CJ Determinations that all magnet drawings are ITAR-controlled technical data under various USML controls.

Mr. Burton, DTSA Senior Electronics Engineer, reviewed the Department of State CJ Determinations, including USML control, for the following part numbers (PNs):

| CJ | USML | PN | Description |
|---|---|---|---|
| CJ-0512-17 | VIII(i) | PN FP24018P1 | F/A-18 E/F and EA-18G Generator Convertor Unit |
| CJ0003925 | XII(f) | PN 3730D-1012 | F-16 Radar |
| CJ0003927 | XX(d) | PN 1500P-1002 | German Submarine Optical Periscope and a modular electro optical payload |
| CJ0003927 | XX(d) | PN 7600B-1002 | German Submarine Optical Periscope and a modular electro optical payload |
| CJ0003928 | XII(f) | PN 6000U-1002 | Raytheon's Multi-Spectral Targeting System |
| CJ0003928 | XII(f) | PN 10500B-1022 | Raytheon's AAQ-27A Mid-Wavelength Infrared (MWIR) Imaging System |
| CJ0003928 | XII(f) | PN 100101 | Hughes Night Vision Systems |
| CJ0003928 | XII(f) | PN 300580 | Raytheon's Scanner Assembly for Thermal Imager called HIREZ |
| CJ0004016 | XII(f) | PN 5750C-1002 | |
| CJ0004018 | XX(d) | PN 030-049759-01 | |
| CJ0004606 | XII(f) | PN 11375B-1002 | Raytheon's Multi-Spectral Targeting System |
| CJ0004681 | XII(f) | PN 30-70112-01 | |
| CJ0004702 | XII(f) | PN 1375-1121 | Raytheon's AIM-9X Sidewinder Missile |

Mr. Burton confirms that the parts listed above are specially designed (22 CFR 120.41) for ITAR-controlled defense articles and that the associated manufacturing drawings are ITAR-controlled technical data, as indicated above. It should be noted that these magnets are not commercial-off-the-shelf (COTS). No existing COTS magnets met DoD requirements so new magnets were specially designed to meet the military requirement.

As an example of how the USML technical data classification was determined, PN FP24018P1 will be used. General Electric Aviation's permanent magnet, PN FP24018P1, was designed for the F/A-18 E/F Super Hornet Generator Converter Unit (GCU). The Super Hornet Aircraft is controlled by USML VIII(a)(2), Fighters, fighter bombers; while the GCU is controlled by USML VIII(h)(1), Parts, components specially designed for the F/A-18 E/F. Since PN FP24018P1 is specially designed for the GCU, the manufactured magnet is controlled by USML VIII(h)(1) and the magnet drawing is controlled by USML VIII(i), Technical data. Note: U.S. contractors routinely label ITAR-controlled technical data, such as the PN FP24018P1 magnet drawing, with visible ITAR export control markings to ensure a DoS export license is obtained before exporting to any foreign individuals, parties, agencies, or countries.

The permanent magnets related to this Indictment are mission critical for the operation of the associated defense platforms and defense articles. First, the magnets are identified by the Secretary of State, Department of Defense, and U.S. defense contractors as USML defense articles. The USML does not make distinctions between different defense articles; all defense articles are equally important. Second, the magnets have part numbers that identify them as unique and essential in the manufacturing bill of materials (BOM) for the related defense article. The manufacturing BOM is a centralized source of information used to manufacture a product (defense article). It is a list of the items needed to create a product as well as the instructions on how to assemble that product. There are several DoD manufacturing BOMs that uniquely identifies these specially designed magnet part numbers in the assembly and operation of the defense article. And third, the magnets are vital components for the operation of military electric generators (converts mechanical to electrical energy) and electric motors (converts electrical to mechanical energy). The permanent magnets are the only source for the required magnet field to enable mechanical to electrical conversion, and vice versa. If the magnets were defective or unavailable, then the defense platforms would be non-mission capable and unable to perform their military mission. In the example of the F/A-18 E/F GCU, if the GCU permanent magnets were defective or unavailable then the aircraft would not be able to generate the required electrical power to operate onboard mission systems (radar, electronic warfare suite, radio, etc) thus making the aircraft non-mission capable.

Because the magnets are critical to the U.S. military, DTSA cares about what country has possession or access to technical data to create the defense article. A national security consideration for the United States and our allies is interference with the military supply chain. In technical positions to DoS, DTSA does not recommend export of ITAR-controlled technology to U.S. adversaries (i.e., China) who could potentially disrupt the supply chain. In addition to being ITAR-controlled, the Indictment magnets have foreign acquisition restrictions levied by the Defense Federal Acquisition Regulation Supplement (DFARS). DFARS provides uniform acquisition policies and procedures for the DoD, is applicable to all DoD contracts and subcontracts, and facilitates the acquisition of goods and services DoD requires to ensure America's Warfighters continued worldwide success. According to DFARS 225.7018-2, the magnets (samarium-cobalt and neodymium-iron-boron) are not allowed to be "melted or produced in any covered country" (China, Russia, North Korea, or Iran).

Daily, DTSA and Mr. Burton participate in DoS export license request assessments for ITAR-controlled defense articles and technical data. When DoS DDTC receives an export

license request, DDTC reviews and makes sure that it is within U.S foreign policy interests and decides whether a national security review needs to be performed by the DoD. DTSA has a formal role in export license determinations. DTSA is the DoD entry and exit point for DoS (and Department of Commerce) export license referrals. Department of State licenses referred to DoD are circulated to the Army, Navy, Air Force, and other DoD Stakeholders (NSA, DARPA, etc.) before DTSA consolidates a DoD position back to DoS. In general, the export license process begins when a U.S. defense contractor wants to export ITAR-controlled defense articles and/or services. The contractor submits a DoS license request for what they want to export, including USML category of the commodities, the end-user or foreign party, and the intended end-use. When DoS refers the license request to DoD for a national security review, DTSA receives the request and conducts an initial assessment to see if a quick determination of approval or rejection is possible or if an in-depth DoD review is needed. The DoD process is to get the request in and adjudicated as soon as possible. If it is a technologically complicated request (i.e., F-35), subject matter experts would review and make sure the approval is applicable to the country of export. DTSA can staff internally to senior engineers as well as to government agencies such as Air Force, Navy, and other DoD Stakeholders (F-35 Program Office). DTSA consolidates all technical responses and provides one DoD position to DoS DDTC. State issues the final U.S. Government decision (Approval, Approval with Provisos, Return Without Action, or Deny) to the defense contractor. Because the Indictment magnets are USML-controlled defense articles, the export of associated technical data requires a DoS DDTC export license approval before exporting outside the United States.

II. Basis and reasons for opinions: Training, experience, education, and information contained above.

III. Witness qualifications: Retired United States Air Force Lieutenant Colonel (November 1989 to April 2010). U.S. Government Federal Civil Service, GS-15 (January 2010 to the present). See attached resume.

IV. Prior testimony in the last 4 years. Has never testified before.

V. Publications in the last 10 years. No publications.

BURTON.STEVEN.B.1047561775
Digitally signed by BURTON.STEVEN.B.1047561775
Date: 2023.12.03 19:14:36 -05'00'

Steven B. Burton, GS-15

Steven B. Burton, Senior Engineer
Department of Defense/OUSD(Policy)/Defense Technology Security Administration
Export Control Directorate/Manned Aircraft Division

4800 Mark Center Drive
Alexandria, VA  22350-1600
Work:  (571)372-2513
E-mail:  steven.b.burton3.civ@mail.mil

EXPERIENCE:

July 2005 to Present; Senior Engineer; OSD Policy - Defense Technology Security Administration.

Senior electrical engineer reviewing and developing coordinated DoD technical recommendations on aircraft avionics and control systems (engine and aircraft).  DoD subject matter expert and team lead for the Joint Strike Fighter (JSF) F-35 Program.  Perform professional engineering work reviewing international transfers of defense-related goods, services, and technologies to ensure they are consistent with U.S. national security interests.  Mentor junior engineers and review their products and provide feedback.  Formulates, directs, interprets, monitors, and applies current DoD technology security policies and practices.  DoD representative on several Department of State delegations, at the 42-country Wassenaar Arrangement.  Current DoD Top Secret security clearance; cleared for programs involving Sensitive Compartmentalized Information (SCI) and Special Access Programs (SAPs).  DTSA's representative to the Low Observable/Counter Low Observable Tri-Service Committee contemplating export of DoD state-of-the-art technology.

August 2002 to July 2005; Chief, Force Optimization Analyses; Air Force Studies and Analyses Agency, Headquarters United States Air Force, Pentagon, Washington, District of Columbia

Combat Forces Assessment Model (CFAM) Manager – pioneered software improvements which shortened critical force structure analysis cycle times, enabling senior leadership to quickly compare future Air Force capabilities options.  Negotiated a munitions data agreement with the Air Armament Center resulting in an improved weapons database.  The performance parameters generated by this agreement greatly enhanced the fidelity of the Agency's campaign analyses, strongly underpinning far-term force structure decisions.  Led F/A-22 Program Acquisition Decision Memorandum Study for Air Force position supporting spiral development as the best way to generate more combat capability.  Generated and briefed F/A-22 and F-35 crew ratio optimization study showing senior leaders how to increase air campaign performance by augmenting the number of crews per combat aircraft.

April 1999 to August 2002; Operations Officer; 30th Student Squadron, Squadron Officer School, Air University, Maxwell Air Force Base, Alabama

Mentored 14 instructors/flight commanders as well as 520 Air Force and international officers and Department of Defense civilians, ensuring smooth execution of every aspect of day-to-day squadron operations.  Hand-picked to cadre for the 1999 test of the Air and Space Basic Course, a Air Force Chief of Staff initiative.  Key instructor implementing Squadron Officer School's largest curriculum changes in 52 years; 7-week curriculum reduced to 5-weeks.  Selected by peers as Flight Commander of the Class four times.

February 1996 through April 1999; B-2 Research Engineering Flight Commander; 509th Logistics Group, Whiteman Air Force Base, Missouri

Supervised six engineers and three technicians in a flight that served as an engineering consulting agency to the B-2 logistics group commander. Directed and managed a wide-range of activities in support of B-2 stealth bomber operations: reliability and maintainability analysis, troubleshooting, repair process development, failure/fault analysis, radar cross section (RCS) signature prediction and analysis, and technical order interpretation.

December 1992 to February 1996; Systems Engineer, Nuclear Command and Control; National Security Agency, Fort Meade, Maryland

Chief, led team of 15 engineers and scientists that identified and validated requirements for the next generation nuclear command and control (NC2) automated emergency action message authentication system. Designed and implemented technical solutions to meet stringent operational, nuclear security, and integrity requirements for the Joint Chiefs of Staff and military commander-in-chiefs. Performed nuclear testing of electronic components and computer systems.

November 1989 to December 1992; Foreign Computer Analyst; National Air and Space Intelligence Center, Wright-Patterson Air Force Base, Ohio

Scientific and technical intelligence analysis of foreign computer hardware and software technologies and associated military applications. Specialized in the technical evaluation of supercomputers, neural networks, fuzzy logic, and highly parallel computers. Briefed Vice Presidential Aide on neural network technology before Presidential visit to the Pacific Rim region.

May 1989 to November 1989; Computer Programmer; GS-7; 7th Communication Group, Pentagon, Washington, District of Columbia

Programming in C and Oracle's Sequential Query Language (SQL). Developed a database management system to simplify the tracking of division-wide tasks.

EDUCATION:

Master of Science Mathematics/Applied, Central Missouri State University, May 1999; Major: Applied Mathematics; Specialty: Computer modeling and simulation.

Bachelor of Science in Electrical Engineering with Honors, University of Tennessee at Knoxville, May 1989; Major: Electrical Engineering.

SPECIALIZED TRAINING:

Air War College: 2007
Department of Commerce, Export Controls and Policy: 2005
Air Command and Staff College: 2002
Academic Instructor School: 1999
Squadron Officer School: 1996

ACQUISITION QUALIFICATIONS:

Member Air Force Acquisition Corps
Systems, Planning, Research, and Development Engineering - Level II
Communications-Computer Systems - Level II
Test and Evaluation - Level I