UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA                                    PLAINTIFF

v.                                            CRIMINAL NO. 3:22-CR-88-DJH
                                                      *Filed Electronically*

QUADRANT MAGNETICS, LLC et al.                              DEFENDANTS

## UNITED STATES' RESPONSE TO DEFENDANTS' MOTION TO SUPPRESS EVIDENCE CONCERNING ALLEGED ITAR VIOLATIONS

Defendants Quadrant Magnetics, LLC ("Quadrant Magnetics"), Phil Pascoe, Scott Tubbs, and Monica Pascoe (collectively "Defendants") ask this Court to suppress physical and electronic evidence related to the government's charged allegations of violations of the International Traffic in Arms Regulations ("ITAR")[1] obtained pursuant to five federal search warrants. ECF 87. Defendants claim that, despite each of the relevant technical drawings containing conspicuous ITAR markings, and notwithstanding the State Department's determination (issued pursuant to authority duly delegated by the President) that the United States Munitions List ("USML") covered the drawings, law enforcement agent affiants were nonetheless required to engage in their own analysis to determine whether the items were "actually" on the USML. *Id.* at 9.

---

[1] Defendants do not attack the warrants' probable cause to search for evidence related to violations of the Defense Federal Acquisition Regulation Supplement (DFARS), Wire Fraud, Obstruction, False Claims Act, False Statements, Destruction of Records, Conspiracy, or Visa Fraud. *See* ECF 87 Ex. 1 ¶ 9; Ex. 2 ¶ 7. The government responds here to Defendants' attack on evidence obtained in relation to the ITAR violations. The government notes, however, that the evidence obtained pursuant to the search warrants for investigation of ITAR violations likely could have been obtained as part of the investigation into the other uncontested bases for search of the relevant premises.

1

As a threshold issue, Defendants' motion is flawed because Defendants fail to show they had a reasonable expectation of privacy such that they are entitled to Fourth Amendment protections relating to four of the search warrants. Even if they did, Defendants' motion amounts to an unsupported attempt to elevate the probable cause standard required for a search warrant based upon Defendants' own theory of the case. Instead, the operative question for the Court is whether there was sufficient evidence for the magistrate judge to conclude, from the totality of the circumstances, that there was a fair probability that contraband or evidence of a crime would be found in a particular place to be searched. Based on the facts set out in the search warrants, there was overwhelmingly probable cause and, if the Court disagrees, the *Leon* good faith exception would still apply. For these reasons, the Court should deny Defendants' motion.

## FACTS

The investigation into Quadrant Magnetics and its employees originated when law enforcement received information that Quadrant Magnetics supplied magnets melted and produced in China to a U.S. defense subcontractor, which incorporated those magnets into production contracts with Naval Supply Systems Command and Naval Air Systems Command. ECF 87 Ex. 1 ¶¶ 37-38.[2] Law enforcement used that information to open an investigation into potential violations of the Defense Federal Acquisition Regulation Supplement ("DFARS"), the Arms Export Control Act ("AECA"), and the ITAR.

**The 2018 Search Warrant at Quadrant Magnetics in Louisville, Kentucky**

On October 22, 2018, Naval Criminal Investigative Service Special Agent James McCartney applied for and received a search warrant for Quadrant Magnetics. In support of the warrant, Special Agent McCartney, an agent with thirty years of law enforcement experience,

---

[2] For ease of reference, the government will refer to the search warrants attached to Defendants' motion (ECF 87, Exhibits 1-5).

submitted an affidavit with a detailed statement outlining the facts justifying the search. *See* ECF 87 Ex. 1. The 2018 search warrant ("2018 Search Warrant") affidavit discussed how, in 2017, GE Aviation Systems ("GEA") contacted the government via a letter and told them that samarium cobalt magnets they had purchased from Quadrant Magnetics for use in a component part, P/N FP24018P1, of the F-18 were melted and produced in China, in violation of the DFARS. *Id.* ¶¶ 37-38. The 2018 Search Warrant affidavit further described that, at the request of GEA, the Department of State's Directorate of Defense Trade Controls ("DDTC") determined that the magnets were on the USML and that, pursuant to the ITAR, a license was required to export or import them. *Id.* ¶¶ 39-40. The affidavit described a letter from GEA to DDTC recounting these facts and how it directly informed Quadrant Magnetics of the issue. *Id.* The affidavit further described how a copy of that letter was provided to Quadrant Magnetics employees Scott Tubbs, Phil Pascoe, and Piece Hackett. *Id.* ¶ 41. An email from GEA to Quadrant Magnetics in 2015 relating to a request for quote for FP24018P1 showed that Quadrant Magnetics also saw explicit ITAR control warnings in connection with the part:

> This technical data is considered ITAR and/or EAR controlled pursuant to 22 CFR Part 120-130 and 15 CFR Parts 730-774 respectively. Transfer of this data by any means to a Non-US Person, whether in the United States or abroad, without the proper U.S. Government authorization (e.g., License, exemption, NLR, etc.), is strictly prohibited.

*Id.* ¶ 53.

The affidavit discussed how documents from GEA confirm that, as early as 2011, Quadrant Magnetics was delivering Chinese-made magnets produced from ITAR restricted drawings to GEA in violation of the DFARS and that the invoices from Quadrant Magnetics to GEA themselves listed China as the country of origin. *Id.* ¶ 45. The affidavit discussed how Scott Tubbs wrote a letter to GEA entitled "FP24018P1 Product Compliance" falsely stating that no technical

3

data was sent to China regarding P/N FP24018P1 and that since Quadrant Magnetics did "value-add secondary operations" in Louisville, the country of origin for the magnet was actually the United States. *Id.* ¶ 46. The affidavit also recounted, however, that correspondence and records from Quadrant Magnetics documented the manufacture and sale of the samarium cobalt magnets to GEA for inclusion in the F-18 and how Scott Tubbs stated to the affiant that the magnets were manufactured and magnetized in China – directly contrary to his previous statement in his letter to GEA that no technical data was sent to China and that Quadrant Magnetics provided only "value-add" secondary operations in Louisville, thus making the country of origin for the magnets the United States. *Id.* ¶¶ 48-50.

Finally, the affidavit discussed how, after GM realized that GEA knew that Quadrant Magnetics was importing samarium cobalt magnets from China, Mr. Tubbs coordinated the destruction of ITAR marked drawings at Quadrant Magnetics' facility in China. *Id.* ¶¶ 58-60.

**The Four 2022 Search Warrants**

In 2022, Federal Bureau of Investigation Special Agent Kailea Bogner applied for and received search warrants for: (a) the personal residence of Hang Sun, a/k/a Cody Sun, CEO and owner of Quadrant Magnetics and its affiliated companies; (b) Quadrant International, the parent company for Quadrant Magnetics; (c) Quadrant Solutions, Inc., another subsidiary company of Quadrant International; and (d) the personal residence of CongCong "Michelle" Qian, a purported employee of Quadrant Magnetics according to documents filed with United States Citizenship and Immigration Services ("USCIS"), but who was listed as Chief Operating Officer for Quadrant International according to an organizational chart dated January 22, 2022 seized as part of the investigation.

In support of these warrants ("2022 Search Warrants"), Special Agent Bogner submitted an affidavit with a detailed statement outlining the facts justifying the search. *See generally* ECF 87 Ex. 2.[3] The affidavit detailed how emails with schematic and technical descriptions of magnet product numbers sent to China were obtained in the 2018 Search Warrant and how agents subpoenaed GEA and General Dynamics for information regarding the end use of the magnet product numbers. *Id.* ¶ 103. Based on those responses, agents determined that the end use items were various defense products, to include a submarine periscope, targeting system, missile system, fighter jet radar, among others. *Id*. After identifying the company that received the magnet product numbers from Quadrant Magnetics and the end use items for the requested magnet product numbers, agents then requested commodity jurisdiction determinations ("CJ Determinations") from the U.S. State Department. *Id.* ¶¶ 103-05. The State Department's DDTC informed agents through numerous CJ Determination letters that the magnet product numbers identified were defense articles under Category VIII(h)(1) of the USML subject to the jurisdiction of the ITAR that could not be exported without a license. *Id.* ¶¶ 105-06.

The affidavit described how agents requested a License and Registration History Check for Quadrant Magnetics from the DDTC, which found no licenses or registrations. ECF 87 Ex. 2 ¶ 107. Agents then reviewed emails obtained in the course of the 2018 Search Warrant, including an email where Quadrant Magnetics employee Scott Tubbs emailed Phil Pascoe asking him to "re-draw" a GEA drawing for "export reasons." *Id.* ¶ 108(b). The affidavit cited multiple instances of Quadrant Magnetics employees sending ITAR-marked technical drawings to Chinese companies or individuals, including a February 29, 2012 email from Phil Pascoe to Jane Gu, an employee of Hangzhou X-Mag, a company based in China that was manufacturing Quadrant Magnetics'

---

[3] The government adopts Defendants' custom and refers to ECF 87 Ex. 2 as representative of the other three 2022 Search Warrants found at ECF 87 Exhibits 3-5.

Case 3:22-cr-00088-DJH   Document 105   Filed 01/26/24   Page 6 of 18 PageID #: 1352

magnets. *Id.* ¶ 108(f); *see id.* ¶¶ 108(l) (December 12, 2016 email from Phil Pascoe to Jane Gu);

(o) (January 10, 2018 email from Phil Pascoe to Jane Gu); (q) (March 23, 2017 email from Phil

Pascoe to non-U.S. person J.G.).

        In addition, the affidavit described how Quadrant Magnetics employees were aware of

ITAR restrictions and represented to customers and the FBI that Quadrant Magnetics was ITAR-

compliant, while at the same time taking internal actions to flout ITAR regulations. Scott Tubbs

emailed an employee of General Dynamics claiming that Quadrant Magnetics was registered with

the Department of State as evidence that Quadrant Magnetics "was serious and compliant to ITAR

regulations." Attached to that email was an ITAR registration letter that stated:

> A U.S. person means a U.S. citizen, a lawful permanent resident (i.e., a green
> cardholder) or a protected refugee or asylee as defined by 8 U.S.C.
> 1324(B)(a)(3). It also means any corporation, business association, partnership,
> society, trust, or any other entity, organization or group that is incorporated to
> do business in the United States. It also includes any government (Federal,
> State or local entity). It does not include any "foreign person" as defined in
> Section 120.16 of the International Traffic Arms Regulations (ITAR). Any
> disclosure of technical data controlled under the ITAR to a foreign person
> requires prior written approval from the U.S. Department of State Directorate
> of Defense Trade Controls (DDTC). You may access the ITAR regulations by
> visiting the following website: www.pmddtc.state.gov.
>
> Please provide the information requested below. This information is needed in
> order to send you ITAR-controlled technical data (as defined in ITAR 120.10).

*Id.* ¶ 108(g). Phil Pascoe told FBI agents that he sent prints to China to make parts but that the

prints did not contain ITAR data or the part's application. Phil Pascoe admitted he knew General

Dynamics and GEA magnets were for military use. *Id.* ¶ 108(i). Scott Tubbs discussed with another

Quadrant Magnetics executive keeping the DDTC registration with Quadrant Solutions because

changing to Quadrant Magnetics would raise red flags, and the as-filed DDTC registration with

the State Department failed to disclose Cody Sun as owner of Quadrant Magnetics and falsely claimed that there were no U.S. (or foreign) subsidiaries engaged in ITAR activities. *Id.* ¶ 108(k).

Finally, the affidavit described how Quadrant Magnetics and its employees, upon being confronted with their actions of ITAR violations, did not contest the fact that the magnet and parts were ITAR-controlled, but instead took additional actions to falsify where Quadrant Magnetics produced its magnets and to obfuscate the company's ITAR violations. When GEA discovered that Quadrant Magnetics was making magnets to be used in the F-18 in China, they confronted Quadrant Magnetics and an employee told GEA the parts were manufactured in China. Later, however, Mr. Tubbs drafted a letter to GEA falsely stating: "[t]his letter is to confirm there has been no technical information sent to China regarding part number FP24018P1. The part is purchased semi-finished by [Quadrant Magnetics] with value-add secondary operations performed at the Quadrant facility in Louisville, KY. Thus the country of origin . . . is the United States of America." *Id.* ¶¶ 108(t), (u). Between August 2017 to January 2018, while discussions between GEA attorneys and Quadrant Magnetics employees were ongoing regarding whether violations of ITAR or DFARS had occurred, Phil Pascoe and Scott Tubbs created and caused the creation of a Government-Industry Data Exchange Program ("GIDEP") Problem Advisory for Magnet PMG Rotor for PN 36B423718P1 falsely claiming that the magnets were magnetized by Quadrant Magnetics in Louisville, Kentucky, before shipping to GEA. *Id.* ¶¶ 108(gg); *see id.* ¶¶ 108(w)- (vv). In truth, the magnets were smelted and magnetized in China. And then, in January 2018, GEA carbon copied Quadrant Magnetics on a letter to DDTC in which GEA confirmed that DDTC had issued a Commodity Jurisdiction Determination that the magnet was on the USML under Category VIII(h)(1). Moreover, as detailed in the letter, GEA requested that Quadrant Magnetics destroy the drawings it had sent, which Quadrant Magnetics confirmed it did. *Id.* Quadrant

Magnetics took no action to contest the Commodity Jurisdiction Determination or otherwise change its behavior, but rather continued sending ITAR marked technical data to China through at least October 2018. *Id.* ¶ 108(rr); (w)-(lll).

## ARGUMENT

**I.     Defendants Did Not Have a Reasonable Expectation of Privacy in the Places Searched Pursuant to the 2022 Search Warrants.**

As stated above, the 2022 Search Warrants were executed to search residences or premises belonging to Cody Sun, Michelle Qian, Quadrant International, and Quadrant Solutions. Noticeably absent from any of those warrants were requests to search premises of Defendants Quadrant Magnetics, Phil Pascoe, Scott Tubbs, or Monica Pascoe. Therefore, Defendants cannot challenge the 2022 Search Warrants because none of the warrants were executed at premises for which Defendants had subjective expectations of privacy.

The burden of establishing a reasonable expectation of privacy to invoke Fourth Amendment protections lies squarely upon a defendant. *See Rakas v. Illinois,* 439 U.S. 128, 130 n.1 (1978); *United States v. Talley*, 275 F.3d 560, 563 (6th Cir. 2001). In order to establish standing, the defendant must demonstrate a subjective expectation of privacy in the place that was searched or the items seized, and society must recognize this subjective expectation of privacy as reasonable. *United States v. Sangineto–Miranda*, 859 F.2d 1501, 1510 (6th Cir.1988) (citing *California v. Ciraolo*, 476 U.S. 207, 211 (1986)). In other words, "rights such as those conferred by the Fourth Amendment are personal in nature, and cannot bestow vicarious protection on those who do not have a reasonable expectation of privacy in the place to be searched." *Steagald v. United States*, 451 U.S. 204, 219 (1981); *see also Rakas*, 439 U.S. at 134 (citations omitted) ("A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth

Amendment rights infringed. And since the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment, it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections.").

Defendants "bear the burden of establishing standing." *United States v. Russell*, 26 F.4th 371, 377 (6th Cir. 2022). They have made no effort to meet that burden. Moreover, "[o]n their face, the documents subpoenaed here are not [Defendants'] 'private papers.'" *United States v. Miller*, 425 U.S. 435, 440 (1976). That is enough to deny Defendants' motion to suppress outright.

Defendants do not address how they had a reasonable expectation of privacy in the premises searched pursuant to the 2022 Search Warrants, such that they could challenge search warrants executed at the personal residences of two individuals not charged in this case. The reason they do not address this issue is because they can offer no support for it. They have not alleged a preexisting personal relationship with Mr. Sun or Ms. Qian, or any other reason to have had privacy expectations in Mr. Sun or Ms. Qian's residences. *See United States v. Contreras*, 2003 WL 22004161, at *3 (E.D. Mich. Aug. 8, 2003) (stating "defendant ordinarily cannot challenge search of a colleague's or relative's residence"; finding no standing for defendant to challenge search of sister's home).

Similarly, Defendants fail to establish or address how Quadrant Magnetics or its employees Phil Pascoe, Scott Tubbs, or Monica Pascoe had a reasonable expectation of privacy in Quadrant Magnetics' parent company, Quadrant International, or a California-based affiliate, Quadrant Solutions. *See United States v. Vicknair,* 610 F.2d 372, 379 (5th Cir. 1980) ("When corporate property is seized or searched, an individual cannot assert the corporation's Fourth Amendment rights absent a showing that he had an independent privacy interest in the goods seized or the area searched."); *United States v. Judd,* 889 F.2d 1410, 1413 (5th Cir.1989) (finding that President,

Chief Operating Officer, and sole shareholder of a corporation, together with the corporation's Vice-President, did not have standing to challenge search warrant of corporation's bookkeeping office even though the corporate President had prepared some of the records that had been seized). *Cf. Doe v. United States*, 253 F.3d 256, 270 n.4 (6th Cir. 2001) (defendant had no personal ownership interest in "business records of [a] bank"). None of the individual Defendants were officers or owners or Quadrant International or Quadrant Solutions. *See United States v. Mohney*, 949 F.2d 1397, 1403 (6th Cir. 1991) (recognizing officer of a corporation may have standing to challenge a corporate search). Since Defendants fail to satisfy their threshold burden to show a reasonable expectation of privacy to invoke Fourth Amendment protections with respect to the 2022 Search Warrants, the Court should deny their motion without further consideration.

## II.     The 2018 and 2022 Search Warrants Provide Probable Cause to Search.

Even if the Court considers the merits of Defendants' motion, the Court should deny it because the 2018 Search Warrant and the 2022 Search Warrants established sufficient probable cause. Defendants' basic argument is that the 2018 and 2022 Search Warrants lacked probable cause because the affiant law enforcement officers relied on CJ Determinations from the State Department that said the technical drawings at issue were on the USML without checking behind that process, which is provided for by regulation, to determine whether the State Department's process was flawed. ECF 87 at 1-2, 4.

Defendants seek to hold these affidavits to an unreasonable standard. An affidavit must be "judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added." *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000). While reviewing courts should avoid rubber stamping an earlier decision, "great deference" should be given to a "magistrate's determination of probable cause." *United States v. Abboud*, 438 F.3d 554,

571 (6th Cir. 2006) (citations omitted). When the probable cause determination of the issuing magistrate is challenged, "[t]he standard of review for the sufficiency of an affidavit is whether the magistrate had a substantial basis for finding that the affidavit established probable cause to believe that the evidence would be found at the place cited." *United States v. Johnson,* 351 F.3d 254, 258 (6th Cir. 2003); *see United States v. Coffee*, 434 F.3d 887, 892 (6th Cir. 2006) (stating probable cause requires "reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion"). "Review of an affidavit and search warrant should rely on a totality of the circumstances determination, rather than a line-by-line scrutiny." *Johnson*, 351 F.3d at 258 (internal citations and alterations omitted); *see id*. ("Courts should review the sufficiency of the affidavit in a commonsense, rather than hypertechnical manner.").

The magistrate judge's determination of probable cause for the 2018 and 2022 Search Warrants—a determination entitled to "great deference"—was supported by the face of the affidavits. *Abboud*, 438 F.3d at 571. What Defendants suggest is that the agents themselves were required to engage in an analysis to determine whether the magnets implicate and satisfy the "commercial equivalent provision" of the ITAR regulations—a repackaged argument recycled in many of Defendants' other motions. In other words, Defendants would require that agents peek behind the curtain to confirm information they received from the U.S. State Department—the agency whose responsibility it is by law to make determinations regarding whether items are on

the USML. That cannot be what is required to support a probable cause showing.[4] "Commonsense" dictates that the affiants were entitled to rely on the determination of the U.S. State Department to satisfy the need to show that the items at issue were on the USML and required a license to export. *Johnson*, 351 F.3d at 258. Indeed, it would be unreasonable to expect a law enforcement affiant *not* to rely on a U.S. Government agency's expertise over its own regulations. Defendants' standard would impermissibly require *prima facie* proof of the magnet and its parts' status on the USML to support a probable cause determination, but probable cause is not such a "high bar."[5] *United States v. Sheckles*, 996 F.3d 330, 337 (6th Cir. 2021) (quotations omitted). As the Supreme Court has stated, affidavits "are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity . . . have no proper place in this area." *Illinois v. Gates*, 462 U.S. 213, 235 (1983) (quotations omitted).

Defendants' fixation on the commercial equivalent exception analysis misses the point of what is required for a probable cause determination. "[P]robable cause is not the same thing as proof." *United States v. Christian*, 925 F.3d 305, 310 (6th Cir. 2019). A search warrant affidavit

---

[4] Defendants also use language in their motion which suggests a possible *Franks* argument, namely, that affiants' reliance on the CJ Determinations without further inquiry or acknowledgement that the CJ Determinations were insufficient amounted to "reckless omissions." ECF 87 at 9; *see id.* at 8 (citing *Franks v. Delaware*, 438 U.S. 154 (1978)). To obtain a *Franks* hearing, Defendants must (1) make a substantial preliminary showing of an intentional or reckless omission and (2) demonstrate that the omission was essential to the probable cause determination. *Franks*, 438 U.S. at 155-56. Defendants have done neither. There is absolutely no evidence that affiants intentionally or recklessly omitted any information from their affidavits. *See Franks*, 438 U.S. at 171 (requiring affidavits or sworn witness statements as proof of omissions). Moreover, as discussed in the government's response, affiants were not required to independently undertake a separate ITAR analysis or question the sufficiency of CJ Determinations made by the agency that regulates the ITAR and USML.

[5] Similarly, Defendants' cryptic and unsupported footnote that CJ Determinations "do[] *not* equate to a determination that the items were actually on the USML," ECF 87 at 4 n.4, and post hoc incorrect statement that "it is now clear that [the magnets] are not [on the USML]," *id*. at 4, have no bearing on the question of whether the CJ Determinations provided probable cause for purposes of a search warrant.

need not allege a defendant has committed all elements of an offense, *id.*, nor "require officers to rule out a suspect's innocent explanation for suspicious facts," *United States v. Tagg*, 886 F.3d 579, 586 (6th Cir. 2018) (quotation omitted). Even if the affidavits made no mention of the commercial equivalent exception or the State Department's commodity jurisdiction determinations, they would still be supported by probable cause, or a "fair probability," *Gates*, 462 U.S. at 236, that evidence of a crime would be found at the places of search. That is because the affidavits alleged that (a) GEA discovered that the magnets for P/N FP24018 that it was purchasing from Quadrant Magnetics were being produced in China with technical data that was sent to China unlawfully, ECF 87 Ex. 1 ¶¶ 39-40; (b) GEA raised the alarm bells regarding the fact that Quadrant Magnetic sent technical data relating to P/N FP24018 to China for magnets on the USML, and GEA communicated this concern directly to the DDTC, *see, e.g.*, ECF 87 Ex. 1 ¶ 40; (c) GEA marked its drawings as controlled for export or ITAR-specifically controlled in its correspondence with Quadrant Magnetics, *see, e.g.*, ECF 87 Ex. 1 ¶ 53-54; Ex. 2 ¶ 108(e), (p); (d) Defendants, who self-proclaimed being "serious and compliant to ITAR," ECF 87 Ex. 2 ¶ 108(g), never contested these restrictions—they just ignored them, *see generally* ECF 87 Exs. 1, 2; and (e) Defendants made false statements to GEA regarding the country where it produced the magnets and in two GIDEP Problem Advisories, and coordinated the destruction of ITAR-marked drawings at the Quadrant Magnetics facility in China, ECF 87 Ex. 1 ¶¶ 45-62; Ex. 2 ¶¶108(t)-(vv). These facts are more than enough to support probable cause.

Defendants also challenge the reliability of the State Department's CJ Determinations in the search warrant affidavits as unsupported hearsay, challenging the "veracity" and "basis of knowledge" underlying the determinations. ECF 87 at 9 & n.8. Defendants' argument misses the mark. Consideration of the veracity, reliability, and basis of knowledge of sources in search

warrants is necessary "where the majority of information in the affidavit comes from confidential sources." *United States v. Dyer*, 580 F.3d 386, 390 (6th Cir. 2009). "[P]ublic officials," like "another law enforcement officer" or "the average citizen," are "presumed to be reliable, and thus no special showing of such reliability in the particular case is necessary." 2 Wayne R. LaFave, *Search and Seizure* § 3.5(a) & n.11 (6th ed. 2020); *cf. United States v. Ventresca*, 380 U.S. 102, 111 (1965) ("Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant"); *United States v. Lapsins*, 570 F.3d 758, 764 (6th Cir. 2009) (holding similarly). There should be no dispute that determinations made by the U.S. State Department (a named Government entity) "ha[ve] been obtained in a reliable way by an honest or credible person." *Gates*, 462 U.S. at 240.[6] And, if there had been any doubt as to the reliability, veracity, or basis of knowledge of the State Department, the magistrate judge "remain[ed] perfectly free to exact such assurances" as were required. *Id.*

At bottom, Defendants' challenge to the search warrants represents nothing more than another arena within which to again trot out their incorrect and unsupported defense theory. Probable cause does not, and should not, require agents to unilaterally question a United States Government agency's decision duly delegated by law and within the particular expertise and scope of that agency.

### III.      The *Leon* Good Faith Exception to the Exclusionary Rule Applies in this Case.

All five warrants in this case adequately established probable cause for each to be issued as to suspected ITAR violations. However, should the Court determine that there was any

---

[6] For the same reason, Defendants' reliance on *United States v. Waide*, 60 F.4th 327, 336 (6th Cir. 2023), a case involving "a minimum of two levels of hearsay—from [an] unidentified property owner and from [an] unnamed witness"—is inapposite.

constitutional deficiency, the search should nonetheless be upheld under the good faith exception established in *United States v. Leon*, 468 U.S. 897 (1984). The exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights." *Leon*, 468 U.S. at 906 (internal quotation marks omitted). Its purpose is not to "cure the invasion of the defendant's rights which he has already suffered," *id.* at 906 (internal quotation marks omitted), but to prevent "future violations of Fourth Amendment rights through the rule's general deterrent effect," *Arizona v. Evans*, 514 U.S. 1, 10 (1995). The good-faith exception to the exclusionary rule prevents the suppression of evidence "when the police conduct a search in 'objectively reasonable reliance' on a warrant later held to be invalid." *Davis v. United States*, 564 U.S. 229, 238-39 (2011) (quoting *Leon*, 468 U.S. at 922); *see United States v. Carpenter*, 360 F.3d 591, 596 (6th Cir. 2004) ("The *Leon* exception is applicable in cases where we determined that the affidavit contained a minimally sufficient nexus between the illegal activity and the place to be searched to support an officer's good faith belief in the warrant's validity, even if the information provided was not enough to establish probable cause."). Such is the case here.

*Leon* identified four circumstances in which the good faith exception will not apply: (1) where the "magistrate judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false"; (2) where the "issuing magistrate wholly abandoned his judicial role"; (3) where the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) where a search warrant is "so facially deficient—i.e., in failing to particularize the place to be searched or things to be seized— that the executing officers cannot reasonably presume it to be valid." 468 U.S. at 923 (internal quotation marks omitted); *see United States v. Hython*, 443 F.3d 480, 484 (6th Cir. 2006).

In the present case, none of these circumstances would preclude the *Leon* good faith exception. There is no evidence that any of the warrants issued in this case included information an affiant knew was false, that the issuing judges acted as rubber stamps when authorizing the warrants, or that the warrants are facially deficient in specifying the place to be searched or things to be seized. *See* ECF 87 Ex. 1 Atts. A, B; Ex. 2 Atts. A, B. Nor are the affidavits so lacking in indicia of probable cause that they state only "suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge," to the point where "no reasonable officer would rely on it." *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017). Not even Defendants maintain that the affidavits underlying the five search warrants at issue here would fall to this level of bare bones pleading. As explained above, the affidavits provided multiple independent facts—including determinations from the U.S. Department of State—supporting the affiants' belief that the parts were on the USML and therefore ITAR-restricted. Beyond that contested element of the alleged ITAR offenses, they also provided factual bases to satisfy probable cause that Defendants committed ITAR violations, including factual allegations that Defendants (i) sent ITAR-restricted data overseas or to non-U.S. persons; (ii) without a license; and (iii) did so willfully; and that evidence of those crimes would be found at the locations to be searched. *See, e.g.*, ECF 87 Ex. 1 ¶¶ 45-46, 52, 55, 65, 71-73; Ex. 2 ¶ 108, 113-131.

As discussed above, the 2018 Search Warrant and the 2022 Search Warrants established sufficient probable cause. However, if there was any constitutional violation the Court can easily find that any reasonably well-trained officer faced with executing these warrants would objectively rely in good faith on the issuance of the warrants.

## **CONCLUSION**

For the foregoing reasons, the United States requests that Defendants' Motion to Suppress, ECF 87, be DENIED.


Respectfully submitted,

MICHAEL A. BENNETT                          JENNIFER KENNEDY GELLIE
United States Attorney                       Executive Deputy Chief
Western District of Kentucky                 Counterintelligence and Export Control Section
                                             National Security Division


 s/ *Joshua D. Judd*                          s/ *Alex Wharton*
Joshua D. Judd                               Alex Wharton
Christopher C. Tieke                         Trial Attorney
Assistant U.S. Attorneys                     950 Pennsylvania Ave., NW
717 W. Broadway                              Washington, DC 20530
Louisville, KY  40202                        (202) 514-4523
(502) 582-5911                               alexander.wharton@usdoj.gov
Joshua.judd@usdoj.gov
Christopher.tieke@usdoj.gov

CERTIFICATE OF SERVICE

On January 26, 2024, I electronically filed this document through the ECF system, which will send a notice of electronic filing to counsel for the defendants.


 s/ *Joshua D. Judd*_____
Assistant United States Attorney