UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA | PLAINTIFF |
| v. | CRIMINAL NO. 3:22-CR-88-DJH<br>*Filed Electronically* |
| QUADRANT MAGNETICS, LLC et al. | DEFENDANTS |

**UNITED STATES' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE EXPERT TESTIMONY FROM SCOTT MCCALL, JAMES BLANKENSHIP, AND STEVEN BURTON**

Defendants Quadrant Magnetics, LLC ("Quadrant Magnetics"), Phil Pascoe, Scott Tubbs, and Monica Pascoe (collectively "Defendants") ask the Court to exclude testimony from Scott McCall, James Blankenship and Steven Burton. ECF 93 (filed under seal).

A motion *in limine* is a pre-trial mechanism by which this Court can give the parties advance notice of the evidence upon which they may or may not rely to prove their theories of the case at trial.[1] Although the Federal Rules of Evidence do not explicitly authorize a court to rule on an evidentiary motion *in limine,* the United States Supreme Court has noted that the practice of ruling on such motions "has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984).

To obtain the *in limine* exclusion of evidence, a party must prove that the evidence is clearly inadmissible on all potential grounds. *See id.* Any ruling on a motion *in limine*, however, is "no more than a preliminary, or advisory, opinion that falls entirely within the discretion of the district

---

[1] Pursuant to the Court's scheduling Order, the deadline to file any motions *in limine* is four weeks prior to trial, which is scheduled to commence on April 1, 2024. *See* ECF 98. Any responses are due two weeks prior to trial, and there shall be no replies. *Id.*

1

court, and the district court may change its ruling where sufficient facts have developed that warrant the change." *United States v. Yannott*, 42 F.3d 999, 1007 (6th Cir. 1994); *see United States v. Kistner*, 2013 WL 80255, at *2 (S.D. Ohio Jan. 7, 2013).

Defendants move to limit the testimony of Scott McCall, James Blankenship, and Steven Burton. First, they argue the testimony is irrelevant and unhelpful to the issues related to the charges. Second, they assert the testimony of Dr. McCall and Mr. Burton should be excluded under Federal Rule of Evidence ("FRE") 403 because it poses a substantial danger of unfair prejudice, misleading the jury, and wasting time. Third, Defendants claim Dr. McCall's testimony should be excluded because it is unreliable and based on flawed methodology. Defendants' claims go to the weight of the evidence and may be proper lines of inquiry on cross examination, but the Government witnesses' proposed testimony is relevant, not unduly prejudicial, and comports with FRE 702.

## **LEGAL STANDARD**

Federal Rule of Evidence 702 governs expert testimony. Trial courts serve a "gatekeeper" role for expert witnesses, which involves three basic inquiries:

> First, the witness must be qualified by 'knowledge, skill, experience, training, or education.' Fed. R. Evid. 702. Second, the testimony must be relevant, meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.' *Id.* Third, the testimony must be reliable. *Id.*

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008). Testimony meets the reliability threshold when "an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the

practice in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). The court's gatekeeping inquiry must be tied to the facts of a particular case. *Id.* at 150.

The Rule 702 inquiry is "a flexible one," and "[t]he focus . . . must be solely on the principles and methodology, not on the conclusions they generate." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594-95 (1993). The Sixth Circuit "recognize[s] that a district court operates with wide latitude in deciding how to test an expert's reliability, and, as such, must be afforded considerable leeway in deciding how to go about determining whether particular expert testimony is reliable." *United States v. LaVictor*, 848 F.3d 428, 443 (6th Cir. 2017) (cleaned up). "[T]he requirement that an expert's testimony be reliable means that it must be supported by appropriate validation—i.e., good grounds, based on what is known." *In re Scrap Metal*, 527 F.3d at 529 (internal quotation marks omitted). "The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *Id*. at 529-30; *see United States v. Stapleton*, 2013 WL 5966122, at *5 (E.D. Ky, Nov. 8, 2014) (stating expert's opinions "must be the product of a reliable application of an otherwise acceptable method").

In determining whether an expert's opinion is reliable, the trial court evaluates the opinion according to several factors, including, but not necessarily limited to, the following four factors enunciated in *Daubert*: (1) whether the theory or technique at issue has been subjected to testing; (2) whether the theory or technique has been subjected to publication and peer review; (3) whether the theory or technique has a known or potential rate of error; and (4) whether the theory or technique has achieved general acceptance in the particular technical or scientific community. *Daubert*, 509 U.S. at 593-94. Since *Daubert*, numerous courts have dealt with challenges to experts

similar to those presented here, and have concluded, as this Court should conclude, that the challenges go to weight and not to admissibility. Indeed, the *Daubert* Court itself recognized that:

> [v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.

509 U.S. at 596. A litigant need not demonstrate to the court that the expert's assessments are correct, only reliable. Rule 702 is broad enough to permit testimony that is the product of competing principles or methods in the same field of expertise. *See* Fed. R. Evid. 702, Advisory Committee Notes (2000).

In the Sixth Circuit, "rejection of expert testimony is the exception, rather than the rule[.]" *United States v. Gowder*, 2018 WL 6932119, at *4 (E.D. Ky. Nov. 14, 2018) (*citing In re Scrap Metal*, 527 F.3d at 530); *see also* Fed. R. Evid. 702 Advisory Committee Notes (2000) (stating "[d]oubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility"). The benchmark for exclusion of expert testimony is whether the proffered testimony will usurp the function of the jury or the court. In performing its gatekeeper function, the trial court has broad discretion in deciding how to test an expert's reliability and in determining whether expert testimony is admitted or excluded. Notably, pre-trial challenges to expert testimony should not become "a series of mini-trials with regard to every objection raised against a party's expert witnesses." *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1234-35 (10th Cir. 2004). "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1061 (8th Cir. 2002); *see SCF, LLC v. Hartford Fire Ins. Co.*, 2021 WL 6932658, at *3 (citing *Hartley*, 310 F.3d at 1061).

Defendants needlessly request a hearing to argue their points. Defendants do not contend the experts themselves are unqualified but rather that some of their testimony is not relevant or

4

reliable. Defendants' challenges to these witnesses are not grounded in the requirements of *Daubert*, *Kumho Tire*, or Federal Rule of Evidence 702. Instead, Defendants' challenges are grounded in issues related to the credibility and weight of the witnesses' testimony. *Louderback v. Orkin Exterminating Company, Inc.*, 26 F. Supp. 2d 1298, 1307 (D. Kan. 1998) (issues of credibility are for cross-examination); *accord Reynolds v. Freightliner, LLC*, 2006 WL 5249847, at * 5 (E.D. Ky. Sept. 18, 2006). Consequently, the Court should overrule the Defendant's *Daubert* challenges without a hearing.

## ARGUMENT

### I. DR. MCCALL'S TESTIMONY IS RELEVANT, BASED ON SUFFICIENT FACTS AND DATA, AND RELIABLE.

Scott McCall is the Actinide and Lanthanide Science Group Leader within the Materials Science Division of Lawrence Livermore National Laboratory and a founding member of the Critical Materials Institute, a Department of Energy Innovation Hub, where he has served as the Magnet Thrust Lead and on the CMI Leadership Team as deputy for Driving Reuse & Recycling and currently the lead for Crosscutting Research. He earned a Ph.D. in condensed matter physics from Florida State University (2000), where he worked at the National High Magnetic Field Laboratory under Professor Jack Crow, the founding director. He was a Scowcroft Fellow at the Bush School (Texas A&M) where he earned a Certificate in National Security Affairs (2012). He has more than 100 peer reviewed publications, predominately on magnetism and magnetic materials, six patents, and two R&D 100 Awards. He is a member of the American Physical Society, the Minerals, Metals, and Materials Society, and the Institute of Electrical and Electronics Engineers. He served as an editor for the journal Intermetallics (2016-19) and is currently the guest editor for a special issue of Journal of The Minerals, Metals, & Materials Society (JOM) on Advances in Processing, Manufacturing, and Applications of Magnetic Materials. He has an

established track record of scientific service including organizing multiple symposia on magnetism and critical materials at international conferences. His research interests include magnetism; materials criticality; and energy security and sustainability.

Dr. McCall will testify to the properties of magnets in the Second Superseding Indictment ("Indictment") based on their technical data. Dr. McCall will testify that the properties of the samarium cobalt magnets sold by Quadrant Magnetics to GE Aviation Systems ("GEAS") did not match the technical data. The United States disclosed the following reports for Dr. McCall:

   a. FBI Lab No. 2021-00145-3 dated December 2021 (GEAS Magnets)
   b. FBI Lab No. 2021-00145-9 dated June 2023 (SunPower Magnets)
   c. FBI Lab No. 20121-00145-11 – Specialty Metal Assessment prepared by Dr. McCall November 28, 2023.[2]

Dr. McCall is expected to testify to the technical data for the part numbers contained in the Indictment, including the properties and forces involved in the magnets made using the data. He also examined a sample of Quadrant Magnetics' magnets for part PN FP24018P1, used for the F-18 generator convertor unit. He examined the magnets using scientific processes and issued his opinion that "the measured magnetic properties of the specimens indicated a large, calculated failure rate (> 60%) of the magnets in all five FBI composite items. The lowest failure rate was >63% in Item 3 [a batch of one of the two magnet sizes analyzed], while the highest was > 87% in Item 5 [a batch of the other magnet sample size]."

The alarming and significant failure rates are relevant to Counts I-IV of the Indictment because they show that Quadrant Magnetics sold products that were not what was requested in the technical data, thereby further indicating that Quadrant Magnetics engaged in and took steps as part of a conspiracy to engage in fraud on the Department of Defense (DOD) and its customers.

---

[2] Defendants do not challenge Dr. McCall's November 28, 2023 report.

These results are corroborated by Dr. McCall's June 2023 report, which analyzed magnetic properties for another Quadrant Magnetics customer, SunPower. In that report, Dr. McCall sampled magnets with International Traffic in Arms Regulation ("ITAR")-marked drawings belonging to SunPower. The magnet samples included Samarium Cobalt (SmCo5) and Aluminum Nickel Cobalt (AlNiCO). Alarmingly, again, the measured magnetic properties of the specimens indicated a failure rate of >28% for the smallest sampled magnets (Item 17), and an overall absolute failure rate of 44% for the rest. The lowest failure rate for any sampled batches of magnets was 20%, while the highest was 100%.

Dr. McCall's testimony regarding Quadrant Magnetics' sale of magnets that would not have met the requested specifications is relevant. To assert a count of wire fraud or conspiracy to commit a scheme involving wire fraud, the Government must assert "a scheme to defraud," which is "any plan or course of action by which someone intends to . . . deprive another by deception of money or property by means of false or fraudulent pretenses, representations, or promises." *United States v. Daniel*, 329 F.3d 480, 486 (6th Cir. 2003). The "scheme to defraud" element "is not defined according to a technical standard. The standard is a 'reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society.'" *Id.* (quotations and citations omitted).

Here, Quadrant Magnetics' clients were U.S. defense contractors with contracts with the DOD. The parts that they ordered were placed in sensitive military equipment vital to the nation's national security. Any deviation from the specifications contracted for would have been concerning to the companies and the DOD. Dr. McCall's testimony will show that the contractors and DOD were promised magnets with certain specifications, but that Defendants intended to give and did give them magnets that did not meet those specifications and instead exhibited higher than

average failure rates across several parameters. This testimony is relevant to the Government's wire fraud charges.

Moreover, the parade of horribles that would result from allowing Dr. McCall's (and the Government's other experts) testimony would not be "wasting time." *See* 93 at 13 (stating Quadrant Magnetics would have to call witnesses from the Navy, Boeing, and General Electric "to explain properly to a jury the concepts of magnetic voltage, PMGs, GCUs, regulators, pulse transformers, and other highly technical matters"). As stated above, the issue of whether Quadrant Magnetics fraudulently sold magnets that did not meet the required or intended specifications to U.S. defense contractor customers for equipment intended for use by the DOD is not an issue of "no relevance"—it goes to the heart of several counts in the Indictment.[3]

Defendants also assert Dr. McCall's testimony is unreliable because Dr. McCall's report fails to describe how or if Dr. McCall calibrated his magnet testing machines and fails to account for something known as the demagnetization factor or effect. Such questions raised by the defense do not rise to the level of excluding Dr. McCall's testimony. The basic question is whether the expert used "the methods and procedures of science," *Daubert,* 509 U.S. at 595, and "the level of intellectual rigor of the expert in the field," *Kumho Tire,* 526 U.S. at 152. Defendants' motion ignores and disregards these teachings. Instead, Defendants have cloaked an argument of reliability of evidence with an argument of weight of the evidence.

---

[3] Defendants challenge the testimony of Dr. James Blankenship to the extent he would testify to the contents of Dr. McCall's reports. ECF 93 at 9. It is highly unlikely that the United States will call James Blankenship. Dr. Blankenship was the FBI laboratory liaison to Dr. McCall at Lawrence Livermore National Laboratory. His resume and lab reports are disclosed in an abundance of caution. It is highly unlikely that he will testify to any testing or lab results but rather may identify items in the lab report that were submitted for testing to Dr. McCall.

"A trial court should exclude an expert opinion only if it is so fundamentally unsupported that it cannot help the factfinder." *Johnson Group, Inc. v. Beecham, Inc.*, 952 F.2d 1005, 1007 (8th Cir. 1991) (citation omitted). Defendants' motion falls short of this high hurdle for excluding the Government's experts. Dr. McCall's reports examine several finished magnets made by Quadrant Magnetics to determine based on their magnetic properties that they do not comport with the technical data used to create those magnets. He conducted sampling of those magnets consistent with laboratory approaches. Dr. McCall demonstrates the faulty performance of the magnets through thorough, sector-specific parameters and testing accepted within the forensic science community, including "mensuration," "EDM cutting," "VSM analyses," "hysteresigraph analyses." *See* ECF 93 Ex. 2 at 3; Ex. 3 at 3. His methodology is accepted and the only criticisms from Defendants' magnet experts were that he did not calibrate his testing equipment or account/document the demagnetization factors. The issues raised by Defendants' expert amount to no more than possible cross examination questions that are easily answered by Dr. McCall. This is not the type of "fundamentally unsupported" testimony "that it cannot help the factfinder." *Johnson Group*, 952 F.2d at 1007.

## II. MR. BURTON'S TESTIMONY IS RELEVANT AND NOT PREJUDICIAL.

The testimony of Steve Burton is relevant and not unduly prejudicial.[4] Burton serves as a Senior Engineer for the DOD in the Defense Technology and Security Administration ("DTSA"), Export Control Directorate in the Manned Aircraft Division. Burton brings nineteen years of experience and the perspective of the DOD to the transmission of technical data for military use

---

[4] In a separate motion, Defendants challenge Mr. Burton's testimony as it relates to whether the magnets and associated technical data are on the United States Munitions List ("USML"), arguing that Mr. Burton's testimony opining on that topic is not relevant, is prejudicial, and is unreliable. *See* ECF 91. The Government responds to those arguments in a separate response filed contemporaneously herewith.

9

to foreign countries both with and without licenses. His perspective and that of the DOD are vital to understanding that the purpose of licensing transmission of USML items and technical data is to protect this information from diminishing the United States ability to provide for national defense and maintain our competitive military advantages.

It is important for the jury to understand the significance of what Quadrant Magnetics exported and the importance of that information to one of the most crucial victims: the DOD. As example are thirteen parts transmitted by Quadrant Magnetics, Phil Pascoe and Scott Tubbs to a Chinese company to manufacture magnets. Burton will explain the significance of this technical data and the impact the export of the manufacture of the defense article and its technical data had on the DOD.

Burton served as an engineer with the DTSA and participated in Commodity Jurisdiction ("CJ") determinations about technical data. He provides the perspective of the DTSA and the DOD on the process. He also provides a unique perspective to specially designed end use of military items through his experience with DTSA and the DOD. Burton looked at approximately thirteen technical data diagrams and reviewed the CJ determinations, part numbers, technical data and end use for parts in the case.

Burton will testify as to how and why "the permanent magnets related to this Indictment are mission critical for the operation of the associated defense platforms and defense articles." ECF 93 Ex. 4. at 3. He will state that the magnet parts are "unique and essential" for the related defense articles, and that "[t]he permanent magnets are the only source for the required magnet field to enable mechanical to electrical conversion, and vice versa. If the magnets were defective or unavailable, then the defense platforms would be non-mission capable and unable to perform their military mission." *Id.* In particular, Burton will testify that for an F/A-18 Generator Convertor

Unit, "if the GCU permanent magnets were defective or unavailable then the aircraft would not be able to generate the required electrical power to operate onboard mission systems (radar, electronic warfare suite, radio, etc.) thus making the aircraft non-mission capable." *Id.*

Defendants claim that Burton's testimony is not relevant, and therefore prejudicial, because the issue of "the quality of Quadrant's magnets" is not relevant to the offenses charged. ECF 93 at 9. But for the same reasons as discussed above with respect to Dr. McCall's testimony, Burton's testimony is equally applicable to Counts I-IV. Defendants take issue with the ultimate conclusions that Burton and Dr. McCall together draw, namely, that magnet parts that did not meet the specifications ordered from Quadrant Magnetics would be harmful to the customer and ultimate end user the DOD, but this testimony is relevant to the Government's wire fraud and conspiracy to commit wire fraud charges.

For example, Defendants cite to a U.S. Navy review of one of the magnet part numbers tested by Dr. McCall that concluded that the magnet "was not the cause of any problems and had no appreciable effect on reliability or performance." ECF 93 at 12 (referring to Exs. 5 & 6); *see* Exs. 5 at 6 (discussing performance within tolerance levels). Defendants have not noticed any authors of that report or PowerPoint as experts in this case, and do not otherwise explain how those reports would be offered at trial as non-hearsay evidence. They also misunderstand the elements of a wire fraud charge, which "do not require proof that the intended victim was actually defrauded; the actual success of a scheme to defraud is not an element" of the charge. *United States v. Merklinger*, 16 F.3d 670, 678 (6th Cir. 1994); *see Daniel*, 329 F.3d at 486-87. In other words, so long as Defendants made assertions they knew to be false and "that would have affected a reasonable person's actions in the situation," *Daniel*, 329 F.3d at 487, the victim's final disposition post-fraud does not matter.

That is what happened here—Defendants knew that the products would be made in China and would not meet the exacting ITAR-controlled technical specifications, and customers relied on the misrepresentations that the products would in fact be on par with the specifications. A "reasonable person" would not have taken a chance on sub-contracting with a company they knew could not guarantee the magnet's exact specifications, even if the end result was within a range of performance that would be acceptable for one particular contract, because a reasonable company would not want to take the risk of deviations being greater or interfering with requirements for other contracts, including those subject to DFARS or other Government regulations. More to the point, though, to the extent there is a difference of opinion as to the effect of the magnet's properties in U.S. Government products, that is a matter that is squarely relevant, non-prejudicial, and a matter of credibility that should be saved for cross-examination. *See Louderback*, 26 F. Supp. 2d at 1307. Defendants' insistence on correcting the alleged performance incapabilities of the magnet parts only helps to disprove their argument and show the relevance of the magnet's true properties.[5]

---

[5] The Government vigorously denies that Burton or Dr. McCall's testimony is inadmissible in this case. Both Burton and Dr. McCall intend to provide Defendants with a supplement to their disclosures to provide additional description of their proposed testimony. However, these supplements in no way are intended to suggest that the experts' initial disclosures are irrelevant, prejudicial, or unreliable.

## **CONCLUSION**

WHEREFORE, the United States requests that Defendants' Motion *in limine*, ECF 93, be DENIED.

Respectfully submitted,

| | |
|---|---|
| MICHAEL A. BENNETT | JENNIFER KENNEDY GELLIE |
| United States Attorney | Executive Deputy Chief |
| Western District of Kentucky | Counterintelligence and Export Control Section |
| | National Security Division |

 s/ *Joshua D. Judd*                                    s/ *Alex Wharton*                              

| | |
|---|---|
| Joshua D. Judd, | Alex Wharton |
| Christopher C. Tieke | Trial Attorney |
| Assistant U.S. Attorneys | 950 Pennsylvania Ave., NW |
| 717 W. Broadway | Washington, DC 20530 |
| Louisville, KY 40202 | (202) 514-4523 |
| (502) 582-5911 | alexander.wharton@usdoj.gov |
| Joshua.judd@usdoj.gov | |
| Christopher.tieke@usdoj.gov | |

<u>CERTIFICATE OF SERVICE</u>

 On January 26, 2024, I electronically filed this document through the ECF system, which will send a notice of electronic filing to counsel for the defendants.

              <u>s/ *Joshua D. Judd*      </u>
              Assistant United States Attorney