UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA

v.                                                    CRIMINAL NO. 3:22-CR-88-DJH
                                                      ***Filed Electronically***

QUADRANT MAGNETICS, LLC et al.

### UNITED STATES' RESPONSE TO DEFENDANTS' MOTION TO DISMISS UNCONSTITUTIONALLY VAGUE AECA AND ITAR ALLEGATIONS

Defendants Quadrant Magnetics, LLC ("Quadrant Magnetics"), Phil Pascoe, Scott Tubbs, and Monica Pascoe (collectively "Defendants") move the Court to dismiss subparagraphs 16(a)-(b), 17(b)-(c), and 18(c)-(v) of Count One, charging conspiracy under 18 U.S.C. § 371; Counts Five through Eight, charging willful violations of the Arms Export Control Act ("AECA") under 22 U.S.C. § 2778(b)(2) and (c); and Count Nine, charging smuggling under 18 U.S.C. § 554, of the Second Superseding Indictment ("Indictment"). ECF 88. Defendants claim that the AECA and its implementing regulations, the International Traffic in Arms Regulations ("ITAR"), are unconstitutionally vague as applied to Defendants. ECF 88.

Defendants' motion is flawed for two reasons. First, the ITAR's specially designed provision is not unconstitutionally vague as applied to Defendants. They had fair notice the law proscribed their conduct, and the specially designed rule does not encourage arbitrary and discriminatory enforcement but rather sets forth a reasonably precise standard for enforcement when placed within its larger regulatory framework. Second, and in the alternative, Defendants' challenge is premature. Their as-applied vagueness challenge must wait until the jury has considered the facts established at trial. Accordingly, this Court should deny Defendants' motion.

1

## BACKGROUND

**The AECA, ITAR, and USML**

The AECA regulates the export of defense articles from the United States to further our national security. Among other things, the AECA authorizes the President to: (1) designate defense articles on the United States Munitions List ("USML"); (2) promulgate regulations for their export; and (3) require a license or other approval for their export. *See* 22 U.S.C. §§ 2778(a)-(b). The President delegated this authority to the U.S. Secretary of State, *see* Executive Order 13637, who further delegated certain authorities to the U.S. State Department's Directorate of Defense Trade Controls ("DDTC") within the State Department's Bureau of Political-Military Affairs. As a result, DDTC is primarily responsible for promulgating, administering, and implementing the AECA.

The regulations that control the export of defense articles are known as the ITAR, 22 C.F.R. §§ 120-130. Part of the ITAR, the USML enumerates categories of items that are "defense articles." 22 C.F.R. § 121.1. The USML is categorical by necessity, ensuring coverage of evolving defense technologies and directly related technical data without subjecting every new iteration, design, or enhancement to review before they are controlled. Absent an exemption not applicable here, the ITAR prohibit exporting defense articles and related technical data without a license. 22 C.F.R. § 123.1. Accordingly, the ITAR set forth procedures for obtaining such licenses from DDTC. *See* 22 C.F.R. §§ 123.1, 125.1-2. Registration with DDTC is "generally a precondition to the issuance of any license." *See* 22 C.F.R. §§ 122.1, 123.1.

The ITAR provide a safe harbor through which one can seek confirmation from DDTC about an item's USML classification. If, for example, a United States Department of Defense ("DOD") subcontractor is unsure whether an item is or should be covered by the USML, and thus ITAR-controlled, it can seek a determination from DDTC—known as a commodity jurisdiction

determination. *See* 22 C.F.R. § 120.4. The ITAR set forth specific procedures for submitting a request for a commodity jurisdiction determination as well as the criteria DDTC considers on a case-by-case basis to determine whether an article is on the USML and, if so, under which USML category the item is classified. *See* 22 C.F.R. § 120.12(a)-(b).[1] Specifically, DDTC considers the article's "form and fit," its "function and performance capability," and [o]ther applicant-provided information" such as the product's history, specifications, and other relevant data. 22 C.F.R. § 120.12(b). If an applicant disagrees with DDTC's determination, it may appeal and receive a written determination. 22 C.F.R. § 120.12(e). Registration with DDTC is not a precondition to submitting a commodity jurisdiction determination request. 22 C.F.R. § 120.12(f).

The ITAR define key terms. For example, "[d]efense article means any item or technical data designated in § 121.1 of this subchapter and includes: (1) technical data recorded or stored in any physical form, models, mockups or other items that reveal technical data directly related to items designated in § 121.1." 22 C.F.R. §120.31(a). The ITAR define "technical data" to include information "required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance, or modification of defense articles." 22 C.F.R. § 120.33(a). "Technical data" includes "blueprints, photographs, plans, instructions, or documentation," but not "information in the public domain." 22 C.F.R. § 120.33(b).

The USML contains catch-all categories of defense articles to ensure the export control of unspecified parts if they were "specially designed" for military items on the USML. *See* 22 C.F.R. § 120.42(g) (defining "catch-all control"). DDTC promulgated the specially designed framework as part of the President's Export Control Reform ("ECR") effort in 2013. *See* 78 Fed. Reg. 22740

---

[1] These provisions were set forth in 22 C.F.R. § 120.4 until on or around September 6, 2022. *See* 87 Fed. Reg. 16396, at 16397 (Mar. 23, 2022). DDTC has moved other provisions too, but each is the same in sum and substance now as it was during the relevant conduct.

(Apr. 16, 2013).[2] Prior to the ECR, the ITAR contained "*specifically* designed" catch-all categories. *See, e.g.*, 22 C.F.R. § 121.1(c)(VIII)(h) (2009). In determining whether a part was specifically designed for defense articles, an original equipment manufacture's ("OEM") intent for designing the item was relevant. Re-exporters of specifically designed parts, however, often were not well-situated to know an OEM's intent behind its design. As a result, DDTC used more objective criteria when implementing the specially designed provision in 2013.

The ITAR's specially designed provision continued to ensure that the USML broadly covered parts for use in or with a defense article. *See* 22 C.F.R. § 120.41. New under the specially designed framework were the narrow exceptions to the rule that provide objective criteria for industry to apply to determine whether a part should be classified, without requiring knowledge of the design's intent. *See* 22 C.F.R. § 120.41(b). The exception relevant here is that a part "for use in or with a defense article" is not specially designed if it "[h]as the same function, performance capabilities, and the same or equivalent form and fit as a commodity or software used in or with a commodity that: (i) [i]s or was in production (*i.e.,* not in development) . . . ." 22 C.F.R. § 120.41(b)(3)(i). The ITAR define each of "form," "fit," "function," "performance capability," and "equivalent," 22 C.F.R. § 120.42; they are objective criteria that can be applied to decontrol an item even if it was designed for use in a defense article. This also makes the USML more flexible, better providing for release of items originally intended for use in a defense article if an item meeting the definitions of the objective criteria above is or was in commercial use.

Finally, the AECA and ITAR make it unlawful "[t]o export or attempt to export from the United States any defense article or technical data . . . for which a license or written approval is required" or to conspire to do so. 22 C.F.R. §§ 127.1(a)(1), (4). Those who willfully violate the

---

[2] The Department of Commerce implemented a specially designed framework in the Export Administration Regulations at the same time. *See* 78 Fed. Reg. 22660 (Apr. 16, 2013).

AECA and ITAR face a maximum term of imprisonment of twenty years and a maximum fine of $1,000,000. 22 U.S.C. § 2778(c).

**Application of the ITAR and USML to Quadrant Magnetics' Magnets**

Defendant Quadrant Magnetics produced specially designed magnets for use in a host of military items, including: (i) a submarine optical periscope, (ii) a radar for the F-16 fighter jet, (iii) a multi-spectral targeting system, (iv) a mid-wavelength infrared imaging system, and (v) a generator convertor unit for the F-18 fighter jet. To demonstrate how the USML's categorical framework applied in this case, PN FP24018 provides a helpful example. *See* ECF 73 ¶ 18(b).

Quadrant Magnetics manufactured, smelted, and magnetized magnets in China for GE Aviation Systems ("GE Aviation" and "US Company 1" in the Indictment). GE Aviation was a DOD subcontractor and required a specially designed magnet, PN FP24018, for use in a generator convertor unit for the F/A-18 E/F Super Hornet. GE Aviation's drawings for these magnets contained the specifications, parameters, and dimensions needed to manufacture the magnets. GE Aviation's generator convertor unit was a "part[], component[], accessor[y], [or] attachment[] specially designed for [one of] the following U.S.-origin aircraft: [t]he . . . F/A-18 E/F" under USML Category VIII(h)(1). Likewise, GE Aviation's magnet, PN FP24018, was a part specially designed for the specially designed generator convertor unit and was thus controlled under Category VIII(h)(1) as well. GE Aviation's drawing for its specially designed magnet was "[t]echnical data . . . directly related to [a] defense article[] described in paragraphs (a) through (h) of this category" under USML Category VIII(i). *See* 22 C.F.R. § 120.33. Accordingly, the magnet and its related technical data were captured under USML Category VIII(h)(1) and VIII(i), respectively. *See generally* 22 C.F.R. § 121.1. DDTC confirmed as much in a commodity

5

jurisdiction determination dated December 22, 2017, which DDTC issued to GE Aviation in response to its October 6, 2017 request. *See* Exhibit 1.

**The Government's Allegations Against Defendants**

Defendant Quadrant Magnetics supplied rare earth magnets for aviation, naval, and other military items. ECF 73 ¶ 1. Defendant Phil Pascoe was Quadrant Magnetics' Vice President of Operations until October 2018, when he became its President. *Id.* ¶ 3. Defendant Tubbs was Quadrant Magnetics' Vice President of Sales and Marketing. *Id.* ¶ 4. Defendant Monica Pascoe was Quadrant Magnetics' accounting manager. *Id.* ¶ 5.

Quadrant Magnetics' customers included GE Aviation and General Dynamics Ordnance and Tactical Systems ("General Dynamics" and "US Company 2" in the Indictment), which were DOD subcontractors. *See id.* ¶¶ 1-2. Hangzhou X-Mag ("X-Mag" and "Chinese Company 1" in the Indictment), manufactured, smelted, and magnetized rare earth samarium cobalt magnets for Quadrant Magnetics in China. *See id.* ¶ 2. X-Mag shipped these magnets to Quadrant Magnetics in Kentucky. *Id.* Quadrant Magnetics then repackaged the magnets in containers with Quadrant Magnetics labels and forwarded them to its customers, concealing the magnets' country of origin. *Id.* Defendants exported technical data with prominent ITAR warnings related to the magnets to China from at least as early as 2012 until at least in or around October 2018. *See id.* ¶ 6, 26.

In part, Count One of the Indictment charges Defendants with knowingly and willfully conspiring in violation of 18 U.S.C. § 371 to export ITAR-controlled technical data from the United States to China and to non-U.S. persons, without a license or approval from DDTC, in violation of the AECA and ITAR. *See id.* ¶ 16(a). The Indictment alleges twenty-two overt acts in furtherance of the conspiracy, including that:

- Defendants Phil Pascoe and Tubbs caused the creation of two Problem Advisory reports to be submitted to the Government Industry Data Exchange Program that falsely

claimed Quadrant Magnetics magnetized its magnets in Louisville, Kentucky, *id*. ¶¶ 18(a)-(b);

- Defendant Monica Pascoe processed General Dynamics' purchase orders containing explicit ITAR warnings that the related technical data could not be exported from the United States, *id*. ¶ 18(e);

- Defendant Phil Pascoe emailed (i.e., exported) ITAR-controlled technical data on ten occasions to a X-Mag employee who was not a U.S. person, *e.g., id*. ¶ 18(r);

- In March 2018, Defendant Monica Pascoe created a spreadsheet identifying General Dynamics part numbers that had directly related "ITAR print[s]," which spreadsheet Defendant Phil Pascoe then emailed to Defendant Tubbs, *id*. ¶ 18(u); and

- Defendants Phil Pascoe and Tubbs instructed Quadrant Magnetics employees to conceal their magnets' country of origin from General Dynamics, *id*. ¶ 18(v).

Counts Five through Eight charge Defendants Quadrant Magnetics, Phil Pascoe, and Tubbs with willful violations of the AECA and ITAR by exporting and attempting to export to China ITAR-controlled technical data without a license or approval from DDTC. *See id.* ¶¶ 21-28.

**The Government's Evidence**

For purposes of responding to Defendants' motion only, the government previews some of the evidence it intends to present at trial to prove that Defendants willfully violated the AECA.

<u>Quadrant's Business and Mr. Sun's Ownership</u>

According to its website, "Quadrant is the worldwide leader in the magnetic industry." QUADRANT, *About Us*, https://www.quadrant.us (last visited Jan. 12, 2024). Quadrant Magnetics was one of several affiliated entities operating in the United States and China, among other locations. As the government's witnesses will testify at trial, Quadrant Magnetics' historic ownership was convoluted and its corporate structure amorphous. In sum and relevant here, Quadrant Magnetics and Quadrant Solutions were subsidiaries of Quadrant International. The entities operated distinct business lines under the Quadrant name.

During most of the relevant period and by as late as January 1, 2016, Hang Sun a/k/a Cody Sun owned and operated the Quadrant entities. He purchased Quadrant Magnetics by on or around January 1, 2014, and Quadrant Solutions by on or around January 1, 2016. Mr. Sun also owned and operated X-Mag, which produced magnets for Quadrant Magnetics.

Defendants' Knowledge of the ITAR

Quadrant Magnetics has been intimately familiar with the ITAR and DDTC for more than a decade. In 2012, Quadrant Solutions registered with DDTC. *See* Exhibit 2. In its letter confirming Quadrant Solutions' registration, DDTC provided Quadrant Solutions with a registration number, M31748, and compliance information regarding the AECA and ITAR when seeking to export controlled defense articles and technical data. *See id.* Among other things, DDTC explained how to request a commodity jurisdiction determination if there were questions regarding whether the USML covered an article or technical data. *Id.*

In February 2013, Defendant Tubbs, from his Quadrant Magnetics' email address and as its Director of Sales and Marketing, emailed Quadrant Solutions' ITAR registration letter to General Dynamics. *See* Exhibit 3. The subject line was: "Quadrant Magnetics – ITAR Registration – #M31748." *Id.* He indicated that Quadrant Magnetics registered with DDTC in response to General Dynamics' inquiry regarding Quadrant Magnetics' ability to engage in ITAR business. *See id.* ("[W]e went through this process in an effort to provide General Dynamics 'proof' that we are serious and compliant to ITAR regulations."). Defendant Tubbs noted that Quadrant Magnetics hoped its DDTC registration would "open up new opportunities with General Dynamics." *Id.*

On or around June 3, 2013, Defendant Tubbs signed an ITAR Confirmation for one of Quadrant's customers. *See* Exhibit 4. Defendant Tubbs certified that Quadrant Solutions was registered with DDTC in accordance with 22 C.F.R. § 122.1. *Id.* He identified himself as the

individual to receive ITAR-controlled technical data and provided his Quadrant Magnetics' email address. *See id.* The ITAR Confirmation stated that "[a]ny disclosure of technical data controlled under the ITAR to a foreign person requires prior written approval from the [DDTC]." *Id.* The government will prove that Defendant Tubbs—who never worked for Quadrant Solutions— completed ITAR related documentation in Quadrant Solutions' name without authorization.

In January 2014, Mr. Sun—who also owned Quadrant's affiliated magnet supplier X-Mag—purchased Quadrant Magnetics. Thereafter, Defendant Tubbs renewed the DDTC registration, again under Quadrant Solutions' name. In the registration form, he disclaimed any foreign ownership of the intended registrant, which he knew was false because Mr. Sun, who was a Chinese national without lawful permanent resident status in the United States at the time, owned the intended registrant, Quadrant Magnetics. In January 2016, Mr. Sun also purchased Quadrant Solutions. By this time, Mr. Sun had obtained lawful permanent resident in the United States.

One piece of evidence during the conspiracy that the government will present at trial is an October 26, 2016 email thread between Defendants Monica Pascoe, Tubbs, and Quadrant's Chief Financial Officer ("CFO") regarding payment for Quadrant Magnetics' "ITAR renewal." *See* Exhibit 5. In the email, Defendant Monica Pascoe, using her Quadrant Magnetics' email address and as its Accounting Manager, told Quadrant's CFO that payment "must come from Quadrant Solutions . . . [and] then QS sends Quadrant Magnetics an invoice to reimburse." *Id.* Defendant Tubbs, as Quadrant Magnetics' Vice President of Sales and Marketing, responded directly to Quadrant's CFO to provide historical context about Quadrant's DDTC registration. Defendant Tubbs admitted that he had been renewing the DDTC registration under Quadrant Solutions' name to avoid "rais[ing] a lot of red flags" by registering Quadrant Magnetics. *See id.* He wrote that he had to use his name and social security number and could not use Mr. Sun's "for obvious reasons."

*See id*. Defendant Tubbs concluded by stating there were "smoke and mirrors going on here . . . we would have lost opportunities and customers without this certification." *Id.*

Approximately one month later, Defendant Tubbs renewed Quadrant Solutions' DDTC registration under number M31748 as a manufacturer of materials and miscellaneous defense articles on the USML. *See* Exhibit 6. Defendant Tubbs falsely certified that Quadrant Solutions had no U.S. or foreign affiliates engaged in the manufacturing or exporting of defense articles. *See id.* He also certified that Quadrant Solutions was not owned or controlled by foreign persons. *Id.*[3] Defendant Tubbs signed the form as the "Senior Officer" of the registrant, Quadrant Solutions, while providing his title of Quadrant Magnetics' Vice President of Sales and Marketing. *Id.*

DDTC renewed Quadrant Solutions' registration in a letter to Defendant Tubbs dated December 15, 2016. Exhibit 7. Like its previous letters, DDTC provided information to ensure compliance with the ITAR, directed Defendant Tubbs to DDTC's website containing a compliance guide and the ITAR, and explicitly referenced DDTC's commodity jurisdiction process should Defendant Tubbs or the registrant have questions about whether the USML covers an article or technical data. *See id.* DDTC reminded Defendant Tubbs that "[r]egistration serves as a precondition to submitting an application for an export license or other approval from [DDTC], or to use export exemptions." *Id.* DDTC wrote that "managers, supervisors and employees need appropriate training on AECA and ITAR requirements and must understand the individual and organizational ramifications of failure to comply . . . [including,] criminal charges." *Id*. DDTC's letter stated that Quadrant Solutions' registration would expire on December 31, 2017. *Id.*

---

[3] It appears Defendant Tubbs continued to conceal Mr. Sun's ownership of the intended registrant, Quadrant Magnetics, even after Mr. Sun had become a lawful permanent.

<u>GE Aviation Discovered Quadrant Magnetics' Magnets were from China</u>

In August 2017, Defendant Quadrant Magnetics' customer GE Aviation discovered that Quadrant Magnetics manufactured in China a specially designed magnet for use in a defense article, namely, a generator convertor unit for the F/A-18 fighter jet. *See* Exhibits 8,[4] 9. GE Aviation also discovered that Quadrant Magnetics might have exported technical data to China. GE Aviation confronted Quadrant Magnetics about its potential export violations and outsourcing to China, requested that Quadrant Magnetics destroy the technical data, submitted a voluntary disclosure to DDTC, and investigated whether Quadrant Magnetics was producing its magnets in violation of the AECA and the Defense Federal Acquisition Regulation Supplement ("DFARS"). *See* Exhibits 8, 9. As part of its investigation, GE Aviation asked Defendant Tubbs whether Quadrant Magnetics "ma[d]e a commercial magnet that would meet the requirements of the FP24018P1." *See* Exhibit 10. Defendant Tubbs stated he did not think that there was an industrial off-the-shelf magnet that could be used to fulfill GE Aviation's order and noted the "specified technician requirements on [GE Aviation's] print." *See id*. He continued that FP24018P1 was "not an easy part to make – mostly based on what we do to the material here at Quadrant." *Id.*

In further response to GE Aviation's inquiries, Defendant Tubbs sent GE Aviation a letter on Quadrant Magnetics' behalf falsely stating that Quadrant Magnetics (1) had not sent any technical data to China regarding PN FP24018P1 and (2) produced its magnets in a manner that complied with the DFARS. *See* Exhibit 11. This letter provided GE Aviation with Quadrant Solutions' ITAR registrant code. At the same time, however, Defendant Phil Pascoe was attempting to procure magnets for PN FP24018 and another GE Aviation part, PN 26B423718P1,

---

[4] The government has not included certain attachments to Exhibits submitted in support of its public response to Defendants' motion as the attachments contain ITAR-controlled information.

from a rare earth magnets company in Pennsylvania that could sinter the magnets in the United States. *See* Exhibit 12. Defendant Pascoe told a representative of the company that Quadrant Magnetics did not have the technical ability to produce a specially designed magnet for the two parts in a compliant manner. *See id.* ("I can not machine the material in house. So you sinter and machine, these are the requirements needed. Raw material can be procured in China, but the ITAR requirement is that the mixing, sintering can be done by an approved country source.").

On August 16, 2017, GE Aviation informed Defendant Tubbs and another employee of Quadrant Magnetics that it was going to submit a commodity jurisdiction request to DDTC regarding the magnet material. *See* Exhibit 13. On or around December 22, 2017, in response to GE Aviation's request, DDTC issued CJ 0512-17, determining that the samarium cobalt magnet, PN FP24018, was a defense article under USML Category VIII(h)(1). Exhibit 1. On January 2, 2018, GE Aviation submitted a closure report to DDTC regarding the incident. Exhibit 9. GE Aviation copied Defendants Phil Pascoe and Tubbs, as well as another Quadrant Magnetics' employee, on its letter to DDTC. *Id.* GE Aviation informed DDTC that it had "communicated with the supplier, Quadrant Magnetics, and has suggested it files a CJ on its drawing. It has also suggested evaluating whether an initial disclosure should be filed concurrent or post filing of the CJ." *Id.* On January 3, 2018, GE Aviation emailed DDTC's commodity jurisdiction determination, CJ 0512-17, to Defendants Phil Pascoe and Tubbs, as well as another Quadrant Magnetics' employee. *See* Exhibits 14, 1 (attachment to Exhibit 14). Quadrant Magnetics never submitted a commodity jurisdiction request to DDTC. The government will prove that Quadrant Magnetics' owner, Mr. Sun, knew about the potential violations GE Aviation disclosed to DDTC.

After all this, Defendants continued to willfully violate the AECA. Specifically, the government will prove that Defendant Phil Pascoe sent technical data containing explicit ITAR

export control warnings to a non-U.S. person who worked for X-Mag in China on dozens of occasions after Quadrant Magnetics' issue with GE Aviation. On each of these emails, Defendant Phil Pascoe carbon copied Mr. Sun, who owned and controlled Quadrant Magnetics and X-Mag. Each technical drawing contained a warning similar to the following:

> **WARNING** – This document contains technical data within the definition of the International Traffic in Arms Regulations (ITAR) and is subject to the export control laws of the U.S. Government. Transfer of this data by any means to a foreign person, whether in the United States or abroad, without an export license or other approval from the U.S. Department of State, is prohibited.

On or around November 1, 2018, Defendant Phil Pascoe, as Quadrant Magnetics' President, sent a letter to Quadrant Magnetics' U.S.-based customers with the subject "ITAR registration / DFARS conformance." *See* Exhibit 15. Defendant Phil Pascoe informed Quadrant Magnetics' customers that Quadrant Magnetics would "forgo the renew our [sic] ITAR registration . . . [and] will no longer be able to facilitate the acceptance of new orders or RFQ's specified as ITAR controlled and or DFARS specific." *Id.* Quadrant Magnetics never registered with DDTC and never obtained a license from DDTC to export ITAR-controlled technical data.

## ARGUMENT

Defendants move to dismiss the AECA and ITAR charges on the grounds that the ITAR's specially designed provision, 22 C.F.R. § 120.41, is unconstitutionally vague as applied to Defendants. *See* ECF 88 at 1. The Court should deny Defendants' motion for two reasons. First, the ITAR's specially designed provision is not unconstitutionally vague as applied to Defendants. They had fair notice that the law proscribed their conduct, and the specially designed rule does not encourage arbitrary and discriminatory enforcement, particularly when placed within the ITAR's regulatory framework. Second, and in the alternative, Defendants' challenge is premature because it seeks to challenge facts that have yet to be established at trial.

Correctly framed, Defendants' argument is not credible. At this juncture, the Court must assume the government will prove each element of the offense. *See United States v. Edwards*, 291 F. Supp. 3d 828, 831 (S.D. Ohio 2017) (cleaned up) ("On a motion to dismiss an indictment, the court must view the indictment's factual allegations as true."). Accordingly, Defendants' pre-trial as-applied challenge is not a test of the government's evidence; rather, it is a test of the legal prohibition of Defendants' conduct. To successfully assert their pre-trial as-applied vagueness challenge, therefore, Defendants must establish that a person who exported technical data without a license knowing that (1) a license was required and (2) the technical data related to specially designed parts for use in military items did not have fair notice the law proscribed their conduct. Or they must prove that the law was so standardless that it permitted arbitrary and discriminatory enforcement. While Defendants have crafted for purposes of this case a defense attacking the ITAR and questioning whether Quadrant Magnetics' magnets were released from the USML, there is no evidence that Defendants ever questioned that these magnets were ITAR-controlled. At its core, the defense is not that what Defendants did was lawful or that Defendants did not know their conduct was unlawful, but rather that it should not have been illegal to do what they did.

### Legal Principles

"Vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 n.7 (1982) (collecting cases). "To survive a challenge of unconstitutional vagueness in application, a penal statute must 'define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary or discriminatory enforcement.'" *United States v. Search of Music City Mktg., Inc.*, 212 F.3d 920, 924-25 (6th Cir. 2000) (internal citations omitted) (quoting

*Posters "N" Things, Ltd. v. United States*, 511 U.S. 513, 526 (1994)). The void-for-vagueness doctrine "focuses on both actual notice and arbitrary enforcement." *Staley v. Jones*, 239 F.3d 769, 791 (6th Cir. 2001) (citation omitted). The Supreme Court has made clear that "one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." *Boyce Motor Lines v. United States*, 342 U.S. 337, 340 (1952); *see also United States v. Caseer*, 399 F.3d 828, 836 (6th Cir. 2005) (quoting *Nash v. United States*, 229 U.S. 373, (1913)) (describing fair warning doctrine: "the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree").

If a statute defines and proscribes the defendant's conduct, his vagueness challenge must fail. *See United States v. Hill*, 167 F.3d 1055, 1064 (6th Cir. 1999). Such a defendant cannot complain about the vagueness of the law as it might apply to others. *See Hill*, 167 F.3d at 1064 (quoting *Hoffman*, 455 at 495) ("A court should therefore examine the complainant's conduct before analyzing other hypothetical applications of the law."). "The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Hoffman*, 455 U.S. at 498. Economic regulation is "'subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action.'" *Caseer*, 399 F.3d at 835 (quoting *Hoffman*, 455 U.S. at 498). Additionally, "the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process." *Hoffman*, 455 U.S. at 498 (collecting cases). Finally, "'a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed.'" *Caseer,* 399 F.3d at 839 (quoting *Hofman*, 455 U.S. at 499).

Applying these standards, courts repeatedly have rejected vagueness challenges to the AECA and ITAR. *See, e.g.*, *United States v. Hsu*, 364 F.3d 192, 196-98 (4th Cir. 2004); *United States v. Sun*, 278 F.3d 302, 309-10 (4th Cir. 2002); *United States v. Gregg*, 829 F.2d 1430, 1437 (8th Cir. 1987); *see also United States v. Lee*, 183 F.3d 1029, 1032-33 (9th Cir. 1999) (finding AECA's scienter requirement "protects the innocent exporter who might accidentally and unknowingly export a proscribed component or part whose military use might not be apparent"); *United States v. Swarovski*, 592 F.2d 131 (2d Cir. 1979) (rejecting vagueness challenge to AECA's predecessor statute). The reasons are straightforward.

First, the AECA regulates a narrow economic activity: the exportation of military items. Thus, a less strict vagueness test applies. *See Caseer*, 399 F.3d at 835. Second, any individual who is unsure whether the USML covers an item can simply ask DDTC, *see* 22 C.F.R. §§ 120.4, 120.12, mitigating any purported vagueness, *see Hoffman*, 455 U.S. at 498. Third, the AECA has a scienter requirement: a defendant can only be held criminally responsible for willfully exporting defense articles without a license. 22 U.S.C. § 2778(c). In the Sixth Circuit, to prove a defendant willfully violated the AECA, the government must establish the defendant knew his conduct was unlawful and not that the defendant knew the item he exported was on the USML. *United States v. Roth*, 628 F.3d 827, 835 (6th Cir. 2011). Indeed, a vagueness challenge "comes with little grace from one who was fully cognizant of the wrongfulness of his acts." *Swarovski,* 592 F.2d at 132.

## I.    The AECA and ITAR Are Not Unconstitutionally Vague As Applied to Defendants

"[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement," *Kolender v. Lawson*, 461 U.S. 352, 357 (1983), but one "who engages in some conduct that is clearly proscribed cannot

complain of the vagueness of the law as applied to the conduct of others," *Holder v. Humanitarian L. Project*, 561 U.S. 1, 18–19 (2010). Ordinary people can understand that the ITAR prohibits exporting parts that are specially designed for use in military items, and the related technical data, without a license. And the specific ITAR provision that Defendants challenge does not encourage arbitrary and discriminatory enforcement.

### A.  Defendants Had Actual Notice the Law Proscribed Their Conduct

A criminal statute can be vague as applied if it "fails to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits." *Caseer*, 399 F.3d at 836 (cleaned up). Defendants do not challenge the clarity of the law's prohibitions of their conduct. They do not even address whether a person who exported technical data without a license knowing that the technical data was controlled and required a license for export had fair notice the law proscribed their conduct. Moreover, Defendants do not "complain that the language of the 'specially designed' provision is incomprehensible." ECF 88 at 6. Instead, Defendants argue that an exception to the ITAR's prohibition on exporting defense articles is impermissibly vague. Because the AECA and ITAR clearly define the prohibited conduct for which the defendants were charged, and because Defendants do not even suggest that the purported lack of clarity in a specific regulatory exception has harmed them, their vagueness challenge fails.

As previewed above, the government will present evidence at trial to prove that Defendants were well aware the magnets they sold were controlled on the USML, and indeed argued to others that they were so specialized that there was no commercial equivalent. Defendants had fair notice—actual notice—that the ITAR proscribed their conduct. The Indictment alleges that Quadrant Magnetics illegally exported ITAR-controlled technical data from the United States on

approximately seventy occasions. As explained above, it alleges twenty-two overt acts in furtherance of the conspiracy.

Moreover, the evidentiary preview the government submits today shows Defendants' knowledge that the law proscribed their conduct. Quadrant Magnetics and its employees, including Defendant Tubbs, have been intimately familiar with the ITAR and DDTC for nearly a decade. For years, Defendants Tubbs and Monica Pascoe concealed Quadrant Magnetics as the intended registrant with DDTC. *See, e.g.*, Exhibit 5 ("[T]there's a little smoke and mirrors going on here."). In addition, GE Aviation provided Defendants with actual notice in August 2017 that they were unlawfully exporting technical data to China. In doing so, GE Aviation asked Defendant Tubbs if Quadrant Magnetics made a commercial magnet that could be used for PN FP24018P1. Defendant Tubbs argued they did not, confirming that an off-the-shelf magnet was not available because of the specific technical requirements on GE Aviation's drawing. *See* Exhibit 10 ("If you are asking about a[n] . . . off the shelf[] vs. the specified technician requirements on your print, I don't think so."). GE Aviation then suggested that Quadrant Magnetics submit a commodity jurisdiction request for the technical drawing related to PN FP24018P1. Quadrant Magnetics chose not to, but GE Aviation did. And it sent DDTC's determination to Defendants Quadrant Magnetics, Tubbs, and Phil Pascoe, putting them on notice of their unlawful conduct. They continued exporting ITAR-controlled technical data that was marked conspicuously with warnings.

Ordinary people understand the law prohibits this conduct. But Defendants were not just ordinary people. They were experienced professionals working for the purported worldwide leader in the magnetic industry. They specifically pursued DOD business and sought registration from DDTC to provide a veneer of legitimacy to do so. "The export of military equipment is a sensitive business directed by a relatively small group of sophisticated international businessmen." *United*

*States v. Zhen Zhou Wu*, 711 F.3d 1, 14 (1st Cir. 2013) (cleaned up). The law demands that those who operate in heavily regulated industries comply with the requirements for doing so, "even if the meaning of those regulations might not be immediately obvious to someone lacking the same sophistication." *Zhou*, 711 F.3d at 14 (citing *Hoffman*, 455 U.S. at 498). Further, Defendants knew they had the "ability to clarify the meaning of the regulation by [their] own inquiry, or by resort to an administrative process." *Hoffman*, 455 U.S. at 498 (collecting cases). They chose not to. Accordingly, their vagueness challenge "comes with little grace." *Swarovski*, 592 F.2d at 132.

## B. The AECA and ITAR Do Not Encourage Arbitrary and Discriminatory Enforcement

Defendants argue that the government's allegations "rest on a regulatory provision that, as applied, nobody can determine has been violated and is thus constitutionally vague." ECF 88 at 1. And they suggest that the specially designed provision of the ITAR, as applied to Quadrant Magnetics' magnets, "encourages the most 'arbitrary and discriminatory enforcement of all'—the wild guess." *Id.* at 2 (quoting *Kolender*, 461 at 357). Defendants misunderstand the as-applied vagueness doctrine's arbitrary and discriminatory enforcement standard.

Laws are not vague as applied merely because it might be "difficult to prove an incriminating fact but rather [only when] it is unclear what fact must be proved." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Defendants' argument is quintessentially the former type of challenge. It is quite clear what the government must prove: that the magnets Quadrant Magnetics produced in China were specially designed for defense articles under the applicable USML categories. *See Gregg*, 829 F.2d at 1427 (stating "[w]hen the case gets to court, all that the Government needs to prove is that the item exported appears on the Munitions List").

Moreover, Defendants disregard the broader ITAR framework within which the narrow exception about which they complain resides. Indeed, the USML, "when placed within its larger

regulatory framework, sets forth reasonably precise standards for enforcement." *Zhou*, 711 F.3d at 13. The ITAR's exception to the prohibition on the unlicensed export of "specially designed" defense articles and related technical data, *see* 22 C.F.R. § 120.41(b)(3), exists within a regulatory framework that "provides specific guidance that would allow individuals and law enforcement officials alike to determine whether" an article falls within a specific category on the USML. *Id.* at 14. That framework includes recourse to the commodity jurisdiction procedure, which permits people like Defendants to submit a request with relevant information and obtain a determination by DDTC "if doubt exists as to whether an article or service is covered by the [USML]." 22 C.F.R. §§ 120.4, 120.12. Thus, DDTC's commodity jurisdiction procedure provides those who may be unsure the opportunity to determine with certainty whether a part for use in or with a military item otherwise qualifies for one of the exceptions to the specially designed rule based on the objective criteria set forth under 22 C.F.R. § 120.41(b)(3).

Further, the *mens rea* element of the AECA and ITAR shields from criminal liability those who export a defense article without a license under the mistaken but good faith belief that an otherwise specially designed part falls within an exception to the rule. AECA's willfulness requirement substantially mitigates the risk that an unclear regulation could subject an individual to arbitrary criminal enforcement. If Defendants had a good faith belief during the conspiracy that they were not acting unlawfully, they will not be found guilty of the charged AECA offenses.

As Defendants acknowledge, courts have repeatedly upheld this regulatory framework, including against targeted as-applied attacks to provisions like the specially designed provision. *See* ECF 88 at 6; *see Sun*, 278 F.3d at 311-12 (finding so-called "scrap exemption" under a Commerce export control regulation not unconstitutionally vague as applied); *Lee*, 183 F.3d at (finding USML category listing "fuzes and components thereof" not unconstitutionally vague as

applied to defendants who unlawfully exported cutter blades); *see also United States v. Lachman*, 387 F.3d 42, 44 (1st Cir. 2004) (finding Commerce regulation requiring license to export hot isostatic press and all "specially designed . . . components, accessories and controls therefor" not unconstitutionally vague); *cf. United States v. Durrani*, 659 F. Supp. 1177, 1181 (D. Conn. 1987) (rejecting vagueness challenge to phrase "engages in the business of exporting defense articles" under AECA). Defendants claim, however, that their "challenge is different." ECF 88 at 86. It is not. And the "ubiquity" of magnets, *id.* at 2, does not distinguish it.

Defendants disregard the fact that the final landing place for Quadrant Magnetics' magnets was defense articles. *See Roth*, 628 F.3d at 833 (stating ITAR, including definition of technical data, were "written to cover a broad range of articles at all stages"; rebuking defendant for ignoring fact that final goal of project was to incorporate parts on military aircraft). The USML covers parts that are specially designed *for use in or with a defense article*. Defendants made magnets *for use in or with a defense article*. But they ask the Court to ignore this by skipping the rule and looking straight to the exception, which nevertheless provide objective criteria that do not encourage arbitrary or discriminatory enforcement but rather equal application of the ITAR.

Faced with a regulatory framework that has consistently withstood as-applied vagueness challenges, Defendants launch what is, at its core, a facial challenge to the ITAR's specially designed provision. Their defense amounts to a claim that large portions of the ITAR are unenforceable, arguing essentially that it is impossible to prove a global negative and lamenting that the specially designed provision "calls not for sophistication, but omniscience." *Id.* at 13. If the Court found that argument had any merit, it would jeopardize the entirety of DDTC's (and the Department of Commerce's) specially designed program. Indeed, the term specially designed appears hundreds of times on the USML. *See* 22 C.F.R. § 121.1. Defendants offer no limiting

principle for their argument, revealing the true nature of their challenge. But the law precludes such a facial attack in contexts other than the First Amendment. *See Music City Mktg.*, 212 F.3d at 923 (citations omitted) (noting facial vagueness challenge to definition of drug paraphernalia under 21 U.S.C. § 863 appeared foreclosed by Supreme Court and Sixth Circuit caselaw). And, fortunately, the language of the exception does not require omniscience. Defendants point to no support for their preferred interpretation that the exception at 22 C.F.R. § 120.41(b)(3) requires a worldwide canvas to prove a global negative, i.e., that no uncontrolled equivalent part that satisfies the exception's objective criteria exists anywhere. Indeed, the government expects that, to the contrary, a State Department witness would testify that DDTC has interpreted this regulation to require consideration of the evidence submitted to DDTC through the commodity jurisdiction procedure and a reasonable search under the circumstances.

Considered from the perspective of a person in the business of exporting a part that is specially designed for use in a defense article, the application of the § 120.41(b)(3) exception, and the scope of the conduct prohibited by the AECA and ITAR, is clear. If the potential exporter is not aware of, or cannot find, another part that is a potential commercial equivalent, then they are left with no doubt that the part they intend to export is controlled under the USML. But an exporter who believes that there is a non-controlled part that is the same as a part he would like to export that is controlled under the USML, because it is specially designed for use in a defense article, can determine whether the exception at § 120.41(b)(3) is triggered by evaluating the purported equivalent under the exception's objective criteria of "form," "fit," "function," "performance capability," and "equivalent." If the exporter doubts his analysis, or seeks to confirm it, he may submit a commodity jurisdiction request to DDTC. In sum, the real world application of the ITAR's specially designed control program requires no "wild guess" or "omniscience" to

determine whether a part is controlled, or released from control under the exception at § 120.41(b)(3). The vagueness and indeterminacy Defendants identify in the ITAR are a construct of Defendants' own legal ingenuity, not a real world problem that denies potential exporters fair warning of the law's prohibitions or threatens arbitrary and discriminatory enforcement.

Defendants assert that courts have held that "[r]ules with indeterminate metrics, like the 'specially designed' rule . . . have been held unconstitutionally vague." ECF 88 at 13. They rely on the district court's order in *Doe v. Snyder*, 101 F. Supp. 3d 672 (E.D. Mich. 2015), *rev'd on other grounds*, 834 F.3d 696 (6th Cir. 2016), where the court found certain provisions of Michigan's Sex Offenders Registration Act ("SORA") were unconstitutionally vague.[5] But the district court in *Snyder* did not hold broadly that rules with "indeterminate metrics" are unconstitutionally vague. Indeed, such a holding would have been contrary to the Supreme Court's decision in *Fox Television Stations*. *See* 567 U.S. at 253 (stating laws not vague if difficult to prove incriminating fact). Rather, the district court concluded that SORA did not provide fair notice as to the conduct it criminalized for all the reasons courts have found that the AECA and ITAR do. SORA's geographic exclusions were not economic regulations, the exclusion zones were not physically marked, the regulations included no guidance for registrants or law enforcement as to how to measure the exclusion zone, and SORA held offenders strictly liable for criminal violations. *See Snyder*, 101 F. Supp. at 681, 683-84.

Defendants also rely on the First Circuit's decision in *Zhou* to argue that the government must prove "the actus reus that the magnets were actually on the USML." ECF 88 at 14. This is not a vagueness argument. In *Zhou*, a jury convicted appellants of unlawfully exporting to China items that fell under Category XI(c) of the USML. *See* 711 F.3d at 13. The Court rejected

---

[5] In reversing the district court's order, the Sixth Circuit did not consider the district court's analysis of plaintiffs' vagueness challenge. *Snyder*, 834 F.3d at 706.

appellants' argument that the challenged ITAR provision—which was the predecessor to the specially designed provision—was unconstitutionally vague as applied. *See id.* 13-16. As it existed at the time, USML Category XI(c) covered parts "*specifically* designed or modified for use" with military equipment "except for such items as are in normal commercial use.'" *Id.* at 13 (emphasis added) (quoting 22 C.F.R. § 121.1(c)(XI)(c)). The Court had little trouble finding that this framework provided "specific guidance that would allow individuals and law enforcement officials alike to determine whether the [relevant items] fall within Category XI(c)." *Zhou*, 711 F.3d at 14. It was "quite clear what specific facts would determine whether the phase shifters fall within Category XI(c): whether they were designed for military use; whether they are used in conjunction with the items described in Categories XI(a) and (b); and whether they are also amenable to normal commercial uses that would take them outside the scope of the ITAR." *Id.* So too here.

The appellate court in *Zhou* took issue with the district court's instruction that the jury "must accept without question the State Department's after-the-fact determinations" via commodity jurisdiction determinations that the items were on the USML. *See id.* at 16. The court found this instruction "improperly wrested a key question from the jury"—i.e., the element of the offense that the items were controlled at the time defendants exported them—because the only commodity jurisdiction determinations regarding the products at issue were issued after defendants' unlawful exports. *Id.* at 17-18. The court did not question the form of the government's proof but rather the timing of when it was obtained. *See id.* at 17. Here, the government will not request such a jury instruction and does not intend to rely solely on commodity jurisdiction determinations to prove that the drawings Defendants exported were technical data on the USML.

## II.     Defendants' As-Applied Challenge is Premature

Defendants claim their motion is an as-applied vagueness challenge to the AECA and ITAR. The basis for Defendants' challenge, however, is fundamentally flawed. The benchmark for such a challenge is whether the AECA and ITAR were vague as applied to Defendants, not in hypothetical scenarios. *See Hsu*, 364 F.3d at 196. Defendants "must wait to bring an as-applied vagueness challenge until the facts have been established by evidence introduced at trial and the factfinder has had an opportunity to weigh in." *United States v. Raniere,* 384 F. Supp. 3d 282, 320 (E.D.N.Y. 2019) (collecting cases). This is because, in order to evaluate whether the AECA and ITAR as applied to Defendants provided fair notice, "it must be clear what the defendant[s] did." *Raniere*, 384 F. Supp. 3d at 320 (internal quotations omitted).

Defendants' challenge requires the Court to examine the facts bearing on their awareness that the items they exported were controlled. While the government has alleged facts in the Indictment and now previewed some of its evidence demonstrating that Defendants knew the law proscribed their conduct, that inquiry ultimately is for the jury. *See United States v. Qing Li*, 2008 WL 789899, at *2 (S.D. Cal. Mar. 20, 2008) (citing *Hsu*, 364 F.3d at 197). But until that evidentiary record exists, Defendants' as-applied "constitutional challenge [is] moot at this juncture." *Qing Li*, 2008 WL 789899, at *2; *see United States v. Gowadia*, 2006 WL 2520599, at *5 (D. Haw. Aug. 28, 2006) (declining to consider factual argument that information was not technical data under the ITAR's definition at motion to dismiss stage). For this alternative reason, the Court should deny Defendants' motion.

## CONCLUSION

For the reasons stated herein, the United States requests that Defendants' Motion to Dismiss, ECF 88, be DENIED.

Respectfully submitted,

MICHAEL A. BENNETT
United States Attorney
Western District of Kentucky

JENNIFER KENNEDY GELLIE
Executive Deputy Chief
Counterintelligence and Export Control Section
National Security Division


 s/ *Joshua D. Judd*
Joshua D. Judd,
Christopher C. Tieke
Assistant U.S. Attorneys
717 W. Broadway
Louisville, KY 40202
(502) 582-5911
Joshua.judd@usdoj.gov
Christopher.tieke@usdoj.gov

s/ *Alex Wharton*
Alex Wharton
Trial Attorney
950 Pennsylvania Ave., NW
Washington, DC 20530
(202) 514-4523
alexander.wharton@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

On January 26, 2024, I electronically filed this document through the ECF system, which will send a notice of electronic filing to counsel for the Defendants.


s/ *Alex Wharton*
Trial Attorney