UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| **United States of America** | |
| v. | No. 3:22-CR-88-DJH |
| **Quadrant Magnetics LLC et al.** | |

### DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION *IN LIMINE* TO EXCLUDE EXPERT TESTIMONY FROM ALEX DOUVILLE AND STEVEN BURTON

Defendants moved to exclude these expert witnesses' testimony on whether Quadrant's magnets are ITAR-controlled because their reports failed to state whether they or others considered the existence of commercial equivalents under 22 C.F.R. § 124.41(b)(3)—a glaring omission given how magnets are simple and ubiquitous parts with hundreds of commercial applications. The government responds that the witnesses did so. According to the government, it is implicit in Mr. Douville's report and the wrong standard used in Mr. Burton's report is a mere matter of semantics. But the reports speak for themselves and show the absence of a (b)(3) analysis.[1]

One week ago, the government sent Defendants supplemental disclosures from Mr. Douville and Mr. Burton. *See* Exs. 1, 2. But these supplements are untimely, and Mr. Douville's suffers from the same fatal defect as his original report: it fails to give assurance that a commercial-equivalent analysis was performed before deeming Quadrant's magnets ITAR-controlled.

---

[1] The government appears to suggest that Defendants may not file a reply on this motion. (D.N. 107, PageID.1384 n.1.) The Court's recent order, however, provides: "The United States shall respond to the pretrial motions filed on December 18, 2023 [citing all eight motions, including this one], no later than January 26, 2024. Defendants shall file their replies within 14 days of service of the United States' responses." (D.N. 98, PageID.1304) Additionally, the Court's original scheduling order treated separately motions "to exclude the testimony of an expert witness pursuant to *Daubert*" from closer-to-trial, no-reply motions *in limine*. (D.N. 37, PageID.128–29)

## ARGUMENT AND AUTHORITIES

**1. Mr. Douville's original disclosure is unreliable.**

The government quotes three statements from Mr. Douville's original disclosure as support for the proposition that he considered commercial equivalents:

- He will testify "as to why the articles at issue in the case met descriptions in Categories in the [USML]." (D.N. 107, PageID.1390 (quoting Mr. Douville's report).)

- "[W]hen DDTC's Office of Policy issues a determination letter, it conducts a thorough review to consider whether any information might cause the item at issue to not match a description on the USML." (*Id.* (quoting Mr. Douville's report).)

- "[B]ased on his own independent review of defense articles at issue … he agrees with the DDTC's assessment and rationales made therein [that the magnets and parts are 'specially designed']." (*Id.* (brackets in government's filing) (quoting Mr. Douville's report).)

The government argues that "these statements are based on a complete analysis of what is required for a part to be 'specially designed,'" and that they "necessarily encompass[]" a determination of whether or not it falls within any of the regulatory releases. (*Id.*)

Defendants agree with the government that is the correct mode of analysis. An item is not ITAR-controlled unless and until a commercial equivalent is ruled out. But Mr. Douville's spare statements give no assurance that that was actually done. His first statement is a general introductory phrase. His third statement says he conducted his own "independent review," but his original report says nothing about what that review constituted.

As for the second statement, and reflective of his report more broadly, it relies on his faith in the reliability of the commodity-jurisdiction (CJ) determination process generally. And nothing more. Mr. Douville's original report contains no assurances that he looked at any of the underlying documentation for any of the determinations, the inquiries made, reports generated, emails sent, sources checked, or any of the other due diligence that would be expected to see if that faith is justified in this instance. He only looked at the final product, the two-page CJ determination.

The government must satisfy its burden by a preponderance of the evidence that Mr. Douville's testimony would be reliable. *See* Fed. R. Evid. 702. But Mr. Douville's testimony, which is dependent on others' procedures but which he did not review here, looks much the same as that excluded in *United States v. Sheppard* when underlying data was lost, despite assurances that the underlying process was reliable:

> Shanks [the proffered expert] explained that Axis's [the lab's] internal review process requires review and approval of the data that is now lost in order for results to be reported. In other words, Shanks's testimony is that the results would not have been reported in Axis's system or database, or ultimately, to the government, without assurance that the lab's principles and methods were reliably applied to its testing of T.M.'s and K.M.'s [the victims'] blood samples. Despite this explanation of Axis's standard procedures, and even accepting that such procedures are in place, Shanks's testimony does not demonstrate that the testing was conducted reliably by a preponderance of the evidence. Simply, Shanks's reliance on Axis's standard procedures is not enough to establish, by a preponderance of the evidence, that the U-4 testing was done properly. The results depend on the lost calibration data, quality control data, and specimen data. Shanks argues that Axis would not have published the results unless the data mentioned above were accurate. This is not enough in this case. Absent the data supporting the claimed results, the results are not reliable.

No. 5:17-CR-00026-TBR-1, 2021 U.S. Dist. LEXIS 82221, at *15–16 (W.D. Ky. Apr. 29, 2021).

It is also similar to the expert materials properly excluded in *Auto Industry Supplier ESOP v. Ford Motor Co.*, 435 F. App'x 430 (6th Cir. 2011) (unpublished). There, the Sixth Circuit held that the district court properly rejected an expert report for lack of "sufficient facts and data," *id.* at 454 (quoting Fed. R. Evid. 702(1)), when the expert "had no familiarity with the underlying source documents" but instead simply relied on information generated by others without any effort to verify it, *id.* While Mr. Douville is familiar with how CJ determinations are generated in a general sense, nothing in his original report suggests he undertook any significant independent activity to conclude that the determinations here were properly done, much less that the determinations' authors considered commercial equivalence.

**2. Mr. Douville's supplemental disclosure does not fix the unreliability problem.**

Perhaps concerned by these deep problems in the original report, the government filed one week ago a "Supplemental Witness Disclosure" for Mr. Douville. *See* Ex. 1. It is unavailing.

First, the disclosure is untimely. Expert disclosures were due December 4, 2023, and rebuttals on December 11, 2023. (D.N. 37, PageID.127 ¶¶ (3)(b), (c).) The Court's more recent scheduling order "extend[ed] no other deadlines that have already passed . . . ." (D.N. 98, PageID.1306) Mr. Douville's supplement is in the nature of a rebuttal report. It responds to the interpretation of the ITAR's "specially designed" provision, including its importance, raised in the initial disclosure of Defendants' ITAR regulations expert Tom McCarthy.

Even if it were timely, Mr. Douville's supplemental disclosure does not remedy the defects of his initial disclosure. Mr. Douville says in his supplemental disclosure that he independently considered in his mental processes the commercial-equivalence criterion when coming to his conclusion that the magnet was specially designed. But most respectfully, he does not describe actually doing anything meaningful about it. Instead, he simply continues to vouch for the general process as the basis for his purportedly independent knowledge. He begins by stating, "I undertook my own review, *based in part on the final commodity jurisdiction (CJ) determination issued by DDTC*." Ex. 1 at 1 (emphasis added). He then says, "when the identified USML Control contains the term 'specially designed,' DDTC analysts are careful to consider all applicable releases." *Id.* "Thus, when I looked at the CJ determination," he continues, "I independently went to the USML control entry cited. I looked at the control description. I expressly noted that it included the specially designed qualifier. I then knew the specially designed framework and referenced it. I relied then, as I normally do, on my knowledge that the part at issue would have at least been used in or with a defense article and that the DDTC analyst would have expressly assessed as much." *Id.* As

described here, it appears that the extent of Mr. Douville's independent analysis was to read the CJ determination and then simply read the corresponding regulatory provisions.

The rest of his supplement does not improve the government's position. Mr. Douville says, "I also knew from experience, personal knowledge, and by virtue of my position in the agency that one of the following routine assessments *must* have also occurred," and then he details two ways a commercial-equivalence analysis could happen. *Id.* (emphasis added). He did not do any such analysis himself, nor did he have anything beyond the CJ determination itself to determine it occurred here. To the contrary, Mr. Douville continues by stating, "It is not my role as a licensing officer to perform an exhaustive check of the entire global marketplace for comparable items. Nor did I have access to the technical specifications of the parts at issue. I feel comfortable relying on the DDTC analysts because I am familiar with their processes and diligence." *Id.* at 2.

The Court should not feel so comfortable. The supplemental disclosure gives more insight into Mr. Douville's subjective mental processes. But Mr. Douville's supplemental disclosure shows he has only thought about what he believes DDTC did, not that he independently reviewed any of DDTC's analysis.

**3. Mr. Burton's original disclosure is unreliable.**

The Court should likewise exclude Mr. Burton's expert testimony to the extent he seeks to opine that Quadrant's magnets are ITAR-controlled. Defendants incorporate their arguments above about how it is insufficient for Mr. Burton to have simply relied on a CJ determination prepared by someone else.

Defendants' motion also pointed out how Mr. Burton applied the wrong legal test for whether an item is "specially designed" under the ITAR, equating "specially designed" with *not* "COTS." Mr. Burton's disclosure stated, among other things, that he "confirms that the parts listed

5

above are specially designed (22 CFR § 120.41)," that "these magnets are not commercial-off-the-shelf (COTS)," that "[n]o existing COTS magnets met DoD requirements so new magnets were specially designed to meet the military requirement," and that the magnets "are the only source for the required magnet field to enable mechanical to electrical conversion, and vice versa." (D.N. 91-2, PageID.1066.)

The government responds that Defendants' concern is over "semantics," and that Mr. Burton's statements are "fundamentally explaining [his] consideration of whether the magnets met one of the exception categories of 22 C.F.R. § 120.41(b)." (D.N. 107, PageID.1391.) Respectfully, that is not a fair reading of what Mr. Burton actually wrote, which clearly shows his view that the test is *COTS* or *not-COTS*. *See* (D.N. 91-2, PageID.1066 ("No existing COTS magnets met DoD requirements so new magnets were *specially designed* to meet the military requirement." (emphasis added)).)

The government next argues, "Defendants claim that because the term 'commercial off the shelf' is not found in the regulations, it is not an appropriate measure of whether a part is not specially designed pursuant to 22 C.F.R. § 120.41(b)(3) . . . . But a litigant need not demonstrate to the Court that an expert's assessments are correct, only reliable. Rule 702 is broad enough to permit testimony that is the product of competing principles or methods in the same field of expertise." (D.N. 107, PageID.1391.) In essence, the government argues that it may present evidence that § 120.41(b)(3) is shorthand for COTS.

The State Department itself has rejected that review. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (experts must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"). When promulgating the "specially designed provision," it noted a commenting party's "concern that ITAR § 120.41(a)

6

(and its 'as a result of "development"' standard) and ITAR § 120.41(b)(3) of the definition, when taken together, appear to mean that only commercial off the shelf ('COTS') items with no changes in form or fit are released from the definition of specially designed." 78 Fed. Reg. 22740, 22746 (Apr. 16, 2013). In response, the State Department wrote that it had "revised the paragraphs in question to address this concern because the Department did not intend such a conclusion to be an implication of the definition." *Id.*

Had the State Department intended to equate (b)(3) with COTS, it would have said so, rather than denying precisely that. COTS is a well-established term in government contracting. *See, e.g.*, 48 C.F.R. § 1.201 (definition of *commercially available off-the-shelf (COTS) item*). And COTS is different from, and in most respects a subset of, the items described in (b)(3), comprising as COTS does only those "commercial product[s] … [s]old in substantial quantities in the commercial marketplace … [o]ffered to the Government … without modification, in the same form in which it is sold in the commercial marketplace." *Id.* Other definitions are similar. *See, e.g.*, Dep't of Commerce, Nat'l Inst. of Standards & Tech., Computer Sec'y Resource Ctr., *Commercial-Off-the-Shelf (COTS)* (citing various NIST standards: "A software and/or hardware product that is commercially ready-made and available for sale, lease or license to the general public." "Software and hardware that already exists and is available from commercial sources."), http://tinyurl.com/cdm8cvyp. As noted by the Defense Logistics Agency, "the definition for COTS is much narrower than 'commercial,'" referring to 48 C.F.R. § 1.201's definition of the broader term *commercial item*. DOD, DLA, *Defense Standardization Program: Frequently Asked Questions (FAQs)*, http://tinyurl.com/ymazr86n.

7

**4. Mr. Burton's supplemental disclosure is an untimely rebuttal report, so it should be excluded and disregarded.**

Like Mr. Douville, Mr. Burton has submitted a supplemental disclosure. Ex. 2 at 1. Mr. Burton's supplement contains more detail about how the Department of Defense assesses CJ requests. It then adds an entirely new area of testimony about what, in Mr. Burton's view, the "commercially equivalent" exception means. "[A] court should decline to defer to a merely 'convenient litigating position' or 'post hoc rationalizatio[n] advanced' to 'defend past agency action against attack.'" *Kisor v. Wilkie*, 139 S. Ct. 2400, 2417 (2019) (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U. S. 142, 155 (2012)).

But putting that aside, Mr. Burton's supplement is untimely. As noted above, rebuttal disclosures were due December 11, 2023. Mr. Burton's supplement is in the nature of a rebuttal report. It responds directly to the interpretation of the "specially designed" framework, including the (b)(3) analysis, in the Defendants' expert disclosures from Dr. Stanley Trout and Tom McCarthy. And Mr. Burton's supplement does far more than just clarify what he might have meant by COTS. It opines at length on new subject matter about the (b)(3) exception. This could have been included in Mr. Burton's initial disclosure or a rebuttal disclosure. It is too late to do so now.[2]

## CONCLUSION

For the reasons stated in Defendants' original motion (D.N. 91) and above, the expert testimony of Mr. Douville and Mr. Burton should be excluded to the extent they seek to opine that Quadrant's magnets, and thereby their underlying drawings, are "specially designed" or otherwise fall within the U.S. Munitions List and are thus controlled by the Arms Export Control Act as implemented through the ITAR.

---

[2] Defendants reserve the right to challenge and move for the exclusion of all or portions of the material in Mr. Douville's and Mr. Burton's supplemental disclosures in a separate motion or at trial on these or other grounds.

Dated: February 9, 2024   By:  */s/ John Brownlee*

John L. Brownlee (*pro hac vice*)
William F. Gould (*pro hac vice*)
Timothy J. Taylor (*pro hac vice*)
Caitlin A. Eberhardt (*pro hac vice*)
HOLLAND & KNIGHT LLP
1650 Tysons Blvd., Suite 1600
Tysons, VA 22201
T: 703.720.8053
F: 703.720.8610
John.Brownlee@hklaw.com
William.Gould@hklaw.com
Timothy.Taylor@hklaw.com
Caitlin.Eberhardt@hklaw.com

ATTORNEYS FOR DEFENDANT
QUADRANT MAGNETICS, LLC

*/s/ Kent Wicker (with permission)*
Kent Wicker
WICKER / BRAMMELL PLLC
323 W. Main Street, 11th Floor
Louisville, Kentucky 40202
(502) 541-5533
Kent@wickerbramel.com
*Counsel for Phil Pascoe*

*/s/ Patrick Renn (with permission)*
Patrick J. Renn
Smith & Helman
600 W. Main Street, Suite 100
Louisville, KY 40202
502-540-5700
Fax: 502-568-3600
prenn@600westmain.com
*Counsel for Scott Tubbs*

*/s/ Scott Cox (with permission)*
Scott C. Cox
Cox & Mazzoli, PLLC
600 W. Main Street, Suite 300
Louisville, KY 40202
502-589-6190
502-584-1744
CoxECF@aol.com
*Counsel for Monica Pascoe*

9

**CERTIFICATE OF SERVICE**

I hereby certify that on February 9, 2024, the foregoing was electronically filed with the Clerk of the Court via the CM/ECF system, which sent a notice of electronic filing to the attorneys of record.

/s/ *John Brownlee*