UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA                                          PLAINTIFF

v.                                              CRIMINAL NO. 3:22-CR-00088-DJH
                                                *Electronically Filed*

QUADRANT MAGNETICS, LLC,
PHIL PASCOE,
SCOTT TUBBS, and
MONICA PASCOE                                                     DEFENDANTS

## UNITED STATES' TRIAL MEMORANDUM

The United States submits this pretrial memorandum for the trial of Defendants Quadrant

Magnetics, LLC ("Quadrant Magnetics"), Phil Pascoe, Scott Tubbs, and Monica Pascoe

(collectively, "Defendants"), currently scheduled to begin on April 1, 2024, in Louisville,

Kentucky.

### I.   Statement of Facts

The government provides a summary of the evidence it anticipates introducing at trial to

prove the elements of the offenses that Defendants are alleged to have committed.

Quadrant Magnetics was a Delaware limited liability company operating in Louisville,

Kentucky and registered with the Kentucky Secretary of State. Quadrant Magnetics was one of

several affiliated entities operating in the United States, China, and elsewhere. Quadrant Magnetics

and Quadrant Solutions, among other entities, were subsidiaries of Quadrant International. During

most of the relevant period, and by no later than January 1, 2016, Hang Sun a/k/a Cody Sun owned

and operated the Quadrant entities. Mr. Sun also owned and operated Hangzhou X-Mag ("X-

Mag"). X-Mag manufactured, smelted, and magnetized rare earth samarium cobalt magnets for Quadrant Magnetics in China. Defendant Phil Pascoe was Quadrant Magnetics' Vice President of Operations and then its President. Defendant Tubbs was Quadrant Magnetics' Vice President of Sales and Marketing. Defendant Monica Pascoe was Quadrant Magnetics' accounting manager.

Quadrant Magnetics supplied rare earth magnets produced by X-Mag for use in defense items. Quadrant Magnetics also supplied rare earth magnets for use in commercial items. Quadrant Magnetics' customers in the defense industry included GE Aviation Systems ("GE Aviation") and General Dynamics Ordnance and Tactical Systems ("General Dynamics"). GE Aviation and General Dynamics were, as Defendants knew, Department of Defense ("DOD") subcontractors.

In order to manufacture magnets according to the specifications required by GE Aviation and General Dynamics for end use in military items, GE Aviation and General Dynamics provided to Quadrant Magnetics a technical drawing for each part number, which was unique to the magnets that Quadrant Magnetics manufactured pursuant to each such drawing. The lifecycle of each order Quadrant Magnetics manufactured for General Dynamics, as an example, typically involved General Dynamics transmitting to Quadrant Magnetics a purchase order with an attached technical drawing. Quadrant Magnetics then transmitted that purchase order and the attached technical drawing to X-Mag in China. X-Mag then produced the magnets pursuant to the drawing and shipped them to Quadrant Magnetics.

At trial, the government anticipates introducing evidence proving Defendants knew that (1) exporting technical data belonging to GE Aviation and General Dynamics to China and (2) selling magnets made in China to government contractors and DOD was unlawful. For the export, the evidence will show that Defendants were (i) familiar with the International Traffic in Arms Regulations ("ITAR") and the State Department's Directorate of Defense Trade Controls

2

("DDTC"), (ii) explicitly warned by colleagues that the technical data—which contained prominent export control warnings—could not be exported, and (iii) provided actual notice from GE Aviation in August 2017 that their Chinese production scheme was illegal. For the sale, the evidence will show that Defendants were (i) familiar with the DFARS and (ii) when confronted about where the magnets were made, took active measures to conceal and obfuscate the fact that they were completely produced in China, in violation of DFARS.

From 2012 to 2016, Defendants caused Quadrant Solutions to register annually as a manufacturer of defense articles with the State Department's Office of Defense Trade Controls Compliance ("DTCC"). (DDTC and DTCC are separate offices.) The government's evidence shows that Defendants agreed to register Quadrant Solutions to conceal that Quadrant Magnetics, the entity engaged in ITAR business and the true intended ITAR registrant, had foreign ownership and control and that its Chinese affiliate produced its magnets for military items. For example, during the heart of the conspiracy, Defendant Monica Pascoe emailed Quadrant's Chief Financial Officer (CFO), copying Scott Tubbs, requesting payment to renew Quadrant Magnetics' ITAR registration. She stated the payment had to be made by Quadrant Solutions which would then be reimbursed by Quadrant Magnetics. Tubbs responded directly to Quadrant's CFO and stated he had been registering the company with DTCC under Quadrant Solutions' name to avoid "rais[ing] a lot of red flags." *See* Ex. 5 to ECF 111. He wrote that he had to use his name and social security number and could not use the name of Quadrant's owner, Mr. Sun, "for obvious reasons." *See id.* Tubbs acknowledged the "smoke and mirrors" before stating Quadrant Magnetics "would have lost opportunities and customers without this certification." *Id.*

Each year when DTCC renewed Quadrant Solutions' registration, it issued a letter to Quadrant Solutions in which DTCC provided compliance information regarding the AECA and

ITAR; directed the registrant to DDTC's website containing the ITAR; explained how to request a commodity jurisdiction determination if there were questions regarding whether the USML covered an article and technical data specifically; and stated that the individual and organizational ramifications for failing to comply with the ITAR included criminal charges. The letters also stated that DTCC registration was merely a precondition to applying for an export license or other approval from DDTC. Most of DTCC's registration letters were addressed to Defendant Tubbs.

The government's evidence will show that Quadrant Magnetics used Quadrant Solutions' ITAR registration to its economic benefit. For example, in February 2013, Defendant Tubbs, emailed Quadrant Solutions' 2012 ITAR registration letter to General Dynamics. He confirmed in his email that Quadrant Magnetics (not Quadrant Solutions) registered in response to General Dynamics' inquiry regarding Quadrant Magnetics' ability to engage in ITAR business. Likewise, in March 2013, Tubbs signed an ITAR confirmation form for one of Quadrant Magnetics' customers in which he certified that Quadrant Solutions was registered with DDTC in accordance with the ITAR and identified himself as the individual to receive ITAR-controlled technical data. The government's evidence also includes specific communications from a Quadrant Magnetics' employee warning Defendants Phil Pascoe and Tubbs that the same customers' technical data could not leave the United States due to the ITAR and the Defense Federal Acquisition Regulation Supplement ("DFARS"). On several occasions thereafter, Defendant Pascoe exported that customers' technical data to China.

In August 2017, Quadrant Magnetics' customer GE Aviation notified Defendants that their production process was unlawful. GE Aviation discovered that Quadrant Magnetics manufactured in China one of GE Aviation's specially designed magnets for use in a defense article, namely, a generator convertor unit for the F/A-18 fighter jet. GE Aviation also discovered that Quadrant

Magnetics might have exported technical data to China. GE Aviation confronted Quadrant Magnetics about its potential export violations and outsourcing to China and submitted a voluntary disclosure to DDTC. As part of its own investigation of whether Quadrant Magnetics was producing magnets in violation of the AECA and the DFARS, GE Aviation asked Tubbs whether Quadrant Magnetics "ma[d]e a commercial magnet that would meet the requirements of the FP24018P1." *See* Ex. 10 to ECF 111. Defendant Tubbs stated he did not think that there was an industrial off-the-shelf magnet that could be used to fulfill GE Aviation's order and noted the "specified technician requirements on [GE Aviation's] print." *See id*. Tubbs's statement refutes Defendants' anticipated defense in this case and confirms that Quadrant Magnetics knew their magnets were specially designed for military items.

In response to GE Aviation's investigation, Defendant Tubbs sent GE Aviation a letter on Quadrant Magnetics' behalf falsely stating that Quadrant Magnetics (i) had not sent any technical data to China regarding PN FP24018P1 and (ii) produced its magnets in a manner that complied with the DFARS. At the same time, however, likely knowing that GE Aviation would no longer accept magnets sintered, magnetized, and produced in China, Defendant Phil Pascoe was attempting to procure magnets for GE Aviation from a rare earth magnets company in Pennsylvania that could sinter the magnets in the United States. Defendant Pascoe told a representative of that company that Quadrant Magnetics did not have the technical ability to sinter a specially designed magnet in Kentucky. GE Aviation also requested that Quadrant Magnetics submit a Government Industry Data Exchange Program (GIDEP) Problem Advisory Report alerting DOD and the defense industry to the potential procurement issues. Defendants Phil Pascoe and Scott Tubbs caused the creation of two GIDEP Problem Advisory Reports falsely stating that Quadrant Magnetics magnetized PN FP24018P1 and another magnet for GE Aviation in

Louisville, Kentucky. The government's evidence will show that Defendants' misstatements to GE Aviation and in the GIDEP forms had a rippling effect, making their way into submissions by GE Aviation to the United States government.

The government's evidence also will show that, in December 2017, DDTC issued a commodity jurisdiction determination for PN FP24018P1. In CJ 0512-17, DDTC determined that Quadrant Magnetics' samarium cobalt magnet was specially designed for use in the F/A-18's generator convertor unit. DDTC determined the magnet was a defense article under USML Category VIII(h)(1) at the time of Quadrant Magnetics' export. GE Aviation suggested to Quadrant Magnetics that it file a commodity jurisdiction determination regarding the drawing related to PN FP24018P1 and also evaluate whether it should file an initial disclosure with DDTC. On January 3, 2018, GE Aviation emailed DDTC's commodity jurisdiction determination, CJ 0512-17, to Defendants Phil Pascoe and Scott Tubbs, as well as another Quadrant Magnetics employee. Quadrant Magnetics never submitted a commodity jurisdiction request to DDTC. Instead, Defendants continued to export to China ITAR-controlled technical data with prominent export warnings belonging to General Dynamics which, as Defendants knew, was also a defense subcontractor.

The Second Superseding Indictment ("Indictment"), ECF 73, charges Defendants with four substantive AECA violations for exporting or attempting to export ITAR controlled technical data after GE Aviation made them aware of the unlawful nature of their procurement process.[1]

---

[1] During the conspiracy, Defendants continuously exported technical data relating to these part numbers and others. The government charged four of the many substantive AECA violations within the statute of limitations to streamline trial. The government alleged other exports of technical data as overt acts in furtherance of the conspiracy.

The government's evidence will show that Quadrant Magnetics' owner, Mr. Sun, was involved in, knew about, and ratified his employees' actions. Mr. Sun knew about the issues with GE Aviation and that Quadrant Magnetics was exporting technical data both before and after those issues arose. Quadrant Magnetics employees had included Mr. Sun on email transmissions of controlled technical data for many years before and during the conspiracy because Mr. Sun's companies in China supplied magnets to Quadrant Magnetics for at least twenty years. And, as the government's evidence will demonstrate, in March 2017, Mr. Sun instructed Defendants to carbon copy him on communications relating to Quadrant Magnetics' customers and products.

Defendants' acts after GE Aviation notified Defendants of the unlawful nature of their scheme also form the basis for the substantive wire fraud charges in April, June, and October 2018. The government's evidence at trial will include emails between Defendants regarding DFARS compliance and testimony that GE Aviation specifically explained to Defendants that the DFARS required samarium cobalt magnets to be sintered in the United States or a qualifying country. The evidence also will show that Defendants knew that General Dynamics' procurement of specially designed magnets was subject to a "flow down" requirement that DOD subcontractors and its vendors, like Quadrant Magnetics, comply with DFARS, and that magnets sold to General Dynamics would be used in defense items. Irrespective of their knowledge that magnets produced in China could not be used in military applications, Defendants continued to sell magnets to General Dynamics until October 2018 while agreeing to conceal from General Dynamics and DOD that the magnets were produced in China.

The government's evidence will show that Defendants Phil Pascoe and Tubbs instructed Quadrant Magnetics employees not to mention China in their dealings with General Dynamics because General Dynamics would not purchase magnets produced in China. They also instructed

Quadrant Magnetics employees to remove Chinese characters from testing data for the magnets that were submitted to General Dynamics. In March 2018, the Naval Criminal Investigative Service ("NCIS") interviewed Defendants Phil Pascoe and Scott Tubbs and served a subpoena for records to Quadrant Magnetics. Thereafter, Defendant Monica Pascoe researched the General Dynamics part numbers for which Quadrant Magnetics produced Chinese magnets. She prepared a spreadsheet titled: "SmCo itar DPAS review," indicating which specific prints were samarium cobalt, ITAR marked, and / or had a Defense Priorities & Allocations ("DPAS") rating, which rating indicated the parts were for DOD's end use. Defendant Phil Pascoe emailed the spreadsheet to Tubbs. The spreadsheet identified General Dynamics' part numbers PN 6000U-1002 and PN 100101, among many others, as ITAR prints. PN 6000U-1002 and PN 100101 are charged in the substantive wire fraud counts.

In an apparent half-hearted attempt to disclose to General Dynamics that Quadrant Magnetics was producing magnets in China, Defendants began to include on the bottom of Quadrant Magnetics' requests for quotes to General Dynamics various versions of "C/N 156," which is the International Organization for Standardization (ISO) code for China. Defendant Pascoe continued to export technical data conspicuously marked with ITAR warning to X-Mag employees in China. Furthermore, Defendants continued to misrepresent that they were magnetizing the magnets in Louisville when they were actually importing them magnetized from China. The Indictment alleges three specific wire communications in April 2018, June 2018, and October 2018. The evidence shows that Defendants knew at this time that they were supplying magnets to General Dynamic and DOD in violation of the DFARS.

Federal law enforcement agents executed a search warrant at Quadrant Magnetics' facility in Louisville, Kentucky on October 31, 2018. It was only at that time—after the government

intervened—that Defendants ceased their unlawful scheme. The day after the search warrant was executed, on November 1, 2018, Defendant Phil Pascoe, as Quadrant Magnetics' President, sent a letter to Quadrant Magnetics' U.S.-based customers informing them that, "effective immediately," Quadrant Magnetics would "forgo the renew our [sic] ITAR registration . . . [and] will no longer be able to facilitate the acceptance of new orders or RFQ's specified as ITAR controlled and or DFARS specific." Ex. 15 to ECF 111. Quadrant Magnetics never registered with, or obtained a license from, the Department of State to export ITAR-controlled technical data. Quadrant Magnetics did not disclose to General Dynamics that it had exported General Dynamics technical data to China. Quadrant Magnetics did not submit a voluntary disclosure to DDTC of its ITAR violations or any disclosure to DOD for its DFARS violations.

## II.   <u>Statutes Involved and Elements of Offenses</u>

### A. <u>Charges</u>

Count One of the Indictment charges Defendants with knowingly and willfully conspiring in violation of 18 U.S.C. § 371 to:

1.      export technical data controlled by the ITAR from the United States to China without a license from the U.S. Department of State, in violation of the Arms Export Control Act ("AECA"), 22 U.S. 2778(b)(2), and the ITAR, 22 C.F.R. §§ 121.1 *et seq.*;

2.      smuggle technical data from the United States contrary to a law or regulation of the United States (namely, the AECA and the ITAR), in violation of 18 U.S.C. § 554;

3.      commit wire fraud by concealing from defense contractors and the United States where Quadrant Magnetics manufactured, smelted, and magnetized their magnets, in violation of 18 U.S.C. § 1343 and 48 C.F.R. § 252.225-7009; and

4.      make materially false statements and make and use false writings or documents knowing the same to contain materially false statements, in violations of 18 U.S.C. §§ 1001(a)(2) and (3).

Counts Two through Four charge Defendants with executing and attempting to execute a scheme to defraud General Dynamics and DOD by concealing and misrepresenting the country of origin of Quadrant Magnetics' magnets by misrepresenting and concealing the country in which they were manufactured, smelted, and magnetized by transmitting wire communications to execute the scheme to defraud, in violation of 18 U.S.C. §§ 1343 and 2.

Counts Five through Eight charge Defendants Quadrant Magnetics, Phil Pascoe, and Scott Tubbs with willful violations of the AECA and ITAR by exporting and attempting to export to China ITAR-controlled technical data without a license or approval from the DDTC, in violation of 22 U.S.C. §§ 2778(b)(2) and (c), 22 C.F.R. §§ 121.1 *et seq.*, and 18 U.S.C. § 2. And finally, Count Nine charges Defendants Quadrant Magnetics, Phil Pascoe, and Scott Tubbs with unlawful smuggling from the United States of technical data for end use in a multi-spectral targeting system, contrary to the AECA and ITAR, in violation of 18 U.S.C. §§ 554 and 2.

**B. <u>Elements of the Offenses</u>**

To prove that Defendants conspired to commit an offense against the United States in violation of 18 U.S.C. § 371, the government must prove that:

1. Two or more persons conspired, or agreed, to commit an offense against the United States;
2. The defendant knowingly and voluntarily joined the conspiracy; and
3. A member of the conspiracy did one of the overt acts described in the indictment for the purpose of advancing or helping the conspiracy.

To prove that Defendants committed wire fraud in violation of 18 U.S.C. § 1343, the government must prove that:

10

1. The defendant devised a scheme to defraud in order to deprive another of money or property, where a "scheme to defraud" includes any plan or course of action whereby someone intends to deprive another or money or property by means of false or fraudulent pretenses, representations, or promises;
2. The scheme included a material misrepresentation or concealment of a material fact;
3. The defendant had the intent to defraud; and
4. The defendant used wire, radio or television communications or caused another to use wire, radio or television communications in interstate commerce in furtherance of the scheme.

To prove that Defendants violated AECA under 22 U.S.C. § 2778(a)-(c) the government must prove that:

1. The defendant exported, attempted to export, or caused to be exported, an item from the United States;
2. The item the defendant exported, attempted to export, or caused to be exported was a defense article within the United States Munitions List ("USML") at the time of export;
3. The defendant exported the item without first obtaining a license or other authorization from the United States Department of State; and
4. The defendant acted knowingly and willfully.

To prove that Defendants committed smuggling in violation of 18 U.S.C. § 554, the government must prove that:

1. The defendant knowingly or fraudulently exported, sent, attempted to export, or attempted to send from the United States an article, merchandise, or object;
2. The defendant's export, sending, or attempt to do so was contrary to a law or regulation of the United States; and
3. That the defendant knew the exportation or sending of the article, merchandise, or object was contrary to a law or regulation of the United States.

To prove that Defendants made false statements in violation of 18 U.S.C. § 1001(a)(2), the government must prove that:

1. The defendant made a statement or representation;
2. The statement was false, fictitious, or fraudulent;
4. The statement or representation was material;
5. The defendant acted knowingly and willfully; and
6. The statement pertained to a matter within the jurisdiction of the executive branch of

the United States government.

To prove that Defendants made false statements in violation of 18 U.S.C. § 1001(a)(3), the government must prove the additional element that the defendant made or used a writing or document that contained a statement or entry that was false, fictitious, or fraudulent.

### C. Discussion of Relevant Authorities[2]

The government identifies and summarizes below certain principles of substantive law that it anticipates will be particularly relevant to the government's case, and requests permission to supplement this memorandum with additional briefing should other legal questions arise prior to or during trial.

#### a. Conspiracy

The government anticipates that Defendants' primary defense at trial will be that Quadrant Magnetics' magnets were not specially designed for use in or with defense articles and thus not covered by the USML. Even if Defendants are right (the government intends to prove they are not), the government still may prove that Defendants unlawfully conspired to commit offenses against the United States, including to violate AECA.

To prove that Defendants unlawfully conspired to commit offenses against the United States, the government need not prove that the Defendants successfully completed any of the objects of the conspiracy. In other words, "a conspirator may be convicted 'even though he was incapable of committing the substantive offense.'" *Ocasio v. United States*, 578 U.S. 282, 289 (2016) (quoting *Salinas v. United States*, 522 U.S. 52 (1997)). Impossibility is not a defense to conspiracy. *See, e.g.*, *United States v. Schaffer*, 586 F.3d 414, 422-23 (6th Cir. 2009), *cert. denied*,

---

[2] The government has provided citations to other relevant authorities concerning the offenses, including wire fraud and smuggling, together with its proposed substantive and special jury instructions filed contemporaneously herewith.

559 U.S. 1021 (2010) (citations omitted) ("The basis of the conspiracy charge is the agreement to commit the unlawful act, and not the unlawful act itself….[I]t is irrelevant that it may have been objectively impossible for the conspirators to commit the substantive offense."); *United States v. Yang*, 281 F.3d 534, 544 (6th Cir. 2002) (legal impossibility not a defense to prosecution for conspiracy to steal trade secrets); *United States v. Hamilton*, 689 F.2d 1262, 1269 (6th Cir. 1982) (citing 16 Am. Jur. 2d 225 (2d ed. 1979) ("'[I]t is no defense to a conspiracy that success of the conspiratorial object was impossible because of unknown circumstances.'"); *United States v. Zhen Zhou Wu*, 711 F.3d 1, 25-26 (1st Cir. 2013) ("[A] defendant can be convicted of conspiracy to export items on the Munitions List even when the items he conspires to export are not in fact on the Munitions List."); *United States v. Posey*, 864 F.2d 1487, 1492 (9th Cir. 1989) (finding actual export of USML items unnecessary for AECA conspiracy).

Accordingly, Defendants can be convicted of conspiring to violate AECA even if the government does no prove that the technical data Quadrant Magnetics exported was on the USML.

### b. AECA/ITAR[3]

Establishing that an item is a defense article on the USML. To prove the substantive AECA violations charged in Counts Five through Eight, the government bears the burden of proving that the technical data Defendants exported or attempted to export related to items that were defense articles on the USML. AECA provides that the State Department's designation of an item as a defense article "shall not be subject to judicial review." *See* 22 U.S.C. § 2778(h).

Judicial decisions involving AECA and its predecessor statute, both before and after Section 2778(h)'s addition to AECA in 1989, *see* Public Law 101-222, 103 Stat. 1892, reflect

---

[3] The government provided the Court with a detailed description of the ITAR's regulatory framework in the government's response to Defendants' Motion to Dismiss Unconstitutionally Vague AECA and ITAR Allegations. *See* ECF 111 at 2-5.

that courts interpreted AECA, and later specifically § 2778(h), to reserve the question of whether items were on the USML for the Executive Branch, and have thus permitted the government to carry its burden of proof by introducing evidence that DDTC had determined the items at issue were on the USML. *See, e.g.*, *United States v. Martinez* 904 F.2d 601, 602 (11th Cir. 1990) (holding whether item on the USML not subject to judicial review; stating in dicta that recently-passed § 2778(h) supported court's determination); *United States v. Spawr Optical Research, Inc.*, 864 F.2d 1467, 1473 (9th Cir. 1988) ("The Secretary has determined that the Spawrs' mirrors could not be exported without an export license. Right or wrong, the trial court must accept this determination as a matter of law."); *United States v. Gregg*, 829 F.2d 1430, 1437 (8th Cir. 1987) (quoting *United States v. Moeller-Butcher*, 560 F. Supp. 550, 552-53 (D. Mass. 1983)) (stating that Congress, under the Export Administration Act of 1979 ("EAA"), "'clearly expressed its desire that the executive branch, not the courts, have the final word on which items should be restricted'"); *cf. Karn v. U.S Dep't of State*, 925 F. Supp. 1, 5-6 (D.D.C. 1996), *remanded on other grounds*, 107 F.3d 923 (Table) (D.C. Cir. 1997) (per curiam) (concluding that, under § 2778(a)(1) and (h) and the ITAR's legislative scheme, Congress precluded judicial review of the State Department's designation of items as defense articles, including determinations made pursuant to its commodity jurisdiction procedure).

The Sixth Circuit, however, has reached a contrary conclusion that the State Department's prior determinations are not conclusive of the question whether a particular item is a defense article, and that it is for the jury to decide whether the item is a defense article. In affirming a defendant's trial conviction for unlawfully exporting defense articles, the Sixth Circuit, in *United States v. Roth*, 628 F.3d 827 (6th Cir. 2011), held that, under Section 2778(h), "courts may not review whether items are properly designated as articles on the Munitions List," but that a jury

in a criminal case must decide "whether the data [underlying defense articles] fall under the definitions of technical data and components." 628 F.3d at 832 (citing *United States v. Pulungan*, 569 F.3d 326, 328 (7th Cir. 2009)).

The *Roth* court affirmed the jury's finding that the underlying data and components were defense articles, and detailed the evidence at trial establishing that the final objective of the project in which the data was used was to develop plasma actuators that could control military drones. 628 F.3d at 833 (finding ITAR cover broad range of articles and "extend export controls to all stages of defense projects that are covered by [AECA], not just the final stages when military devices are directly involved"). The government's trial evidence in *Roth* that the technical data alleged in the indictment "had been subject to a determination that they were defense articles of the nature and type listed in the USML" included (i) a certification from DDTC reflecting the State Department's determination that the relevant items exported by the defendant were defense articles and technical data as defined in the ITAR; (ii) testimony from an employee of DOD's Defense Technology Security Administration ("DTSA") who had recommended that DDTC conclude the data were defense articles; and (iii) testimony from a division chief at DDTC. *United States v. Roth*, 2009 WL 1748748, at *3 (E.D. Tenn. June 19, 2009), *aff'd by*, 628 F.3d 827. On appeal, the Sixth Circuit did not question either the sufficiency or admissibility of the evidence the government presented to the jury.

Here, as in *Roth*, the government intends to present evidence that the technical data alleged in the Indictment was on the USML at the time Defendants exported it through testimony from DDTC and DTSA experts, DDTC witnesses, commodity jurisdiction determinations requested by GE Aviation and the government that provide DDTC's final determination as to individual parts and therefore related technical data, and other evidence regarding DDTC's

determinations.[4] The government also will call witnesses from the companies that owned the technical data, GE Aviation Systems and General Dynamics, who will provide testimony that will help explain why the data met the USML's control specifications.

      <u>Willfulness under the AECA</u>. In the Sixth Circuit, to prove a defendant willfully violated the AECA, the government must establish the defendant knew his conduct was unlawful but not that the defendant knew the item he exported was on the USML. *Roth*, 628 F.3d at 835 (approving jury instruction defining "willfulness as doing something intentionally that the defendant knew was unlawful"). In other words, the government does not need to meet a heightened willfulness standard – i.e., that a defendant had knowledge of the specific statutory prohibitions or licensing requirements that he or she violated. *See Roth*, at 834-35 (citing *Bryan v. United States*, 524 U.S. 184, 195 (1998) (holding defendant knew his act unlawful; rejecting argument that heightened willfulness standard applicable under certain provisions of tax code and banking provisions applied under 18 U.S.C. § 924)).

      <u>Impossibility is not a defense to attempt to violate AECA</u>. In Counts Five through Eight, Defendants are charged with unlawfully exporting and attempting to export defense articles from the United States to China. As with conspiracy, impossibility is no defense to an attempt to violate AECA. *See Yang*, 281 F.3d at 544 (citing *United States v. Shelton*, 30 F.3d 702, 705 (6th Cir.

---

[4] The government outlined in its Response to Defendants' Motion to Dismiss Unconstitutionally Vague AECA and ITAR Allegations the ITAR's specific procedure for submitting a commodity jurisdiction determination as well as the criteria DDTC considers to determine whether an article is on the USML. *See* ECF 111 at 2-3; 22 C.F.R. §§ 120.4, 120.12. During the commodity jurisdiction process, DDTC consults with, and requests information from, DOD, the Department of Commerce, and those in industry with specialized knowledge of the part or item for which a determination was requested. 22 C.F.R. § 120.12. The final decision regarding a commodity jurisdiction determination as to whether a part or item is covered by the USML is delegated by law to DDTC. *Id.* Defendants have moved the Court to exclude certain commodity jurisdiction determinations, ECF 90; the government has responded, ECF 110; and Defendants have replied, ECF 118.

1994)) (finding impossibility not a defense to prosecution under statute prohibiting attempt to steal trade secrets); *United States v. Hsu*, 155 F.3d 189, 202-03 (3d Cir. 1998) ("[L]egal impossibility is not a defense to a charge of attempt."). Accordingly, Defendants can be convicted of attempting to export defense articles under AECA even if the government does not prove that the technical data Quadrant Magnetics exported was on the USML.

### c. Corporate Criminal Liability

In addition to the individual Defendants, the Indictment charges that Defendant Quadrant Magnetics, the limited liability company that employed the individual Defendants, is liable for each crime charged in the Indictment. Accordingly, the government sets forth the relevant substantive law as it relates to Defendant Quadrant Magnetics' liability.

The substantive criminal laws relevant to this case all impose criminal liability on "persons" or "whoever," which terms "include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C. § 1. Moreover, the words "company" or "association" in 1 U.S.C. § 1 and elsewhere in the U.S. Code, "when used in reference to a corporation, shall be deemed to embrace the words 'successors and assigns of such company or association,' in like manner as if these last-named words, or words of similar import, were expressed." 1 U.S.C. § 5.

Under the doctrine of *respondeat superior*, a corporation may be held criminally liable for the illegal acts of its directors, officers, employees, and agents. To hold a corporation liable for these actions, the government must establish that the corporate agent's actions (i) were "related to and done within the course of his employment" and (ii) "have some connection with the furtherance of the business of such corporation." *United States v. Carter*, 311 F.2d 934, 942 (6th Cir. 1963). If a corporate agent's criminal act is "directly related to the performance of the

duties which the officer or agent has the broad authority to perform, the corporate principal is liable for the criminal act also, and must be deemed to have authorized the criminal act." *Id.* (cleaned up) (quoting *Continental Baking Co. v. United States*, 281 F.3d 137, 149 (6th Cir. 1960)); *see also United States v. Automated Med. Labs.*, 770 F.2d 399, 407 (4th Cir. 1985) (citing *United States v. Hilton Hotels Corp.*, 467 F.2d 1000, 1004 (9th Cir. 1972), *cert denied*, 409 U.S. 1125 (1973)) ("The term 'scope of employment' has been broadly defined to include acts on the corporation's behalf in performance of the agent's general line of work."). The agent's position is not the relevant inquiry but rather it is "the function delegated to the corporate officer or agent which determines his power to engage the corporation in a criminal transaction." *C. I. T. Corp. v. United States*, 150 F.2d 85, 89 (9th Cir. 1945).

A corporation is insulated from criminal liability only where its agent's actions are "*inimical* to the interests of the corporation or . . . undertaken solely to advance the interests of that agent or of a party other than the corporation." *Automated Med. Labs.*, 770 F.2d at 207 (emphasis in original) (citing *Standard Oil Company of Texas v. United States*, 307 F.2d 120 (5th Cir. 1962)). A corporation may be held liable as long as one motivation of its agent is to benefit the corporation. *See United States v. Oceanic Illsabe Ltd.*, 889 F.3d 178, 195 (4th Cir. 2018); *see also United States v. Cincotta*, 689 F.2d 238, 241-42 (1st Cir. 1982) (upholding corporation's conviction where fraudulent scheme required money to pass through corporation's treasury and fraudulently obtained goods were resold to corporation's customers in corporation's name). Moreover, a corporation need not necessarily profit from its agent's actions for it to be held liable. Indeed, "'whether the agent's action ultimately redounded to the benefit of the corporation is less significant than whether the agent acted with the intent to benefit that corporation.'" *United States v. Peterson*, 188 F.3d 510, at *13 (6th Cir. 1999) (Table) (Clay, J., concurring) (quoting

*Automated Med. Labs.*, 770 F.2d at 406-07); *see also United States v. Grayson Enterprises, Inc.*, 950 F.3d 386, 408 (7th Cir. 2020) ("[N]ot all the benefits of the crime need to go to a corporation for it to be held criminally liable for its agents' actions.").

A corporation may be convicted of "a crime involving knowledge and willfulness." *Carter*, 311 F.2d at 942 (collecting cases). And, because a corporation acts and knows through its agents, their guilty knowledge and willful conduct is imputed to the corporation. *See id.* (collecting cases); *see also United States v. LaGrou Distrib. Sys.*, Inc., 466 F.3d 585, 591 (7th Cir. 2006) (affirming jury instruction making clear that, in order to convict corporation of offense requiring knowledge, jury had to find authorized agent or employee acted knowingly). Moreover, an employee need not be an executive or officer for his intent to be imputed to a corporation. *See United States v. Under Armour & Co.*, 168 F.2d 342, 344 (3d Cir. 1948) (citations omitted) ("No distinctions are made in these cases between officers and agents, or between persons holding positions involving varying degrees of responsibility."); *United States v. George F. Fish*, *Inc.*, 154 F.2d 798, 801 (2d Cir. 1946) (finding salesman's willfulness imputed to corporation).

In the alternative to *respondeat superior*, a corporation may be liable "if it ratified the illegal acts" of its agent. *Phelan v. Local 305 of United Ass'n of Journeyman*, 973 F.2d 1050, 1062 (2d Cir. 1992); *see Continental Baking Co. v. United States*, 281 F.2d 137, 150 (6th Cir. 1960) (holding corporation "cannot say [its employee] was only 'authorized' to act legally and the corporation will not answer for his violations of law which inure to the corporation's benefit"). A corporation ratifies an agent's acts where it "affirm[s] . . . a prior act which did not bind [the corporation] but which was done or professedly done on [its] account, whereby the act, as to some or all persons, is given effect as if originally authorized by [the corporation]." *Hamm v. United States*, 482 F.3d 135, 140 (2d Cir. 2007) (quoting Restatement (Second) of Agency s. 82 (1958));

19

*see Anderson v. Int'l Union, United Plant Guard Workers of Am.*, 370 F.3d 542, 556 (6th Cir. 2004) (quoting *Davis v. Mutual Life Ins. Co. of New York*, 6 F.3d 367, 374 (6th Cir. 1993)) ("Ratification occurs where the principal receives and retains the benefits of a transaction with full knowledge of all material facts."). Acts of an agent may be imputed to the corporation if (1) "the principal adopts the unauthorized act of [its] agent in order to retain a benefit for [itself]," *Munroe v. Harriman*, 85 F.2d 493, 495 (2d Cir. 1936); (2) acquiesces to the conduct, *see In re Bennett Funding Grp.*, 336 F.3d 94, 101 (2d Cir. 2003); or (3) by implication "fail[s] to dissent within a reasonable time after learning what had been done," *IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp.*, 26 F.3d 370, 375 (2d Cir. 1994).

## III.   Unresolved Substantive Issues of Law

Defendants filed nine substantive motions that are pending before the Court. *See* ECFs 71, 85-91, 93. The government responded to each, and Defendants replied. The parties' briefing reflects numerous unresolved substantive issues of law. The government respectfully directs the Court to its responses to these motions for the government's discussion of, and citation to, relevant authorities.

## IV.   Evidentiary Issues it is Reasonably Believed will be Raised at Trial

Motions *in limine*. Defendants have filed several motions to exclude evidence that are pending before the Court. The government anticipates filing any motions *in limine* no later than four weeks prior to trial in accordance with the Court's Order, ECF 98. The government anticipates Defendants will do the same.

Business records. The United States intends to introduce certain documents obtained from the U.S. Department of State to prove that the technical data exported as charged in Counts One and Five through Eight is on the USML. The United States intends to introduce some of these

records, including State Department records and emails, pursuant to FRE 803(6) through a State Department custodian of records with sufficient knowledge or by a certification that complies with Rule 902(11).

As stated by the Sixth Circuit in *United States v. Daneshvar*, "[o]f course, an email can qualify as an admissible record of a regularly conducted business activity as long as the proponent satisfies the requirements of Rule 803(6)." 925 F.3d 766, 777 (6th Cir. 2019). Email correspondence and internal documents discussing the commodities jurisdiction process meet the four requirement requirements to be considered business records under Rule 803(6), because they are made in the course of regularly conducted business; kept in the course of business; the regular practice of the State Department is to make such communication; and the correspondence and documents were made by persons with knowledge of the activity or from information transmitted by a person with knowledge. *Cobbins v. Tenn. Dep't of Transp.*, 566 F.3d 582, 588 (6th Cir. 2009). "The essential component of the business records exception is that each actor in the chain of information is under a business duty or compulsion to provide accurate information." *United States v. Cecil*, 615 F.3d 678, 690 (6th Cir. 2010). That is true for the commodity jurisdiction determination process. Similar records, including e-mail communications, have been found admissible. *See United States v. Figueroa*, 2023 WL 8373566, at *3 (S.D.N.Y. Dec. 4, 2023); *Ionian Corp. v. Country Mut. Ins. Co.*, 836 F. Supp. 2d 1173, 1177 (D. Or. 2011); *Canatxx Gas Storage Ltd. v. Silverhawk Capital Partners, LLC*, 2008 WL 1999234 (S.D. Tex. May 8, 2008). The United States may also seek to call employees of the relevant agencies with relevant knowledge of the communications to admit such communications.

Admissibility of agent statements against principal. The government may seek to admit certain statements by Quadrant Magnetics' employees in its case-in-chief pursuant to Federal Rule

of Evidence 801(d)(2)(D). Rule 801 provides that an opposing party's statements are not hearsay when offered against the opposing party. Under Rule 801(d)(2)(D), "statements offered against an opposing party and made by the party's agent or employee on a matter within the scope of that relationship and while it existed" are not hearsay. Statements by Quadrant Magnetics' employees made within the scope of their employment, including statements concerning their job responsibilities and Quadrant Magnetics' production of rare earth magnets, are admissible non-hearsay statements under Rule 801(d)(2)(D). Accordingly, all of these statements may be admitted against Quadrant Magnetics. *See Robert R. Jones Assocs., Inc. v. Nino Homes*, 858 F.2d 274, 276 (6th Cir. 1988) (finding district court properly admitted statement by house designer against individual and corporate defendants when concerned, and was made during course of, employment relationship); *United States v. Kirk*, 844 F.2d 660, 663 (9th Cir. 2008) (statements of company salespeople admissible against the founder of company as nonhearsay statements under Rule 801(d)(2)(D)); *United States v. Gibson*, 690 F.2d 697, 699 (9th Cir. 1982) (testimony of investors regarding statements made by company employees not hearsay, or if so, are nonhearsay under Rule 801(d)(2)(D) when offered against founder of company); *cf. United States v. Boling*, 869 F.2d 965, 974 (6th Cir. 1989) (finding co-defendant's statements made during course of employment under direction and control of other defendant admissible under Rule 801(d)(2)(D)).

    <u>Admissibility of co-conspirator statements</u>. Co-conspirator statements are admissible against an opposing party when made in furtherance of the conspiracy. Fed. R. Evid. 801(d)(2)(E). It is the law of this and other circuits that the "conspiracy" for purposes of determining admissibility under Rule 801(d)(2)(E) need no be illegal. Indeed, co-conpsirator "statements may be admissible under Rule 801(d)(2)(E) even when no conspiracy has been charged." *United States v. Martinez*, 430 F.3d 317, 327 n.4 (6th Cir. 2005) (citing *United States v. Blankenship*, 954 F.2d

1224, 1231 (6th Cir. 1992)). Even co-conspirator "statements made in furtherance of a lawful common enterprise are admissible." *United States v. El-Mezain*, 664 F.3d 467, 503 (5th Cir. 2011) (citing *United States v. Gewin*, 471 F.3d 197, 201 (D.C. Cir. 2006); *United States v. Layton*, 855 F.2d 1288, 1400 (9th Cir. 1988), *overruled on other grounds*, *United States v. George*, 960 F.2d 97 (9th Cir. 1992); *United States v. Regilio*, 669 F.2d 1169, 1174 n.4 (7th Cir. 1981)).

The government still must prove "sufficient concert of action to show that the individuals engaged in a joint venture." *Layton*, 855 F.3d at 1397. Once established, however, any statements by a declarant involved in a concert of action with Defendants, including Quadrant Magnetics, may be admitted when made in furtherance thereof. Likewise, any Quadrant Magnetics document about such common enterprise is an admissible co-conspirator statement under Rule 801(d)(2)(E).

Stipulations. The parties will discuss stipulations regarding admission of exhibits under FRE 803(6) as business records, self-authenticating records pursuant to FRE 902(11), and any stipulations regarding certain elements of the charged offenses.

Commodity jurisdiction determinations. The government intends to introduce as evidence certain commodity jurisdiction determinations made by DDTC for two distinct purposes. First, the government will introduce evidence of commodity jurisdiction determinations showing that the parts for which technical data was illegally exported in Counts One and Five through Eight of the Indictment are listed on the USML and are therefore controlled for export under the ITAR. The government intends to admit the commodity jurisdiction determinations pursuant to FRE 803(6) or FRE 803(8) as records of the regularly conducted activity of DDTC or public records through a State Department witness with sufficient knowledge or by a certification that complies with Rule 902(11). The government's witnesses may testify to the fact that DDTC reached these determinations.

Courts have admitted State Department determinations regarding whether an item was on the USML in numerous other cases alleging unlawful export violations pursuant to the AECA. For example, at trial in *Roth*, the government admitted a certification from DDTC that the technical data were defense articles as defined in the ITAR. *See* 2009 WL 1748748, at *3 ("Exhibit 46A is a document from the Department of State [certifying] that each of the items and documents named in the indictment are defense articles and technical data as defined by the ITAR."). Courts have admitted commodity jurisdiction determinations or similar certifications in several export control cases. *See, e.g.*, *United States v. Electro-Glass Prods.*, 298 Fed. App'x 157, 158-59 (3d Cir. 2008) (discussing determination); *United States v. Johnson*, 139 F.3d 1359, 1364 (11th Cir. 1998) (appealing jury instruction based on admitted commodity jurisdiction ruling); *Spawr Optical Research*, 864 F.2d at 1468 (including summary of facts post-jury trial and discussion of license application determination); *United States v. Zhen Zhou Wu*, 2011 WL 31345, at *10 (D. Mass. Jan. 4, 2011), *aff'd in part and vacated in part*, 711 F.3d 1 (1st Cir. 2013) (admitting commodity jurisdiction determinations by both defendants and government); *Karn*, 925 F. Supp. at 4 (stipulating to commodity jurisdiction request determination).

Second, the government will submit as evidence one commodity jurisdiction determination for a part that is not one of the four parts charged in Counts Five through Eight, but rather was received and reviewed by Defendants during the conspiracy, to prove their knowledge and the unlawful object of the conspiracy. As set forth above, on or around January 3, 2018, GE Aviation provided to Defendants Phil Pascoe and Scott Tubbs DDTC's commodity jurisdiction determination, CJ 0512-17, for PN FP24018, pursuant to which DDTC determined that Quadrant Magnetics' magnet was specially designed for use in or with a defense article. This commodity jurisdiction determination, and the non-hearsay fact of its transmission to members of the

conspiracy, is evidence of the conspirators' knowing participation in the unlawful agreement to violate the AECA charged in Count One. It similarly is evidence that when the Defendants subsequently exported the controlled technical data underlying the substantive violations of AECA charged in Counts Five through Eight after having received CJ 0512-17, the Defendants knew that the technical data were defense articles and that it was unlawful to export that technical data without a license.

Testimony obtained pursuant to Touhy requests. The government is aware that Defendants attempted to serve this Court's trial subpoenas on current and former employees of certain U.S. government agencies at their personal residences. These subpoenas were legally ineffective pursuant to the Department of State's *Touhy* regulations, 22 C.F.R. §§ 172.1 *et seq.*, among other applicable agencies' *Touhy* regulations. The government also is aware that, immediately thereafter, Defendants submitted multiple purported *Touhy* requests to government agencies for testimony of government witnesses at trial as well as document productions, including requests to the U.S. Department of State and U.S. Department of Commerce.[5] *See United States ex. rel. Touhy v. Ragen*, 340 U.S. 462, 468 (1951).

The government understands that the State and Commerce Departments are assessing the validity of Defendants' requests. The government also understands that the subpoenaed agencies may challenge the requests pursuant to their department's *Touhy* regulations. *See, e.g.*, 22 C.F.R. § 172.5 (discussing procedure when testimony or production of documents is sought); 22 C.F.R. § 172.8 (discussing considerations in determining whether the Department of State will comply

---

[5] Defendants also attempted to serve current and former employees of certain U.S. government agencies at their personal residences. These subpoenas were legally ineffective pursuant to the Department of State's *Touhy* regulations, 22 C.F.R. §§ 172.1 *et seq.*, among other applicable agencies' *Touhy* regulations.

with a demand or request). If the subpoenaed agencies comply with any part of Defendants' demands, the government reserves the right to assert any appropriate claim of privilege over an agency employee's testimony where necessary. *See United States v. Guild*, 341 Fed. App'x 879, 886 (4th Cir. 2009) (upholding government witness' assertion as to certain topics of deliberative process privilege and refusal to testify on inadmissible plea discussions); *United States v. Rodgers*, 2022 WL 1074013, at *4 (E.D.T.X. Apr. 8, 2022) (quashing *Touhy* subpoena based on government-asserted deliberative process privilege as to testimony that was pre-decisional and deliberative in nature).

For purposes of highlighting potential evidentiary issues for the Court in this brief, the government notes that employees of government agencies are prohibited by law from testifying or providing documents or records unless authorized by the relevant government agency. *See, e.g.,* 22 C.F.R. § 172.4. As to Defendants' requests to at least the Departments of State and Commerce, if the agencies at issue authorize, without conceding the relevance or admissibility of the testimony and documents that Defendants seek, testimony from their employees or production of government records, the scope of the testimony provided by agency employees and the records disclosed will be defined by the agency's written authorization. *See* 22 C.F.R. § 172.5. At trial, the government may object to, or the witness may refuse to answer, questions beyond that scope. The prosecutors in this case are not authorized to expand the scope of any agency authorization regarding its employee's testimony.

404(b) notice if required. The government notes that it may file a Rule 404(b) notice, in an abundance of caution, to admit certain evidence of Defendants' unlawful acts that are not already specifically identified in the Indictment. As detailed below, the government believes that this evidence is direct evidence of, or inextricably intertwined with, the charges in the Indictment, and

therefore not other acts evidence under Rule 404(b), but would be admissible under Rule 404(b) in any event because it will be offered for permissible non-propensity purposes to prove Defendants' intent, knowledge, and absence of mistake.

*Additional transmissions of technical data*. Evidence of and related to additional exports of technical data by Defendants to X-Mag employees in China, and to non-U.S. persons,[6] is admissible direct evidence of the conspiracy charged in Count One, and not "other acts" evidence under Rule 404(b); however, even if the Court were to consider it to be evidence of "other acts," it is offered for the permissible non-propensity purposes to demonstrate that defendants intended, planned, had knowledge of, and did not by mistake or accident engage in the exportation of technical data controlled under the ITAR to China and to non-U.S. persons. Evidence of intent is admissible under 404(b) "where the crime charged is one requiring specific intent." *See United States v. Johnson*, 27 F.3d 1186, 1192 (6th Cir. 1994*); United States v. Lattner*, 385 F.3d 947, 957 (6th Cir. 2004) (similar). Evidence of prior bad acts is admissible under Rule 404(b) to show intent to commit those same acts as charged. *See United States v. Adams*, 722 F.3d 788, 812-18 (6th Cir. 2013) (admitting evidence of defendants' prior vote-buying in vote-buying case); *United States v. Hardy*, 643 F.3d 143, 151 (6th Cir. 2011) (admitting prior drug-distribution evidence because shows intent to distribute). Such evidence is sufficiently probative when "substantially similar and reasonably near in time" to the specific intent offense at issue, and must also have probative value that is not outweighed by potential prejudicial impact. *Johnson*, 27 F.3d at 1192-94. The additional

---

[6] Under the ITAR, an unlawful export occurs where the export is from the United States to another country or within the United States to a non-U.S. person. *See* 22 C.F.R. 120.50(b) (defining export to include "[a]ny release of technical data to a foreign person"). The evidence shows that the recipients of the technical data were both in China and non-U.S. persons. Accordingly, even if Defendants sent technical data to an X-Mag employee while, for example, traveling in the United States, Defendants' transmission would have been unlawful.

technical exports that the government intends to use all occur during or within less than a year of the alleged unlawful exports in the Indictment, and any prejudice can be mitigated with a limiting instruction. *See United States v. Dixon*, 2021 WL 1928538, at *3-4 (E.D.K.Y. May 13, 2021) (admitting prior drug distribution evidence from three years prior with limiting instruction).

The government believes that this evidence would also be admissible as *res gestae* evidence because the additional exports are "part of a continuing pattern of illegal activity" and are "inextricably intertwined" with the evidence of the charged conduct. *United States v. Wilson*, 837 Fed. App'x 396, 399 (6th Cir. 2020); *see Dixon*, 2021 WL 1928538, at *2 (quoting *United States v. Barnes*, 49 F.3d 1144, 1149 (6th Cir. 1995)) (admitting prior drug distribution evidence from up to three years' prior to the charged conduct as *res gestae* because the "similarities between the Defendant's past conduct and the conduct underlying the instant drug distribution charge . . . evince 'a continuing pattern of illegal activity'").

*Visa fraud*. Evidence that Quadrant Magnets, Phil Pascoe, and Monica Pascoe conspired to engage in visa fraud with respect to an X-Mag employee who received ITAR-restricted data. Specifically, the United States intends to present FRE 404(b) evidence that a Chinese citizen and X-Mag employee, C.Q., was sponsored by Quadrant Magnetics for L1-A and L1-B visas, and in those visa applications Quadrant Magnetics, along with certain employees, conspired to falsify statements relating to C.Q.'s residential address, work location, and executive and management responsibilities. Phil and Monica Pascoe also participated in this conspiracy, and Phil Pascoe willfully made a material false statement to United States Citizenship and Immigration Services regarding C.Q.'s visa applications. This evidence will be used to demonstrate that defendants prepared for and intended to engage in a broad criminal conspiracy that included conspiring to commit multiple acts that served to defraud the United States government, including through

28

fraudulently submitting paperwork to obtain multiple visas for an employee of X-Mag in addition to the acts alleged in Count One.

In addition, this evidence will demonstrate that Quadrant Magnetics had a connection to X-Mag based on unlawful activity, both through the visa fraud and through exporting technical data to non-U.S. persons unlawfully, including an X-Mag employee who herself benefitted from visa fraud, and will demonstrate the absence of mistake or lack of accident of the transmission of technical data to X-Mag based on the fact that Quadrant Magnetics worked with X-Mag to benefit both companies without regard for United States law. This information is directly relevant to show the intertwined nature of the Quadrant Magnetics and X-Mag relationship, the broader criminal relationship between co-conspirators, and the criminal purpose of the organization. It also goes to motive, a commonly accepted reason for admission of FRE 404(b) evidence, *see, e.g., United States v. Whitt*, 752 Fed. App'x 300, 304 (6th Cir. 2018), because it will show that the owner of X-Mag and Quadrant Magnetics, Mr. Sun, had a longstanding business interest in profiting from the use of his Chinese company X-Mag to produce the magnets at issue and of using X-Mag and Quadrant Magnetics for both commercial gain and personal enrichment, including enriching friends such as C.Q.

## V.    **Known or Reasonably Anticipated Trial Problems**

Sealed exhibits. This case involves the illegal export of sensitive technical data subject to various regulatory restrictions, including the ITAR. As such, evidence presented at trial will also include ITAR-controlled information to which non-U.S. persons cannot have access, including through the Court's public docket. These materials have been produced in discovery pursuant to the Court's First Modified Agreed Protective Order, which also provides that ITAR-controlled materials shall be filed under seal. ECF 103. The parties will collaborate regarding any additional

protections that need to be put in place at trial to comply with the Court's Order and other rules and to prevent the unauthorized release of export-controlled materials.

Witness Logistics. The government intends to call dozens of witnesses, including expert witnesses who reviewed materials in this case regarding whether the technical data Defendants exported was on the USML. Given the volume of witnesses in this case, including those who will need to travel to Louisville by air; evidentiary challenges the government anticipates that Defendants will raise and which the Court will need to address before a witness testifies; and general scheduling complications that can arise in a case involving three individual defendants and a company; the timing of witness testimony is difficult to predict. The government of course will do its best to keep witnesses flowing, however, there might be disruptions based on schedules.

## VI.   **Proposed Jury Instructions**

The government filed contemporaneously herewith its proposed substantive and special jury instructions.

## VII.   **Proposed Voir Dire**

The government filed contemporaneously herewith its proposed voir dire questions.

## VIII.   **Proposed Statement of the Case**

The Defendants, Quadrant Magnetics, LLC ("Quadrant Magnetics"), Phil Pascoe, Scott Tubbs, and Monica Pascoe have been indicted by a Grand Jury in a Second Superseding Indictment which charges them with committing various offenses.

Count One charges all four Defendants with conspiring to do four things. One, to export technical data controlled by the International Traffic in Arms Regulations (known as "ITAR") from the United States to China without a license from the United States Department of State. Two, to smuggle technical data from the United States contrary to a law or regulation of the United

States. Three, to commit wire fraud by concealing from defense contractors and the United States where Quadrant Magnetics manufactured, smelted, and magnetized the magnets they sold to those defense contractors. And four, to make materially false statements and make and use false writings or documents knowing the same to contain materially false statements.

Counts Two through Four charge all four Defendants with executing and attempting to execute a scheme to defraud government contractor General Dynamics Ordnance and Tactical Systems and the United States Department of Defense by concealing and misrepresenting the country of origin of the manufacture, smelting, and magnetization of Quadrant Magnetics' magnets and, in furtherance of and to execute this scheme to defraud, caused the transmission of interstate wire communications.

Counts Five through Eight charge Defendants Quadrant Magnetics, Phil Pascoe, and Scott Tubbs with willful violations of the Arms Export Control Act (known as "AECA") and ITAR by exporting and attempting to export to China, ITAR-controlled technical data without a license or approval from the United States Department of State.

And finally, Count Nine charges Defendants Quadrant Magnetics, Phil Pascoe, and Scott Tubbs with unlawful smuggling from the United States of technical data for end use in a defense article, namely a multi-spectral targeting system, contrary to the AECA and ITAR.

The Defendants have all pleaded not guilty to all of the charges.

## IX.   **Exhibit List**

The government filed contemporaneously herewith its initial exhibit list.

## X.   **Proposed Witness List**

The government has submitted via email to chambers_judgehale@kywd.uscourts.gov for the Court's *in camera* review a proposed witness list with a brief summary of the expected

testimony of each witness and an estimate as to the amount of time that will be required to present

the testimony of each witness.


Respectfully submitted,

MICHAEL A. BENNETT                JENNIFER KENNEDY GELLIE
United States Attorney            Executive Deputy Chief
Western District of Kentucky      Counterintelligence and Export Control Section
                                  National Security Division


 s/ *Joshua D. Judd*              s/ *Alex Wharton*
Joshua D. Judd                    Alex Wharton
Christopher C. Tieke              Leslie C. Esbrook
Assistant U.S. Attorneys          Trial Attorney
717 W. Broadway                   950 Pennsylvania Ave., NW
Louisville, KY 40202              Washington, DC 20530
(502) 582-5911                    (202) 514-4523
Joshua.judd@usdoj.gov             alexander.wharton@usdoj.gov
Christopher.tieke@usdoj.gov       leslie.esbrook@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on February 26, 2024, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the counsel for defendants.

s/Alex Wharton
Trial Attorney