UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| United States of America, | |
| v. | Case No. 3:22-CR-88 DJH |
| Quadrant Magnetics, LLC, et al. | |

# EXPERT REBUTTAL REPORT OF THOMAS J. MCCARTHY

For Defendants Quadrant Magnetics, LLC, Monica Pascoe, Phil Pascoe, and Scott Tubbs

**INTRODUCTION**

My name is Thomas J. McCarthy. I graduated from the University of Michigan in 1991 with a B.A. in Economics and the University of Virginia School of Law in 1998, where I received a J.D. I am a partner at the law firm of Akin Gump Strauss Hauer & Feld LLP ("Akin") in Washington, D.C. I have practiced international trade law since 1998 and have extensive experience advising clients on the U.S. International Traffic in Arms Regulations ("ITAR").

**ASSIGNMENT**

I and Akin have been requested by Quadrant Magnetics, LLC (Quadrant), Monica Pascoe, Phil Pascoe, and Scott Tubbs to review and provide my opinion on the December 4, 2023 expert reports of Mr. Alex Douville and Mr. Steven Burton submitted by the government on the application of the ITAR to certain drawings sent by Quadrant Magnetics, LLC (the drawings of the QM Magnets) to an overseas supplier in reliance on the expert opinions of Stanley R. Trout, Ph.D.

**SUMMARY OF OPINIONS**

Here is a summary of my opinions. First, the government's expert reports do not apply the correct legal test under the ITAR for determining whether the drawings of the QM Magnets are covered by the USML. To be identified on the USML, the drawings must be directly related to items that are enumerated in USML Categories XII or XX or identified in a "catch all" entry in those categories. Magnets are not enumerated in Categories XII or XX. As a consequence, to be on the USML, the QM Magnets covered by the drawings must be identified in a "catch all" entry, such as USML paragraph XII(e) or XX(c).

Second, even if the government's expert reports were to identify the correct legal test, the government's expert reports do not describe the facts required to support their conclusions.

Third, assuming that Dr. Trout's opinions are correct, the drawings of the QM Magnets are not controlled under the USML, so no ITAR license is required prior to export from the United States. Specifically, based on Dr. Trout's opinions, the QM Magnets are not "specially designed" and, therefore, are not identified on the USML. It follows that the drawings are not identified on the USML.

**QUALIFICATIONS**

I graduated from the University of Michigan in 1991 and received a Bachelor of Arts degree in Economics. I was a U.S. naval officer from 1991 to 1995, where I attained the rank of Lieutenant and was awarded the Navy Commendation Medal and Navy Achievement Medal. I attended the University of Virginia beginning in 1995 and received a Juris Doctor degree upon graduation in 1998.

I began work as an attorney at Akin Gump Strauss Hauer & Feld LLP ("Akin") in 1998. I became a partner in 2008 and currently lead the Regulatory practice group. In my twenty-five years of legal practice since graduation, I have represented U.S. and foreign companies in the aerospace, technology, energy, and manufacturing sectors. I have conducted hundreds of

internal investigations under the U.S. International Traffic in Arms Regulations ("ITAR") and drafted related voluntary disclosures to the Department of State Directorate of Defense Trade Controls ("DDTC"). I have drafted numerous ITAR commodity jurisdiction requests and conducted many export jurisdiction and classification reviews. I have assisted companies in conducting ITAR assessments and developing, drafting, and implementing ITAR compliance policies and procedures, including export jurisdiction and classification procedures. I have represented several U.S. companies under ITAR Consent Agreements with DDTC. I have been a featured speaker at export control conferences, including government-sponsored conferences, in which I have made presentations on U.S. export control jurisdiction, classification, authorizations, and enforcement to U.S. government officials and private sector export compliance personnel. I have authored numerous articles, alerts, and other publications on export controls and related topics, including a chapter in the 2022 book Outer Space Law on international trade law and policy.

My publications for the last ten years are included with this report.

**PREVIOUS EXPERT TESTIMONY**

I have not testified as an expert within the previous four years.

**DOCUMENTS REVIEWED**

I reviewed the following documents in preparing my opinions:

- The superseding indictment in *United States v. Quadrant Magnetics, LLC, et al.*, No. 3:22-CR-88-DJH (W.D. Ky.)

- The December 4, 2023 and December 11, 2023 expert reports of Stanley R. Trout, PhD

- The Code of Federal Regulations, Title 22, Subpart M, Parts 120 and 121, each year from 2016 to 2018

- The Commodity Jurisdiction Determinations for DDTC Cases CJ0003925, CJ0003927 (Revised), CJ0003928, CJ0512-17, CJ000416, CJ0004018, CJ0004606, CJ0004681, and CJ0004702 (the "CJ Determinations")

- The following technical drawings (the "drawings of the QM Magnets"):

    o 3730D-1012 (General Dynamics)
    o 100101 (Vernitron)
    o 10500B-1022 (Axsys)
    o 6000U-1002 (General Dynamics)
    o 1500P-1002 (Vernitron)

- The expert reports of Mr. Alex Douville and Mr. Steven Burton dated December 4, 2023.

3

## BACKGROUND

Section 38 of the Arms Export Control Act ("AECA"), 22 U.S.C. 2778, as amended, authorizes the President to control export and import of defense articles and defense services. The President, through the U.S. Department of State, promulgated the ITAR, which is contained in 22 C.F.R. Parts 120–130. The ITAR contains a list of items known as the USML. The articles, services, and related technical data designated as defense articles or defense services under AECA constitute the USML.

The ITAR is not a static set of rules. Rather, it has changed frequently over the past ten years. This includes numerous changes to the items that are identified on the USML.

USML categories are organized by paragraphs and subparagraphs identified alphanumerically. They usually start by enumerating or otherwise describing end-items, followed by major systems and equipment; parts, components, accessories and attachments; and technical data and defense services directly related to the defense articles of that USML category. Articles are controlled on the USML because they are either enumerated in a category or described in a catch-all paragraph that incorporates specially designed as a control parameter.

With the exception of certain end-items (e.g., the "B-1" bomber), the U.S. State Department does not identify specific individual items by their commercial name on the USML. Rather, in the case of "enumerated" items, it uses descriptions of "control parameters" (i.e., technical characteristics) to identify the items controlled in a particular entry. If an item meets the control parameters in an enumerated entry, it is controlled on the USML.

Even if an item does not meet the control parameters of any enumerated entries on the USML, it still may be controlled if it is "specially designed" for a defense article as described in various entries in the USML. Thus, for example, USML entry XII(e)(1) controls "parts and components specially designed for articles described in paragraph (a)(1) or (a)(5)" of USML Category XII.

The "specially designed" rule was implemented in April 2013 and based on a "catch" and "release" concept for determining whether unenumerated lower-level parts, components, accessories, attachments, or software are covered by the USML. The intent was to create a broad "catch" for items that are "used in or with" defense articles, but to allow for certain "releases" from control if the criteria of the releases are met. There five releases identified in paragraphs (b)(1) through (b)(5) of 22 C.F.R. 120.41.

Paragraph (b)(3) of 22 C.F.R. 120.41 allows for a part or component that is used in or with a defense article to be released from control under the USML if it:

> Has the same function, performance capabilities, and the same or equivalent form and fit as a commodity or software used in or with a commodity that: (i) is or was in production (i.e., not in development); and (ii) is not enumerated on the USML.

The ITAR defines function, performance capabilities, form, and fit, as discussed further below.

Technical data may be identified on the USML if it is "directly related" to a defense article, such as a specially designed part listed in USML paragraph XII or XX(c). Thus, technical data

directly related to an item controlled under USML paragraph XII(e) or XX(c) would be controlled under USML paragraphs XII(f) or XX(d), respectively.

U.S. persons and companies are generally responsible for self-determining whether their items are covered by the USML. The commodity jurisdiction ("CJ") procedure is used with the U.S. Government if doubt exists as to whether an item is covered by the USML. A CJ determination is only as good as the information sent to, or gathered by, the U.S. State Department, which is a reason that the U.S. State Department takes care to provide detailed instructions, require substantial amounts of information, and includes a certification requiring the accuracy and completeness of the information when CJ requests are submitted by the public.

**OPINION**

### I. The Government's Expert Reports

The government's expert reports do not apply the correct legal test or describe all relevant facts in analyzing whether the drawings of the QM Magnets are covered by the USML. First, Mr. Douville states that "magnets that go into submersible submarines or the F-18 fighter jet . . . are described on the USML." This is an incorrect description of the legal test, as described below. Magnets that go into submersible submarines or the F-18 fighter jet are only covered by the USML if they are "specially designed" for a defense article. Mr. Douville also states that "related technical data" to the magnets would be also described on the USML. This is incorrect: only technical data that is "directly related" to a USML magnet – not merely "related" – is covered by the USML.

Mr. Douville stated that he reviewed the "final CJ determination letter, which was provided to the Defense." Based on his description of his review, it appears that he did not review the DDTC record or underlying facts analyzed by DDTC in making the CJ Determinations. Mr. Douville also was not involved in the CJ Determinations and is not part of the DDTC office that renders CJ rulings. None of the CJ Determination letters provide any information regarding the legal analysis or facts supporting such analysis. Therefore, the CJ Determination letters are not useful in determining the correctness of DDTC's conclusions.

Mr. Douville also states that "based on his independent review of defense articles at issue, he agrees with the DDTC's assessment and rationales made therein." However, as discussed below, it is insufficient to merely review the defense articles to determine whether they are covered by the USML. To determine whether the QM Magnets are "specially designed" for a defense article, the government must also analyze whether any "releases" to the legal test apply, which includes gathering information beyond just the magnets themselves (e.g., information regarding comparator magnets). There is no indication in Mr. Douville's report that the government undertook that review.

Second, the legal analysis in Mr. Burton's expert report was also incorrect. Mr. Burton's report state that he "confirms that the parts listed above are specially designed for ITAR-controlled defense articles and that the associated manufacturing drawings are ITAR-controlled technical data." He then explains his reasoning: "It should be noted that these magnets are not

5

commercial-off-the-shelf (COTS). No existing COTS magnets met DoD requirements so new magnets were specially designed to meet the military requirements."

Under the law, it is irrelevant whether the magnets are, or are not, "commercial-off-the-shelf." As discussed below, the question in determining whether the magnets are covered by the USML is whether (1) the magnets are "caught" by the specially designed test and (2) whether they are "released" under that test. Thus, for example, a magnet that is designed for a commercial aircraft, or dental or medical equipment, could provide the requisite basis for a "release" from specially designed when compared to the QM Drawings, even though the commercial aircraft, or dental or medical equipment, magnets are not "COTS."

The example in Mr. Burton's report related to PN FP24018P1 underscores the error in the analysis. He states that the part "was designed" for the GCU in the F/A-18 E/F Super Hornet. Without explaining the legal reasoning or providing facts supporting his conclusions, he states that the part was "specially designed" for the GCU. Importantly, he fails to address whether any of the specially designed releases apply to the part.

## II.      Analysis of Dr. Trout's Opinions

I assume the correctness of Dr. Trout's expert opinions. I am not an expert on magnet performance capabilities or the magnet industry or market. Assuming the correctness of Dr. Trout's expert opinions, my opinion is that each of the five drawings of the QM Magnets identified and described in Dr. Trout's December 4, 2023 report fall within the 22 C.F.R. § 120.41(b)(3) release and is not controlled by the USML, so no ITAR license is required prior to export from the United States.

The CJ determinations for the drawings for the five QM Magnets (CJ00003925, CJ00003927, and CJ0003928) state that the drawings are classified under USML entries XII(f) and XX(d), which means that the U.S. State Department has concluded that these drawings are "directly related" to defense articles in USML Categories XII and XX. The magnets described in the QM Drawings appear to be "parts" as defined under the ITAR. A "part" is any single unassembled element of a major or minor component, accessory, or attachment which is not normally subject to disassembly without the destruction or the impairment of designed use.

Because magnets are not enumerated in USML Categories XII and XX, the only possible basis for the three CJ determinations for the five QM Magnets is that the QM Magnets in the drawings are "specially designed" for a defense article under USML paragraphs XII(e) and XX(c). To be controlled under a "specially designed" entry in the USML, the magnets must be "caught" and not be "released." I have not been provided evidence that these items are "caught" under (a)(1) or (a)(2) of the definition beyond the assertions in the CJ Determinations and the government's expert reports, but I assume for purposes of this opinion that there is evidence that these magnets are "used in or with" a defense article and, therefore, caught under the first prong of the specially designed test.

Dr. Trout compared the drawings of the QM Magnets with other magnets ("comparator magnets") that he stated are or were in production. He also stated that the comparator magnets are purchased and used in a wide a variety of commercial applications, such as medical

6

equipment, motors and generators, sensors, aerospace, clean energy, and consumer electronics. I assume for purposes of this opinion that he is correct and the comparator magnets are or were in production and used in or with a commodity that is not enumerated on the USML.

Dr. Trout provided information that addresses the four prongs of the "specially designed" (b)(3) release. Specifically, to be released under (b)(3), the comparator magnets must have the same function and performance capabilities, and the same or equivalent form and fit, as the QM Magnets.

- o The (b)(3) release requires the part to have the same function as the comparator part. The function of a commodity is the action or actions it is designed to perform.

    - In his December 4, 2023 report, Dr. Trout opined that the QM Magnets have the same function as their comparator parts. Specifically, he stated that both the QM Magnets and the comparators have the intended action of acting as a magnet with the qualities inherent to a rare-earth permanent magnet of that composition and possessing those particular properties (including comparatively higher certain principal properties and samarium–cobalt magnets' ability to operate well at higher temperatures). Thus, assuming he is correct, this (b)(3) requirement is satisfied.

- o The (b)(3) release requires the part to have the same performance capabilities as the comparator part. Performance capability is the measure of a commodity's effectiveness to perform a designated function in a given environment (e.g., measure in terms of speed, durability, reliability, pressure, accuracy, efficiency).

    - In his December 4, 2023 report, Dr. Trout opined that the QM Magnets have the same performance capabilities as their comparator parts. Specifically, Dr. Trout described the three relevant principal properties of rare-earth permanent magnets such as the QM Magnets. He explained how the QM Magnets and the comparator magnets have the same performance characteristics in those three relevant principal properties and that any differences were within industry tolerances for variation and immaterial from a performance standpoint. Thus, assuming he is correct, this (b)(3) requirement is satisfied.

- o The (b)(3) release requires the part to have the same or equivalent form and fit as the comparator part. The form of a commodity is defined by its configuration (including the geometrically measured configuration), material, and material properties that uniquely characterize it. The fit of a commodity is defined by its ability physically interface or connect with or become an integral part of another commodity. For purposes of the release, "equivalent" means its form has been modified solely for fit purposes.

    - In his December 4, 2023 report, Dr. Trout opined that the material of the QM Magnets and their comparators are the same. Dr. Trout stated that

> the size and shape of the QM Magnets is not relevant to the function and performance capabilities as he described them. He also stated that it was his opinion that any differences in size and shape would be done to allow the magnet to be incorporated or integrated into the next higher-level component, system, or equipment. Thus, assuming he is correct, this (b)(3) requirement is satisfied.

In his December 11, 2023 rebuttal report, Dr. Trout stated that it is his opinion that additional commercial comparators exist for the five QM Magnets and the other seven magnets identified by the government in Mr. Burton's expert report. I reserve the right to assess Dr. Trout's analysis of any of those additional magnets as he reviews them. If the QM Magnets, and other magnets identified by the government, are not covered by the USML, then the drawings directly related to those magnets are not covered by the USML.


Thomas J. McCarthy, J.D.

*[signature]*

December 11, 2023

8



1

[mailto:tmccarthy@akingump.com](mailto:tmccarthy@akingump.com)

Washington, D.C.

## Publications

- "Akin Space Law, Regulation and Policy Update," 12.01.23 (with Caroline Shrock (Policy Specialist)).
- "Akin Space Law, Regulation and Policy Update," 11.17.23 (with Caroline Shrock (Policy Specialist)).
- "Akin International Space Law and Policy Update," November 2, 2023.
- "Space Law, Regulation and Policy Update," October 20, 2023.
- "BIS Changes EAR Regarding the Provision of Keys to Unlock Object Code Software," September 20, 2023.
- "New BIS Enforcement Policy Further Encourages Disclosures and Whistleblowers," Akin International Trade Alert, 05.01.23.
- "Federal Agency Settlements with Wells Fargo Illustrate Sanctions Risks Involving IT Systems," Akin International Trade Alert, April 14, 2023.
- "DOJ Focuses on Corporate Crime Involving Sanctions Evasion, Export Controls Violations and Similar Economic Crimes," 03.07.23.
- "BIS Imposes New Controls to Limit the Development and Production of Advanced Computing and Semiconductor Capabilities in China," Akin International Trade Alert, October 27, 2022.
- "Commerce Department Publishes Updated Guidance on Antiboycott Enforcement Policies," Akin International Trade Alert, October 19, 2022.
- "BIS Announces Significant Changes to How It Administers Unverified and Entity Lists," Akin International Trade Alert, October 11, 2022.
- "U.S. Government Imposes Expansive, Novel and Plurilateral Export Controls Against Russia and Belarus," Akin International Trade Alert, March, 8, 2022.
- "US Government Clarifies, Reorganizes and Renames Descriptions of How Foreign-Produced Items Outside the United States Are Subject to US Export Controls as the US Contemplates New Restrictions on Russia," Akin International Trade Alert, February 9, 2022.

© 2023 Akin Gump Strauss Hauer & Feld LLP



2

- "[Ukraine-Russia Crisis: Possible New Sanctions and Export Controls on Russia and Potential Implications for US and Non-US Companies](#)," Akin International Trade Alert, January 28, 2022.
- "[Licenses for Exports to Russia Related to Commercial Space Launches Must be Granted by September 1, 2021](#)," Akin International Trade Alert, June 15, 2021.
- "[Biden Administration Revamps Sanctions Program Targeting Publicly Traded Securities of Designated Chinese Military Companies](#)," Akin International Trade Alert, June 7, 2021.
- "[Treasury Removes UAE from List of Countries Requiring Cooperation with an International Boycott](#)," Akin International Trade Alert, April 15,2021.
- "[Biden Administration Reviewing Comments on Interim Final ICTS Rule](#)," Akin International Trade Alert, February 5, 2021.
- "[New Designations of Chinese Entities Impose Varying Restrictions](#)," Akin International Trade Alert, January 20, 2021.
- "[State Department Extends Temporary Remote Work Provisions and Announces Upcoming Notice and Solicitation of Comments for Permanent ITAR Revisions Relating to Remote Work](#)," Akin International Trade Alert, December 16, 2020.
- "[New China National Security Law](#)," Akin Asia Alert, May 28, 2020.
- "[Commerce Department Extends Export Controls over Foreign-Made Items in Huawei's Contract Manufacturing Supply Chain](#)," Akin International Trade Alert, May 19, 2020.
- "[State Department Responds to COVID-19 by Allowing Certain Third Country Remote Work, Extending Registrations and Licenses, and Reducing Registration Fees to Mitigate Effects of COVID-19 on Defense Industrial Base](#)," Akin International Trade Alert, May 15, 2020.
- "[BIS Announces the Elimination of License Exception CIV, Expanded Licensing Requirements on Exports to Chinese, Russian, and Venezuelan Military End Users and End Uses, and a Proposed Rule to Narrow License Exception APR](#)," Akin International Trade Alert, April 30, 2020.
- "[DHS Eases Immigration Rules Due to COVID-19 Pandemic](#)," Akin Immigration Alert, April 20, 2020.
- "[DDTC Publishes New FAQs on Activities by Non-U.S. Persons After the Expiration of an Agreement](#)," Akin International Trade Alert, April 13, 2020.
- "[United States Suspends Visa Services Abroad, Cancels ESTA Entry Authorizations for European Visitors and Closes USCIS Field Offices](#)," Akin International Trade Alert, March 18, 2020.
- "[International Trade Impacts of The Coronavirus: Update On Government And Industry Actions And Key Considerations For Trade Compliance Professionals](#)," Akin International Trade Alert, March 9, 2020.

© 2023 Akin Gump Strauss Hauer & Feld LLP                                                                                                                                             akingump.com



3

- "DDTC Publishes New FAQs on Defense Services Performed by U.S. Persons Abroad and How to Get Them Approved via GC," Akin International Trade Alert, January 8, 2020.

- "Agencies Release Interim Final Rule Implementing First Phase of 2019 NDAA Section 889," Akin Regulatory Alert, August 9, 2019.

- "Agencies Call for Comments on NDAA 2019 Section 889," Akin Client Alert, June 4, 2019.

- "Reminder: Commerce Department Prohibitions Pertaining to Huawei Can Apply to Transactions by Non-U.S. Companies," Akin International Trade Alert, May 29, 2019.

- "Commerce Department Imposes Controls on Five Types of 'Emerging Technologies' Agreed to by Multilateral Regime Allies," Akin International Trade Alert, May 28, 2019.

- "Commerce Department Issues Temporary General License Authorizing Certain Transactions with Huawei and its Designated Affiliates," Akin International Trade Alert, May 21, 2019.

- "Commerce Adds Huawei, Its Non-US Affiliates Worldwide and Others to the Entity List," Akin International Trade Alert, May 17, 2019.

- "President Trump Declares National Emergency to Secure the Information and Communications Technology and Services Supply Chain," Akin International Trade Alert, May 16, 2019.

- "State and Commerce Open Public Comment Period on Rocket, Missile, Launch Vehicle, Spacecraft and Satellite Export Controls," Akin International Trade Alert, March 12, 2019.

- "CFIUS Pilot Program Expands Jurisdiction and Imposes Mandatory Reporting on Certain Industries," Akin International Trade Alert, October 11, 2018.

- "The Export Control Reform Act and Possible New Controls on Emerging and Foundational Technologies," Akin International Trade Alert, September 12, 2018.

- "White Paper: Recent Department of Defense Guidance on Cybersecurity Requirements and Related Export Control Issues," May 31, 2018.

- "Challenging Executive Actions Under the International Emergency Economic Powers Act," The National Law Journal, May 31, 2018.

- "International trade aspects of outer space activities," Outer Space Law: Legal Policy and Practice, November 2, 2017.

- "Census Begins Review of Routed Export Reporting Requirement," Akin International Trade Alert, October 12, 2017.

- "CFIUS Effectively Blocks German Acquisition of U.S. Technology Company," Akin International Trade Alert, March 7, 2017.

- "Executive Order Suspends the Admission of Certain Immigrants and Nonimmigrants from Seven Countries and the U.S. Refugee Admissions Program," Akin Client Alert, January 30, 2017.



- "DDTC and BIS Request Comments on Additional Proposals for Category XII and Infrared Detection Items," Akin International Trade Alert, January 24, 2017.

- "New Requirements for Exports and Reexports to and from Hong Kong: BIS Requires Exporters and Reexporters to Confirm Compliance with Hong Kong Import and Export Controls," Akin International Trade Alert, January 23, 2017.

- "Obama Administration Takes Action To Terminate Sudan Sanctions Program," Akin International Trade Alert, January 20, 2017.

- "U.S.-India Partnership: BIS Establishes Licensing Policy of General Approval, Expands Validated End-User Program," Akin International Trade Alert, January 19, 2017.

- "DoD's Proposed Rule Would Create Additional Risk and Burdens for Contractors Handling Export-Controlled Information," Akin Government Contracts and International Trade Alert, November 4, 2016.

- "OFAC Guidance on U.S. Dollar Transactions Involving Iran," Akin International Trade Alert, October 11, 2016.

- "Is Chinese Investment in the U.S. Film and Entertainment Industry the Next Area of CFIUS Scrutiny?," Akin Entertainment Alert, September 29, 2016.

- "Would the International Emergency Economic Powers Act Help Trump?," The National Law Journal, August 22, 2016.

- "Cleared for Takeoff: OFAC's General License J Allows Boeing, Airbus and Other Aircraft to Land in Iran," Akin International Trade Alert, August 2, 2016.

- "Export Control Reform Offers Revisions to Key Terms, and DDTC Increases Penalty Authority; More Work Remains (Part 1)," Akin International Trade Alert, June 10, 2016.

- "DOJ Civil Rights Division Underscores Risk of Discrimination Claims When Requesting Information from Applicants and Employees for Export Compliance," Akin International Trade Alert, May 2, 2016.

- "The Panama Papers: Managing Corporate Risk and Uncertainty," Akin Global Investigations and Compliance Alert, April 19, 2016.

- "OFAC Authorizes Certain Commercial Passenger Aircraft Transactions with Iran," Akin International Trade Alert, April 1, 2016.

- "DOE Overhauls Export Controls for Nuclear Technology," Akin International Trade Alert, February 27, 2015.

- "Court Orders CFIUS to Increase Transparency but Rejects Review of Presidential Determination," Akin International Trade Alert, July 21, 2014.

- "Iran Sanctions Relief Offers Limited Opportunities and Substantial Risks," Akin International Trade Alert, January 28, 2014.



5

- "OFAC Issues General License Authorizing Exports and Re-Exports to Iran of Personal Communications Products and Related Internet, Satellite and Telecommunications Services," Akin International Trade Alert, June 18, 2013.

- "Export Control Reform Is Here: Aerospace Industry Is First, Others To Follow," The Metropolitan Corporate Counsel, June 2013.

- "Export Control Reform Is Here: Aerospace Industry is First, Others to Follow," Akin International Trade Alert, April 19, 2013.

- "United States Passes New Iran Sanctions Legislation," Akin International Trade Alert, January 3, 2013.

© 2023 Akin Gump Strauss Hauer & Feld LLP

akingump.com