UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

**United States of America**

v.

**Quadrant Magnetics LLC et al.**

No. 3:22-CR-88-DJH

## DEFENDANTS' MOTION TO DISMISS DUE TO GOVERNMENT'S PUBLIC RELEASE OF ALLEGED ITAR INFORMATION

One week ago federal prosecutors from the National Security Division and the Western District of Kentucky (hereinafter, "prosecutors") intentionally released to the public technical data, contained in the unredacted expert report of Dr. Stanley Trout, for five drawings of magnets manufactured and sold by Quadrant Magnetics LLC.[1] This technical data serves as the foundation for the government's 6-year investigation and 9-count Second Superseding Indictment (indictment), which alleges that Defendants violated the International Traffic in Arms Regulations (ITAR) by exporting the same technical data to a manufacturing facility in China without a license. The government's intentional release of this technical data by filing it on the court's public case-management system, PACER, immediately removed the technical data from the United States Munitions List (USML). *See* 22 C.F.R. § 120.33(b). Also, the government's careless handling of this information, and its acknowledgment that the technical data is only "allegedly potentially controlled ITAR-controlled information," creates insurmountable doubt as to whether the released information from the 5 drawings was ever properly designated as ITAR-controlled. Accordingly, the ITAR-related counts of the indictment are no longer viable and should be dismissed.[2]

---

[1] The technical data was included in the following drawings: (1) 3730D-1012 (General Dynamics); (2) 100101 (Vernitron); (3) 10500B-1022 (Axsys); (4) 6000U-1002 (General Dynamics) and (5) 1500P-1002 (Vernitron).

[2] The Court should dismiss the ITAR-related allegations and overt acts contained in Count One (Conspiracy), Counts Two, Three and Four (Wire Fraud as it relates to ITAR); Counts Five, Six, Seven, and Eight (ITAR substantive counts); and Count Nine (Smuggling contrary to ITAR).

## BACKGROUND

On March 4, the government filed its motion in limine to exclude the testimony of Defendants' witness Thomas J. McCarthy on the Court's public docket on PACER. (D.N. 134.) The government attached several exhibits to that motion, including the unredacted report of Defendants' expert witness Dr. Trout. (*See* D.N. 134-3.)[3] Defendants had submitted Dr. Trout's report to the government on December 4, 2023. In his report, Dr. Trout opined on the qualities of certain commercial magnets in relation to magnets described in five technical drawings, which Defendants are charged with unlawfully exporting in this case. (*See* D.N. 134-3, PageID.1843; *see generally* D.N. 73.) Dr. Trout evaluated the "principal magnet properties" of each magnet, which are located on the five technical drawings for each magnet. (*See* D.N. 134-3, PageID.1846.) Dr. Trout's report listed these principal properties from the 5 drawings in his expert report. (*See* D.N. 134-3, PageID.1847–49.) As explained below, the government claims that this information is ITAR-controlled technical data.

On March 8, after the technical data had been publicly released by the government and accessible to the public for an entire week, the government, in a regular motion filed after the Court had closed on Friday evening, moved to seal the report. (D.N. 146.) The technical data for the five magnets remains freely accessible to the public, including foreign persons, at the time of this filing.

By including such technical data in a public filing on PACER, the government has disclosed the very information that it claims is subject to ITAR protection on pain of criminal penalty. This motion addresses the consequences of the government's public disclosure of the same technical data it is prosecuting Defendants for allegedly disclosing.

---

[3] As the government noted in its motion to seal, Defendants previously filed a redacted version of Dr. Trout's report because his report includes the same technical data and specifications, the disclosure of which forms the basis of the criminal ITAR charges against Defendants.

## ARGUMENT & AUTHORITIES

This case arises from the government's belief that Defendants unlawfully shared technical data for magnet part numbers in violation of the ITAR. But as of March 4, the government has now publicly shared much of that very same technical data. This public sharing removes the technical data from the USML and ITAR control, meaning that as of March 4, the government can no longer claim that the technical data is ITAR-controlled.[4] Indeed, the government's own conduct in releasing this technical data (and its lackadaisical response addressing the disclosure by filing a non-emergency motion to seal nearly a week after the public release) strongly supports Defendants' position[5] that the technical data was *never* ITAR-controlled. Because the government's own conduct demonstrates that the technical data that Defendants are charged with exporting is not, and never has been, subject to ITAR, the ITAR-related counts and allegations of the indictment should be dismissed.

1. **The information the government publicly disclosed is the same information Defendants are being prosecuted for allegedly disclosing.**

Under the ITAR, technical data means "[i]nformation . . . which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance, or modification of defense articles. This includes information in the form of blueprints, drawings, photographs, plans, instructions, or documentation." 22 C.F.R. § 120.33(a)(1). As the government's own proffered expert Alex Douville highlights, "technical data does not have a limit on the form it takes. Such information can be disclosed and thus exported by . . . any method that

---

[4] To be very clear, Defendants' position is that none of the so-called technical data contained in the drawings for the company's magnets was ever actually on the USML because of the abundance of commercial equivalent magnets throughout the world. Although we understand the government disagrees with this position, there should be no disagreement that once the government released the technical data for the 5 magnets on PACER, it no longer is on the USML and subject to ITAR.

[5] Defendants incorporate by reference their argument, as set forth in several of their pretrial motions, that the drawings for the magnet parts listed in the indictment are not ITAR-controlled because the government cannot prove beyond a reasonable doubt that a commercial equivalent did not exist for these magnets.

allows a foreign person to access, view, or possess it. . . . In recent decades, technical data has been most commonly presented in electronic form." (D.N. 144-1, PageID.2002 (citations omitted).)

The government disclosed this "technical data" when it published an unredacted version of Dr. Trout's expert report on PACER. (*See* D.N. 134-3, PageID.1847–49.)[6] Dr. Trout's expert report evaluated technical data for drawings of five magnet part numbers listed in the indictment, which correspond to all counts alleged in the indictment: 3730D-1012 (Count 1); 100101 (Counts 1, 8) 10500B-1022 (Counts 1, 6); 6000U-1002 (Counts 1, 2, 3, 4, 7, 9); and 1500P-1002 (Counts 1, 5). (*See* D.N. 134-3, PageID.1847; *see generally* D.N. 73.)[7] Dr. Trout evaluated these drawings by reviewing what the drawings listed as the relevant magnets' composition and other "principal properties" pertinent to at a minimum the "design, development, production, [and] manufacture," of those magnets. (D.N. 134-3, PageID.1847); 22 C.F.R. § 120.33(a)(1). He described this information as "principal properties," and they are measured on a "per-cubic-centimeter basis," meaning they "do not change with the size or shape of a magnet." (D.N. 134-3, PageID.1847). So although Dr. Trout's report did not include the size, shape, or actual drawings of the magnets, the report still contains technical data necessary to the "design, development, production, [or] manufacture" of the magnets the government claims are ITAR-controlled. 22 C.F.R. § 120.33(a)(1). The dimensions of a magnet are not sufficient for its design, development, production, or manufacture. It is necessary to have the magnets' principal properties related to their magnetic strength, resistance to demagnetization, molecular composition, and so on. Otherwise all that is being requested is an empty rectangle.

---

[6] Defendants, out of an abundance of caution, filed with the Court a redacted version of Dr. Trout's report. (*See generally* D.N. 92; D.N. 93.) The government clearly did not share the same concern regarding this allegedly ITAR-controlled technical data.

[7] The only magnets listed in the indictment that are not evaluated in Dr. Trout's report are 36B423718P1 and FP24018, which Defendants are *not* charged with unlawfully exporting. (*See* D.N. 73, PageID.460–61.)

The government's expert, Dr. McCall, would have to agree on this limited but all-important point for our purposes here. He was asked to test Quadrant's magnets in December 2021: "the request was to compare empirical data with specified acceptance parameters indicative of reliable magnet composition and performance." (D.N. 93, Ex. 3 at Dec. 2021 report, page 1).) He wrote "[t]he magnetic properties of the selected subsamples were determined using a" special machine. (*Id.*, page 3). He then tested the magnets and reported on their properties, including their composition and their *Br*, *Hc*, and *Hci* (*see id.*, page 5), some of the same properties disclosed in Dr. Trout's now-public report. Dr. McCall's June 2023 report is similar. He was asked again to "compare empirical data with specified acceptance parameters indicative of reliable magnet composition and performance." (*Id.* at June 2023 report, page 1.) He then tested the magnets and reported on their properties, including their composition and (depending on the sample) their *Br*, *Hc*, *Hci*, and *BH(max)*. (*See id.*, pages 5–6.) Again, these are the same properties disclosed in Dr. Trout's now-public report. And Dr. McCall's supplemental report makes it even clearer: "Details of the magnet shape as well as the intrinsic magnetic properties are important. The intrinsic magnetic properties are measurable and *necessary to define the requirements for the magnet . . . .*" (D.N. 143-3, PageID.1954 (emphasis added).) Accordingly, the government publicly disclosed technical data by filing an unredacted version of Dr. Trout's report on PACER. As explained below, that action placed the technical data in the public domain, and the government can no longer argue the technical data is subject to ITAR control.

**2. The government placed the pertinent technical data in the public domain when it filed an unredacted version of Dr. Trout's report on PACER, so it is not ITAR-controlled.**

Information no longer qualifies as technical data subject to ITAR control once it is "in the public domain." 22 C.F.R. § 120.33(b); *see also Stagg, P.C. v. U.S. Dep't of State*, 983 F.3d 589, 603 (2d Cir. 2020) ("[The] information is in the 'public domain,' and therefore is not subject to

the ITAR.") (quoting 22 C.F.R. § 125.1(a)). Public domain "means information which is published and which is generally accessible or available to the public" through several enumerated fora. 22 C.F.R. § 120.34(a). This includes, most relevant here, (i) "subscriptions which are available without restriction to any individual who desires to obtain or purchase the published information"; (ii) "libraries open to the public or from which the public can obtain documents"; and (iii) "public release (*i.e.*, unlimited distribution) in any form (e.g., not necessarily in published form) after approval by the cognizant U.S. government department or agency." 22 C.F.R. § 120.34(a)(2), (4), (7); *see also* 22 C.F.R. 125.4(b)(13) ("The following exports are exempt from the licensing requirements": "Technical data approved for public release . . . by the cognizant U.S. Government department or agency. This exemption is applicable to information approved . . . for public release in any form. It does not require that the information be published in order to qualify for the exemption.").

Moreover, "[n]owhere do the ITAR state or imply that prior government authorization is required for information to qualify as 'in the public domain.' To the contrary, [§ 120.34] states unambiguously that any information which is 'published' and 'generally accessible or available' through one of the listed means is in the public domain, and therefore is not subject to the ITAR's licensing requirement." *Stagg*, 983 F.3d at 602.

Here, the government placed the above-discussed technical data in the public domain by publishing the technical data on PACER. The government's publishing of the technical data on this widely used, publicly and generally accessible website—which anyone in the world can view or access at any time—put the information in the "public domain" by way of any one or all of the three above-mentioned methods.

6

For one, PACER constitutes a "subscription" available "without restriction to any individual who desires to obtain or purchase the public information." 22 C.F.R. § 120.34(a)(2). The ITAR does not define "subscription," but the dictionary definition is "an arrangement for . . . receiving, or making use of something of a continuing or period nature . . . such as for a certain period of access to or use of something (such as an online service)."[8] The very name and functions of PACER puts it squarely within this definition. PACER, which stands for "Public Access to Court Electronic Records," is, as its name explicitly states, a publicly accessible court website.[9] PACER "provides electronic public access to federal court records" and "the public with *instantaneous access* to more than 1 billion documents filed at all federal courts."[10] All any person must do to subscribe to PACER is register for a PACER account.[11] The person subscribing to PACER can then view *any* case and *any* court filing filed in *any* federal court unless that case or filing is sealed.[12] PACER users can also "subscrib[e] to a court's [feed], which is free and includes automatic notification of case activity, summarized text, and links to the [case filing]."[13] Case information is available at any time: "24 hours a day, including weekends and holidays."[14]

Not only do PACER's name and functions fall within the dictionary definition of subscription—federal courts very commonly *describe* PACER as a subscription service. *See, e.g.*, *Hollins v. Dep't of Corrections*, 191 F.3d 1324, 1326 (11th Cir. 1999) ("PACER subscribers may use computers to retrieve electronic case information."); *In re French*, 401 B.R. 295, 317 (Bankr.

---

[8] *Subscription*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/subscription (last visited Mar. 10, 2023).
[9] *What is PACER?*, PACER, https://pacer.uscourts.gov/help/faqs/what-pacer (last visited Mar. 10, 2023).
[10] *Id.* (emphasis added).
[11] *Find a Case FAQs*, PACER, https://pacer.uscourts.gov/help/faqs/find-a-case (last visited Mar. 10, 2023).
[12] *Id.*; *Can I find sealed documents on PACER?*, PACER, https://pacer.uscourts.gov/help/faqs/can-i-find-sealed-documents-pacer (last visited Mar. 10, 2023).
[13] *How can I receive case alerts using an RSS feed?*, PACER, https://pacer.uscourts.gov/help/faqs/how-can-i-receive-case-alerts-using-rss-feed (last visited Mar. 10, 2023).
[14] *Find a Case FAQs*, PACER, https://pacer.uscourts.gov/help/faqs/find-a-case (last visited Mar. 10, 2023).

E.D. Tenn. 2009) (noting the ECF system for viewing purposes is "limited to subscribers of [PACER]"); *Copeland v. Allstate Ins. Co.*, No. 1:22-CV-693-SCJ, 2023 WL 2119134, at *1 (N.D. Ga. Jan. 13, 2023) ("Plaintiff may also subscribe to [PACER]."). For these reasons, information on PACER is available through a "subscription" and is in the public domain and not ITAR-controlled. 22 C.F.R. 120.34(a)(2).

Information published on PACER also is in the public domain because PACER qualifies as a library. *See* 22 C.F.R. § 120.34(a)(4). The ITAR also does not define *library*. However, it is beyond dispute that a library "is not limited to brick-and-mortar buildings with print collections, and may exist on the Internet with digital collections." *Stagg P.C. v. U.S. Dep't of State*, 354 F. Supp. 3d 448, 466 (S.D.N.Y. 2019) (noting that the word *library* in 22 C.F.R. § 120.34(a)(4) is unambiguous and agency's definition was not entitled to deference), *vacated on other grounds*, 983 F.3d 589. PACER, which is a digital collection of federal court cases and filings accessible to the public, also squarely falls within this definition.

Lastly, the government's publishing of the technical data to PACER constituted the cognizant government agency's "approval" for public release. *See* 22 C.F.R. 120.34(a)(7). Public release can be done in "*any form*," and the information need not be published. *Id.* (emphasis added); *see also United States v. Hoffman*, 10 F.3d 808, *5 (9th Cir. 1993). The Department of Justice approved release of the technical data to PACER when individuals prosecuting this case[15] published Dr. Trout's unredacted expert report, which contained the technical data at issue. As already discussed, PACER allows for "unlimited distribution" of the material. As such, the government's filing the information on PACER constituted a public release.

---

[15] The federal prosecutors listed on the on public filing include the United States Attorney for the Western District of Kentucky; the Executive Deputy Chief of the Counterintelligence and Export Control Section, National Security Division; two Assistant U.S. Attorneys for the Western District of Kentucky; and two Trial Attorneys from the National Security Division at the U.S. Department of Justice.

8

For these reasons, the government placed the technical data at issue in the public domain when the government filed Dr. Trout's unredacted and unsealed expert report on PACER for all the world to see.

3. **This case should be dismissed because the government's own conduct makes clear that the government does not view the publicly disclosed technical data as ITAR-controlled.**

As explained above, the government can no longer argue that the aforementioned technical data is ITAR-controlled because the government placed the technical data in the public domain. But the government's actions also mandate dismissal of all the indictment's ITAR-related counts. The government's publishing of the alleged ITAR technical data and its cavalier approach in moving to seal the technical data, demonstrate that this technical data *was never* ITAR-controlled.

The government placed the technical data in the public domain on Monday, March 4. (*See* D.N. 134.) On Friday, March 8—after the court had closed—the government filed its motion requesting that Dr. Trout's unredacted expert report be sealed, which contains the technical data and which the government had attached to its motion in limine. (D.N. 146.) The government's motion to seal noted that Defendants had redacted "allegedly potential" ITAR-controlled information from Dr. Trout's report. (D.N. 146, PageID.2032.) Borrowing Defendants' language, the government then requested, "[i]n an abundance of caution," that Dr. Trout's expert report be sealed. (D.N. 146, PageID.2032.) By only moving to seal this report "[i]n an abundance of caution," the government acted nonchalantly about the potential disclosure of ITAR-controlled information. Moreover, the motion to seal was filed late on Friday, when the government knew the Court would likely not review or rule on the motion until the following week. The government did not request an emergency hearing or that its motion be reviewed in an expeditious manner. Nothing in the government's motion alerted the Court that the alleged ITAR-controlled

9

information—which is apparently among the "crown jewels" of our nation's national-security and military technology (*see* D.N. 144-1, PageID.2003)—was disclosed to the world on a public website. The government's own conduct demonstrates that sharing this data does not raise the dire national-security concerns that the government originally alleged, and for which the government is seeking criminal sanctions. For this reason, and for the reasons stated in Defendants' other pretrial motions, *see* n.5, the Court should dismiss the ITAR related allegations contained in the indictment.

## CONCLUSION

For these reasons, Defendants respectfully ask the Court to dismiss the ITAR-related allegations contained in the indictment.

Dated: March 11, 2024            By:    */s/ John Brownlee*

                                         John L. Brownlee (*pro hac vice*)
                                         William F. Gould (*pro hac vice*)
                                         Timothy J. Taylor (*pro hac vice*)
                                         Caitlin A. Eberhardt (*pro hac vice*)
                                         HOLLAND & KNIGHT LLP
                                         1650 Tysons Blvd., Suite 1600
                                         Tysons, VA 22201
                                         T: 703.720.8053
                                         F: 703.720.8610
                                         John.Brownlee@hklaw.com
                                         William.Gould@hklaw.com
                                         Timothy.Taylor@hklaw.com
                                         Caitlin.Eberhardt@hklaw.com
                                         *Counsel for Quadrant Magnetics, LLC*

                                         */s/ Kent Wicker (with permission)*
                                         Kent Wicker
                                         WICKER / BRAMMELL PLLC
                                         323 W. Main Street, 11th Floor
                                         Louisville, Kentucky 40202
                                         (502) 541-5533
                                         Kent@wickerbramel.com
                                         *Counsel for Phil Pascoe*

                                         */s/ Patrick Renn (with permission)*
                                         Patrick J. Renn
                                         Smith & Helman
                                         600 W. Main Street, Suite 100
                                         Louisville, KY 40202
                                         502-540-5700
                                         Fax: 502-568-3600
                                         prenn@600westmain.com
                                         *Counsel for Scott Tubbs*

                                         */s/ Scott Cox (with permission)*
                                         Scott C. Cox
                                         Cox & Mazzoli, PLLC
                                         600 W. Main Street, Suite 300
                                         Louisville, KY 40202
                                         502-589-6190
                                         502-584-1744
                                         CoxECF@aol.com
                                         *Counsel for Monica Pascoe*

**CERTIFICATE OF SERVICE**

      I hereby certify that on March 11, 2024, the foregoing motion was electronically filed with the Clerk of the Court via the CM/ECF system, which sent a notice of electronic filing to the attorneys of record.

                                            /s/ *John Brownlee*