UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA | PLAINTIFF |
| v. | CRIMINAL NO. 3:22-CR-88-DJH |
| | *Filed Electronically* |
| QUADRANT MAGNETICS, LLC et al. | DEFENDANTS |

### UNITED STATES' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE EVIDENCE RELATED TO ALLEGED IMMIGRATION ISSUES

Defendants Quadrant Magnetics, LLC ("Quadrant Magnetics"), Phil Pascoe, Scott Tubbs, and Monica Pascoe (collectively, "Defendants") move *in limine* to exclude broadly "any evidence related to the immigration or visa status of Quadrant employees and evidence of Chinese-language signs at Quadrant's facilities." DN 141, at 1. Much of this evidence, however, is directly relevant to the charged offenses and does not risk unfair prejudice. Accordingly, the Court should deny Defendants' motion.

**ARGUMENT**

**I.  Evidence Related to Ms. Qian and Signs with Chinese Characters is Relevant**

Defendants argue that allegations related to immigration offenses, including the unlawful hiring of CongCong Qian a/k/a Michelle Qian, are "not relevant to any of the charged conduct and are likely to unfairly prejudice and confuse the jury." DN 141, at 2. While Defendants are not charged with immigration offenses in this case, much of the evidence related to Defendants' knowledge of Ms. Qian's immigration status, citizenship, employment, place of residence, and visa sponsorship by Quadrant Magnetics is inextricably intertwined with the charges in the Second

1

Superseding Indictment ("Indictment"), DN 73. *See United States v. Barnes*, 49 F.3d 1144, 1149 (6th Cir. 1995) (finding testimony intrinsic to alleged conduct did not implicate Rule 404(b)).

As set forth in its Trial Memorandum, DN 129, at 28-29, the government's evidence shows that Defendants Quadrant Magnetics and Phil and Monica Pascoe conspired to engage in visa fraud with respect to Ms. Qian, who was an employee of Hangzhou X-Mag International ("X-Mag") and, at times, a purported employee of Quadrant Magnetics and its parent company, Quadrant International. In connection with her 2014 B-1/B-2 business/tourist visa application, Ms. Qian completed an immigration form indicating that she was traveling to the United States for business/tourism, that she would be staying at 800 East Main St., Louisville, Kentucky 40206 (the address where Quadrant Magnetics was located at this time), and that her intended length of stay in the United States was seven days. On January 15, 2014, Ms. Qian was issued a visa for a temporary stay in the United States. On April 22, 2014, travel records show that Ms. Qian entered the United States on a B-1/B-2 Tourist Visa with an authorized stay until October 21, 2014. Despite being here on a B-1/B-2 visa permitting a temporary stay, Quadrant Magnetics obtained a lease agreement for Ms. Qian for an apartment in Louisville. During her time in the United States in 2014, the evidence shows that Ms. Qian was given access to Quadrant Magnetics' server which contained restricted technical data controlled under the International Traffic in Arms Regulations ("ITAR"). Subsequently, Ms. Qian fraudulently obtained L1-A and L1-B visas sponsored by Quadrant Magnetics. Pursuant to these visas, Ms. Qian lived in the United States from 2015 until at least 2021, with occasional trips to China. That is, she resided in the United States during the heart of the charged conspiracy pursuant to a fraudulently obtained visa sponsored by Defendant Quadrant Magnetics.

The Court should permit the government to present evidence related to Ms. Qian's immigration status, citizenship, and purported employment history to demonstrate Quadrant Magnetics' and its co-conspirators' knowledge of Quadrant Magnetics' relationship with its Chinese affiliate X-Mag. The government alleges that Defendants executed a scheme to defraud General Dynamics Ordnance and Tactical Systems ("General Dynamics") and the United States Department of Defense ("DOD") by concealing and misrepresenting the country of origin of the magnets at issue in this case. DN 73 ¶¶ 16(c), 17(e), 20. The country of origin of the magnets at issue in this case was China. X-Mag produced the magnets in China. Likewise, the government alleges multiple unlawful transmissions of technical data to X-Mag employees in China in furtherance of the conspiracy and as charged AECA offenses. *See, e.g.*, DN 73 ¶¶ 18(d), (g), (k), (m), (o), 21-30. The government's evidence of Defendants' knowledge of Ms. Qian's employment relationship with X-Mag and Quadrant Magnetics, as well as with those companies' owner and controller, Mr. Sun, would help prove that Defendants knew they were procuring magnets that were manufactured, smelted, and magnetized in China. So too would evidence regarding Defendants' vague reference to "signs with Chinese characters at Quadrant's facilities." DN 141, at 4. This evidence also would help prove that Defendants knew they were transmitting technical data to China and to non-U.S. persons.[1] The government's evidence shows that Defendants provided access to the database in which they stored their customers' technical data to non-U.S. persons, including Ms. Qian. Her immigration status, therefore, is directly relevant to the charged

---

[1] Under the ITAR, an unlawful export occurs where the export is from the United States to another country or within the United States to a non-U.S. person. *See* 22 C.F.R. 120.50(b) (defining export to include "[a]ny release of technical data to a foreign person"). Defendants transmitted and provided access to technical data to employees of Quadrant Magnetics and its affiliates who were both in China and non-U.S. persons. Accordingly, even if Defendants sent technical data to an X-Mag employee while, for example, traveling or living in the United States, Defendants' transmission would have been unlawful.

conspiracy, as she would have been prohibited by law from receiving such data whether in the United States or China. Her immigration, citizenship, and employment status, and Defendants' knowledge thereof, would be directly relevant to, among other elements of the charged offenses, Defendants' willfulness and the *actus reus* of the AECA offenses.

Moreover, evidence regarding the corporate relationship between X-Mag and Quadrant Magnetics, as well as Defendants' knowledge thereof, would show the intertwined nature of Quadrant's business structure. It also would help demonstrate that Defendants' actions were taken for the mutual benefit of both Quadrant Magnetics and X-Mag, as well as their common owner and controller, Mr. Sun. It is relevant evidence that would help demonstrate the broad criminal relationship between co-conspirators and its criminal purpose. These facts would be presented by witnesses who have fist-hand knowledge of Quadrant Magnetics' immigration practices and the citizenship of Quadrant Magnetics' and X-Mag's employees, as well as the sometimes-overlapping nature of their employment with each company. This evidence would not relate to the type of other acts contemplated by Rule 404(b); rather, it would be evidence providing "coherence to the government's case." *United States v. Torres*, 685 F.2d 921, 924 (5th Cir. 1982).

Even if the government were to provide notice and seek to introduce this evidence as "other acts," it would be admissible under Rule 404(b) to prove opportunity, intent, knowledge, absence of mistake, and motive, commonly accepted reasons for admission of FRE 404(b) evidence. *See, e.g., United States v. Whitt*, 752 Fed. App'x 300, 304 (6th Cir. 2018).[2] The evidence would show that the owner of X-Mag and Quadrant Magnetics, Mr. Sun, had a longstanding business interest in profiting from the use of his Chinese company X-Mag to produce the magnets at issue and of

---

[2] This Court set a deadline for the government to provide, upon Defendants' request, notice of Rule 404(b) evidence within fourteen days of trial. DN 37; *see* DN 98.

4

using X-Mag and Quadrant Magnetics for both commercial gain and personal enrichment, including enriching friends and employees such as Ms. Qian. It likewise would demonstrate the absence of mistake or lack of accident of the transmission of technical data to X-Mag because Quadrant Magnetics worked with X-Mag to benefit both companies without regard for United States law. Finally, evidence related to Defendants' participation in Quadrant Magnetics' sponsorship of Ms. Qian's L1-A and L1-B visas, as well as her residence and purported employment at Quadrant Magnetics and Quadrant International in the United States during the heart of the charged conspiracy, would demonstrate that Defendants prepared for and intended to engage in a broad criminal conspiracy that included conspiring to commit multiple acts that defrauded and misrepresented facts to the United States government, including by fraudulently submitting paperwork to obtain Ms. Qian's visas.

## II.     Evidence Related to Ms. Qian and Signs with Chinese Characters Would Not Risk Unfair Prejudice or Confusing the Jury

Defendants assert that introducing evidence related to an employee's visa status or "Quadrant's hiring of foreign citizens . . . [will] likely have the effect of prejudicing the jury against Defendants by suggesting an inappropriate level of foreign control or entanglement in Quadrant's business." DN 141, at 4. That is exactly what the evidence would suggest. And that is exactly why it would be relevant and not unfairly prejudicial in a case involving a broad conspiracy whereby Quadrant Magnetics' procured magnets from its affiliated supplier in China, a company under common ownership and control with Quadrant Magnetics. Mr. Sun's historic ownership and

control of Quadrant Magnetics as a Chinese citizen[3] and the Chinese ownership and location of Quadrant Magnetics' affiliated magnet supplier X-Mag provide important context. They are directly relevant facts in a case alleging that Defendants transmitted technical data to China and concealed from General Dynamics and the DOD that they were making their magnets in China. The Defense Federal Acquisition Regulation Supplement ("DFARS") required Quadrant Magnetics to smelt and produce the magnets charged in the Indictment in the United States or a "qualifying country." *See* 48 C.F.R. § 252.225-7009. China was not a qualifying country. *See* 48 C.F.R. § 252.003. The Court should permit the government to present evidence demonstrating Defendants' knowledge of the foreign control and entanglement of the entities involved in Quadrant Magnetics' supply chain. For the same reasons, evidence regarding signs at Quadrant's facilities using Chinese characters would be relevant and not unfairly prejudicial were the government to present it.

Defendants' suggestion that the government seeks to add a "subtextual narrative that Defendants are too cozy with China," DN 141, at 6, is misplaced. China is, as Defendants note, "one of the United States' chief geopolitical rivals." *Id.* It also is the "policy of the United States to deny licenses and other approvals for exports and imports of defense articles" to China. 22 C.F.R. § 126.1(a)(d). This case involves the transmission of ITAR-controlled technical data to China by Defendants who work for a company that has significant ties to China and a Chinese citizen. These ties are directly relevant to the offenses charged, and would not unfairly prejudice Defendants or confuse the jury. *See Miller ex rel. Miller v. Evenflo Co.*, 2012 WL 112976, at *2

---

[3] Defendants note that Mr. Sun is a green-card holder entitled to review ITAR-controlled material without a license. DN 141, at 6. He was not a green-card holder during much of the conspiracy and, in any event, Defendants could not lawfully transmit technical data from the United States to Mr. Sun when he was in China. *See* 22 C.F.R. §§ 120.50, 120.54. As the government has previewed elsewhere, Defendants' understanding of Mr. Sun's inability at times to lawfully engage in ITAR business is directly relevant to the charged scheme.

(W.D. Pa. Jan. 12, 2012) (denying motion *in limine*; finding probative value of Chinese manufacturing of product was not substantially outweighed by defendant's "vague contention that a xenophobic jury will harbor ill-will against China and any foreign manufactured products"); *see also Moose Agric., LLC v. Layn USA, Inc.*, 2022 WL 326564, at *1 (D. Colo. Feb. 3, 2022) (finding evidence that defendant was a subsidiary of a Chinse company not prejudicial because there was "no reason whatsoever to surmise that jurors in this contract dispute will disregard the evidence and decide the case because of some prejudice against China or Chinese people"). The Court should not require the government to skirt the obvious in presenting its case.[4]

Finally, Defendants argue that evidence related to alleged immigration offenses should be excluded "as it would result in a variance from the indictment." DN 141, at 5. To be clear, the government will not present evidence or argument at trial that Defendants or other co-conspirators should or will be charged with immigration offenses. Rather, the government may rely on evidence related to Quadrant Magnetics' immigration practices and the immigration status of its and X-Mag's employees, as well as Defendants' knowledge thereof, to prove the offenses alleged in the Indictment. Evidence in this regard would "merely constitute a presentation of additional evidence to substantiate charged offenses," and would not be offered for proof of facts "materially different from those alleged in the indictment." *See United States v. Bradley*, 917 F.3d 493, 502 (6th Cir. 2019) (cleaned up) (citing *United States v. Kuehne*, 547 F.3d 667, 686 (6th Cir. 2008)) (finding evidence of improper tax filings not materially different from facts charged).

---

[4] The government notes that it does not intend to present evidence regarding any control or affiliation between Defendants or their co-conspirators and the government of the People's Republic of China.

7

## CONCLUSION

For the reasons stated herein, the government requests that Defendants' Motion *in Limine*, DN 141, be DENIED.

Respectfully submitted,

| | |
|---|---|
| MICHAEL A. BENNETT | JENNIFER KENNEDY GELLIE |
| United States Attorney | Executive Deputy Chief |
| Western District of Kentucky | Counterintelligence and Export Control Section |
| | National Security Division |
| | |
| s/ *Joshua D. Judd* | s/ *Alex Wharton* |
| Joshua D. Judd | Alex Wharton |
| Christopher C. Tieke | Leslie C. Esbrook |
| Assistant U.S. Attorneys | Trial Attorneys |
| 717 W. Broadway | 950 Pennsylvania Ave., NW |
| Louisville, KY 40202 | Washington, DC 20530 |
| (502) 582-5911 | (202) 514-4523 |
| joshua.judd@usdoj.gov | alexander.wharton@usdoj.gov |
| christopher.tieke@usdoj.gov | leslie.esbrook@usdoj.gov |

CERTIFICATE OF SERVICE

On March 11, 2024, I electronically filed this document through the ECF system, which will send a notice of electronic filing to counsel for the defendants.

    s/ *Joshua J. Judd*
Trial Attorney