UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA | PLAINTIFF |
| v. | CRIMINAL NOS. 3:22-CR-00088-DJH<br>3:25-CR-00168-DJH |
| | *Electronically Filed* |
| QUADRANT MAGNETICS LLC | DEFENDANT |

**UNITED STATES' SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the Western District of Kentucky, respectfully submits this memorandum in aid of sentencing of Quadrant Magnetics LLC ("Quadrant") at the sentencing hearing currently scheduled for March 18, 2026, in Louisville, Kentucky. For the reasons stated below, the government recommends that the Court impose fines and penalties in the amount of $1,000,000 ($500,000 penalty in Count 1 of the Second Superseding Indictment in 3:22CR00088 and a $500,000 fine for Count 1 of the Information 3:25CR-00168-DJH), followed by term of probation for two years. In addition, there is an agreed forfeiture money judgment in the amount of $1,332.515.25.

I.   **SUMMARY**

On December 1, 2025, Quadrant, represented by Michael Brand, pled guilty to a one count Information filed in U.S. District Court in 3:25CR00168 for conspiracy to commit visa fraud in violation of 18 U.S.C. §§ 1546(a) and 371. In addition, Quadrant pled guilty to Count 1 in 3:22CR00088 for conspiracy to willfully export from the United States to China, and to non-U.S. persons, defense articles, specifically, technical data covered by the United States Munitions List,

without first obtaining a valid license or other approval for such export from the U.S. Department of State, in violation of 22 U.S.C. § 2778(b)(2) and 22 C.F.R. §§ 121.1, 123.1, and 127.1(a)(4).

On February 26, 2025, defendants Phil Pascoe and Scott Tubbs, officers at Quadrant, pled guilty to Count 1 of the Second Superseding Indictment charging each with conspiracy to willfully export from the United States to China and to non-U.S. persons defense articles without obtaining authorization from the U.S. Department of State, to fraudulently and knowingly sell rare earth magnets manufactured, smelted, and magnetized in China to defense contractors and the U.S. government, misrepresenting and concealing the location of the manufacturing process and the country or origin, and to knowingly and willfully make a materially false statement and representation, all in violation of Title 18, United States Code, Section 371. *See* Presentence Investigation Report, DN 390 at ¶ 1; Presentence Investigation Report, DN 393 at ¶ 1.

As Quadrant has now admitted, it conspired to commit visa fraud and export technical data related to parts specially designed for U.S. military fighter jets and other military applications to Chinese nationals and to China. Quadrant pled guilty pursuant to a plea agreement under Fed. R. Crim. P. (11)(c)(1)(A) and (C). Defendant is a corporation and faces a penalty of $500,000 in Count 1 of the Second Superseding Indictment in 3:22CR00088 and a $500,000 fine in Count 1 of the Information. In addition, Quadrant agreed to a money judgment forfeiture of $1,332.515.25.

## II.    BACKGROUND FACTS[1]

### *Background for 3:22CR00088, Conspiracy to Violate the AECA*

The Arms Export Control Act ("AECA"), 22 U.S.C. § 2778, authorized the President of the United States to control the export of "defense articles" by designating items on the United

---

[1] The United States agrees and adopts herein the offense conduct stated in the Pre Sentence Report for 3:22-CR-00088-DJH, DN 473 at ¶¶ 2-39, and in the Pre Sentence Report for 3:25-CR-00169, DN 11, at ¶¶ [2-39].

States Munition List ("USML" or "Munitions List"), which is codified at 22 C.F.R. Part 121. The AECA and its implementing regulations, the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. Parts 120-130, required a person to apply for and obtain an export license from the U.S. Department of State, Directorate of Defense Trade Controls ("DDTC"), before exporting from the United States arms, ammunition, articles of war, or related technical data, which were all categorized as defense articles under 22 U.S.C. § 2778(b)(2) and 2794(3), and 22 C.F.R. Parts 120.1 and 121.1. Defense articles that were subject to licensing requirements were designated on the Munitions List. Category VIII of the USML designated technical data for enumerated military aircraft. Category XII of the USML designated technical data for enumerated fire control, laser, imaging, and guidance equipment. Category XX designated certain technical data for enumerated submersible vessels and related articles.

From 2012 through October 1, 2018, Quadrant's officers conspired to and did send dozens of drawings of rare earth magnet schematics that required a license to be exported from the United States to China without the required license.

Quadrant Magnetics contracted with customers in the U.S. defense industry such as General Electric Aviation Systems ("GE Aviation"), General Dynamics, and other companies to supply rare earth magnets. Quadrant knew that these companies were U.S. government subcontractors, specifically subcontractors for the U.S. Department of Defense. To produce the magnets, Pascoe and Quadrant Magnetics received proprietary technical schematics from the U.S. companies, many of which had markings on the face of the schematics that warned users that the information was controlled for export outside of the United States and required a license or other

authorization to export abroad or to non-U.S. persons. *See, e.g.*, Gov't Ex. 32[2] (drawing for magnet part 100101 with the following stamp: "Warning – This document contains technical data within the definition of the International Traffic in Arms Regulations (ITAR) and is subject to the export control laws of the U.S. Government. Transfer of this data by any means to a foreign person, whether in the United States or abroad, without an export license or other approval from the U.S. Department of State, is prohibited."). Nevertheless, Quadrant sent these drawings to a Chinese company, Hangzhou X-Mag, and its non-U.S. person employees, to manufacture the magnets in China. *See, e.g.*, Gov't Ex. 32 (transmission of part 100101 drawing in February 2012).

For years, Quadrant sent dozens of drawings containing ITAR-warning and other export-control stamps to Hangzhou X-Mag employees. As far back as 2006, Quadrant emailed ITAR-marked technical data for General Dynamics' (or its predecessors') magnet part drawings to Chinese nationals working for Hangzhou X-Mag. These emails all contained an attachment with the name of the company that owned the drawing and a stamp stating the drawing was ITAR-controlled and proprietary General Dynamics information. *See, e.g.*, Gov't Exs. 11, 12, 13 (transmissions of ITAR-stamped drawings in 2009).

These drawings were controlled by the U.S. Department of State as technical data directly related to defense articles. For example, part FP24018P1 was a component specially designed for the F/A-18 E/F and G aircraft (fighter jets) (Category VIII of the USML). Gov't Ex. 576. Several other drawings were for components specially designed for submarine systems, motors for weapons, targeting, or infrared systems. Gov't Ex. 588.

Quadrant knew that the ITAR applied to Quadrant Magnetics' defense business since at

---

[2] Government exhibits refer to exhibits listed in Docket 341, USA Exhibit List, filed on March 7, 2025.

4

least 2009. In June 2014, Pascoe informed Federal Bureau of Investigation ("FBI") agents that he received magnet drawings from GE Aviation and General Dynamics that were controlled by ITAR and that the magnets were manufactured in China, but that he (and Quadrant Magnetics) did not send any ITAR-controlled data to China to manufacture the magnets. *See* Dkt. 373 at 16:12. Less than two weeks prior, Quadrant had sent to Hangzhou X-Mag employees an email with an ITAR-marked technical drawing attachment owned by General Dynamics' predecessor. Gov't Ex. 80. In other words, Quadrant's agents lied to government agents to continue to perpetrate the fraudulent procurement scheme and continue to send ITAR-controlled technical drawings to China for years after that meeting. At no point did Quadrant or any of its co-conspirators seek or obtain a license to export ITAR-controlled technical data from the United States to China or to non-U.S. persons.

In August 2017, GE Aviation notified Pascoe that GE Aviation had concerns about where two of its magnets that went into the generator convertor unit for the F/A-18 fighter jet, part numbers FP24018P21 and 36B423718P1, were produced. In response to GE Aviation, Quadrant caused fabricated part drawings for part numbers FP24018P21 and 36B423718P1 to be provided to GE Aviation to conceal the unlawful export of GE Aviation's technical data to China to produce the magnets for GE Aviation. *See* Gov't Exs. 180, 180A, 199, 594. Another lie, this time to a defense contractor. These "RAW" drawings did not include the "Notes" section of the instructions, specified that the magnet was sent unmagnetized, and removed the original owner's proprietary information stamp. Gov't Exs. 180, 199. The drawings provided to GE Aviation in response to questions about what drawings were sent by Quadrant Magnetics to China were not the drawings that Quadrant in fact forwarded to employees of Hangzhou X-Mag in China.

From August 2017 through November 2018, and with notice of ITAR requirements from

GE Aviation, Quadrant continued to repeatedly and systematically export ITAR-marked technical data belonging to General Dynamics to Hangzhou X-Mag employees in China. For example, Phil Pascoe emailed Hangzhou X-Mag employees ITAR-marked part number drawings for General Dynamics parts 1500P-1002, 10500B-1022, 6000U-1002, 100101, and 3730D-1012. S*ee, e.g.*, Gov't Exs. 283 (transmission of part 11375B-1002); 285 (transmission of part 6000U-1002); 288 (transmission of part 7600B-1012). In the midst of these transmissions, in January 2018, GE Aviation informed Quadrant Magnetics that the U.S. Department of State had determined that the drawing for its magnet part number FP24018P1 was classified on the USML. Thereafter, Phil Pascoe continued to send General Dynamics' drawings to Hangzhou X-Mag.

### *Background for 3:25CR00169, Conspiracy to Commit Visa Fraud*

From September 2014 to November 2021, Quadrant conspired to commit visa fraud regarding C.Q., a Chinese national who was purportedly part of the executive management for Quadrant. On December 4, 2013, C.Q. completed a DS-160 (Application for a Non-immigrant Visa) document indicating that she was traveling to the United States for business/tourism and that she would be staying at a specific address in Louisville (the address where Quadrant Magnetics was located at the time) and that her intended length of stay in the United States was seven days. She was issued a B1 visa on January 15, 2014. However, a Quadrant employee executed a 12-month lease agreement on behalf of Quadrant for an apartment located in Louisville listing C.Q. as the occupant. The following day, C.Q. came to the United States from China.

On July 2014, Quadrant filed with United States Citizenship and Immigration Services (USCIS) a Form I-129, Petition for a Nonimmigrant Worker, requesting L-1B classification for C.Q. Quadrant requested a non-immigrant visa L-1B allowing her to work for Quadrant in Louisville, Kentucky. Real estate records confirmed that in September 2015, C.Q. purchased a

home in Birmingham, Alabama. Additionally, an employee of Quadrant prepared a Notice of Intent to Vacate the Riverpark Place Apartments in February 2016, stating that C.Q. would be "out of state." USCIS officers later confirmed that C.Q. vacated the apartment on February 28, 2016.

On November 2016, Quadrant filed a Form I-129, Petition for a Nonimmigrant Worker requesting L-1A classification for C.Q. It was denied by USCIS. In January 2017, Quadrant filed a Form I-129, requesting an L-1A classification for C.Q., which was also denied by USCIS. In August 2017, Quadrant filed a Form I-129 seeking to extend C.Q.'s stay in the United Sates on her L-1B visa. The August petition indicated that C.Q.'s residential address was still in Louisville, Kentucky when she had vacated that address in February 2016 and had purchased a residence in Alabama. The petition also claimed that C.Q. would be supervising employees in Louisville and working at Quadrant in Louisville, which was not true because she was living in Alabama. The I-129 petition was approved by USCIS on August 4, 2017. A W-2 issued by Quadrant for tax year 2017 and listed C.Q.'s address as Quadrant Magnetics address at the time in Louisville.

In November 2017, C.Q. sold her home in Alabama and moved to San Jose, California. A W-2 issued by Quadrant to C.Q. for tax year 2018 listed her address as Quadrant's new and current address, as did an IRS Form1040 that was filed on behalf of C.Q. In February 2019, Quadrant filed a Form I-129 to change C.Q.'s visa classification from L-1B (specialized knowledge) to L-1A (executive or management). The petition maintained that C.Q. still lived in Louisville, Kentucky, would be working at Quadrant in Louisville, and would be directly managing Quadrant employees in Louisville. In addition, C.Q. completed a Form DS-160 and declared that she would reside at an address in Prospect, Kentucky and her present work was at Quadrant in Louisville. The petition was approved by USCIS on May 10, 2019, with a validity date of August 18, 2017, to May 6, 2020.

In May 2020, Quadrant filed a Form I-129 to change C.Q.'s visa classification from L-1B to L-1A. The petition claimed C.Q.'s residential address was located in Prospect, Kentucky when she was actually living and working in San Jose, California. The petition also noted C.Q. would be working as the Vice President of Operations at Quadrant and directly managing employees. It was later learned that one of the employees noted as being managed by C.Q. was not employed beginning in the third quarter of 2019.

On August 20, 2021, USCIS conducted a site visit to Quadrant in Louisville. During the site visit, Phil Pascoe advised USCIS that C.Q. did not live in Louisville, and that she was last in Louisville 1 ½ to 2 years ago. C.Q.'s address was in San Jose, California. Pascoe further stated that C.Q. did not oversee or supervise anyone at Quadrant and her salary was still from the Quadrant budget, but he was unsure why.

Employees that the petition claimed were being supervised by C.Q. were interviewed by USCIS. The employees said that C.Q. was not their manager and some had only seen her on one occasion. In November 2021, USCIS located C.Q. at her residence in California. She indicated that she moved to San Jose in 2017. C.Q. indicated that she supervised employees but when asked additional questions, she advised that the employees reported to Phil Pascoe. Furthermore, she advised that she was now employed as the Engineering, Sales, & Quality Control Manager and not the Vice President as was stated in the 2020 I-129 petition.

### III.  GUIDELINES CALCULATION

The sentencing guidelines do not provide specific guidance as to the application of the fine calculation regarding export control violations and the visa fraud offenses. Therefore, the appropriate guidance for fine calculation is 18 U.S.C. §§ 3553 and 3572. The United States recommends penalty in the amount of a penalty of $500,000 for the plea to the ITAR object of

Count 1 of the Second Superseding Indictment; a forfeiture money judgment in the amount of $1,332,515.25 for the plea to the ITAR conspiracy object of Count 1 of the Second Superseding Indictment; and a fine in the amount of $500,000 for Count 1 of the Information; totaling $2,332,515.25. The $2,332,515.25 payment shall be paid no later than the date of sentencing. The United States and Quadrant have executed an Agreed Money Judgment and Final Order of Forfeiture for the $1,332,515.25. A Motion and the Agreed Order have been tendered to the Court. DN 474. It is anticipated that Quadrant will deliver the penalties to the United States Clerk prior to sentencing.

### *Compliance program*

Pursuant to the plea agreement, Quadrant agreed to implement a compliance program designed to prevent and detect U.S. export controls and procurement violations throughout the Quadrant's operations, including any entity over which it exercises direct or indirect control. One year after the date of sentencing, Quadrant, by a duly authorized Officer of Quadrant, agreed to certify to the United States that it has met its compliance obligations.

In order to address any deficiencies in its internal export controls and procurement compliance policies and procedures, Quadrant will represent that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under the plea agreement, a review of the Quadrant's existing internal controls, policies, and procedures regarding compliance with U.S. export controls and procurement laws and regulations. Quadrant agreed to adopt a new compliance program, or to modify its existing one, including internal controls, compliance policies, and procedures to ensure that Quadrant maintains a rigorous compliance program covering applicable U.S. export controls and procurement laws and regulations. The compliance committment between the USAO/DOJ and Quadrant requires an

authorized Quadrant Officer to certify compliance one year after the date of sentencing for a period of two years. As part of the plea agreement, Quadrant agreed to destroy and have destroyed all export-controlled magnet drawings. Quadrant provided declarations dated January 24, 2026 signed by a corporate officer and its counsel confirming the destruction of the drawings as required by the plea agreement.

## IV.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

This Court must impose a sentence which is sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a). Title 18, United States Code, Section 3553(a) guides the Court by listing factors to consider when imposing a sentence. That section directs courts to consider the following:

>   (1)   the nature and circumstances of the offense and the history and characteristics of the defendant;
>
>   (2)   the need for the sentence imposed:
>
>   (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
>   (B)   to afford adequate deterrence to criminal conduct;
>
>   (C)   to protect the public from further crimes of the defendant; and
>
>   (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
>   (3)   the kinds of sentences available;
>
>   (4)   the kinds of sentence and the sentencing range established for—
>
>   (A)   the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines— . . .
>
>   (5)   any pertinent policy statement— . . .
>
>   (6)   the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
>   (7)   the need to provide restitution to any victims of the offense.

The United States submits that the requested sentence is necessary to accomplish the sentencing purposes of Section 3553(a).

A. **Nature and Circumstances of the Offense**

Quadrant and its agents conspired to export and did export to individuals in China and to non-U.S. persons technical drawings of rare earth magnets that were controlled by the ITAR, the export of which therefore required a license or other authorization from the U.S. Department of State. Quadrant knew that those magnets were specially designed for use in military applications, and that the magnets were sold to military contractors for use in government contracts with the U.S. Department of Defense. Quadrant's agents knew that export to China of the drawings used to manufacture these magnets was not permitted without a license.

The United States controls exports like these magnet drawings to keep military-grade technology and associated technical data out of its adversaries' possession. Quadrant and its agents knew of these rules and conspired to act contrary to them. The fines and penalties against Quadrant reflect the seriousness of the offense and punishment for Quadrant.

In addition, the U.S. government has expressed particular concern over China acquiring American technology to achieve strategic military advantages. Countering Chinese national security threats is a strategic priority of the United States government. *See, e.g.*, "The China Threat," https://www.fbi.gov/investigate/counterintelligence/the-china-threat; "How China's Economic Aggression Threatens the Technologies and Intellectual Property of the United States and the World," White House Office of Trade and Manufacturing Policy, June 2018.[3] Defendant's criminal conspiracy provided drawings for magnets that were specially designed for U.S. military technology to China and to Chinese nationals. Supplying Chinese nationals and a Chinese company with the military know-how to produce these magnets enhances the United States' technology transfer concerns and risks reducing the effectiveness of U.S. research and

---

[3] https://trumpwhitehouse.archives.gov/wp-content/uploads/2018/06/FINAL-China-Technology-Report-6.18.18-PDF.pdf

11

development for U.S. warfighting capabilities. Once such technical data is exported to China without a license, the U.S. government no longer has insight into who, including potentially the Chinese government or military industrial complex, possesses it or may be using the technology. The requested sentence will demonstrate to the public that the United States takes these violations seriously and provide adequate deterrence to others who may seek to violate the AECA.

### B. History and Characteristics of the Defendant

Each of the factors under Section 3553(a)(2)(A) weigh in favor of the penalties and forfeiture agreed to in the plea agreement as well as the compliance program imposed by the plea agreement. Multiple branches of government have determined that export of defense articles is a serious offense that jeopardizes national security. Congress has stated that offenses involving the unlawful export of goods are serious crimes. So too, has the President by Executive Order when delegating authority to the Department of State to control export of defense articles and services. *See* Executive Order 13637 (Mar. 8, 2013). And the Department of State has echoed that sentiment in controlling for export the technical drawings that Quadrant's agents emailed to China and to non-U.S. persons for years, and by implementing a policy to deny licenses for exports of defense articles destined for China (*see* 22 C.F.R. § 126.1).

The sentence agreed to in the plea agreement is necessary to capture the intended seriousness of penalizing unlawful export of USML items. The sentence affords adequate deterrence and promotes respect for the rule of law. Penalizing Quadrant for this willful failure to comply with the law will promote respect for U.S. export controls amongst other companies that work with controlled technology and encourage compliance with U.S. export control laws. Finally, the agreed sentence ensures just punishment. It balances Quadrant's acceptance of responsibility and lack of prior criminal history with the gravity of conspiring to send ITAR-controlled technology to China and Chinese nationals for years. The sentence identified in the

plea agreement will impose punishment that is fair, proportionate, and consistent with the seriousness of the offense.

## V.  CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court impose the fines/penalties agreed to by the parties in the Plea Agreement, the agreed Money Judgment, the compliance program for a term of 2 years, and 2 years' probation.

Respectfully submitted,

| | |
|---|---|
| KYLE G. BUMGARNER<br>United States Attorney<br>Western District of Kentucky | JOHN A. EISENBERG<br>Assistant Attorney General<br>National Security Division |
| | s/ *Alex Wharton* |
| s/ *Joshua D. Judd* | Alex Wharton |
| Joshua D. Judd | Leslie C. Esbrook |
| Assistant U.S. Attorney | Trial Attorneys |
| 717 W. Broadway | 950 Pennsylvania Ave., NW |
| Louisville, KY 40202 | Washington, DC 20530 |
| (502) 582-5911 | (202) 514-4523 |
| Joshua.Judd@usdoj.gov | Alexander.Wharton@usdoj.gov |
| | Leslie.Esbrook@usdoj.gov |

**CERTIFICATE OF SERVICE**

   I hereby certify that on March 9, 2026, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the counsel for defendant.

              *s/Joshua Judd*
              Joshua Judd
              Assistant U.S. Attorney